ACCEPTED
04-15-00056-CV
FOURTH COURT OF APPEALS
SAN ANTONIO, TEXAS
4/14/2015 5:21:04 PM
KEITH HOTTLE
CLERK

No. 04-15-00056-CV

IN THE 4th DISTRICT COURT OF APPEALS

SAN ANTONIO, TEXAS

FILED IN
4th COURT OF APPEALS
SAN ANTONIO, TEXAS

04/14/2015 5:21:04 PM

KEITH E. HOTTLE
Clerk

GARY HODGE AND
ROBERT HART III,

*Appellants*,

v.

STEPHEN KRAFT INDIVIDUALLY
AND AS MEMBER ON BEHALF OF
GRUPO HABANERO, LLC,

*Appellees*.

_____

On appeal from the 225th District Court of Bexar County, Texas

_____

**BRIEF OF APPELLANTS**
_____

Respectfully submitted,

Roderick J. Regan
Attorney for Appellants
BRANSCOMB | PC
711 Navarro St., Suite 500
San Antonio, TX 78205
Phone: (210) 598-5400
Fax: (210) 598-5405
SBN: 16733040

**APPELLANTS REQUEST ORAL ARGUMENT**

i

## IDENTITY OF PARTIES AND COUNSEL

**Appellants:**

Gary Hodge and Robert Hart III

**Appellant Counsel/Trial Counsel:**

Roderick J. Regan
SBN: 16733040
Jessica Mann
SBN: 24080165
Allison E. Moore
SBN: 24077616
BRANSCOMB | PC
711 Navarro Street, Suite 500
San Antonio, TX 78205
Phone: (210) 598-5400
Fax: (210) 598-5405

**Appellees:**

Stephen Kraft Individually
And as member on behalf of
Grupo Habanero, LLC

**Appellee Counsel/Trial Counsel:**

Richard W. Espey
SBN: 06667580
Matthew Soliday
SBN: 24079367
Espey & Associates, PC
13750 San Pedro Avenue, Suite 730
San Antonio, TX  78232-4375
Phone: (210) 404-0333
Fax: (210) 404-0336

# TABLE OF CONTENTS

IDENTITY OF PARTIES AND COUNSEL ............................................................ ii

TABLE OF CONTENTS ...................................................................................... iii

INDEX OF AUTHORITIES ................................................................................... v

REFERENCE CITATION GUIDE ..................................................................... viii

STATEMENT OF THE CASE ............................................................................. ix

ISSUES PRESENTED ........................................................................................... x

STATEMENT OF FACTS .................................................................................... 1

SUMMARY OF THE ARGUMENT ..................................................................... 5

ARGUMENT ........................................................................................................ 8

ISSUE I   Whether the trial court has abused its discretion in denying Appellants' Motion to Compel Appraisal based on the argument that a condition precedent to initiating appraisal by appraiser appointed by the American Arbitration Association has not been met .................................................................. 8

ISSUE II    Whether Appellees' receipt of timely notice of option election to repurchase membership interest satisfying the alleged condition precedent to initiating appraisal was established as a matter of law. ..........................................................................12

ISSUE III    Whether strict compliance with the alleged condition precedent to compelling appraisal was excused.......................................17

     A.    Due to original impossibility ...........................................18

     B.    Due to mutual mistake.....................................................20

     C.    Due to Appellee's false representation and/or concealment of a material fact........................................23

ISSUE IV    Whether Appellees are estopped from asserting a right to receive timely notice of Appellants' exercise of their option to repurchase stock due to Appellees' false representation and/or concealment making any exercise of notice under the strict contract provisions impossible...............................................25

PRAYER ..........................................................................................................28

# INDEX OF AUTHORITIES

**Cases:**

*Burford v. Pounders*, 199 S.W.2d 141 (Tex. 1947)...................................................24

*Butler v. Prop. & Cas. Ins. Co. of Hartford*, 2011 WL 2174965 (S.D. Tex. 2011) 10

*Cattle Feeders, Inc. v. Jordan*, 549 S.W.2d 29 (Tex. Civ. App.—Corpus Christi, 1977) ........................................................................................................................25

*Chambers v. Hunt Petroleum Corp.*, 320 S.W.3d 578 (Tex. App.—Tyler 2010) ........................................................................................................................23, 24, 25

*City of The Colony v. N. Texas Mun. Water Dist.*, 272 S.W.3d 669 (Tex. App.—Fort Worth 2008) ...............................................................................................22

*Crown Constr. Co. v. Huddleston*, 961 S.W.2d 552 (Tex. App.—San Antonio 1997) ......................................................................................................................20

*Davis v. Grammer*, 750 S.W.2d 766 (Tex. 1988)...................................................22

*Durham v. Uvalde Rock Asphalt Co.*, 599 S.W.2d 866 (Tex. App.—San Antonio 1980) ......................................................................................................................22

*Faucette v. Chantos*, 322 S.W.3d 901 (Tex. App.—Houston [14th Dist.] 2010) ...12

*Gulbenkian v. Penn.*, 252 S.W.2d 929 (Tex. 1952)...............................................25

*In re Allstate Cnty. Mut. Ins. Co.*, 85 S.W.3d 193 (Tex. 2002)..............................11

*In re Clarendon Ins. Co.*, 2004 WL 2984916 (Tex. App.—Fort Worth 2004).......11

*In re State Farm Lloyds*, 170 S.W.3d 629 (Tex. 2005) .........................................11

*In re Universal Underwriters of Tex. Ins. Co.*, 345 S.W.3d 404 (Tex. 2011)...........9

*James v. Prop. & Cas. Ins. Co. of Hartford*, 2011 WL 4067880 (S.D. Tex. 2011)..9

*Janak v. Fed. Deposit Ins. Corp.*, 586 S.W.2d 902 (Tex. App.—Houston [1st Dist.] 1979) ...................................................................................................................18

*Jones v. Gibbs*, 130 S.W.2d 265 (Tex. App. 1939, no writ)..................................23

*Lexmark Intern., Inc. v. Ink Technologies Printer Supplies*, LLC, 291 F.R.D. 172 (S.D. Ohio 2013)...................................................................................................15

*Marvin v. Rodgers*, 115 S.W. 863 (Tex. Civ. App. 1909).......................................19

*Mathis v. Lockwood*, 166 S.W.3d 743 (Tex. 2005) .................................................15

*Miller v. Baum*, 400 F.2d 176 (5th Cir. 1968) ........................................................19

*NYKCool A.B. v. Pac. Intern. Servs., Inc.*, --F.Supp.3d--, 2014 WL 3605632 (S.D.N.Y. 2014) ....................................................................................................15

*S.K.Y. Inv. Corp. v. H.E.Butt Grocery Co.*, 440 S.W.2d 885 (Tex. App.—Corpus Christi 1969) .........................................................................................................19

*Safadjou v. Mohammadi*, 964 N.Y.S.2d 801 (App. Div. [4th Dept.] 2013)............15

*Sanchez v. Prop. & Ins. Co. of Hartford*, 2010 WL 413687 (S.D. Tex. 2010) .........9

*Scott v. Sebree*, 986 S.W.2d 364 (Tex. App.—Austin 1999) .................................23

*Seymour v. Am. Engine & Grinding Co.*, 956 S.W.2d 49 (Tex. App.—Houston [14th Dist.] 1996)..................................................................................................22

*Smith v. Lipscomb*, 13 Tex. 532 (1855) ...................................................................19

*State Farm Lloyds v. Johnson*, 290 S.W.3d 886 (Tex. 2009)...................................9

*Trudy's Texas Star, Inc. v. Weingarten Realty Investors*, 2004 WL 1792374 (Tex. App.—Austin 2004)................................................................................................10

*U.S. ex rel. Barko v. Halliburton Co.*, 952 F.Supp.2d 108 (D.D.C. 2013)..............15

*Vanguard Underwriters Ins. Co. v. Smith*, 999 S.W.2d 448 (Tex. App.—Amarillo 1999) ........................................................................................................10, 11

*Williams v. Glash*, 789 S.W.2d 261 (Tex. 1990) ....................................................21

*Winegar v. Martin*, 304 S.W.3d 661 (Tex. App.—Fort Worth 2010) .....................21

*Woodward v. Liberty Mut. Ins. Co.*, 2010 WL 1186323 (N.D. Tex. 2010) ............10

**Rules:**

TEX. R. CIV. PROC. 21a(b)(3) ................................................................................14

TEX. R. APP. PROC. 9.5 .........................................................................................14

REFERENCE CITATION GUIDE

**The Parties:**

In lieu of using the full names of the parties, this Brief may refer to the parties as follows:

| | |
|---|---|
| Gary Hodge | "Hodge" or "Appellant" |
| Robert Hart III | "Hart" or "Appellant" |
| Gary Hodge and Robert Hart III | "Appellants" |
| Stephen Kraft | "Kraft" or "Appellee" |
| Stephen Kraft Individually And as member on behalf of Grupo Habanero, LLC | "Appellees" |

**The Record on Appeal:**

This Brief will refer to the record as follows:

| | |
|---|---|
| Clerk's Record | "CR Page" |
| Reporter's Record | "RR Page:Line(s)" |

STATEMENT OF THE CASE

This is a suit for breach of contract, tortious interference with contract, and breach of fiduciary duty, filed prematurely during negotiations between parties on the fair market value of membership interest to be conveyed to Appellants. (CR 1-22) Appellants moved to compel an independent appraisal by an appraiser appointed by the American Arbitration Association, pursuant to the Contract between parties. (CR 34-63) The trial court denied Appellants' motion without entering findings of fact or conclusions of law. (CR 176)

# ISSUES PRESENTED

ISSUE I — Whether the trial court has abused its discretion in denying Appellants' Motion to Compel Appraisal based on the argument that a condition precedent to initiating appraisal by appraiser appointed by the American Arbitration Association has not been met.

ISSUE II — Whether Appellees' receipt of timely notice of option election to repurchase membership interest satisfying the alleged condition precedent to initiating appraisal was established as a matter of law.

ISSUE III — Whether strict compliance with the alleged condition precedent to compelling appraisal was excused.

    A. Due to original impossibility
    B. Due to mutual mistake
    C. Due to Appellee's false representation and/or concealment of a material fact

ISSUE IV — Whether Appellees are estopped from asserting a right to receive timely notice of Appellants' exercise of their option to repurchase stock due to Appellees' false representation and/or concealment making any exercise of notice under the strict contract provisions impossible.

No. 04-15-00056-CV
IN THE 4th DISTRICT COURT OF APPEALS
SAN ANTONIO, TEXAS

GARY HODGE AND
ROBERT HART III,

*Appellants*,

v.

STEPHEN KRAFT INDIVIDUALLY
AND AS MEMBER ON BEHALF OF
GRUPO HABANERO, LLC,

*Appellees*.

_____

On appeal from the 225th District Court of Bexar County, Texas

_____

**BRIEF OF APPELLANTS**
_____

TO THE HONORABLE COURT OF APPEALS:

Appellants Gary Hodge and Robert Hart III ("Appellants"), submit this

Brief. Appellants respectfully show:

STATEMENT OF FACTS

Appellee, Stephen Kraft, was hired by Appellants dba Grupo Habanero,

LLC (the "Company") on September 19, 2012 in the role of Managing Director.

(CR 9) The parties executed an employment agreement (the "Contract") (CR 9-

1

18). As part of the employment agreement, in consideration for his obligations therein and in conjunction with salary and other benefits, Mr. Kraft received 100 units of membership interest, "which is equal to ten percent (10%) of all issued and outstanding units of membership interest of the Company on a fully diluted basis with an agreed value of $35,000 (the 'Initial Membership Interest Price')." (CR 10-11).

The Company's business was under-performing and Appellee resigned from his employment with the Company on June 6, 2014. (CR 22) On such occurrence the Contract provided that:

> (e) If the employee's employment is terminated for any reason by either part after the first anniversary of the Effective Date, ***the Company may, at its option, repurchase the Membership Interest; the Company must exercise such option in writing and close such repurchase within thirty (30) days of the termination of employment.*** The aggregate purchase price for the Membership Interest upon exercise of the option in this Section 3.4(e) shall be the "Fair Market Value" of the Membership Interest. The "Fair Market Value" of the Membership Interest shall be the price agreed to by the parties; if the parties cannot within thirty (30) days of the exercise of the option agree upon a Fair Market Value, the Fair Market Value shall be determined by a single appraiser chosen by the parties. ***If the parties cannot agree upon an appraiser, the parties shall apply to the American Arbitration Association (the "AAA") to appoint a single appraiser.*** (CR 13, §3.4(e)) (emphasis added).

Pursuant the Contract, Appellants immediately initiated negotiations with Mr. Kraft regarding the value of the membership interest to be repurchased, communicating the intention to elect the option in §3.4(e) of the Contract. (RR 17:14-21). Although the intention to elect the repurchase option was clearly communicated to Mr. Kraft, the parties could agree on neither the fair market value of the membership interest nor an independent appraiser to settle the dispute. (*Id*.) As such, the provision requiring the fair market value dispute to be submitted to an appraiser appointed by the American Arbitration Association was invoked. (CR 13, §3.4(e))

When discussions between parties broke down, Appellants personally served Mr. Kraft with formal notice that Appellants have chosen to elect the option to repurchase Mr. Kraft's membership interest on July 3, 2014. Appellants drafted a formal letter, indicating that "[p]ursuant to the provisions of Section 3.4(e) of the Employment Agreement, the Company hereby exercises its option to repurchase your 100 units of membership interest in the Company (the "Units")." (CR 22) Gary Hodge and Kenneth Rourke, two members of the Company, personally drove out to the address Mr. Kraft provided for personal service (1114 Birch Hill, San Antonio, Texas 78232). (CR 108-12, 116-17) The notice provision in the Contract required that:

> … notices and all other communications provided for herein shall be in writing and shall be deemed to have been duly given (a) when received if delivered personally or by courier, (b) on the date receipt is acknowledged if delivered by certified mail, postage prepaid, return receipt requested, or (c) one day after transmission if sent by facsimile transmission with confirmation of transmission, as follows: If to Employee, addressed to: 1114 Birch Hill, San Antonio, TX 78232; If to Company, addressed to: 108 N. Mesquite Street, Corpus Christi, TX 78401, or to such other addresses as either party may furnish to the other in writing in accordance herewith, except that notices or changes of address shall be effective only upon receipt. (CR 16 §6.1)

Mr. Kraft did not provide an alternative address or facsimile information. (*Id*.) The Contract's notice provision was referenced several times throughout the contract. *See, e.gs.*, (CR 10, § 2.2(d) Notice of Termination); (CR 12, §§3.4(c)(i.v.), (v) Membership Interest Grants); (CR 13, §§3.4(d),(e) Membership Interest Grants); (CR 16, §6.1 Notices); (CR 17, §6.10 Modification; Waiver).

Hodge and Rourke approached the front door to the address provided, knocked several times, and when no one answered, taped the notice letter to the door. *Id*. In addition, the Company emailed the notice letter to an email address known to be used by Mr. Kraft, on the same day. (CR 113-116) The email did not bounce back. (*Id*.)

Mr. Kraft does not have any affiliation with his notice address in the Contract. (CR 173) In fact, Mr. Kraft alleges that his notice address (1114 Birch Hill) in the Contract is a "scrivener's error". (CR 173, para. 4) Mr. Kraft's physical

4

home address is: 1115 Birch Hill, San Antonio, Texas 78232. (CR 173, para. 3)

Again, negotiations regarding the fair market value of the membership interest resumed, but the parties were unable to agree on the fair market value. (RR 17:14-21) Instead of agreeing to submit the dispute over the value of the membership interest to an arbitrator appointed by the American Arbitration Association, pursuant to the Contract, Appellee prematurely filed suit on November 17, 2014, alleging breach of contract, tortious interference with contract, and breach of fiduciary duty. (CR 1-22) Appellants moved to compel appointment of an independent appraiser by the American Arbitration Association, pursuant to Section 3.4(e) of the Contract. (CR 34-63) Appellees responded to Appellants' motion. (CR 140-174) The trial court denied the request without entering findings of fact or conclusions of law in support of its order. (CR 176)

## SUMMARY OF THE ARGUMENT

The Texas Supreme Court has enunciated a strong policy in favor of enforcing appraisal clauses in contracts and the trial court has abused its discretion to deny submission of the appraisal value dispute to an appraiser appointed by the American Arbitration Association. The parties executed a valid, binding employment contract that included an option for Appellants' repurchase of the

5

membership interest granted to Appellee on hiring in the event that Appellee ceased employment with Appellant. Appellants properly executed their election of the option as a matter of law, obligating the Appellee to sell his membership interest for fair market price to Appellants. Parties dispute the value of the membership interest, requiring submission of the dispute to an appraiser appointed by the American Arbitration Association by the terms of the contract; however, in spite of his contractual obligations, Appellee prematurely files suit against of Appellants alleging breach of contract, tortious interference of contract and breach of fiduciary duty, claiming that a condition precedent to creating an enforceable obligation to submit the dispute to an appraiser appointed by the American Arbitration Association was not met.

Appellants satisfied the alleged condition precedent as a matter of law. Appellee was on notice through continued negotiations of Appellants intention to elect the option, thereby creating a binding obligation on behalf of both parties to complete the transaction. Furthermore, Appellants formalized the intention to elect the option by delivering written notice to Appellee through personal service effected through hand-delivery and email on the last day of the option period.

Although Appellee alleges that the personal service was insufficient to meet the alleged condition precedent to a binding option election, Appellants were

excused from strict compliance with the notice provision of the contract due to either (1) original impossibility of personal service, (2) mutual mistake of the "scrivener's error" in Appellee's address in the notice provision, and/or (3) Appellee's intentional fraudulent representation and/or concealment of the material fact that the only method he provided for effecting personal service through the notice provision on the contract was not an address at which he could be reached. Appellants maintained no knowledge or means of knowledge that Appellee's address in the notice provision could not be used to effectuate personal service.

In the alternative, Appellee is estopped from reliance on the alleged condition precedent due to his own admission that he fraudulently misrepresented his address in the notice provision of the contract, even after the opportunity to correct the mistake arose, and allowed Appellants to rely on that misrepresentation to their detriment, including participation in this needless litigation. On these facts, the trial court abused its discretion and should have concluded that Appellants are entitled to compel Appellee to submit the dispute to an independent appraiser appointed by the American Arbitration Association, disposing of all issues in this matter.

ARGUMENT

**ISSUE I**    **Whether the trial court has abused its discretion in denying Appellants' Motion to Compel Appraisal based on the argument that a condition precedent to initiating appraisal by appraiser appointed by the American Arbitration Association has not been met.**

The trial court abused its discretion to deny submission of the appraisal value dispute to an appraiser appointed by the American Arbitration Association. After Appellants' election of the option to repurchase the stock from Mr. Kraft,[1] Parties could not agree on the value of the stock in order to complete the transaction. (RR 17: 11-23)[2] As such, Parties do not dispute that the contract required an independent appraisal appointed by the American Arbitration Association in the event that the Parties could not agree upon the fair market value

---

[1] (CR 108-09) (sworn affidavit of Gary Hodge evidencing election of option and personal service of notice); (CR 113-16) (sworn affidavit of Haley Bennet evidencing same); (CR 117-18) (sworn affidavit of Kenneth Rourke evidencing same).

[2] Appellee's counsel stated at the hearing, "… when it came to the issue of trying to determine the value of the company on whether we wanted to negotiate a resolution…," thus proving that the issue of valuation and negotiation of same was on the table and unresolved. (RR 17: 11-23)

of the stock.[3] Regardless, once the Parties receive an independent appraisal, the transaction will move forward, as Appellees no longer possess a right to refuse to complete the transaction.

The Texas Supreme Court has enunciated "a strong policy in favor of enforcing appraisal clauses" in contracts. *Sanchez v. Prop. & Cas. Ins. Co. of Hartford*, 2010 WL 413687, at *4 (S.D. Tex. 2010) (citing *State Farm Lloyds v. Johnson*, 290 S.W.3d 886, 888-89, 895 (Tex. 2009)); *James v. Prop. & Cas. Ins. Co. of Hartford*, 2011 WL 4067880, at *3 (S.D. Tex. 2011) (not reported) ("The Texas Supreme Court has long recognized that appraisal clauses are valid"); *In re Universal Underwriters of Tex. Ins. Co.*, 345 S.W.3d 404, 407 (Tex. 2011) ("Appraisals can provide a less expensive, more efficient alternative to litigation, and we have held that they 'should generally go forward without preemptive intervention by the courts.'") (quoting *Johnson*, 290 S.W.3d at 895).

A competed appraisal is a condition precedent to bringing a suit on that contract. *Johnson*, 290 S.W.3d at 894. "Indeed, if an appraisal clause is properly

---

[3] The operative contract stated: "… if the parties cannot within thirty (30) days of the exercise of the option agree upon a Fair Market Value, the Fair Market Value shall be determined by a single appraiser chosen by the parties. If the parties cannot agree upon an appraiser, the parties shall apply to the American Arbitration Association (the "AAA") to appoint a single appraiser." (CR 13)

invoked and one party to the contract refuses to participate in the appraisal process, a court lacks discretion not to issue an order compelling that party to participate." *Woodward v. Liberty Mut. Ins. Co.*, 2010 WL 1186323, at *3 (N.D. Tex. 2010) (not reported) (citing *Vanguard Underwriters Ins. Co. v. Smith*, 999 S.W.2d 448, 449, 451 (Tex. App.—Amarillo 1999, orig. proceeding) (per curiam) (conditionally granting a writ of mandamus ordering a trial court to grant an insurer's motion to compel an insured to submit to appraisal); *see also Butler v. Prop. & Cas. Ins. Co. of Hartford*, 2011 WL 2174965, at *2 (S.D. Tex. 2011) (not reported) (finding *Vanguard* persuasive, abatement of the entire case pending compelled appraisal is appropriate in the interest of the efficient and inexpensive administration of justice); *Trudy's Texas Star, Inc. v. Weingarten Realty Investors*, 2004 WL 1792374, at * 4 (Tex. App.—Austin 2004, rev. denied) (not reported) ("Here, the dispute over fair market rental value falls squarely within the scope of the appraisal provision, which thus must be enforced.").

Instead of following precedent that would remove the necessity of continued litigation, and in direct conflict with the established Texas Supreme Court authority, the trial court abused its discretion in denying Appellants' Motion to Compel Appraisal. (CR 176) As such, the trial court has abused its discretion. "Where a[]… contract like the one here mandates appraisal to resolve the parties'

10

dispute regarding the value of a loss and where the appraisal provision has not been waived, a trial court abuses its discretion and misapplies the law by refusing to enforce the appraisal provision." *In re Clarendon Ins. Co.*, 2004 WL 2984916, at \*3 (Tex. App.—Fort Worth 2004) (not reported) (citing *In re Allstate Cnty. Mut. Ins. Co.*, 85 S.W.3d 193, 195-96 (Tex. 2002) (orig. proceeding) (holding trial court abused its discretion by construing appraisal provision as arbitration agreement and refusing to enforce it); *Vanguard*, 999 S.W.2d at 451 (holding trial court abused its discretion by refusing to enforce appraisal provision)); *In re State Farm Lloyds*, 170 S.W.3d 629, 632 (Tex. 2005) ("The Supreme Court… rejected the trial court's conclusion and held that the court abused its discretion by refusing to enforce the [appraisal] provision… Absent some compelling reason to not enforce the appraisal provision, the trial court had no discretion to refuse State Farm's request to enforce the appraisal provision.").

Based on the trial court's abuse of discretion in denying Appellants' Motion to Compel Appraisal, this Court must reverse and remand this matter to the trial court with instructions to compel the appraisal of the stock to be repurchased.

**ISSUE II**  **Whether Appellees' receipt of timely notice of option election to repurchase membership interest satisfying the alleged condition precedent to initiating appraisal was established as a matter of law.**

Even if this Court determines that the trial court has not abused its discretion to deny Appellants' Motion to Compel Appraisal based on the argument that a condition precedent to initiating appraisal has not been met, Appellees' received timely notice of the option to repurchase stock as a matter of law, satisfying the alleged condition precedent.

By Appellants' oral notification to Appellees of Appellants' intent to exercise the option and Appellees' entering into formal negotiations regarding the value of the stock following Kraft's termination, Appellants indicated a formal election to accept Appellees' offer. The act of negotiating the value of the stock was one arrangement that satisfied the intended purpose of the option and the effect of Appellants' election is the formation of a contract that binds both the optionor and the optionee:

> "Election is the act of the optionee which converts the option contract into a binding promise on the part of the optionor to sell. The effect of a timely and proper election under the contract, and of a timely and proper acceptance of an offer, is the same, in that the option contract, on the one hand, and the offer on the other, are turned into a bilateral contract. *Having exercised the option by election the optionee must then proceed to*

12

> *perform the conditions of the option contract in order to complete the transaction.*" *Faucette v. Chantos*, 322 S.W.3d 901, 911 (Tex. App. – Houston [14th Dist.] 2010, no pet.) (citations omitted) (emphasis in original).

Appellants' oral notification to Appellees of their intent to exercise the option was all that was required to create an obligation to perform. *Id*. ("By notifying [optionor] of [optionee's] intent to exercise the option, [optionor] entered into a bilateral contract and became obligated to perform."). It is undisputed that negotiations regarding the value of the membership interest to be transferred began prior to the expiration of the option and continued throughout the option period. (RR 17:14-21).

After negotiations broke down, but before the end of the option period, Appellants reasserted their intention to exercise the option by formally invoking the notice provision of the contract through personal service. Personal service was executed through personal delivery and e-mail. Personal delivery was executed through hand-delivery to the physical address in the notice provision of the contract and by email to Mr. Kraft. Appellant Hodge "personally hand-delivered a letter to [Appellant's] address as listed in the Employment Agreement – 1114 Birch Hill, San Antonio, Texas 78232 – exercising Grupo Habanero, LLC's option to repurchase Plaintiff's 100 units of membership interest. The letter was hand

13

delivered by me on July 3, 2014. I knocked on the front door at the 1114 Birch Hill address two or three times. No one answered the door. I then scotch taped the letter to the door. Ken Rourke, Grupo Habanero, LLC's Chief Operating Manager at the time, witnessed the hand-delivery of the option exercise letter to 1114 Birch Hill, San Antonio, TX, on July 3, 2014…." (CR 108-09) (sworn affidavit of Gary Hodge).

Email service was successfully completed to a known email address of Mr. Kraft, on the last day of the option period (July 3, 2014), at which Appellants verified Mr. Kraft had received and sent emails from in the past. "[Appellants] delivered the option exercise letter by email to Plaintiff on July 3, 2014. We used an email address for Plaintiff that we had used before and we knew to be accurate." (CR 108-09) (sworn affidavit of Gary Hodge); *see also* (CR 113-116) (sworn affidavit of Haley Bennet certifying contents and delivery date and time of email). Email service has been adopted as personal service in numerous contexts, if only quite recently in Texas. Tex. R. App. Proc. 9.5 (personal service includes email to served party and is complete on transmission of the document). Service by email is presumably complete on transmission of the document to the receiving party. *Id.*; *cf.* Tex. R. Civ. Proc. 21a(b)(3) (e-service is complete on transmission of document to party's electronic filing service provider). "[N]otice properly sent

pursuant to Rule 21a raises a presumption that notice was received." *Mathis v. Lockwood*, 166 S.W.3d 743, 745 (Tex. 2005).

Personal service via email is often appropriate in the international and federal law context, especially recently, due to similar obstacles as Appellants' encountered in attempting hand-delivery. "Service of process on [Appellees] by electronic mail can be proper, as it was here." *U.S. ex rel. Barko v. Halliburton Co.*, 952 F.Supp.2d 108, 117 (D.D.C. 2013) (international party). "Service by e-mail is appropriate under [Federal] Rule 4(f)(3) in some circumstances. In evaluating whether a particular method of service is sufficient, the court must determine whether the alternative method is reasonably calculated, under all circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *NYKCool A.B. v. Pac. Intern. Servs., Inc.*, --F.Supp.3d--, 2014 WL 3605632, at * 4 (S.D.N.Y. July 2014) (citation omitted) (international party); *Lexmark Intern., Inc. v. Ink Technologies Printer Supplies, LLC*, 291 F.R.D. 172, 175 (S.D. Ohio 2013) (when serving party "has demonstrated that is has verified that each of the email addresses at which it seeks to serve those [parties] is valid, and that communication has occurred with a representative of the respective [party] at those email addresses" personal service via email is appropriate and complete) (international party); *Safadjou v.*

15

*Mohammadi*, 964 N.Y.S.2d 801, 803-04 (App. Div. [4th Dept.] 2013) (although service of process by email is not directly authorized by either New York law or the Hague Convention, it is not prohibited under either state of federal law).

Similarly, no state of federal law prohibits personal service by email; therefore, notice to Mr. Kraft, via a known, verified and valid email address of the letter formally communicating notice of Appellants' election of their option to repurchase membership interest from Mr. Kraft, transmitted during the option period satisfies the alleged condition precedent for an independent appraisal of the value of membership interest and obligates Mr. Kraft to complete the transaction as a matter of law. The weight of the authority commands that email service was an appropriate means to perfect election of the option by personal service prior to the option's expiration. Based on proof of a valid exercise of the option, this Court must reverse and remand this matter to the trial court with instructions to compel the appraisal of the membership interest to be repurchased. Regardless, any argument that strict compliance with the notice provision was not satisfied is excused due to original impossibility, mutual mistake and/or fraudulent misrepresentation by Appellees.

**ISSUE III** **Whether strict compliance with the alleged condition precedent to compelling appraisal was excused.**

The alleged condition precedent requires that the option be elected "in writing and close such repurchase within thirty (30) days of the termination of employment" and that the parties remain in disagreement of the fair market value of the stock in order to invoke the provision requiring that a "parties shall apply to the American Arbitration Association (the "AAA") to appoint a single appraiser" to settle the dispute over the value of the stock. (CR 13, Employment Contract, p. 5.)

In order to elect the option, the contract provided that "notices and all other communications provided for herein shall be in writing and shall be deemed to have been duly given (a) when received if delivered personally or by courier, (b) on the date receipt is acknowledged if delivered by certified mail, postage prepaid, return receipt requested, or (c) one day after transmission if sent by facsimile transmission, as follows: If to Employee [Kraft], addressed to: 1114 Birch Hill, San Antonio, TX 78232… or to such other address as either party may furnish to the other in writing in accordance herewith,[4] except that notices or changes of

---

[4] No facsimile number or alternative address was furnished in writing to Appellants as required to supplement the contractual provisions herein. (CR 16)

17

address shall be effective only upon receipt." (CR 16, Employment Contract, p. 8.)

It is undisputed that Kraft did not live or have any association with the property at 1114 Birch Hill, nor did any agent of Kraft. (CR 173, paras. 3, 4, 6, 7) Thus, short of Kraft providing an alternative method of supplying notice under the contract, of which Appellee did not,[5] both parties were under the same misunderstanding of the same material fact—that the address provided in the Employment Contract was accurate and available avenue to proper written notice.

### A. *Due to original impossibility*

Appellants are excused from performance of the alleged condition precedent because strict compliance with the notice provision of the option was impossible to perform at the outset due to facts unknown to the Appellants. "A promise imposes no duty if performance of the promise is impossible because of facts existing when the promise is made of which the promissor neither knows nor has reason to know." *Janak v. Fed. Deposit Ins. Corp.*, 586 S.W.2d 902, 907 (Tex. App.—Houston [1st Dist.] 1979, no pet.). "When one party to a contract, by wrongful

---

[5] Although Mr. Kraft states in his affidavit that "I notified [Appellants] of this error prior to my termination" (CR 173, para. 5), Mr. Kraft has supplied no evidence to support any alleged notification, as required by the contract itself. (CR 16, Notices, § 6.1) ("… or to such other address as either party may furnish to the other in writing in accordance herewith, except that notices or changes of address shall be effective only upon receipt.").

18

means, prevents the other party from performing, as by making it impossible for him to perform, such an action by the party at fault constitutes a breach of contract. The effect of such a breach is not only to excuse performance by the injured party, but also to entitle him to recover for any damage he may sustain by reason of the breach." *S.K.Y. Inv. Corp. v. H.E.Butt Grocery Co.*, 440 S.W.2d 885, 889 (Tex. App.—Corpus Christi 1969, no pet.) (citing *Smith v. Lipscomb*, 13 Tex. 532 (1855)); *Miller v. Baum*, 400 F.2d 176, 178 (5th Cir. 1968) ("Under the law of Texas, 'where two parties enter into a contract and consummation of said contract is dependent upon occurrence of a future event, the promissor should do nothing to prevent the occurrence of such future event.'"); *Marvin v. Rodgers*, 115 S.W. 863, 865 (Tex. Civ. App. 1909, no writ) ("It seems clear that, where a contract is made which is performable at the time of the occurrence of a future event, the law imputes to the promisor an agreement that he will put no obstacle in the way of the happening of that event, and that he will hold himself in readiness to co-operate where his co-operation is a necessary element in the happening of the contingency. If, in violation of this implied covenant on his part, he does something which prevents the happening of the event, the contract becomes absolute and must be performed as if the event had occurred.").

Here, input from Appellees alone prevented Appellants from strict

compliance with the contract. Appellees provided an address to be incorporated into the notice provision of the option at which personal service to Mr. Kraft was objectively impossible.[6] (CR 173) As such, Appellants' strict compliance with the notice provision of the contract was excused. Notwithstanding, Appellee was not harmed by any perceived lack of strict compliance with the notice provision because Mr. Kraft had actual notice, through negotiations on the value of membership interest to be repurchased under the option (RR 17:14-21) and through his admissions of receiving the written notice (CR 173, para. 7). Therefore, because Appellants' strict compliance with the notice provision was excused and Appellees are not harmed, this Court must reverse and remand this matter to the trial court with instructions to compel the appraisal of the membership interest to be repurchased.

### B. Due to mutual mistake

In the alternative, if personal service was not possible at the address provided by Mr. Kraft, Appellants are excused from performance of the alleged

---

[6] *Cf. Crown Constr. Co. v. Huddleston*, 961 S.W.2d 552 (Tex. App.—San Antonio 1997, no pet.) (attempt to perform personal service by taping notice to the door of appellee's office was not effective personal service because the office was a valid address at which to serve appellee). *Huddleston* does not address the issue of service to an address that is not a valid address at which to serve Appellee. Furthermore, Appellants taped the notice to the door of a personal single-family residence and not an office.

condition precedent because the option was made under both parties' misconception or ignorance of a material fact and thus this portion is severable and voidable. *Williams v. Glash*, 789 S.W.2d 261, 264 (Tex. 1990) ("Pursuant to the doctrine of mutual mistake, when parties to an agreement have contracted under a misconception or ignorance of a material fact, the agreement will be avoided."). "To prove a mutual mistake, the evidence must show that both parties were acting under the <u>same misunderstanding</u> of the same material fact." *Winegar v. Martin*, 304 S.W.3d 661, 667 (Tex. App.—Fort Worth 2010, no pet.) (emphasis added). In *Winegar*, the court held that the parties had <u>opposite understandings</u> of the contract's effect, thus no mutual mistake was made. *Id*. However, in the instant action, both Appellants' and Mr. Kraft entered into the contract with the <u>same misunderstanding</u>—that the notice provision that triggered strict compliance with the option to repurchase the membership interest included at least one method of personal service that could reach Mr. Kraft. Neither party noticed the "scrivener's error" in the contract that was the only means of strictly complying with the notice provision. (CR 173, paras. 3, 4, 7) (sworn statement of Appellee Kraft admitting his mistake in not noticing the "scrivener's error"). Even if Appellee (Mr. Kraft) argues that he had knowledge of the mistake (or that he had the privilege of including any address he wished for personal service, and thus no mistake was

21

made), unilateral mistake by one party and knowledge of that mistake by the other party is equivalent to mutual mistake as a matter of law. *Davis v. Grammer*, 750 S.W.2d 766, 768 (Tex. 1988); *Seymour v. Am. Engine & Grinding Co.*, 956 S.W.2d 49, 58 (Tex. App.—Houston [14th Dist.] 1996, writ denied) ("Knowledge by one party that the other is acting under a mistake of fact is equivalent to a mutual mistake."). The mistake involved material part of the contract because notice to Kraft could not be accomplished as the contract was written, rendering ineffectual several portions of the Employment Contract.[7] *City of The Colony v. N. Texas Mun. Water Dist.*, 272 S.W.3d 669, 735 (Tex. App.—Fort Worth 2008, no pet.) (mutual mistake must "materially affect the agreed-upon exchange"); *Durham v. Uvalde Rock Asphalt Co.*, 599 S.W.2d 866, 870 (Tex. App.—San Antonio 1980, no writ) ("To enable a party to a written contract to be relieved from liability thereunder on the ground of mutual mistake of fact, the mistake in question must deal with a material part of the contract itself."). Therefore, as all parties to the contract maintained either the <u>same misunderstanding</u> or Appellants were

---

[7] The written notice requirement that incorporated the "scrivener's error" was referenced in many contract provisions, therefore the contract itself could not be effective without reliance on this material provision. *See, e.gs.*, (CR 10, § 2.2(d) Notice of Termination); (CR 12, §§3.4(c)(i.v.), (v) Membership Interest Grants); (CR 13, §§3.4(d),(e) Membership Interest Grants); (CR 16, §6.1 Notices); (CR 17, §6.10 Modification;Waiver).

operating under a mistake of fact Mr. Kraft was not, either way, Appellants are excused from strict compliance with the notice provision due to mutual mistake of a material provision in the contract.

Thus, the trial court's order denying Appellants' Motion to Compel Arbitration should be reversed because the alleged condition precedent to its enforcement is excused due to mutual mistake of a collateral matter.

### C. Due to Appellee's false representation and/or concealment of a material fact

Again, in the alternative, even if Appellee (Mr. Kraft) asserts that the address included as his proper notice address in the contract was <u>intentional</u>, Appellee's false representation and/or concealment that he could be reached for personal service at the address made any exercise of notice under the strict contract provisions impossible; therefore, Appellants' strict compliance with same was excused. "Equity excuses strict compliance of an option contract where some act such as a misleading representation by the optionor prevents the optionee for exercising the option right." *Scott v. Sebree*, 986 S.W.2d 364, 372 (Tex. App.—Austin 1999, rev. denied); *Chambers v. Hunt Petroleum Corp.*, 320 S.W.3d 578, 583 (Tex. App. – Tyler 2010, no pet.) (citing *Jones v. Gibbs*, 130 S.W.2d 265, 272 (Tex. Civ. App. 1939, no writ)) ("… the failure of the optionee to comply strictly

with the terms or conditions of the option will be excused when the failure is brought about by the conduct of the optionor."). Notwithstanding the disagreement between parties of the value of the stock to be repurchased, Appellants were at all times ready, willing and able to close the purchase within the option period. (CR 110). A tender of consideration was all that was required to complete the option requirements. *Chambers*, 320 S.W.3d at 583.

Appellees' rejection of Appellants' proposed value of the membership interest to be repurchased and Kraft's false representation of a notice address that would make timely notice impossible serve as evidence of Kraft's open refusal to transfer the membership interest as required by the option. "It is thoroughly settled that where [optionor] has openly and avowedly refused to perform his part of the contract or declared his intention not to perform it, the [optionee] need not make tender or payment of the consideration before bringing suit." *Chambers*, at 583 (citing *Burford v. Pounders*, 199 S.W.2d 141, 144 (Tex. 1947)) (citations omitted). Thus, tender was not required to maintain a proper election of the option and due to the dispute between parties on the fair market value of the membership interest (RR 17:14-21), Appellants are entitled to invoke the contract provision allowing an independent appraisal. (CR 13)

Appellee's intentional false representation, as an intentional act designed to

24

defeat Appellants' attempts as strict compliance with the notice provision in the contract, justify excusing Appellants' from strict compliance. *Chambers*, 320 S.W.3d at 583-84 ("The trial court was justified in inferring that the Chamberses' refusal to respond to Hunt's repeated attempts to communicate with them during the critical sixty day period for closing was calculated to defeat Hunt's exercise of its option."). As such, the trial court's order denying Appellants' Motion to Compel Arbitration should be reversed because the alleged condition precedent to its enforcement is excused due to Appellee's false representations.

**ISSUE IV** **Whether Appellees are estopped from asserting a right to receive timely notice of Appellants' exercise of their option to repurchase stock due to Appellees' false representation and/or concealment making any exercise of notice under the strict contract provisions impossible.**

Appellees are estopped from refusing to execute Appellants' option to repurchase the membership interest because strict compliance with the notice provision was prevented by misleading representations or conduct by the Appellee. "The elements of equitable estoppel are: 1) a false representation or concealment of material fact; 2) made with actual or constructive knowledge of the facts; 3) to a party without knowledge or means of knowledge of the real facts; 4) made with the intention that it should be acted on; and 5) the party to whom it was made must have relied on or acted on it to his prejudice." *Cattle Feeders, Inc., v. Jordan*, 549

S.W.2d 29, 33 (Tex. Civ. App.—Corpus Christi 1977, no writ) (citing *Gulbenkian v. Penn*, 252 S.W.2d 929 (Tex. 1952)) (citations omitted).

Appellee chose to sign the employment agreement that included no address at which Appellants could successfully complete personal service to Mr. Kraft—a false representation or concealment of material fact. (Compare CR 16 and CR 173 paras. 3-7) No dispute remains that Mr. Kraft knew that the address in the employment contract was not his correct home address. (CR 173, paras. 3, 5) Further, Mr. Kraft did not provide alternative means under the notice provision as contemplated. (CR 16) Mr. Kraft could have provided a facsimile number for which to send written notice in the alternative to a physical address, instead, no alternative means of providing strict compliance with the notice provision was available. (*Id*.) Appellants had no knowledge or means of knowledge that personal delivery to Mr. Kraft could not be accomplished at the address provided in the contract. (CR 108-09, 113-18) Mr. Kraft had every right to list any address he preferred for personal service; therefore, Appellants did not have any means to disprove the address provided after the Contract was signed. Appellants attempted personal service nonetheless. (*Id*.) Mr. Kraft signed the agreement with the intention that the notice provision could and should be acted on in the event that

Appellants wished to elect their option to repurchase the membership interest.[8] (CR 18) And, Appellants relied on the terms of the notice provision, including the false address, to attempt personal delivery to Mr. Kraft. (CR 108-09, 113-18) The alleged failure of which is the subject of the current litigation, causing damages and prejudice to Appellants by delaying the transfer of the membership interest that may affect the value of the membership interest to Appellants' detriment. With all applicable elements of estoppel met without dispute, this Court must reverse and remand this matter to the trial court with instructions to compel the appraisal of the membership interest to be repurchased.

---

[8] Mr. Kraft relies on the same agreement to argue that he now owns 10% of the membership interest of Grupo Habanero, LLC. Therefore, Mr. Kraft is estopped from asserting that the false representation in the contract was not meant to be relied on, due to Kraft's own reliance on the same agreement.

## PRAYER

WHEREFORE, Appellants respectfully request that this Court reverse the trial court's order denying Appellants' Motion to Compel Appraisal, remand the matter for entry of order granting Appellants' Motion to Compel Appraisal and grant such other and further relief to which Appellants may show itself to be justly entitled.

Respectfully submitted,

Roderick J. Regan
Attorney for Appellants
BRANSCOMB | PC
711 Navarro St., Suite 500
San Antonio, TX 78205
Phone: (210) 598-5400
Fax: (210) 598-5405
SBN: 16733040

## CERTIFICATE OF COMPLIANCE

I certify that this document was produced on a computer using Microsoft Word 2010 and contains 6,504 words, as determined by the computer software's word-count function, excluding the sections of the document listed in Texas Rule of Appellate Procedure 9.4(i)(1).

_____
Roderick J. Regan

## CERTIFICATE OF SERVICE

I hereby certify that on this the 14th day of April, 2015, a true and correct copy of the foregoing Appellant's Brief has been forwarded to the counsel below via certified mail, return receipt requested and email pursuant to the Texas Rules of Civil Procedure and the Texas Rules of Appellate Procedure.


Richard W. Espey
Matthew Soliday
Espey & Associates, PC
13750 San Pedro Avenue, Suite 730
San Antonio, TX  78232
Fax: (210) 404-0336
Attorneys for Appellees

_____
Roderick J. Regan

# APPENDIX

A.1     Employment Agreement

A.2     July 3, 2014 Letter to Kraft

A.3     Affidavit of Gary Hodge

A.4     Affidavit of Haley Bennet

A.5     Affidavit of Kenneth Rourke

A.6     Motion

A.7     Response

A.8     Order

A.9     Rules Cited

A.10   Selected Case Authority Cited

# EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT ("Agreement") is made effective as of "Effective Date," as defined below, by and between **Grupo Habanero, LLC**, a Texas limited liability company ("Company") and **Stephen Kraft**, an individual residing in San Antonio, Texas ("Employee").

## ARTICLE I
## EMPLOYMENT AND DUTIES

**1.1** **Employment; Effective Date**. Company agrees to employ Employee and Employee agrees to be employed by Company, beginning as of September 19, 2012 (the "Effective Date") and continuing for the period of time set forth in Article II below, subject to the terms and conditions of this Agreement.

**1.2** **Position**. From and after the Effective Date, Employee shall serve as the Managing Director. The Managing Director shall devote full time and best efforts to the overall supervision of the restaurants owned by the Company and shall report directly to the Managers of the Company. The Managing Director shall live in the "vicinity" of Bexar County, Texas, as determined by the Company with reasonable discretion.

**1.3** **Duties**. Employee agrees to serve in the position referred to in Section 1.2 above and shall perform such duties as may from time to time be assigned by the Managers.

## ARTICLE II
## TERM AND TERMINATION OF EMPLOYMENT

**2.1** **Term**. This Agreement shall terminate on the first anniversary of the Effective Date ("the Term"), unless sooner terminated in accordance with the terms in this Article II.

**2.2** **Company's Right to Terminate**. Notwithstanding the provisions of Section 2.1 above, Company shall have the right to terminate Employee's employment under this Agreement at any time for any of the following reasons:

(a) by virtue of his physical or mental disability, Employee is unable to perform substantially and continuously the essential functions of his duties, with or without reasonable accommodations, for a period of 90 consecutive days or for a period of 120 non-consecutive days during any 12 month period; or

(b) at any time for any reason whatsoever or for no reason at all, in the sole discretion of Company; or

(c) for cause, which for purposes of this Agreement shall mean Employee (i) has been indicted for, or convicted of, or pleaded no contest to, a misdemeanor involving moral turpitude or a felony, (ii) has willfully refused without proper legal reason to perform Employee's duties, (iii) has materially breached any material provision of this Agreement, (iv) has engaged in any act of serious dishonesty which adversely affects, or reasonably could in the

9 {C0673907.DOC:6}



DOCUMENT SCANNED AS FILED

future adversely affect, the value, reliability or performance of Employee in a material manner, or (v) breach of fiduciary duty by Employee.

(d) **Notice of Termination**. If Company desires to terminate Employee's employment at any time for any reason or for no reason at all prior to the expiration of the Term, it shall do so by giving written notice to Employee that it has elected to terminate Employee's employment and stating the effective date of the termination. Further, Company's termination of Employee's employment shall not alter or amend the provisions of Articles IV and V below.

2.3 **By Company**. If Employee's employment is terminated by Company prior to the expiration of the Term as provided in Section 2.1 above, then, upon the effective date of such termination, regardless of the reason therefore, Company's obligations under this Agreement shall immediately cease. If Employee is terminated pursuant to Sections 2.2(a) or (b) above, Company will offer to Employee and Employee will be entitled to receive severance benefits equal to $5,000.00 per month for the remainder of the Term payable on the Company's regular payment dates for employees but no less frequently than monthly, less applicable statutory deductions and withholdings (the "Severance Benefits").

## ARTICLE III
## COMPENSATION AND BENEFITS

3.1 **Base Salary**. Company promises to provide, and Employee agrees to accept, an annual Base Salary of Sixty Thousand Dollars ($60,000) ("Base Salary"), less applicable statutory deductions and withholdings, payable in accordance with Company's regular payroll procedures as presently in effect and amended from time to time. Company, by action of its Managers, may review Employee's Base Salary from time to time to determine if it should be increased.

3.2 **Bonuses**. During the Term, Company will pay Employee a quarterly bonus equal to 15% of the amount by which "Total Controllable Income" as defined hereafter exceeds "Base TCI" as defined hereafter. "Total Controllable Income" shall mean the gross revenue from all restaurants operated by the Company or its subsidiaries less those direct operating expenses identified in Exhibit A attached hereto. As an example, in 2011, the two Habaneros restaurants had a combined Total Controllable Income of $210,869 (the "Base TCI").

3.3 **Other Perquisites**. During his employment, Company will provide Employee and his family with: (i) health benefits substantially the same as those provided to Employee in 2011 by the prior owner of the restaurants; (ii) a $300 monthly car allowance; and (iii) a $200 monthly phone allowance. Employee and, to the extent applicable, Employee's spouse, dependents and beneficiaries, shall be allowed to participate, if eligible, in all other benefit plans and programs of Company, including improvements or modifications of the same, which are now, or may hereafter be, available to similarly situated employees and their spouses, dependents, and beneficiaries.

3.4 **Membership Interest Grants.**

(a) Upon execution of this Agreement and the Company Agreement of the Company, Employee shall be issued 100 units of membership interest (the "Membership Interest"), which is

DOCUMENT SCANNED AS FILED

equal to ten percent (10%) of all issued and outstanding units of membership interest of the Company on a fully diluted basis with an agreed value of $35,000 (the "Initial Membership Interest Price").

(b)     Company hereby makes the following representations and warranties to Employee intending Employee to rely upon them in connection with entering this Agreement:

(i)     Organization, Good Standing and Qualification.  The Company is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Texas.  The Company has all requisite limited liability company power and authority to own and operate its properties and assets, to execute and deliver this Agreement, to issue and sell the Membership Interest and to carry out the provisions of this Agreement.

(ii)     Capitalization; Voting Rights.  As of the Effective Date and including the Membership Interest issued as set forth in this Agreement, the Company will have 1,000 issued and outstanding units of membership interest. As of the date hereof, there are no outstanding options, warrants, or other rights for the purchase or acquisition from the Company of units of membership interest. The rights, preferences, privileges and restrictions of the Membership Interest are as set forth in the Company Agreement of the Company and in this Agreement. When issued in compliance with the provisions of this Agreement, the Membership Interest will be validly issued, fully paid and non-assessable, and will be free of any liens or encumbrances, other than the Company's right to repurchase the Membership Interest and the general restriction on transfer all as provided in Section 3.4(d).

(iii)     Limited Liability Company Documents.  Complete and accurate copies of the Company's Certificate of Formation and Company Agreement are attached hereto as Exhibit B. The Company is not currently contemplating any amendment to such documents.

(iv)     Authorization; Binding Obligations.  All limited liability company action on the part of the Company, its officers, managers and members necessary for the authorization of this Agreement, the performance of all obligations of the Company hereunder as of the Effective Date and the authorization, sale, issuance and delivery of the Membership Interest pursuant hereto has been taken or will be taken prior to the Effective Date. This Agreement, when executed and delivered, will be valid and binding obligation of the Company enforceable in accordance with its terms, except (a) as limited by applicable bankruptcy, insolvency, reorganization, moratorium or other laws of general application affecting enforcement of creditors' rights, and (b) general principles of equity that restrict the availability of equitable remedies.

(v)     Members.  Exhibit C contains a complete list of all of the Company's members, the units of membership interest they own and their addresses.

DOCUMENT SCANNED AS FILED

(vi)     Compliance with Laws. To its knowledge, the Company is not in violation of any applicable statute, rule, regulation, order or restriction of any domestic or foreign government or any instrumentality or agency thereof in respect of the conduct of its business or the ownership of its properties, which violation would materially and adversely affect the business, assets, liabilities, financial condition, operations or prospects of the Company.

(c)     Right of First Offer for Equity Securities.

(i)     Notwithstanding subsection (ii) below, until the first anniversary of this Agreement, the Company shall not issue any "Equity Securities" as defined below.

(ii)     Employee shall have a right of first offer to purchase his Pro Rata Portion (as defined below) of all Equity Securities that the Company may, from time to time, propose to sell and issue after the date of this Agreement.

(iii)     Employee's "Pro Rata Portion" is equal to the ratio of (x) the number of units of membership interest of the Company which the Employee holds immediately prior to the issuance of such Equity Securities to (y) the total number of units of the Company's outstanding membership interests, immediately prior to the issuance of the Equity Securities. The term "Equity Securities" shall mean (1) any membership interest of the Company, (2) any security convertible, with or without consideration, into any membership interest (including any option to purchase such a convertible security), (3) any security carrying any warrant or right to subscribe to or purchase any membership interest or (4) any such warrant or right.

(iv)     In the event the Company proposes to undertake an issuance of Equity Securities, the Company shall deliver written notice ("Notice") to the Employee via reputable overnight delivery service of (1) its bona fide intention to undertake an issuance of Equity Securities, (2) a description of the designations, preferences, privileges and rights of the Equity Securities to be offered and of each and every right, agreement and instrument to be attached to, delivered with or made appurtenant to such securities ("Appurtenant Rights"), (3) the aggregate number of Equity Securities to be offered to the offerees thereunder (the "Offerees"), (4) the identity of the Offerees and (5) the price and terms and conditions upon which the Company proposes to offer the Equity Securities to the Offerees.

(v)     Within thirty (30) days of receiving the Notice, Employee shall notify the Company in writing if he desires to exercise, in full or in part, his rights set forth in this Paragraph (c). If Employee exercises his rights, Employee may purchase the offered Equity Securities which such Employee elects to purchase by paying the same consideration, as paid by the Offerees, and under the same terms and conditions applicable to the Offerees.

DOCUMENT SCANNED AS FILED

(vi)    If Employee purchases Equity Securities under this Paragraph (c) hereof, he shall also receive all Appurtenant Rights provided or granted to investors as part of the offering of Equity Securities, and shall, as a condition to receiving the Equity Securities and the Appurtenant Rights, execute and become obligated under any agreements and other instruments required to be executed by all investors in connection with such offering.

(d)    If the Employee's employment is terminated for any reason by either party on or before the first anniversary of the Effective Date, the Company may, at its option, repurchase the Membership Interest; the Company must exercise such option in writing and close such repurchase within thirty (30) days of the termination of employment. If the Company terminates Employee's employment prior to the first anniversary of the Effective Date, the Employee has the option to put the Membership Interest to the Company; the Employee must exercise such put in writing and close such repurchase within thirty (30) days of the termination of employment. In either case the aggregate purchase price for the Membership Interest will be the Initial Membership Interest Price plus or minus an amount equal to the percentage increase or decrease over Base TCI multiplied by the Initial Membership Interest Price. For example, if Base TCI is $227,000 and Total Controllable Income is increased to $327,000 then the percentage increase would be (327,000 - 227,000)/227,000 or 44.05% multiplied by the Initial Membership Interest Price of $35,000 for an increase of $15,418.50. Therefore, the purchase price for the Membership Interest would be $35,000 plus $15,418.50 equals $40,418.50. Conversely, if Base TCI is $227,000 and Total Controllable Income is reduced to $127,000 then the percentage decrease would be (127,000 - 227,000)/227,000 or -44.05% multiplied by the Initial Membership Interest Price of $35,000 for a decrease of $15,417.50. Therefore, the purchase price for the Membership Interest would be $35,000 minus $15,418.50 equals $19,581.50. In the event that the purchase of Membership Interest contemplated by this Section 3.4 occurs before the full year of Total Controllable Income has elapsed from the Effective Date, then the available data shall be annualized for purposes of the calculation of the purchase price for the Membership Interest. The Membership Interest shall not be transferred by Employee except with the express written consent of the Company. Any transfer of legal or beneficial ownership shall be void ab initio.

(e)    If the Employee's employment is terminated for any reason by either party after the first anniversary of the Effective Date, the Company may, at its option, repurchase the Membership Interest; the Company must exercise such option in writing and close such repurchase within thirty (30) days of the termination of employment. The aggregate purchase price for the Membership Interest upon exercise of the option in this Section 3.4(e) shall be the "Fair Market Value" of the Membership Interest. The "Fair Market Value" of the Membership Interest shall be the price agreed to by the parties; if the parties cannot within thirty (30) days of the exercise of the option agree upon a Fair Market Value, the Fair Market Value shall be determined by a single appraiser chosen by the parties. If the parties cannot agree upon an appraiser, the parties shall apply to the American Arbitration Association (the "AAA") to appoint a single appraiser. The appraiser shall provide a written appraisal and shall determine the Fair Market Value of the Membership Interest without deduction for its minority position and restrictions on transfer. The determination of the appraiser shall be final and binding upon the parties and the closing of the sale shall be completed within thirty (30) days of receiving the appraiser's determination. The parties shall supply the appraiser with any requested information about the Company and shall split the cost of the appraiser and any AAA fees.

DOCUMENT SCANNED AS FILED

(f)    All certificates evidencing units of membership interest now owned or that may be acquired by the Employee will note conspicuously on the back as follows:

"REFERENCE IS HEREBY MADE TO AN AGREEMENT DATED EFFECTIVE AS OF SEPTEMBER 19, 2012, ON FILE AT THE PRINCIPAL PLACE OF BUSINESS OF THE COMPANY AND AT ITS REGISTERED OFFICE IF THE TWO ARE NOT THE SAME, WHICH AGREEMENT RESTRICTS THE TRANSFER OR PLEDGE OF THE UNITS OF MEMBERSHIP INTEREST REPRESENTED BY THIS CERTIFICATE AND CONTAINS CERTAIN OTHER AGREEMENTS CONTEMPLATED TO BE BINDING ON THE OWNER OF MEMBERSHIP INTERESTS IN THE COMPANY. THE COMPANY WILL FURNISH A COPY OF THE AGREEMENT TO THE RECORD HOLDER OF THIS CERTIFICATE WITHOUT CHARGE, UPON WRITTEN REQUEST TO THE COMPANY AT ITS PRINCIPAL PLACE OF BUSINESS OR REGISTERED OFFICE."

## ARTICLE IV
## PROTECTION OF INFORMATION

**Confidential Information.** Employee acknowledges that during his employment with Company, Company will provide him with and/or give him access to Confidential Information (defined below) of Company. Confidential Information means all information and compilations of information of any kind, type or nature (tangible and intangible, written or oral, and including information contained, stored, or transmitted through any electronic medium), which relates to Company including, without limitation; products; services; plans, including, without limitation, business and marketing plans; procedures; formulae; processes; pricing; customers. Confidential Information does not, however, include any information that is available to the public other than as a result of any act, directly or indirectly, of Employee. Employee agrees that all Confidential Information is and shall remain the sole property of Company.

## ARTICLE V
## NON-COMPETITION AND NON-SOLICITATION OBLIGATIONS

5.1    **Non-Competition and Non-Solicitation Obligations.** In exchange for the consideration delivered in connection with that certain Asset Purchase Agreement between Coastal King, Ltd., Texas Burrito Co., LLC and Habaneros Mexican Grill, LP (the "APA") and as a material inducement for Coastal King, Ltd. to enter into the APA, and in order to protect the Confidential Information that the Company will provide in accordance with Article IV above, Employee expressly covenants and agrees that, for any reason, directly or indirectly, for himself or on behalf of or in conjunction with any other person, entity or business of whatever nature for any period during which Employee is an officer, employee, consultant or manager of the Company and for an additional 30 months from and after the date of termination of any such relationship (the "Prohibited Period") he shall not:

EMPLOYMENT AGREEMENT
14C0673907.DOC:6)

DOCUMENT SCANNED AS FILED

Engage, within the Bexar County, Texas (the "Prohibited Area") as an officer, director, manager, owner, investor, lender, partner, member, joint venturer or in a managerial or advisory capacity (whether as an employee, independent contractor, consultant or advisor, or as a sales representative, dealer or distributor), or as an employee, agent, service provider or in any other non-managerial capacity, in any Mexican restaurant business (the "Restricted Business");

For Employee or on behalf of or in conjunction with any other person, solicit or attempt to solicit, recruit, or attempt to recruit any employee, consultant or agent of Company or any of its affiliates;

Request or attempt to request any business related to any Restricted Business from any corporation, association, partnership, organization, business, individual or governmental entity, who as of the date of the request or attempted request or within 36 months prior to that date, is or was a customer, or an actively sought prospective customer, or a significant vendor or supplier of the Company or any of its affiliates.

5.2     **Separate Covenant.** The covenants in this Article are severable and separate, and the unenforceability of any specific covenant shall not affect the provisions of any other covenant.

5.3     **Subsequent Employment.** The Employee further expressly covenants and agrees that during the Prohibited Period, he will advise the Company of the identity of any new employer of the Employee or business started by Employee within the Prohibited Area within ten days of accepting such employment or forming such business.

5.4     **Reasonableness of Restrictions.** Employee agrees that (i) the terms of this Article V are reasonable and constitute an otherwise enforceable agreement to which the terms of this Agreement are ancillary or a part of; (ii) the consideration provided by the Company under this Agreement is not illusory; (iii) the restrictions of this Article V are necessary and reasonable for the protection of the legitimate business interests and goodwill of the Company; and (iv) the consideration of employment given to Employee by the Company under this Agreement, including without limitation, the provision by the Company or its affiliates of Confidential Information and specialized training to Employee, gives rise to the Company's interests in the covenants set forth in this Article V.

5.5     **Severability.** Employee and the Company agree that it was both parties' intention to enter into a valid and enforceable Agreement. Employee agrees that if any covenant contained in this Article V is found by a court of competent jurisdiction to contain limitations as to time, geographic area, or scope of activity that are not reasonable and impose a greater restraint than is necessary to protect the goodwill or other business interests of the Company or its affiliates, then the court shall reform the covenant to the extent necessary to cause the limitations contained in the covenant as to time, geographic area, and scope of activity to be restrained to be reasonable and to impose a restraint that is not greater than necessary to protect the goodwill and other business interests of the Company and its affiliates.

5.6     **Rights and Remedies Upon Breach.** Employee acknowledges that money damages would not be sufficient remedy for any breach of this Article V by the Employee. In

DOCUMENT SCANNED AS FILED

the event that the Company determines that Employee has breached or attempted or threatened to breach any provision of this Article V, in addition to any other remedies at law or in equity the Company may have available to it, it is agreed that the Company shall be entitled to terminate any payments then owing to Employee under this Agreement, and, shall be entitled, upon application to any court of proper jurisdiction, to a temporary restraining order or preliminary injunction against Employee prohibiting such breach or attempted or threatened breach by proving only the existence of such breach or attempted or threatened breach. Employee agrees that the period during which the covenants contained in this Article are in effect shall be computed by excluding from such computation any time during which Employee is in violation of any provision of this Article. Furthermore, Employee agrees to waive any bonding requirement in connection with any injunction or temporary restraining order sought by the Company under this section.

## ARTICLE VI
## MISCELLANEOUS

6.1    **Notices.** For purposes of this Agreement, notices and all other communications provided for herein shall be in writing and shall be deemed to have been duly given (a) when received if delivered personally or by courier, (b) on the date receipt is acknowledged if delivered by certified mail, postage prepaid, return receipt requested, or (c) one day after transmission if sent by facsimile transmission with confirmation of transmission, as follows:

If to Employee, addressed to:

> 1114 Birch Hill
> San Antonio, TX 78232

If to Company, addressed to:

> 108 N. Mesquite Street
> Corpus Christi, TX 78401

or to such other address as either party may furnish to the other in writing in accordance herewith, except that notices or changes of address shall be effective only upon receipt.

6.2    **Applicable Law.** This Agreement is entered into under, and shall be construed and interpreted, and the rights of the parties shall be governed by, the laws of the State of Texas with respect to any claim or dispute related to or arising under this Agreement.

6.3    **No Waiver.** No failure by either party hereto at any time to give notice of any breach by the other party of, or to require compliance with, any condition or provision of this Agreement shall be deemed a waiver of similar or dissimilar provisions or conditions at the same or at any prior or subsequent time.

6.4    **Severability and Reformation.** If a court of competent jurisdiction determines that any provision of this Agreement is invalid or unenforceable, then the invalidity or unenforceability of that provision shall not affect the validity or enforceability of any other

DOCUMENT SCANNED AS FILED

provision of this Agreement and all other provisions shall remain in full force and effect. Furthermore, the parties explicitly agree that such court is authorized to reform any such invalid or unenforceable provision to be valid and fully enforceable under the law and that the parties agree that in such case, they will treat the provision as having automatically been so reformed.

6.5 **Counterparts**. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which together will constitute one and the same Agreement.

6.6 **Headings**. The section headings have been inserted for purposes of convenience and shall not be used for interpretive purposes.

6.7 **Assignment**. This Agreement is personal to Employee and shall not be assignable by Employee. This Agreement shall inure to the benefit of and be binding upon the Company and its successors and assigns; the Company may assign and transfer its rights and obligations under this Agreement, by operation of law or otherwise, to any successor to all or substantially all of its equity ownership interests, assets or business by dissolution, merger, consolidation, transfer or assets, or otherwise as permitted under the Company's organizational documents.

6.8 **Survival**. The termination of this Agreement and Employee's employment shall not affect any right or obligation of any party which has accrued and vested prior to such termination or which by its terms survives the termination of this Agreement and Employee's employment. The provisions of Section 3.4, except Section 3.4(c), Articles IV and V shall survive termination of this Agreement.

6.9 **Entire Agreement**. This Agreement constitutes the entire agreement of the parties with regard to the subject matter hereof, and contains all the covenants, promises, representations, warranties and agreements between the parties with respect to employment of Employee by Company. Without limiting the scope of the preceding sentence, all understandings and agreements preceding the date of execution of this Agreement and relating to the subject matter hereof are hereby null and void and of no further force and effect.

6.10 **Modification; Waiver**. Any modification to or waiver of this Agreement will be effective only with the prior written consent of Company and Employee.

*[Signature page follows.]*

DOCUMENT SCANNED AS FILED

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the Effective Date.

COMPANY:

GRUPO HABANERO, LLC

By: _____
Name: _Cliff Graham_____
Title: _President_____

EMPLOYEE:

_____
Stephen Kraft

DOCUMENT SCANNED AS FILED

# EXHIBIT B

## Company Documents

DOCUMENT SCANNED AS FILED

# EXHIBIT A

## Examples of Operating Expenses

(Spreadsheet for calculation of TCI to be attached)

DOCUMENT SCANNED AS FILED

# EXHIBIT C

## List of Members and Units of Membership Interest with Addresses

.

Robert G. Hart, III        400 Units

Gary Hodge               400 Units

Cliff Graham             100 Units

Stephen Kraft            100 Units

DOCUMENT SCANNED AS FILED

**GRUPO HABANERO, LLC**
**108 N. MESQUITE STREET**
**CORPUS CHRISTI, TEXAS 78401**


July 3, 2014


Mr. Stephen Kraft                                    (Via Hand Delivery and U.S. Mail)
1114 Birch Hill
San Antonio, TX 78232

      RE:    Employment Agreement between Grupo Habanero, LLC and Stephen Kraft effective as of September 19, 2012 (the "Employment Agreement").

Dear Mr. Kraft:

As you know, you resigned from your position with Grupo Habanero, LLC (the "Company") as of June 6, 2014. Pursuant to the provisions of Section 3.4(e) of the Employment Agreement, the Company hereby exercises its option to repurchase your 100 units of membership interest in the Company (the "Units"). As you know, the Company loses money and without the advances made by the other principals of the Company the Company would be insolvent. In exchange for $10, which the parties agree is the fair market value of the Units, Stephen Kraft hereby sells, transfers and delivers the Units to the Company free and clear of any lien, pledge, charge, security interest, encumbrance or adverse claim, and the Company hereby accepts the Units.

If you agree to the terms of this letter agreement, please execute this Employment Agreement where indicated in the space below and return a copy to me. Upon receipt of the copy of the duly executed letter agreement, I will deliver the consideration contemplated in this letter agreement to you.

Unless we have received the signed letter agreement from you within 30 days of the exercise of the option set forth in this letter agreement, we will assume that you disagree with the fair market value of the Units set forth herein and that you will invoke the mechanisms for determining the fair market value as set forth in Section 3.4(e) of the Employment Agreement. If so, we will have to split the cost of the appraiser and any AAA fees that may be incurred as a result of such procedure.

Sincerely,

GRUPO HABANERO, LLC                         AGREED AND ACCEPTED:

By: _____           _____
Name: _____           Stephen Kraft
Title: MEMBER                               _____
                                            Date

{C0948458.DOCX:1}

22

**EXHIBIT**
**B**

**GRUPO HABANERO, LLC**
**108 N. MESQUITE STREET**
**CORPUS CHRISTI, TEXAS 78401**

July 3, 2014

Mr. Stephen Kraft                                      (Via Hand Delivery and U.S. Mail)
1114 Birch Hill
San Antonio, TX 78232

RE:   Employment Agreement between Grupo Habanero, LLC and Stephen Kraft effective
as of September 19, 2012 (the "Employment Agreement").

Dear Mr. Kraft:

As you know, you resigned from your position with Grupo Habanero, LLC (the "Company") as of June 6, 2014. Pursuant to the provisions of Section 3.4(e) of the Employment Agreement, the Company hereby exercises its option to repurchase your 100 units of membership interest in the Company (the "Units"). As you know, the Company loses money and without the advances made by the other principals of the Company the Company would be insolvent. In exchange for $10, which the parties agree is the fair market value of the Units, Stephen Kraft hereby sells, transfers and delivers the Units to the Company free and clear of any lien, pledge, charge, security interest, encumbrance or adverse claim, and the Company hereby accepts the Units.

If you agree to the terms of this letter agreement, please execute this Employment Agreement where indicated in the space below and return a copy to me. Upon receipt of the copy of the duly executed letter agreement, I will deliver the consideration contemplated in this letter agreement to you.

Unless we have received the signed letter agreement from you within 30 days of the exercise of the option set forth in this letter agreement, we will assume that you disagree with the fair market value of the Units set forth herein and that you will invoke the mechanisms for determining the fair market value as set forth in Section 3.4(e) of the Employment Agreement. If so, we will have to split the cost of the appraiser and any AAA fees that may be incurred as a result of such procedure.

Sincerely,

GRUPO HABANERO, LLC                          AGREED AND ACCEPTED:

By: _____
Name: _____               _____
Title: MEMBER                                         Stephen Kraft

                                                              _____
                                                              Date

{C0948458.DOCX:1}

EXHIBIT
C

tabbies

DOCUMENT SCANNED AS FILED

FILED
1/13/2015 3:39:33 PM
Donna Kay McKinney
Bexar County District Clerk
Accepted By: Lisa Morales

CAUSE NO. 2014-CI-18038

| | | |
|---|---|---|
| STEVEN KRAFT INDIVIDUALLY | § | IN THE DISTRICT COURT |
| AND AS A MEMBER ON BEHALF | § | |
| OF GRUPO HABANERO, LLC | § | |
| Plaintiff | § | |
| | § | |
| | § | 225th JUDICIAL DISTRICT |
| VS. | § | |
| | § | |
| GARY HODGE AND | § | |
| ROBERT HART III | § | |
| Defendants | § | BEXAR COUNTY, TEXAS |

## AFFIDAVIT

BEFORE ME, the undersigned authority, personally appeared GARY HODGE, who being duly sworn, deposed as follows:

"My name is GARY HODGE. I am a Defendant in the above-styled lawsuit, and am also a principal owner for Grupo Habanero, LLC. I am at least 18 years of age and of sound mind. I am personally acquainted with the facts alleged herein. I hereby swear that the following statements are true and correct.

Plaintiff resigned from his position with the Company on or about June 6, 2014. Plaintiff also has admitted in his Original Petition in this case that he resigned from his position on June 6, 2014.

Pursuant to provision 3.4(e) of the Employment Agreement (attached as "Exhibit A" to *Plaintiff's Original Petition and Application for Temporary Restraining Order and Temporary Injunction* filed in this case, and incorporated by reference), I personally hand-delivered a letter to Plaintiff's address as listed in the Employment Agreement -1114 Birch Hill, San Antonio, Texas 78232- exercising Grupo Habanero, LLC's option to repurchase Plaintiff's 100 units of membership interest. The letter was hand delivered by me on July 3, 2014. I knocked on the front door at the 1114 Birch Hill address two or three times. No one answered the door. I then

108

scotched taped the letter to the door. Ken Rourke, Grupo Habanero, LLC's Chief Operating Manager at the time, witnessed the hand-delivery of the option exercise letter to 1114 Birch Hill, San Antonio, TX, on July 3, 2014. A true and correct copy of the letter is attached as Exhibit 1 to this Affidavit.

In addition, either myself or Haley Bennet, the previous Director of Finance for Grupo Habanero, LLC, delivered the option exercise letter by email to Plaintiff on July 3, 2014. We used an email address for Plaintiff that we had used before and we knew to be accurate. A copy of the email is attached as Exhibit 2 to this Affidavit" We knew this email was delivered to Plaintiff's email address on Exhibit 2, because it did not bounce back.

"Further affiant sayeth not."

_____
GARY HODGE

**SUBSCRIBED AND SWORN TO BEFORE ME** on January 13 , by Julie Regan

_____
Notary Public, State of ___Texas___

JULIE REGAN
My Commission Expires
November 20, 2016

# GRUPO HABANERO, LLC
## 108 N. MESQUITE STREET
## CORPUS CHRISTI, TEXAS 78401

July 3, 2014

Mr. Stephen Kraft                                      (Via Hand Delivery and U.S. Mail)
1114 Birch Hill
San Antonio, TX 78232

      RE:    Employment Agreement between Grupo Habanero, LLC and Stephen Kraft effective as of September 19, 2012 (the "Employment Agreement").

Dear Mr. Kraft:

As you know, you resigned from your position with Grupo Habanero, LLC (the "Company") as of June 6, 2014. Pursuant to the provisions of Section 3.4(e) of the Employment Agreement, the Company hereby exercises its option to repurchase your 100 units of membership interest in the Company (the "Units"). As you know, the Company loses money and without the advances made by the other principals of the Company the Company would be insolvent. In exchange for $10, which the parties agree is the fair market value of the Units, Stephen Kraft hereby sells, transfers and delivers the Units to the Company free and clear of any lien, pledge, charge, security interest, encumbrance or adverse claim, and the Company hereby accepts the Units.

If you agree to the terms of this letter agreement, please execute this Employment Agreement where indicated in the space below and return a copy to me. Upon receipt of the copy of the duly executed letter agreement, I will deliver the consideration contemplated in this letter agreement to you.

Unless we have received the signed letter agreement from you within 30 days of the exercise of the option set forth in this letter agreement, we will assume that you disagree with the fair market value of the Units set forth herein and that you will invoke the mechanisms for determining the fair market value as set forth in Section 3.4(e) of the Employment Agreement. If so, we will have to split the cost of the appraiser and any AAA fees that may be incurred as a result of such procedure.

Sincerely,

GRUPO HABANERO, LLC                                AGREED AND ACCEPTED:

By: _____                        _____
Name: GARY HERDE                                   Stephen Kraft
Title: MEMBER

                                                                         Date

{C0948458.DOCX:1}


EXHIBIT
1

Hart Restaurant
Management, Inc.

## Steve's Employment document

**Gary Hodge** <gary@texasbk.com>                                  Thu, Jul 3, 2014 at 12:24 PM
To: Gary Hodge <gary@texasbk.com>
Cc: Haley Bennett <hbennett@texasbk.com>, Steve <burritoguy1@gmail.com>

Attached hereto is Steve's Employment document dated July 3, 2014.

---

📄 **Steve Document.pdf**
28K



EXHIBIT
2

111

**GRUPO HABANERO, LLC**
**108 N. MESQUITE STREET**
**CORPUS CHRISTI, TEXAS 78401**

July 3, 2014

Mr. Stephen Kraft                                         (Via Hand Delivery and U.S. Mail)
1114 Birch Hill
San Antonio, TX 78232

RE:   Employment Agreement between Grupo Habanero, LLC and Stephen Kraft effective
as of September 19, 2012 (the "Employment Agreement").

Dear Mr. Kraft:

As you know, you resigned from your position with Grupo Habanero, LLC (the "Company") as of June 6, 2014. Pursuant to the provisions of Section 3.4(e) of the Employment Agreement, the Company hereby exercises its option to repurchase your 100 units of membership interest in the Company (the "Units"). As you know, the Company loses money and without the advances made by the other principals of the Company the Company would be insolvent. In exchange for $10, which the parties agree is the fair market value of the Units, Stephen Kraft hereby sells, transfers and delivers the Units to the Company free and clear of any lien, pledge, charge, security interest, encumbrance or adverse claim, and the Company hereby accepts the Units.

If you agree to the terms of this letter agreement, please execute this Employment Agreement where indicated in the space below and return a copy to me. Upon receipt of the copy of the duly executed letter agreement, I will deliver the consideration contemplated in this letter agreement to you.

Unless we have received the signed letter agreement from you within 30 days of the exercise of the option set forth in this letter agreement, we will assume that you disagree with the fair market value of the Units set forth herein and that you will invoke the mechanisms for determining the fair market value as set forth in Section 3.4(e) of the Employment Agreement. If so, we will have to split the cost of the appraiser and any AAA fees that may be incurred as a result of such procedure.

Sincerely,

GRUPO HABANERO, LLC                              AGREED AND ACCEPTED:

By: _____                 _____
Name: _GARY HEUGE_____                Stephen Kraft
Title: _MEMBER_____                  _____

                                                 Date

{C0948458.DOCX:1}

FILED
1/13/2015 3:42:37 PM
Donna Kay McKinney
Bexar County District Clerk
Accepted By: Maria Abilez

CAUSE NO. 2014-CI-18038

| | | |
|---|---|---|
| STEVEN KRAFT INDIVIDUALLY | § | IN THE DISTRICT COURT |
| AND AS A MEMBER ON BEHALF | § | |
| OF GRUPO HABANERO, LLC | § | |
| Plaintiff | § | |
| | § | |
| | § | 225th JUDICIAL DISTRICT |
| VS. | § | |
| | § | |
| GARY HODGE AND | § | |
| ROBERT HART III | § | |
| Defendants | § | BEXAR COUNTY, TEXAS |

## AFFIDAVIT

BEFORE ME, the undersigned authority, personally appeared HALEY BENNET, who being duly sworn, deposed as follows:

"My name is HALEY BENNET. I was the prior Director of Finance and Accounting for Grupo Habanero, LLC. I am at least 18 years of age and of sound mind. I am personally acquainted with the facts alleged herein. I hereby swear that the following statements are true and correct.

On or about June 6, 2014, Plaintiff resigned from his position with the Company. While I have not yet determined for myself the exact date Plaintiff resigned, Plaintiff has admitted in his Original Petition in this case that he resigned from his position on June 6, 2014. On July 3, 2014, Gary Hodge prepared a letter to Plaintiff exercising Grupo Habanero, LLC's option to repurchase Plaintiff's 100 units of membership interest for $10.00. Either myself or Gary Hodge delivered the option exercise letter by email to Plaintiff on July 3, 2014. We used an email address for Plaintiff that we had used before and we knew to be accurate. We knew this email was delivered to Plaintiff's email address on Exhibit 1 because it did not bounce back.

I was the custodian of records for Grupo Habanero, LLC during the time period Plaintiff resigned from the company up until December 31, 2014. Attached hereto as Exhibit 1 is a true

113

and correct copy of the email sent to Plaintiff and letter prepared and sent to Plaintiff. These records are kept by Grupo Habanero, LLC in the regular course of business, and it was in the regular course of business of Grupo Habanero, LLC for any employee or representative of Grupo Habanero, LLC with knowledge of the act, event, condition, opinion, or diagnosis, recorded to make the record or to transmit information thereof to be included in such record; and the record was made at or near the time or reasonably soon thereafter. The records attached hereto are the original or exact duplicates of the original."

"Further affiant sayeth not."

_____
HALEY BENNET

SUBSCRIBED AND SWORN TO BEFORE ME on _____, by _____

ALLYSON TAITE EIERMANN
Notary Public
STATE OF TEXAS
My Comm. Exp. 12-05-2018

_____
Notary Public, State of __Texas__

Hart Restaurant
Management, Inc.

Haley Bennett <hbennett@texasbk.com>

## Steve's Employment document

**Gary Hodge** <gary@texasbk.com>                                    Thu, Jul 3, 2014 at 12:24 PM
To: Gary Hodge <gary@texasbk.com>
Cc: Haley Bennett <hbennett@texasbk.com>, Steve <burritoguy1@gmail.com>

Attached hereto is Steve's Employment document dated July 3, 2014.

 **Steve Document.pdf**
28K



EXHIBIT

1

**GRUPO HABANERO, LLC**
**108 N. MESQUITE STREET**
**CORPUS CHRISTI, TEXAS 78401**

July 3, 2014

Mr. Stephen Kraft                                    (Via Hand Delivery and U.S. Mail)
1114 Birch Hill
San Antonio, TX 78232

      RE:    Employment Agreement between Grupo Habanero, LLC and Stephen Kraft effective as of September 19, 2012 (the "Employment Agreement").

Dear Mr. Kraft:

As you know, you resigned from your position with Grupo Habanero, LLC (the "Company") as of June 6, 2014. Pursuant to the provisions of Section 3.4(e) of the Employment Agreement, the Company hereby exercises its option to repurchase your 100 units of membership interest in the Company (the "Units"). As you know, the Company loses money and without the advances made by the other principals of the Company the Company would be insolvent. In exchange for $10, which the parties agree is the fair market value of the Units, Stephen Kraft hereby sells, transfers and delivers the Units to the Company free and clear of any lien, pledge, charge, security interest, encumbrance or adverse claim, and the Company hereby accepts the Units.

If you agree to the terms of this letter agreement, please execute this Employment Agreement where indicated in the space below and return a copy to me. Upon receipt of the copy of the duly executed letter agreement, I will deliver the consideration contemplated in this letter agreement to you.

Unless we have received the signed letter agreement from you within 30 days of the exercise of the option set forth in this letter agreement, we will assume that you disagree with the fair market value of the Units set forth herein and that you will invoke the mechanisms for determining the fair market value as set forth in Section 3.4(e) of the Employment Agreement. If so, we will have to split the cost of the appraiser and any AAA fees that may be incurred as a result of such procedure.

Sincerely,

GRUPO HABANERO, LLC           AGREED AND ACCEPTED:

By: _____        _____
Name: GARY HOYCE            Stephen Kraft
Title: MEMBER               _____
                                Date

{C0948458.DOCX:1}

**2014CI18038**

CAUSE NO. 2014-CI-~~18035~~

| | | |
|---|---|---|
| STEVEN KRAFT INDIVIDUALLY | § | IN THE DISTRICT COURT |
| AND AS A MEMBER ON BEHALF | § | |
| OF GRUPO HABANERO, LLC | § | |
|     Plaintiff | § | |
| | § | |
| | § | 225th JUDICIAL DISTRICT |
| VS. | § | |
| | § | |
| GARY HODGE AND | § | |
| ROBERT HART III | § | |
|     Defendants | § | BEXAR COUNTY, TEXAS |

## AFFIDAVIT

BEFORE ME, the undersigned authority, personally appeared KENNETH ROURKE, who being duly sworn, deposed as follows:

"My name is KENNETH ROURKE. I previously was the Chief Operating Officer of Grupo Habanero, LLC. I am at least 18 years of age and of sound mind. I am personally acquainted with the facts alleged herein. I hereby swear that the following statements are true and correct.

On or about June 6, 2014, Plaintiff resigned from his position with the Company. Plaintiff resigned from his position with Grupo Habanero, LLC on or about June 6, 2014. While I have not yet determined for myself that exact date that Plaintiff resigned, Plaintiff has admitted in his Original Petition in this case that he resigned from his position on June 6, 2014.

On July 3, 2014, I personally accompanied Gary Hodge when he hand delivered a letter to what he believed was Plaintiff's address - 1114 Birch Hill, San Antonio, Texas 78232 - exercising Grupo Habanero, LLC's option to repurchase Plaintiff's 100 units of membership interest for $10.00. I watched Gary Hodge knock on the front door at the 1114 Birch Hill address two or three times. No one answered the door. I then watched Gary Hodge scotch tape the letter to the door.

117

"Further affiant sayeth not."

Kenneth Rourke
1-13-15

_____
KENNETH ROURKE

SUBSCRIBED AND SWORN TO BEFORE ME on _1/13/15_, by _____



Notary Public, State of _Texas_

ORALIA MADRID
Notary Public, State of Texas
My Commission Expires
April 20, 2016

FILED
12/3/2014 4:00:07 PM
Donna Kay McKinney
Bexar County District Clerk
Accepted By: Daniel Galan

Cause No. 2014-CI-18038

| | | |
|---|---|---|
| STEPHEN KRAFT INDIVIDUALLY AND AS MEMBER ON BEHALF OF GRUPO HABANERO, LLC, Plaintiff | §<br>§<br>§<br>§<br>§ | IN THE DISTRICT COURT |
| | §<br>§ | 225TH JUDICIAL DISTRICT |
| vs. | §<br>§ | |
| GARY HODGE AND ROBERT HART III Defendants | §<br>§<br>§ | BEXAR COUNTY, TEXAS |

<b>DEFENDANTS, GARY HODGE AND ROBERT HART III'S<br>MOTION TO COMPEL APPRAISAL AND ABATE LAWSUIT</b>

**TO THE HONORABLE COURT:**

Defendants, Gary Hodge and Robert Hart, III ("Defendants"), file this Motion to Compel Appraisal and Abate lawsuit in the above numbered and styled cause of action, and in support hereof, respectfully show the Court the following:

**I.      FACTUAL/PROCEDURAL BACKGROUND**

1.      On or about September 19, 2012, Grupo Habanero, LLC (the "Company") was formed to own and operate two Habaneros restaurants in San Antonio, Texas that were previously owned by Plaintiff. The members of the company include Plaintiff, Defendants and Cliff Graham who executed a "Company Agreement". *See* Company Agreement attached hereto as Exhibit "A."

2.      On the same date, Plaintiff executed an Employment Agreement with the Company. *See* Employment Agreement attached hereto as Exhibit "B." Per the Employment Agreement, Plaintiff received 100 membership shares of the Company representing a 10 percent ownership interest in the entity with an agreed value of $35,000.00. Ex. B, Article 3.4(a). Specifically at issue in this case is provision 3.4(e) which states as follows:

> If the Employee's employment is terminated for any reason by either party after the first anniversary of the Effective Date, the Company may, at its option, repurchase the

{C0808503.DOCX:1}                                 1

Membership Interest; the Company must exercise such option in writing and close such repurchase within thirty (30) days of the termination of employment. The aggregate purchase price for the Membership Interest upon exercise of the option in this Section 3.4(e) shall be the "Fair Market Value" of the Membership Interest. The "Fair Market Value" of the Membership Interest shall be the price agreed to by the parties; if the parties cannot within thirty (30) days of the exercise of the option agree upon a Fair Market Value, the Fair Market Value shall be determined by a single appraiser chosen by the parties. If the parties cannot agree upon an appraiser, the parties shall apply to the American Arbitration Association (the "AAA") to appoint a single appraiser. The appraiser shall provide a written appraisal and shall determine the Fair Market Value of the Membership Interest without deduction for its minority position and restrictions on transfer. The determination of the appraiser shall be final and binding upon the parties and closing of the sale shall be completed within thirty (30) days of receiving the appraiser's determination. The parties shall supply the appraiser with any requested information about the Company and shall split the cost of the appraiser and any AAA fees.

3.     On or about June 6, 2014, Defendant resigned from his position with the Company. Pursuant to provision 3.4(e) of the Employment Agreement, the Company exercised its option to repurchase Plaintiff's 100 units of membership interest on July 3, 2014. *See* letter to Plaintiff attached hereto as Exhibit "C." The Company offered to pay Plaintiff $10.00 for his interest, which the Company stated was the fair market value of the units. Ex. C. Negotiations began regarding the offer and were continuing as far as Defendants were concerned. During negotiations, Plaintiff filed an Original Petition and Application for Temporary Restraining Order and Temporary Injunction on November 17, 2014, which specifically addresses the repurchase of his membership units.

4.     Plaintiff claims in his Petition that the offer from the Company for $10 was "obviously frivolous". Yet, Plaintiff failed to comply with the Employment Agreement. Specifically, Plaintiff failed to agree to appoint an appraiser to determine the fair market value of his membership interest or, if no agreement could be reached, allowing the AAA to appoint an arbitrator. Instead, Plaintiff completely ignored his contractual obligations and filed the instant lawsuit.

5.	Since Plaintiff clearly did not agree to the fair market value offered for his interest, Plaintiff's options were to agree to an appraiser or have one appointed by the AAA if no agreement could be reached. At this point, it has become abundantly clear that Plaintiff and Defendants' relationship has deteriorated to the point that agreeing on an appraiser is not likely to happen. As such, Defendants file this Motion to Compel Appraisal to have the AAA appoint an appraiser pursuant to provision 3.4(e) of the Employment Agreement and abate the underlying lawsuit until the appraisal is completed.

## II.	ARGUMENTS AND AUTHORITIES

6.	**Appraisal provisions are enforceable.** The Texas Supreme Court has recently upheld the enforceability of appraisal clauses, distinguishing them from arbitration clauses: [W]hile arbitration determines the rights and liabilities of the parties, appraisal merely 'binds the parties to have the extent or amount of the loss determined in a particular way.' *Trudy's Texas Star, Inc. v. Weingarten Realty Investors*, No. 03-03-00538-CV, 2004 WL 1792374, at *4 (Tex.App.-Austin Aug. 12, 2004, pet. denied) (mem. op.) (citing *In re Allstate County Mut. Ins. Co.*, 85 S.W.3d 193, 195 (Tex.2002) (quoting *Scottish Union & Nat'l Ins. Co. v. Clancy*, 71 Tex. 5, 8 S.W. 630, 631 (Tex. 1888)).

7.	In *Trudy's*, the parties entered into a written lease agreement which provided for two separate and independent monthly payments: the base rent and the percentage rent. *Id* at *3. The lease contained an option to extend, which specified that all the terms of the initial lease continued to apply during the extension period and the base rent was to be adjusted to equal the "fair market rental value." *Id*. The lease agreement contained a provision which specifically outlined an appraisal process to be used when the parties were not able to agree to fair market rental value. *Id*. The tenant, however, wished to enforce an arbitration provision in the lease. *Id*. The Court of Appeals found the lease language could be given a definite legal meaning and it

was not reasonably susceptible to more than one meaning; thus, the procedure for determining how the parties must resolve a dispute over fair market value was not ambiguous. *Id.* Since the appraisal provision was more specific than the arbitration provision, the Court applied general rules of contract construction and held the appraisal provision controlled. *Id.* The Court reasoned the public policy that created a presumption in favor of arbitration was also advanced by the decision of parties to resolve their disputes through means other than arbitration, such as an appraisal process. *Id.* at *4. The Court concluded that the dispute over fair market value fell squarely within the scope of the appraisal provision, which had to be enforced. *Id.*

8.      Here, the parties have specifically contracted to use the appraisal process for determining the fair market value of Plaintiff's membership interest and even included a process for choosing an appraiser should the parties disagree. *See* Ex. B. The parties were in the process of negotiating the fair market value when Plaintiff applied for a temporary injunction and filed his Petition which revolves around the value of his membership interest. Plaintiff failed to abide by the contractual obligations regarding the process by which the value would be determined.

9.      Just as in *Trudy's*, the dispute here centers around the fair market value of Plaintiff's membership interest, which falls directly within the scope of the appraisal provision in the Employment Agreement. As such, the appraisal provision should be enforced.

10.     **Abating the case is proper.** As stated above, courts have deemed appraisal provisions enforceable. In addition, the Fort Worth Court of Appeals granted a writ of mandamus to abate a lawsuit until the parties had complied with the appraisal provision in their contract, likening the appraisal provision to an arbitration clause in the sense that each compels enforcement upon a showing that the dispute falls within its scope. *Id.* (citing *Vanguard Underwriters Ins. Co. v. Smith*, 999 S.W.2d 448, 451 (Tex.App.-Fort Worth 1999, orig. proceeding). The parties here are disputing the fair market value of Plaintiff's membership

interest, which clearly falls within the scope of provision 3.4(e) of the Employment Agreement. Thus, this matter should be abated until the parties comply with the appraisal provision in their contract.

## III. PRAYER

WHEREFORE, Defendants requests that the Court grant their Motion to Compel Appraisal and Abate lawsuit until the appraisal occurs, and for such other and further relief, at law or equity, to which Defendants may be entitled.

Respectfully submitted,

BRANSCOMB | PC
A Professional Corporation
711 Navarro St., Suite 710
San Antonio, Texas 78205
Telephone: (210) 598-5400
Telecopier: (210) 598-5405

By: _____
Roderick J. Regan
TSB# 16733040
Jessica R. Mann
TSB#24080165

ATTORNEYS FOR DEFENDANTS
GARY HODGE AND ROBERT HART, III

## FIAT ON PLAINTIFF'S MOTION TO COMPEL APPRAISAL AND ABATE LAWSUIT

On December 2, 2014, Plaintiff requested that its *MOTION TO COMPEL APPRAISAL AND ABATE LAWSUIT* in the above styled cause be set for hearing.

IT IS THEREFORE **ORDERED** that said Plaintiff's *MOTION TO COMPEL APPRAISAL AND ABATE LAWSUIT* is set for hearing on **December 9, 2014**, at 8**:30 a.m.**, in the ~~235th~~ District Court of Bexar County, 100 Dolorosa, San Antonio, TX 78205. Room# 1.09

Presiding

12/3/2014

David A. Canales

Presiding Judge

73rd District Court

Bexar County, Texas

*(efiled and hearing requested; this is notice of the hearing)*
JUDGE PRESIDING

### CERTIFICATE OF SERVICE

I hereby certify that on this the ___3rd___ day of December, 2014, a true and correct copy of the foregoing has been forwarded to the counsel below pursuant to the Texas Rules of Civil Procedure.

Richard W. Espey - email
Matthew Soliday - email
Espey & Associates, PC
13750 San Pedro Avenue, Suite 730
San Antonio, TX  78232

_____
Roderick J. Regan

# GRUPO HABANERO, LLC

# COMPANY AGREEMENT

The members of Grupo Habanero, LLC (the "company") have adopted this agreement as the company agreement of the company.

## ARTICLE I
## MEMBERS: PURPOSE AND AUTHORITY

1.1 Members. The members of the company are Robert G. Hart, III, Gary Hodge, Cliff Graham and Stephen Kraft.

1.2 Purpose and Authority. The purpose of the company is to own and operate two Habaneros restaurants in San Antonio, Texas. However, in furtherance of that purpose, the company is authorized to engage in any business or investment in which a limited liability company may legally engage.

## ARTICLE II
## CAPITAL CONTRIBUTIONS

2.1 Contributions. Each member will be required to contribute to the company only such money or property as such member agrees to contribute.

2.2 Return of Contributions. The company will not be required to return a capital contribution to a member, except to the extent the law or this agreement requires the company to do so.

## ARTICLE III
## ALLOCATIONS AND DISTRIBUTIONS

3.1 Allocations. The company will maintain capital accounts for the members.

(a) All items of income, gain, loss, deduction, and credit of the company will be allocated among the members in accordance with their relative holdings of Units.

(b) If Units are transferred during a calendar year, the managers will have the discretion to determine how profits or losses will be allocated between the transferor and transferee.

3.2 Distributions. From time to time, the managers may cause the company to distribute cash or other property to the members. Distributions will be made pro rata, in accordance with the members' relative holdings of Units.

## ARTICLE IV
## MANAGEMENT

4.1 Number of Managers: Management by Managers.

{C0705182.DOC:2}                                    1

EXHIBIT
A

(a) The company will have two (2) managers. Except as provided in Sections 4.1(b) and (c), the managers will have the power and authority to cause the company to take any action the managers deem necessary or appropriate, without the consent of any member. The officers of the company will be responsible for the day-to-day operations of the company.

(b) The company will have a managing owner who will be appointed by the holders of two-thirds of the Units held by all members. Notwithstanding anything else in this agreement, the managing owner will have the right to veto any action taken at any meeting of the members and/or managers, or of any committee designated by the managers, or action taken by written consent by the members and/or managers of the company. Robert G. Hart, III is hereby appointed as the managing owner.

(c) Subject to Section 4.1(b), but notwithstanding any other provision of this agreement, the affirmative vote of the holders of a majority of the Units is required to take the following actions:

(i) issue any additional Membership Interests after Membership Interests are issued to the initial members of the company;

(ii) approve any merger, interest exchange, conversion, or sale of all or substantially all of the company's assets;

(iii) voluntarily cause the winding up of the company;

(iv) take or authorize any act that would make it impossible to carry on the ordinary business of the company; or

(v) cause the company to incur any indebtedness for borrowed money.

4.2 Election; Resignation. The managers will be elected by a majority of the votes cast by the members in a position-by-position vote. Each manager elected will serve until his successor is elected. A manager may resign at any time.

4.3 Vacancy. Any vacancy in a manager's position will be filled by a vote of a majority of the votes cast by the members. A manager elected to fill a vacancy will serve until his successor is elected.

4.4 Change of Number. The number of managers may be changed at any time by the members, but a decrease in number will not have the effect of shortening the term of any incumbent manager. The members will be responsible for electing a manager to fill any manager position created by an increase in the number of managers.

4.5 Removal. The members may remove a manager with or without cause at any time. A manager may only be removed by vote of a majority of the votes cast by the members.

4.6     Meetings. The managers will not be required to hold annual meetings. The president or any manager may call special meetings of the managers. The person calling the meeting may fix any place for holding the meeting. The person calling the meeting will give notice of the meeting to each manager at least three days before the date of the meeting, in writing. The purpose of the meeting is not required to be specified in the notice of the meeting except as may be otherwise required by law, the Certificate of Formation or this agreement. The managers may vote on any matter on which a manager requests that a vote be taken.

4.7     Quorum. A majority of the managers must be present to constitute a quorum for action, except as otherwise required by law, the Certificate of Formation, or this agreement. If a quorum is not present at a meeting, the managers who are present may adjourn the meeting. The president will give all managers notice of the reconvening of any adjourned meeting in the manner provided herein for the calling of a meeting of the managers.

4.8     Majority Vote. If a quorum is present at any meeting, the vote of a majority of the managers present will decide any matter brought before such meeting, unless the question is one upon which a different vote is required by law, by the Certificate of Formation, or by this agreement.

4.9 Committees. The managers may designate committees to act on the managers' behalf. Each committee will have such powers as the managers may specify, subject to any restrictions imposed by the TBOC. The managers will have the power at any time to change the number and members of any committee, and to fill vacancies and discharge any committee or any particular member. The requirements of this Article which govern the managers will also apply to committees and their members.

4.10     Written Consent. Any action required or permitted to be taken at a meeting of the managers or any committee may be taken without a meeting if a consent in writing, setting forth the action so taken, is signed by at least the minimum number of managers or committee members necessary to take action at a meeting at which all managers or committee members were present and voted.

ARTICLE V
MEETINGS OF MEMBERS

5.1     Meetings. The members will not be required to hold annual meetings. The president of the company may call special meetings of the members. The president will call a special meeting if members owning one-fourth of all the Units or a majority of the managers request a special meeting in writing, stating the purposes of the proposed meeting. Business transacted at a special meeting will be limited to the purposes stated in the notice of the meeting.

5.2     Location of Meetings. Unless a particular notice states otherwise, the members will hold their meetings at the company's principal office.

5.3     Action by Telephone Conference. Members may participate in and hold a meeting by means of a conference telephone or similar communications equipment or other suitable electronic communications equipment, including video conferencing technology, or the internet, or a combination thereof, by means of which all Members participating in the meeting

42

can hear each other and participate in the meeting. Participation in such meeting will constitute attendance and presence in person at such meeting, except where a Member participates in the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

5.4 <u>Notice</u>. The president will give each member written notice of each meeting. The notice will state the place, day and hour of each meeting and will state the purposes for which the meeting is called. The president will cause the notice to be delivered to the members not less than 10 nor more than 60 days before the date of the meeting, either personally or by mail, at their addresses on the company's books. Notice by mail will be deemed to be given three days after it is deposited in the United States mail, postage paid.

5.5 <u>Waiver of Notice</u>. If a member signs a written waiver of notice (regardless of when the waiver is signed), the member will be deemed to have received proper notice. If a member attends or participates at a meeting, the member will be deemed to have waived notice of the meeting, unless the member attends or participates for the express purpose of objecting to the transaction of a business on the grounds that the meeting is not lawfully called or convened.

5.6 <u>Quorum</u>. The holders of a majority of the Units must be present in person or represented by proxy to constitute a quorum for action, except as otherwise required by law, by the Certificate of Formation, or by this agreement. Once a Unit is represented for any purpose at a meeting, it is deemed present for quorum purposes for the remainder of the meeting until the meeting is adjourned. If, however, a quorum does not exist, the members who are present in person or represented by proxy will have the power to adjourn the meeting. The president will give all members notice of the reconvening of any adjourned meeting, in the manner required for the calling of a special meeting.

5.7 <u>Majority Vote</u>. If a quorum is present at a meeting, the vote of the holders of a majority of the Units present in person or represented by proxy will decide any matter brought before the meeting, unless the question is one upon which a different vote is required by law, by the Certificate of Formation, or by this agreement.

5.8 <u>Voting Rights</u>. Each Unit will be entitled to one vote on each matter submitted to a vote. A member may vote either in person or by written proxy executed by the member or the member's duly authorized attorney.

5.9 <u>Written Consent</u>. Any action required or permitted to be taken at a meeting of the members may be taken without a meeting, without prior notice, and without a vote, if one or more consents in writing, setting forth the action so taken, will be signed by members having not fewer than the minimum number of votes that would be necessary to take the action at a meeting at which all members were present and voted.

ARTICLE VI
OFFICERS

6.1 <u>Officers</u>. The managers will appoint a president and a secretary of the company, and may also appoint other officers. The officers will be responsible for the day-to-day operation of the company. Each officer will have the powers and responsibilities normally

associated with the office, and such other powers and responsibilities as the managers may designate. An officer is not required to be a member or a manager. A person may hold more than one office. Cliff Graham is hereby appointed to serve as the initial President. Robert G. Hart, III is hereby appointed to serve as the initial Secretary.

6.2 Terms. Each officer will hold office until the managers appoint a successor for that officer. The managers will fill any vacancy in any office. The managers may remove any officer at any time, with or without cause. If the managers remove an officer, the removal will not affect any contract rights the officer has. The appointment of a person as an officer will not of itself create contract rights.

## ARTICLE VII
## RESTRICTIONS ON DISPOSITIONS OF UNITS; WITHDRAWAL

7.1 Restrictions on the Disposition of Units. Except as provided in (i) that certain Employment Agreement between the company and Stephen Kraft (the "Kraft Employment Agreement") and (ii) the Agreement Restricting Transfer of Membership Interests dated the same date as this agreement among Robert G. Hart, III, Gary Hodge and Cliff Graham (the "Transfer Restriction Agreement"), no member will make any Disposition of any Units without the written consent of members holding a majority of the Units. Any attempted Disposition of Units that is not in accordance with this agreement, the Kraft Employment Agreement or the Transfer Restriction Agreement will be null and void.

7.2 Admission as a Member. A person to whom Units are transferred in accordance with this agreement, the Kraft Employment Agreement or the Transfer Restriction Agreement will be admitted to the company as a member, effective as of the date the company receives the transferee's written agreement to be bound by this agreement as a member. Until a transferee of Units becomes a member, the transferee will not have the right to vote as a member, nor will the transferee have any of the other rights of a member, except as required by the TBOC.

7.3 Expenses. The member effecting a Disposition and any person admitted to the company in connection with the Disposition will pay, or reimburse the company for, all costs incurred by the company in connection with the Disposition or admission, on or before the tenth day after the receipt by that person of the company's invoice for the amount due.

7.4 Withdrawal. Except as provided in this agreement, the Kraft Employment Agreement or the Transfer Restriction Agreement, a member does not have the right or power to withdraw from the company as a member. A member may withdraw from the company by delivering a letter to the company, signed by the member, notifying the company that the member is withdrawing from the company and assigning the member's entire Membership Interest to the company. A member will not receive any consideration for such an assignment.

## ARTICLE VIII
## WINDING UP

8.1 Winding Up. The company will be wound up only upon the first to occur of the following:

(a)     the written consent of members holding a majority of the Units held by all members; or

(b)     any other event that, under the TBOC, requires that the company be wound up.

8.2     Liquidation and Termination. If the company is wound up, the managers will appoint a liquidator. The liquidator will proceed diligently to wind up the affairs of the company. Until the company's affairs are wound up, the liquidator will manage the company with all of the power and authority of the managers. The steps to be accomplished by the liquidator are as follows:

(a)     the liquidator will cause any notice required by the TBOC to be mailed to each known creditor of and claimant against the company in the manner described in the TBOC;

(b)     the liquidator will cause the company to pay or perform all of its obligations (including all expenses incurred in liquidation), or establish reserves for the payment and performance of those obligations; and

(c)     all remaining assets of the company will be distributed to the members as follows:

(i)     the liquidator may sell company property, including to members, and any resulting gain or loss will be allocated to the members' capital accounts;

(ii)     the liquidator will determine the fair market value of all company property that has not been sold, net of any liabilities to which that property is subject, and the members' capital accounts will be adjusted as if there were a disposition of that property for its fair market value on the date of distribution; and

(iii)     all remaining company property will be distributed among the members in accordance with their positive capital account balances, as determined after taking into account all capital account adjustments for the year in which the liquidation occurs (other than those made by reason of this clause (iii)).

8.3     Deficit Capital Accounts. Notwithstanding anything to the contrary in this agreement, and notwithstanding any custom or rule of law to the contrary, no member will ever be obligated to restore any deficit in the member's capital account.

8.4     Certificate of Termination. Once the company's assets have been applied and distributed as required by law and this agreement, the managers will file a Certificate of Termination with the Texas Secretary of State, and take such other actions as may be necessary to terminate the company.

## ARTICLE IX
## TAXES

9.1    **Tax Returns.** The managers will cause all company tax returns to be prepared and filed with the proper authorities. Each member will furnish to the company all information it has that is necessary to enable the company's income tax returns to be prepared and filed.

9.2    **Tax Elections.** Neither the company nor any member may make an election for the company to be excluded from the application of the provisions of subchapter K of chapter 1 of subtitle A of the IRC.

## ARTICLE X
## GENERAL PROVISIONS

10.1    **Other Opportunities.** Without the written consent of members holding a majority of the Units held by all members, a member or manager will not engage in any other business or investment that is similar to or competitive in nature with the business of the company, without offering any interest or participation in the business or investment to the company and the other members.

10.2    **Unit Certificates.** The Units may be represented by certificates, if the members so elect. The president will sign any certificates that are issued.

10.3    **Entire Agreement; Amendments.** This agreement, the Kraft Employment Agreement and the Transfer Restriction Agreement constitute the members' entire agreement relating to the company, and supersede all prior agreements with respect to the company, whether oral or written. Notwithstanding any other provision of this agreement, the affirmative vote of the holders of all of the Units is required to amend the Certificate of Formation or this agreement.

10.4    **Binding Effect.** Subject to the restrictions in this agreement, the Kraft Employment Agreement and the Transfer Restriction Agreement on Dispositions of Units, this agreement is binding on and inures to the benefit of the members and their respective heirs, legal representatives, successors, and assigns.

10.5    **Governing Law; Severability.** THIS AGREEMENT IS GOVERNED BY AND WILL BE CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS, EXCLUDING ANY CONFLICT-OF-LAWS RULE OR PRINCIPLE THAT MIGHT REFER THE GOVERNANCE OR THE CONSTRUCTION OF THIS AGREEMENT TO THE LAW OF ANOTHER JURISDICTION. In the event of a direct conflict between the provisions of this agreement and (a) any provision of the Certificate of Formation, or (b) any mandatory provision of the TBOC, the applicable provision of the Certificate of Formation or the TBOC will control. If any provision of this agreement or the application of this agreement to any person or circumstance is held invalid or unenforceable to any extent, the remainder of this agreement and the application of that provision to other persons or circumstances will not be affected, and that provision will be enforced to the greatest extent permitted by law.

10.6    Further Assurances.    Each member will execute and deliver any additional documents and instruments and perform any additional acts that may be necessary or appropriate to effectuate and perform the provisions of this agreement and the transactions contemplated by this agreement.

10.7    Indemnification.    To the fullest extent permitted by law, each member will indemnify the company, each manager and each other member and hold them harmless from and against all losses, costs, liabilities, damages, and expenses (including, without limitation, costs of suit and attorney's fees) they may incur on account of any breach by that member of this agreement.

10.8    Counterparts.    This agreement may be executed in any number of counterparts, with the same effect as if all signing parties had signed the same document. All counterparts will be construed together and constitute the same instrument.

## ARTICLE XI
## DEFINITIONS

11.1    Definitions.    As used in this agreement, the following terms have the following meanings:

"Dispose" or "Disposition" means a sale, assignment, transfer, exchange, mortgage, pledge, grant of a security interest, or other disposition or encumbrance (including, without limitation, by operation of law).

"IRC" means the Internal Revenue Code of 1986 and any successor statute, as amended from time to time.

"Membership Interest" means the interest of a member in the company, including all rights and obligations pertaining to the Membership Interest.

"TBOC" means the Texas Business Organizations Code and any successor statute, as amended from time to time.

"Units" means units of Membership Interest in the company. The initial members will initially have the number of Units set out on the signature page of this agreement.

Terms not otherwise defined in this agreement that are defined in the TBOC have the meanings given them in the TBOC.

11.2    Construction.    Whenever the context requires, the gender of all words used in this agreement includes the masculine, feminine, and neuter. All references to Articles and Sections refer to articles and sections of this agreement.

11.3    **Branscomb | PC.** **Each person executing this agreement other than Robert G. Hart, III and Gary Hodge acknowledges that Branscomb|PC and its lawyers are representing only Robert G. Hart, III and Gary Hodge in this transaction. Each such person acknowledges that he has been encouraged to engage separate legal counsel to help**

{C0705182.DOC:2}                                                8

him review this agreement, and the provisions of this Section, and that he has had ample opportunity to do so.

*[Signature Page Immediately Follows]*

Signed on _____, 2012, to be effective as of the date the Certificate of Formation of the company is filed by the Secretary of State.

_____
Robert G. Hart, III
Units: 400

_____
Gary Hodge
Units: 400

_____
Cliff Graham
Units: 100

_____
Stephen Kraft
Units: 100

# EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT ("Agreement") is made effective as of "Effective Date," as defined below, by and between **Grupo Habanero, LLC**, a Texas limited liability company ("Company") and **Stephen Kraft**, an individual residing in San Antonio, Texas ("Employee").

## ARTICLE I
## EMPLOYMENT AND DUTIES

1.1 **Employment; Effective Date**. Company agrees to employ Employee and Employee agrees to be employed by Company, beginning as of September 19, 2012 (the "Effective Date") and continuing for the period of time set forth in Article II below, subject to the terms and conditions of this Agreement.

1.2 **Position**. From and after the Effective Date, Employee shall serve as the Managing Director. The Managing Director shall devote full time and best efforts to the overall supervision of the restaurants owned by the Company and shall report directly to the Managers of the Company. The Managing Director shall live in the "vicinity" of Bexar County, Texas, as determined by the Company with reasonable discretion.

1.3 **Duties**. Employee agrees to serve in the position referred to in Section 1.2 above and shall perform such duties as may from time to time be assigned by the Managers.

## ARTICLE II
## TERM AND TERMINATION OF EMPLOYMENT

2.1 **Term**. This Agreement shall terminate on the first anniversary of the Effective Date ("the Term"), unless sooner terminated in accordance with the terms in this Article II.

2.2 **Company's Right to Terminate**. Notwithstanding the provisions of Section 2.1 above, Company shall have the right to terminate Employee's employment under this Agreement at any time for any of the following reasons:

(a) by virtue of his physical or mental disability, Employee is unable to perform substantially and continuously the essential functions of his duties, with or without reasonable accommodations, for a period of 90 consecutive days or for a period of 120 non-consecutive days during any 12 month period; or

(b) at any time for any reason whatsoever or for no reason at all, in the sole discretion of Company; or

(c) for cause, which for purposes of this Agreement shall mean Employee (i) has been indicted for, or convicted of, or pleaded no contest to, a misdemeanor involving moral turpitude or a felony, (ii) has willfully refused without proper legal reason to perform Employee's duties, (iii) has materially breached any material provision of this Agreement, (iv) has engaged in any act of serious dishonesty which adversely affects, or reasonably could in the



future adversely affect, the value, reliability or performance of Employee in a material manner, or (v) breach of fiduciary duty by Employee.

      (d)    **Notice of Termination**. If Company desires to terminate Employee's employment at any time for any reason or for no reason at all prior to the expiration of the Term, it shall do so by giving written notice to Employee that it has elected to terminate Employee's employment and stating the effective date of the termination. Further, Company's termination of Employee's employment shall not alter or amend the provisions of Articles IV and V below.

      2.3    **By Company**. If Employee's employment is terminated by Company prior to the expiration of the Term as provided in Section 2.1 above, then, upon the effective date of such termination, regardless of the reason therefore, Company's obligations under this Agreement shall immediately cease. If Employee is terminated pursuant to Sections 2.2(a) or (b) above, Company will offer to Employee and Employee will be entitled to receive severance benefits equal to $5,000.00 per month for the remainder of the Term payable on the Company's regular payment dates for employees but no less frequently than monthly, less applicable statutory deductions and withholdings (the "Severance Benefits").

## ARTICLE III
## COMPENSATION AND BENEFITS

      3.1    **Base Salary**. Company promises to provide, and Employee agrees to accept, an annual Base Salary of Sixty Thousand Dollars ($60,000) ("Base Salary"), less applicable statutory deductions and withholdings, payable in accordance with Company's regular payroll procedures as presently in effect and amended from time to time. Company, by action of its Managers, may review Employee's Base Salary from time to time to determine if it should be increased.

      3.2    **Bonuses**. During the Term, Company will pay Employee a quarterly bonus equal to 15% of the amount by which "Total Controllable Income" as defined hereafter exceeds "Base TCI" as defined hereafter. "Total Controllable Income" shall mean the gross revenue from all restaurants operated by the Company or its subsidiaries less those direct operating expenses identified in Exhibit A attached hereto. As an example, in 2011, the two Habaneros restaurants had a combined Total Controllable Income of $210,869 (the "Base TCI").

      3.3    **Other Perquisites**. During his employment, Company will provide Employee and his family with: (i) health benefits substantially the same as those provided to Employee in 2011 by the prior owner of the restaurants; (ii) a $300 monthly car allowance; and (iii) a $200 monthly phone allowance. Employee and, to the extent applicable, Employee's spouse, dependents and beneficiaries, shall be allowed to participate, if eligible, in all other benefit plans and programs of Company, including improvements or modifications of the same, which are now, or may hereafter be, available to similarly situated employees and their spouses, dependents, and beneficiaries.

      3.4    **Membership Interest Grants.**

      (a)    Upon execution of this Agreement and the Company Agreement of the Company, Employee shall be issued 100 units of membership interest (the "Membership Interest"), which is

equal to ten percent (10%) of all issued and outstanding units of membership interest of the Company on a fully diluted basis with an agreed value of $35,000 (the "Initial Membership Interest Price").

(b)     Company hereby makes the following representations and warranties to Employee intending Employee to rely upon them in connection with entering this Agreement:

(i)     Organization, Good Standing and Qualification. The Company is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Texas. The Company has all requisite limited liability company power and authority to own and operate its properties and assets, to execute and deliver this Agreement, to issue and sell the Membership Interest and to carry out the provisions of this Agreement.

(ii)     Capitalization; Voting Rights. As of the Effective Date and including the Membership Interest issued as set forth in this Agreement, the Company will have 1,000 issued and outstanding units of membership interest. As of the date hereof, there are no outstanding options, warrants, or other rights for the purchase or acquisition from the Company of units of membership interest. The rights, preferences, privileges and restrictions of the Membership Interest are as set forth in the Company Agreement of the Company and in this Agreement. When issued in compliance with the provisions of this Agreement, the Membership Interest will be validly issued, fully paid and non-assessable, and will be free of any liens or encumbrances, other than the Company's right to repurchase the Membership Interest and the general restriction on transfer all as provided in Section 3.4(d).

(iii)     Limited Liability Company Documents. Complete and accurate copies of the Company's Certificate of Formation and Company Agreement are attached hereto as Exhibit B. The Company is not currently contemplating any amendment to such documents.

(iv)     Authorization; Binding Obligations. All limited liability company action on the part of the Company, its officers, managers and members necessary for the authorization of this Agreement, the performance of all obligations of the Company hereunder as of the Effective Date and the authorization, sale, issuance and delivery of the Membership Interest pursuant hereto has been taken or will be taken prior to the Effective Date. This Agreement, when executed and delivered, will be valid and binding obligation of the Company enforceable in accordance with its terms, except (a) as limited by applicable bankruptcy, insolvency, reorganization, moratorium or other laws of general application affecting enforcement of creditors' rights, and (b) general principles of equity that restrict the availability of equitable remedies.

(v)     Members. Exhibit C contains a complete list of all of the Company's members, the units of membership interest they own and their addresses.

(vi)     Compliance with Laws. To its knowledge, the Company is not in violation of any applicable statute, rule, regulation, order or restriction of any domestic or foreign government or any instrumentality or agency thereof in respect of the conduct of its business or the ownership of its properties, which violation would materially and adversely affect the business, assets, liabilities, financial condition, operations or prospects of the Company.

(c)     Right of First Offer for Equity Securities.

(i)     Notwithstanding subsection (ii) below, until the first anniversary of this Agreement, the Company shall not issue any "Equity Securities" as defined below.

(ii)     Employee shall have a right of first offer to purchase his Pro Rata Portion (as defined below) of all Equity Securities that the Company may, from time to time, propose to sell and issue after the date of this Agreement.

(iii)     Employee's "Pro Rata Portion" is equal to the ratio of (x) the number of units of membership interest of the Company which the Employee holds immediately prior to the issuance of such Equity Securities to (y) the total number of units of the Company's outstanding membership interests, immediately prior to the issuance of the Equity Securities. The term "Equity Securities" shall mean (1) any membership interest of the Company, (2) any security convertible, with or without consideration, into any membership interest (including any option to purchase such a convertible security), (3) any security carrying any warrant or right to subscribe to or purchase any membership interest or (4) any such warrant or right.

(iv)     In the event the Company proposes to undertake an issuance of Equity Securities, the Company shall deliver written notice ("Notice") to the Employee via reputable overnight delivery service of (1) its bona fide intention to undertake an issuance of Equity Securities, (2) a description of the designations, preferences, privileges and rights of the Equity Securities to be offered and of each and every right, agreement and instrument to be attached to, delivered with or made appurtenant to such securities ("Appurtenant Rights"), (3) the aggregate number of Equity Securities to be offered to the offerees thereunder (the "Offerees"), (4) the identity of the Offerees and (5) the price and terms and conditions upon which the Company proposes to offer the Equity Securities to the Offerees.

(v)     Within thirty (30) days of receiving the Notice, Employee shall notify the Company in writing if he desires to exercise, in full or in part, his rights set forth in this Paragraph (c). If Employee exercises his rights, Employee may purchase the offered Equity Securities which such Employee elects to purchase by paying the same consideration, as paid by the Offerees, and under the same terms and conditions applicable to the Offerees.

(vi)     If Employee purchases Equity Securities under this Paragraph (c) hereof, he shall also receive all Appurtenant Rights provided or granted to investors as part of the offering of Equity Securities, and shall, as a condition to receiving the Equity Securities and the Appurtenant Rights, execute and become obligated under any agreements and other instruments required to be executed by all investors in connection with such offering.

(d)     If the Employee's employment is terminated for any reason by either party on or before the first anniversary of the Effective Date, the Company may, at its option, repurchase the Membership Interest; the Company must exercise such option in writing and close such repurchase within thirty (30) days of the termination of employment. If the Company terminates Employee's employment prior to the first anniversary of the Effective Date, the Employee has the option to put the Membership Interest to the Company; the Employee must exercise such put in writing and close such repurchase within thirty (30) days of the termination of employment. In either case the aggregate purchase price for the Membership Interest will be the Initial Membership Interest Price plus or minus an amount equal to the percentage increase or decrease over Base TCI multiplied by the Initial Membership Interest Price. For example, if Base TCI is $227,000 and Total Controllable Income is increased to $327,000 then the percentage increase would be (327,000 - 227,000)/227,000 or 44.05% multiplied by the Initial Membership Interest Price of $35,000 for an increase of $15,418.50. Therefore, the purchase price for the Membership Interest would be $35,000 plus $15,418.50 equals $40,418.50. Conversely, if Base TCI is $227,000 and Total Controllable Income is reduced to $127,000 then the percentage decrease would be (127,000 - 227,000)/227,000 or -44.05% multiplied by the Initial Membership Interest Price of $35,000 for a decrease of $15,417.50. Therefore, the purchase price for the Membership Interest would be $35,000 minus $15,418.50 equals $19,581.50. In the event that the purchase of Membership Interest contemplated by this Section 3.4 occurs before the full year of Total Controllable Income has elapsed from the Effective Date, then the available data shall be annualized for purposes of the calculation of the purchase price for the Membership Interest. The Membership Interest shall not be transferred by Employee except with the express written consent of the Company. Any transfer of legal or beneficial ownership shall be void ab initio.

(e)     If the Employee's employment is terminated for any reason by either party after the first anniversary of the Effective Date, the Company may, at its option, repurchase the Membership Interest; the Company must exercise such option in writing and close such repurchase within thirty (30) days of the termination of employment. The aggregate purchase price for the Membership Interest upon exercise of the option in this Section 3.4(e) shall be the "Fair Market Value" of the Membership Interest. The "Fair Market Value" of the Membership Interest shall be the price agreed to by the parties; if the parties cannot within thirty (30) days of the exercise of the option agree upon a Fair Market Value, the Fair Market Value shall be determined by a single appraiser chosen by the parties. If the parties cannot agree upon an appraiser, the parties shall apply to the American Arbitration Association (the "AAA") to appoint a single appraiser. The appraiser shall provide a written appraisal and shall determine the Fair Market Value of the Membership Interest without deduction for its minority position and restrictions on transfer. The determination of the appraiser shall be final and binding upon the parties and the closing of the sale shall be completed within thirty (30) days of receiving the appraiser's determination. The parties shall supply the appraiser with any requested information about the Company and shall split the cost of the appraiser and any AAA fees.

(f)    All certificates evidencing units of membership interest now owned or that may be acquired by the Employee will note conspicuously on the back as follows:

"REFERENCE IS HEREBY MADE TO AN AGREEMENT DATED EFFECTIVE AS OF SEPTEMBER 19, 2012, ON FILE AT THE PRINCIPAL PLACE OF BUSINESS OF THE COMPANY AND AT ITS REGISTERED OFFICE IF THE TWO ARE NOT THE SAME, WHICH AGREEMENT RESTRICTS THE TRANSFER OR PLEDGE OF THE UNITS OF MEMBERSHIP INTEREST REPRESENTED BY THIS CERTIFICATE AND CONTAINS CERTAIN OTHER AGREEMENTS CONTEMPLATED TO BE BINDING ON THE OWNER OF MEMBERSHIP INTERESTS IN THE COMPANY. THE COMPANY WILL FURNISH A COPY OF THE AGREEMENT TO THE RECORD HOLDER OF THIS CERTIFICATE WITHOUT CHARGE, UPON WRITTEN REQUEST TO THE COMPANY AT ITS PRINCIPAL PLACE OF BUSINESS OR REGISTERED OFFICE."

## ARTICLE IV
## PROTECTION OF INFORMATION

**Confidential Information.** Employee acknowledges that during his employment with Company, Company will provide him with and/or give him access to Confidential Information (defined below) of Company. Confidential Information means all information and compilations of information of any kind, type or nature (tangible and intangible, written or oral, and including information contained, stored, or transmitted through any electronic medium), which relates to Company including, without limitation, products; services; plans, including, without limitation, business and marketing plans; procedures; formulae; processes; pricing; customers. Confidential Information does not, however, include any information that is available to the public other than as a result of any act, directly or indirectly, of Employee. Employee agrees that all Confidential Information is and shall remain the sole property of Company.

## ARTICLE V
## NON-COMPETITION AND NON-SOLICITATION OBLIGATIONS

5.1    **Non-Competition and Non-Solicitation Obligations.** In exchange for the consideration delivered in connection with that certain Asset Purchase Agreement between Coastal King, Ltd., Texas Burrito Co., LLC and Habaneros Mexican Grill, LP (the "APA") and as a material inducement for Coastal King, Ltd. to enter into the APA, and in order to protect the Confidential Information that the Company will provide in accordance with Article IV above, Employee expressly covenants and agrees that, for any reason, directly or indirectly, for himself or on behalf of or in conjunction with any other person, entity or business of whatever nature for any period during which Employee is an officer, employee, consultant or manager of the Company and for an additional 30 months from and after the date of termination of any such relationship (the "Prohibited Period") he shall not:

Engage, within the Bexar County, Texas (the "Prohibited Area") as an officer, director, manager, owner, investor, lender, partner, member, joint venturer or in a managerial or advisory capacity (whether as an employee, independent contractor, consultant or advisor, or as a sales representative, dealer or distributor), or as an employee, agent, service provider or in any other non-managerial capacity, in any Mexican restaurant business (the "Restricted Business");

For Employee or on behalf of or in conjunction with any other person, solicit or attempt to solicit, recruit, or attempt to recruit any employee, consultant or agent of Company or any of its affiliates;

Request or attempt to request any business related to any Restricted Business from any corporation, association, partnership, organization, business, individual or governmental entity, who as of the date of the request or attempted request or within 36 months prior to that date, is or was a customer, or an actively sought prospective customer, or a significant vendor or supplier of the Company or any of its affiliates.

**5.2     Separate Covenant.** The covenants in this Article are severable and separate, and the unenforceability of any specific covenant shall not affect the provisions of any other covenant.

**5.3     Subsequent Employment.** The Employee further expressly covenants and agrees that during the Prohibited Period, he will advise the Company of the identity of any new employer of the Employee or business started by Employee within the Prohibited Area within ten days of accepting such employment or forming such business.

**5.4     Reasonableness of Restrictions.** Employee agrees that (i) the terms of this Article V are reasonable and constitute an otherwise enforceable agreement to which the terms of this Agreement are ancillary or a part of; (ii) the consideration provided by the Company under this Agreement is not illusory; (iii) the restrictions of this Article V are necessary and reasonable for the protection of the legitimate business interests and goodwill of the Company; and (iv) the consideration of employment given to Employee by the Company under this Agreement, including without limitation, the provision by the Company or its affiliates of Confidential Information and specialized training to Employee, gives rise to the Company's interests in the covenants set forth in this Article V.

**5.5     Severability.** Employee and the Company agree that it was both parties' intention to enter into a valid and enforceable Agreement. Employee agrees that if any covenant contained in this Article V is found by a court of competent jurisdiction to contain limitations as to time, geographic area, or scope of activity that are not reasonable and impose a greater restraint than is necessary to protect the goodwill or other business interests of the Company or its affiliates, then the court shall reform the covenant to the extent necessary to cause the limitations contained in the covenant as to time, geographic area, and scope of activity to be restrained to be reasonable and to impose a restraint that is not greater than necessary to protect the goodwill and other business interests of the Company and its affiliates.

**5.6     Rights and Remedies Upon Breach.** Employee acknowledges that money damages would not be sufficient remedy for any breach of this Article V by the Employee. In

the event that the Company determines that Employee has breached or attempted or threatened to breach any provision of this Article V, in addition to any other remedies at law or in equity the Company may have available to it, it is agreed that the Company shall be entitled to terminate any payments then owing to Employee under this Agreement, and, shall be entitled, upon application to any court of proper jurisdiction, to a temporary restraining order or preliminary injunction against Employee prohibiting such breach or attempted or threatened breach by proving only the existence of such breach or attempted or threatened breach. Employee agrees that the period during which the covenants contained in this Article are in effect shall be computed by excluding from such computation any time during which Employee is in violation of any provision of this Article. Furthermore, Employee agrees to waive any bonding requirement in connection with any injunction or temporary restraining order sought by the Company under this section.

## ARTICLE VI
## MISCELLANEOUS

6.1 **Notices.** For purposes of this Agreement, notices and all other communications provided for herein shall be in writing and shall be deemed to have been duly given (a) when received if delivered personally or by courier, (b) on the date receipt is acknowledged if delivered by certified mail, postage prepaid, return receipt requested, or (c) one day after transmission if sent by facsimile transmission with confirmation of transmission, as follows:

If to Employee, addressed to:

> 1114 Birch Hill
> San Antonio, TX 78232

If to Company, addressed to:

> 108 N. Mesquite Street
> Corpus Christi, TX 78401

or to such other address as either party may furnish to the other in writing in accordance herewith, except that notices or changes of address shall be effective only upon receipt.

6.2 **Applicable Law.** This Agreement is entered into under, and shall be construed and interpreted, and the rights of the parties shall be governed by, the laws of the State of Texas with respect to any claim or dispute related to or arising under this Agreement.

6.3 **No Waiver.** No failure by either party hereto at any time to give notice of any breach by the other party of, or to require compliance with, any condition or provision of this Agreement shall be deemed a waiver of similar or dissimilar provisions or conditions at the same or at any prior or subsequent time.

6.4 **Severability and Reformation.** If a court of competent jurisdiction determines that any provision of this Agreement is invalid or unenforceable, then the invalidity or unenforceability of that provision shall not affect the validity or enforceability of any other

provision of this Agreement and all other provisions shall remain in full force and effect. Furthermore, the parties explicitly agree that such court is authorized to reform any such invalid or unenforceable provision to be valid and fully enforceable under the law and that the parties agree that in such case, they will treat the provision as having automatically been so reformed.

6.5     **Counterparts**. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which together will constitute one and the same Agreement.

6.6     **Headings**. The section headings have been inserted for purposes of convenience and shall not be used for interpretive purposes.

6.7     **Assignment**. This Agreement is personal to Employee and shall not be assignable by Employee. This Agreement shall inure to the benefit of and be binding upon the Company and its successors and assigns; the Company may assign and transfer its rights and obligations under this Agreement, by operation of law or otherwise, to any successor to all or substantially all of its equity ownership interests, assets or business by dissolution, merger, consolidation, transfer or assets, or otherwise as permitted under the Company's organizational documents.

6.8     **Survival**. The termination of this Agreement and Employee's employment shall not affect any right or obligation of any party which has accrued and vested prior to such termination or which by its terms survives the termination of this Agreement and Employee's employment. The provisions of Section 3.4, except Section 3.4(c), Articles IV and V shall survive termination of this Agreement.

6.9     **Entire Agreement**. This Agreement constitutes the entire agreement of the parties with regard to the subject matter hereof, and contains all the covenants, promises, representations, warranties and agreements between the parties with respect to employment of Employee by Company. Without limiting the scope of the preceding sentence, all understandings and agreements preceding the date of execution of this Agreement and relating to the subject matter hereof are hereby null and void and of no further force and effect.

6.10    **Modification; Waiver**. Any modification to or waiver of this Agreement will be effective only with the prior written consent of Company and Employee.

[*Signature page follows.*]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the Effective Date.

COMPANY:

GRUPO HABANERO, LLC

By: _____
Name: Cliff Graham
Title: President

EMPLOYEE:

_____
Stephen Kraft

# EXHIBIT A

## Examples of Operating Expenses

(Spreadsheet for calculation of TCI to be attached)

# EXHIBIT B

## Company Documents

# EXHIBIT C

## List of Members and Units of Membership Interest with Addresses

| | |
|---|---|
| Robert G. Hart, III | 400 Units |
| Gary Hodge | 400 Units |
| Cliff Graham | 100 Units |
| Stephen Kraft | 100 Units |

**GRUPO HABANERO, LLC**
**108 N. MESQUITE STREET**
**CORPUS CHRISTI, TEXAS 78401**

July 3, 2014

Mr. Stephen Kraft                                                    (Via Hand Delivery and U.S. Mail)
1114 Birch Hill
San Antonio, TX 78232

> RE:     Employment Agreement between Grupo Habanero, LLC and Stephen Kraft effective as of September 19, 2012 (the "Employment Agreement").

Dear Mr. Kraft:

As you know, you resigned from your position with Grupo Habanero, LLC (the "Company") as of June 6, 2014. Pursuant to the provisions of Section 3.4(e) of the Employment Agreement, the Company hereby exercises its option to repurchase your 100 units of membership interest in the Company (the "Units"). As you know, the Company loses money and without the advances made by the other principals of the Company the Company would be insolvent. In exchange for $10, which the parties agree is the fair market value of the Units, Stephen Kraft hereby sells, transfers and delivers the Units to the Company free and clear of any lien, pledge, charge, security interest, encumbrance or adverse claim, and the Company hereby accepts the Units.

If you agree to the terms of this letter agreement, please execute this Employment Agreement where indicated in the space below and return a copy to me. Upon receipt of the copy of the duly executed letter agreement, I will deliver the consideration contemplated in this letter agreement to you.

Unless we have received the signed letter agreement from you within 30 days of the exercise of the option set forth in this letter agreement, we will assume that you disagree with the fair market value of the Units set forth herein and that you will invoke the mechanisms for determining the fair market value as set forth in Section 3.4(e) of the Employment Agreement. If so, we will have to split the cost of the appraiser and any AAA fees that may be incurred as a result of such procedure.

Sincerely,

GRUPO HABANERO, LLC                          AGREED AND ACCEPTED:

By: _____                 _____
Name: GARY HOYOE                                   Stephen Kraft
Title: MEMBER
                                                              _____
                                                              Date

{C0948458.DOCX:1}

**EXHIBIT**
**C**

DOCUMENT SCANNED AS FILED

FILED
1/14/2015 9:31:38 AM
Donna Kay McKinney
Bexar County District Clerk
Accepted By: Brenda Carrillo

R:\13598.0001\pleadings\mtns&ords\plts resp to defs mtn to comp app and mtn for protect.docx

CAUSE NO. 2014-CI-18038

| STEVE KRAFT INDIVIDUALLY AND | § | IN THE DISTRICT COURT OF |
| AS A MEMBER ON BEHALF OF | § | |
| GRUPO HABANERO, LLC | § | |
|    Plaintiff | § | |
| | § | |
| | § | |
| VS. | § | 225th JUDICIAL DISTRICT |
| | § | |
| | § | |
| GARY HODGE AND ROBERT HART III | § | |
| Defendant | § | BEXAR COUNTY, TEXAS |

## PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO COMPEL APPRAISAL AND MOTION FOR PROTECTION

COMES NOW Plaintiffs STEVE KRAFT, Individually and as a member on behalf of GRUPO HABANERO, LLC, ("Plaintiff") files this their response to Defendants' Motion to Compel Appraisal and Motion for Protection and would show unto the court as follows:

### I. Factual Background

In September, 2012 Plaintiff agreed to sell his restaurants to the Defendants. A new entity was created, Grupo Habanero, LLC ("Grupo") to effectuate the sale. Plaintiff retained a 10% interest in the new entity and entered into an employment contract with the new entity. See Company Agreement attached hereto as Exhibit A and Employment Agreement attached hereto as Exhibit B. At the time of the sale, Plaintiff's interest in the new entity had an agreed value of $35,000.00.

On June 6, 2012, Grupo terminated the Plaintiff's employment. Under the terms of their contract Grupo had an option to purchase the membership interest of the Plaintiff. In order to be effective, the "Company must exercise such option in writing and close such repurchase within thirty (30) days of the termination of employment." See Exhibit B. Notice of the option to repurchase were governed by Article 6.1 of the Employment Agreement which states:

1

"For purposes of this Agreement, notices and all other communications provided for herein shall be in writing and shall be deemed to have been duly given (a) when received if delivered personally or by courier, (b) on the date receipt is acknowledged if delivered by certified mail, postage prepaid, return receipt requested, or (c) one day after transmission if sent by facsimile transmission with confirmation of transmission, as follows:

If to Employee, addressed to:

> 1114 Birch Hill
> San Antonio, TX
> 78232

…

*or to such other address* as either party may furnish to the other in accordance herewith, except that notices or changes of address shall be effective only upon receipt" (emphasis added).

This notice provision contained a scrivener's error as the Plaintiff's address is 1115 Birch Hill, San Antonio, TX 78232. Defendants were well aware of the Plaintiff's actual address.

Defendants attempted, and failed, to timely exercise the purchase option. The Defendants drafted a letter dated July 3, 2012 which states that it was sent via hand delivery and U.S. Mail. See letter attached hereto as Exhibit C. They did not hand deliver the letter to the Plaintiff and Defendants have provided no evidence, despite numerous requests, that the letter was ever sent to the Defendant by certified mail, return receipt requested. As such Defendants never timely exercised the repurchase option.

Upon realizing that that they had not exercised the purchase option, the Defendants began to make threats against the Plaintiff's interest. The Defendants engaged in oppressive conduct to freeze out the Plaintiff, including denying him access to the financial records of the company to which he is entitled by law, records they are still refusing to produce as requested by Plaintiffs in their requests for production from which Defendants are seeking protection.

2

## II. Argument and Authorities

In order to enforce an arbitration or appraisal clause, the party seeking to compel arbitration must present evidence of an arbitration agreement that governs the dispute at issue in the case. *Weekley Homes v. Jennings*, 936 S.W. 2d 16, (Tex. App. – San Antonio, 1996, writ denied). It is the movant's burden to establish their contractual right to arbitration[1]. *Id.* at 19. This burden includes proof of compliance with a condition precedent. *Id.* at 19. Establishing the existence of an arbitration agreement is generally evidentiary. *Murdock v. Trisun Healthcare, LLC*, 2013 Tex. App. LEXIS 5638 (Tex. App. – Austin, 2013, pet. denied). If the material facts necessary to determine the issue are controverted, the trial court must conduct an evidentiary hearing to determine the disputed material facts. *Jack B. Anglin Co. v. Tipps,* 842 S.W. 2d 266 (Tex. 1992).

In *Weekley,* the agreement containing the arbitration clause also contained a condition precedent: the parties had to first mediate the case before they could invoke binding arbitration. *Weekley,* 936 S.W. 2d at 17. The Movant's only evidence to support its motion to compel arbitration was the contract itself. *Id. at* 18. The Court upheld the denial of the motion to compel because the movant "did not produce any evidence that it complied with its contractual requirements which would entitle it to arbitration." *Id* at 19.

Here, the Employment Contract also contains a condition precedent: in order to invoke the appraisal process, the Defendants must first show that the Company timely exercised its repurchase option. Defendants have made no effort to show that they properly and timely exercised the option. In fact, they filed their motion for protection to prevent Plaintiffs from discovering the very facts necessary to establish their right to compel an appraisal. As in *Weekley,* the only evidence they have offered in the contract itself.

---

[1] The Employment Agreement does not contain an arbitration clause, but many of the same principles apply in the context of when an appraisal clause is enforceable.

3

It is well settled law that strict compliance with the provisions of an option contract is mandatory. *Crown Constr. Co. v Huddleston,* 961 S.W. 2d 552 (Tex. App. –San Antonio 1997, no pet.). Failure to exercise an option according to its terms, including untimely or defective acceptance is simply ineffectual, and legally amounts to nothing more than a rejection. *Id.* at 558. Here the contract required that the Company exercise the option in writing *and close* the repurchase within thirty (30) days of the termination of employment. The contract also stipulated that proper notice of the exercise could only be made through personal delivery, certified mail return receipt requested, or facsimile transmission with confirmation.

It is an undisputed fact the Plaintiff was never hand delivered the purported notice. What actually happened is that the Defendants posted the notice, after the expiration of thirty days, on the door of the Plaintiff's neighbor, as they purposefully used an address they knew to be incorrect. See Affidavit of Stephen Kraft, attached hereto as Exhibit D and incorporated in to this response. Such delivery does not constitute personal delivery and does not strictly comply with the contract. See *Crown Constr. Co.* 961 S.W. 2d at 557 (holding that personal delivery means actual hand to hand delivery, taping notice to a door fails to properly deliver notice.)

It is also undisputed that the Company did not timely send the notice to the Plaintiff via U.S. certified mail return receipt requested. As noted above, Defendants filed a motion for protection to prevent Plaintiffs from this exact discovery (presumably because Defendants are well aware they did not timely send the notice). It is similarly undisputed that the Company did not send the required notice by facsimile transmission. As Defendants have not met their burden to establish that they met the required conditions precedents to establish their right to an appraisal, their motion to compel an appraisal should be denied.

4

Furthermore, the claims of the Plaintiffs are not within the scope of the appraisal clause. The Defendants bear the initial burden to establish the to-be-arbitrated claims fall within the agreement's scope. *Grand Homes 97, L.P. v. Loudermilk,* 208 S.W. 3d 696 (Tex. App. – Fort Worth, 2006, pet. denied). In the present case, the appraisal clause is very narrow. First, as previously discussed, it only applies if the repurchase option has been properly exercised. It should, of course, be noted that the Employment Agreement does not contain an arbitration agreement, only an appraisal process. That process can only determine the fair market value of the membership interest of the Plaintiff. It cannot determine whether defendants have breached their fiduciary duty, or whether they have engaged in oppressive conduct toward a minority member, or even whether the repurchase option was exercised. This case is not about the fair market value of Plaintiff's membership interest in Grupo, it is about whether the Defendants can force him to sell his interest, and whether the Defendants have breached their duties to the Company in attempting to freeze out a member. In short, compelling an appraisal would be putting the cart before the horse.

WHEREFORE PREMISES CONSIDERED Plaintiffs Stephen Kraft and Grupo Habanero, LLC pray that this Court deny Defendants Motion to Compel an Appraisal, as Defendants have offered no proof they fulfilled all conditions precedent to invoke the appraisal process. In the alternative, Plaintiffs pray that the Court deny Defendants' Motion for Protection, grant Plaintiffs' motion for expedited discovery, and continue Defendants' Motion to Compel an Appraisal until discovery has been completed on the issue of notice, at which time the Court will conduct an evidentiary hearing and for such further relief as the Plaintiffs may show themselves justly entitled.

5

Respectfully submitted,

**ESPEY & ASSOCIATES, PC**
13750 San Pedro Avenue, Suite 730
San Antonio, Texas 78232-4375
Telephone:    (210) 404-0333
Telecopier:   (210) 404-0336

By: _____
RICHARD W. ESPEY
State Bar No. 06667580
respey@lawespey.com
MATTHEW SOLIDAY
State Bar No. 24079367
msoliday@lawespey.com

ATTORNEYS FOR PLAINTIFFS, STEPHEN KRAFT,
INDIVIDUALLY AND AS A MEMBER ON BEHALF OF GRUPO
HABANERO, LLC

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served in compliance with Rules 21 and 21a of the Texas Rules of Civil Procedure on January 14, 2015, on the following counsel of record:

Roderick J. 'Rod' Regan
Branscomb | PC
711 Navarro, Suite 500
San Antonio TX 78401-0036
210.598.5405 Facsimile
*Attorneys for Defendants*

_____
RICHARD W. ESPEY
MATTHEW B. SOLIDAY

6

**GRUPO HABANERO, LLC**

**COMPANY AGREEMENT**

{C0705182.DOC:2}



EXHIBIT

A

# TABLE OF CONTENTS

ARTICLE I MEMBERS; PURPOSE AND AUTHORITY ............................................................ 1
    1.1    Members. ................................................................................................................... 1
    1.2    Purpose and Authority. ............................................................................................ 1

ARTICLE II CAPITAL CONTRIBUTIONS ............................................................................. 1
    2.1    Contributions. .......................................................................................................... 1
    2.2    Return of Contributions. .......................................................................................... 1

ARTICLE III ALLOCATIONS AND DISTRIBUTIONS ........................................................ 1
    3.1    Allocations. .............................................................................................................. 1
    3.2    Distributions. ........................................................................................................... 1

ARTICLE IV MANAGEMENT ................................................................................................ 1
    4.1    Number of Managers; Management by Managers. ................................................... 1
    4.2    Election; Resignation. .............................................................................................. 2
    4.3    Vacancy. .................................................................................................................. 2
    4.4    Change of Number. ................................................................................................. 2
    4.5    Removal. .................................................................................................................. 2
    4.6    Meetings. ................................................................................................................. 3
    4.7    Quorum. ................................................................................................................... 3
    4.8    Majority Vote. .......................................................................................................... 3
    4.9    Committees. ............................................................................................................. 3
    4.10   Written Consent. ...................................................................................................... 3

ARTICLE V MEETINGS OF MEMBERS ............................................................................... 3
    5.1    Meetings. ................................................................................................................. 3
    5.2    Location of Meetings. .............................................................................................. 3
    5.3    Action by Telephone Conference. ........................................................................... 3
    5.4    Notice. ..................................................................................................................... 4
    5.5    Waiver of Notice. .................................................................................................... 4
    5.6    Quorum. ................................................................................................................... 4
    5.7    Majority Vote. .......................................................................................................... 4
    5.8    Voting Rights. .......................................................................................................... 4
    5.9    Written Consent. ...................................................................................................... 4

ARTICLE VI OFFICERS ......................................................................................................... 4
    6.1    Officers. ................................................................................................................... 4
    6.2    Terms. ...................................................................................................................... 5

ARTICLE VII RESTRICTIONS ON DISPOSITIONS OF UNITS; WITHDRAWAL ............. 5
    7.1    Restrictions on the Disposition of Units. ................................................................. 5
    7.2    Admission as a Member. .......................................................................................... 5
    7.3    Expenses. ................................................................................................................. 5
    7.4    Withdrawal. .............................................................................................................. 5

ARTICLE VIII WINDING UP..................................................................................................... 5

   8.1    Winding Up.................................................................................................................. 5

   8.2    Liquidation and Termination. .................................................................................... 6

   8.3    Deficit Capital Accounts............................................................................................ 6

   8.4    Certificate of Termination. ........................................................................................ 6

ARTICLE IX TAXES .................................................................................................................... 7

   9.1    Tax Returns................................................................................................................. 7

   9.2    Tax Elections. ............................................................................................................. 7

ARTICLE X GENERAL PROVISIONS ....................................................................................... 7

   10.1   Other Opportunities. .................................................................................................. 7

   10.2   Unit Certificates. ........................................................................................................ 7

   10.3   Entire Agreement; Amendments. ............................................................................... 7

   10.4   Binding Effect............................................................................................................. 7

   10.5   Governing Law; Severability. .................................................................................... 7

   10.6   Further Assurances. .................................................................................................... 8

   10.7   Indemnification........................................................................................................... 8

   10.8   Counterparts................................................................................................................ 8

ARTICLE XI DEFINITIONS ........................................................................................................ 8

   11.1   Definitions. ................................................................................................................. 8

   11.2   Construction............................................................................................................... 8

   **11.3   Branscomb | PC.**...................................................................................................... 8

# GRUPO HABANERO, LLC

## COMPANY AGREEMENT

The members of Grupo Habanero, LLC (the "company") have adopted this agreement as the company agreement of the company.

## ARTICLE I
## MEMBERS; PURPOSE AND AUTHORITY

1.1    Members. The members of the company are Robert G. Hart, III, Gary Hodge, Cliff Graham and Stephen Kraft.

1.2    Purpose and Authority. The purpose of the company is to own and operate two Habaneros restaurants in San Antonio, Texas. However, in furtherance of that purpose, the company is authorized to engage in any business or investment in which a limited liability company may legally engage.

## ARTICLE II
## CAPITAL CONTRIBUTIONS

2.1    Contributions. Each member will be required to contribute to the company only such money or property as such member agrees to contribute.

2.2    Return of Contributions. The company will not be required to return a capital contribution to a member, except to the extent the law or this agreement requires the company to do so.

## ARTICLE III
## ALLOCATIONS AND DISTRIBUTIONS

3.1    Allocations. The company will maintain capital accounts for the members.

(a)    All items of income, gain, loss, deduction, and credit of the company will be allocated among the members in accordance with their relative holdings of Units.

(b)    If Units are transferred during a calendar year, the managers will have the discretion to determine how profits or losses will be allocated between the transferor and transferee.

3.2    Distributions. From time to time, the managers may cause the company to distribute cash or other property to the members. Distributions will be made pro rata, in accordance with the members' relative holdings of Units.

## ARTICLE IV
## MANAGEMENT

4.1    Number of Managers; Management by Managers.

(a)     The company will have two (2) managers. Except as provided in Sections 4.1(b) and (c), the managers will have the power and authority to cause the company to take any action the managers deem necessary or appropriate, without the consent of any member. The officers of the company will be responsible for the day-to-day operations of the company.

(b)     The company will have a managing owner who will be appointed by the holders of two-thirds of the Units held by all members. Notwithstanding anything else in this agreement, the managing owner will have the right to veto any action taken at any meeting of the members and/or managers, or of any committee designated by the managers, or action taken by written consent by the members and/or managers of the company. Robert G. Hart, III is hereby appointed as the managing owner.

(c)     Subject to Section 4.1(b), but notwithstanding any other provision of this agreement, the affirmative vote of the holders of a majority of the Units is required to take the following actions:

(i)     issue any additional Membership Interests after Membership Interests are issued to the initial members of the company;

(ii)     approve any merger, interest exchange, conversion, or sale of all or substantially all of the company's assets;

(iii)     voluntarily cause the winding up of the company;

(iv)     take or authorize any act that would make it impossible to carry on the ordinary business of the company; or

(v)     cause the company to incur any indebtedness for borrowed money.

4.2     Election; Resignation. The managers will be elected by a majority of the votes cast by the members in a position-by-position vote. Each manager elected will serve until his successor is elected. A manager may resign at any time.

4.3     Vacancy. Any vacancy in a manager's position will be filled by a vote of a majority of the votes cast by the members. A manager elected to fill a vacancy will serve until his successor is elected.

4.4     Change of Number. The number of managers may be changed at any time by the members, but a decrease in number will not have the effect of shortening the term of any incumbent manager. The members will be responsible for electing a manager to fill any manager position created by an increase in the number of managers.

4.5     Removal. The members may remove a manager with or without cause at any time. A manager may only be removed by vote of a majority of the votes cast by the members.

4.6    Meetings.  The managers will not be required to hold annual meetings.  The president or any manager may call special meetings of the managers.  The person calling the meeting may fix any place for holding the meeting.  The person calling the meeting will give notice of the meeting to each manager at least three days before the date of the meeting, in writing.  The purpose of the meeting is not required to be specified in the notice of the meeting except as may be otherwise required by law, the Certificate of Formation or this agreement.  The managers may vote on any matter on which a manager requests that a vote be taken.

4.7    Quorum.  A majority of the managers must be present to constitute a quorum for action, except as otherwise required by law, the Certificate of Formation, or this agreement.  If a quorum is not present at a meeting, the managers who are present may adjourn the meeting.  The president will give all managers notice of the reconvening of any adjourned meeting in the manner provided herein for the calling of a meeting of the managers.

4.8    Majority Vote.  If a quorum is present at any meeting, the vote of a majority of the managers present will decide any matter brought before such meeting, unless the question is one upon which a different vote is required by law, by the Certificate of Formation, or by this agreement.

4.9 Committees.   The managers may designate committees to act on the managers' behalf.   Each committee will have such powers as the managers may specify, subject to any restrictions imposed by the TBOC.  The managers will have the power at any time to change the number and members of any committee, and to fill vacancies and discharge any committee or any particular member. The requirements of this Article which govern the managers will also apply to committees and their members.

4.10    Written Consent.  Any action required or permitted to be taken at a meeting of the managers or any committee may be taken without a meeting if a consent in writing, setting forth the action so taken, is signed by at least the minimum number of managers or committee members necessary to take action at a meeting at which all managers or committee members were present and voted.

ARTICLE V
MEETINGS OF MEMBERS

5.1    Meetings.  The members will not be required to hold annual meetings.  The president of the company may call special meetings of the members.  The president will call a special meeting if members owning one-fourth of all the Units or a majority of the managers request a special meeting in writing, stating the purposes of the proposed meeting.  Business transacted at a special meeting will be limited to the purposes stated in the notice of the meeting.

5.2    Location of Meetings.  Unless a particular notice states otherwise, the members will hold their meetings at the company's principal office.

5.3    Action by Telephone Conference.  Members may participate in and hold a meeting by means of a conference telephone or similar communications equipment or other suitable electronic communications equipment, including video conferencing technology, or the internet, or a combination thereof, by means of which all Members participating in the meeting

can hear each other and participate in the meeting. Participation in such meeting will constitute attendance and presence in person at such meeting, except where a Member participates in the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

5.4     Notice. The president will give each member written notice of each meeting. The notice will state the place, day and hour of each meeting and will state the purposes for which the meeting is called. The president will cause the notice to be delivered to the members not less than 10 nor more than 60 days before the date of the meeting, either personally or by mail, at their addresses on the company's books. Notice by mail will be deemed to be given three days after it is deposited in the United States mail, postage paid.

5.5     Waiver of Notice. If a member signs a written waiver of notice (regardless of when the waiver is signed), the member will be deemed to have received proper notice. If a member attends or participates at a meeting, the member will be deemed to have waived notice of the meeting, unless the member attends or participates for the express purpose of objecting to the transaction of a business on the grounds that the meeting is not lawfully called or convened.

5.6     Quorum. The holders of a majority of the Units must be present in person or represented by proxy to constitute a quorum for action, except as otherwise required by law, by the Certificate of Formation, or by this agreement. Once a Unit is represented for any purpose at a meeting, it is deemed present for quorum purposes for the remainder of the meeting until the meeting is adjourned. If, however, a quorum does not exist, the members who are present in person or represented by proxy will have the power to adjourn the meeting. The president will give all members notice of the reconvening of any adjourned meeting, in the manner required for the calling of a special meeting.

5.7     Majority Vote. If a quorum is present at a meeting, the vote of the holders of a majority of the Units present in person or represented by proxy will decide any matter brought before the meeting, unless the question is one upon which a different vote is required by law, by the Certificate of Formation, or by this agreement.

5.8     Voting Rights. Each Unit will be entitled to one vote on each matter submitted to a vote. A member may vote either in person or by written proxy executed by the member or the member's duly authorized attorney.

5.9     Written Consent. Any action required or permitted to be taken at a meeting of the members may be taken without a meeting, without prior notice, and without a vote, if one or more consents in writing, setting forth the action so taken, will be signed by members having not fewer than the minimum number of votes that would be necessary to take the action at a meeting at which all members were present and voted.

ARTICLE VI
OFFICERS

6.1     Officers. The managers will appoint a president and a secretary of the company, and may also appoint other officers. The officers will be responsible for the day-to-day operation of the company. Each officer will have the powers and responsibilities normally

associated with the office, and such other powers and responsibilities as the managers may designate. An officer is not required to be a member or a manager. A person may hold more than one office. Cliff Graham is hereby appointed to serve as the initial President. Robert G. Hart, III is hereby appointed to serve as the initial Secretary.

6.2     Terms. Each officer will hold office until the managers appoint a successor for that officer. The managers will fill any vacancy in any office. The managers may remove any officer at any time, with or without cause. If the managers remove an officer, the removal will not affect any contract rights the officer has. The appointment of a person as an officer will not of itself create contract rights.

ARTICLE VII
RESTRICTIONS ON DISPOSITIONS OF UNITS; WITHDRAWAL

7.1     Restrictions on the Disposition of Units. Except as provided in (i) that certain Employment Agreement between the company and Stephen Kraft (the "Kraft Employment Agreement") and (ii) the Agreement Restricting Transfer of Membership Interests dated the same date as this agreement among Robert G. Hart, III, Gary Hodge and Cliff Graham (the "Transfer Restriction Agreement"), no member will make any Disposition of any Units without the written consent of members holding a majority of the Units. Any attempted Disposition of Units that is not in accordance with this agreement, the Kraft Employment Agreement or the Transfer Restriction Agreement will be null and void.

7.2     Admission as a Member. A person to whom Units are transferred in accordance with this agreement, the Kraft Employment Agreement or the Transfer Restriction Agreement will be admitted to the company as a member, effective as of the date the company receives the transferee's written agreement to be bound by this agreement as a member. Until a transferee of Units becomes a member, the transferee will not have the right to vote as a member, nor will the transferee have any of the other rights of a member, except as required by the TBOC.

7.3     Expenses. The member effecting a Disposition and any person admitted to the company in connection with the Disposition will pay, or reimburse the company for, all costs incurred by the company in connection with the Disposition or admission, on or before the tenth day after the receipt by that person of the company's invoice for the amount due.

7.4     Withdrawal. Except as provided in this agreement, the Kraft Employment Agreement or the Transfer Restriction Agreement, a member does not have the right or power to withdraw from the company as a member. A member may withdraw from the company by delivering a letter to the company, signed by the member, notifying the company that the member is withdrawing from the company and assigning the member's entire Membership Interest to the company. A member will not receive any consideration for such an assignment.

ARTICLE VIII
WINDING UP

8.1     Winding Up. The company will be wound up only upon the first to occur of the following:

153

(a)     the written consent of members holding a majority of the Units held by all members; or

(b)     any other event that, under the TBOC, requires that the company be wound up.

8.2     Liquidation and Termination.  If the company is wound up, the managers will appoint a liquidator.  The liquidator will proceed diligently to wind up the affairs of the company.  Until the company's affairs are wound up, the liquidator will manage the company with all of the power and authority of the managers.  The steps to be accomplished by the liquidator are as follows:

(a)     the liquidator will cause any notice required by the TBOC to be mailed to each known creditor of and claimant against the company in the manner described in the TBOC;

(b)     the liquidator will cause the company to pay or perform all of its obligations (including all expenses incurred in liquidation), or establish reserves for the payment and performance of those obligations; and

(c)     all remaining assets of the company will be distributed to the members as follows:

(i)     the liquidator may sell company property, including to members, and any resulting gain or loss will be allocated to the members' capital accounts;

(ii)     the liquidator will determine the fair market value of all company property that has not been sold, net of any liabilities to which that property is subject, and the members' capital accounts will be adjusted as if there were a disposition of that property for its fair market value on the date of distribution; and

(iii)     all remaining company property will be distributed among the members in accordance with their positive capital account balances, as determined after taking into account all capital account adjustments for the year in which the liquidation occurs (other than those made by reason of this clause (iii)).

8.3     Deficit Capital Accounts.  Notwithstanding anything to the contrary in this agreement, and notwithstanding any custom or rule of law to the contrary, no member will ever be obligated to restore any deficit in the member's capital account.

8.4     Certificate of Termination.  Once the company's assets have been applied and distributed as required by law and this agreement, the managers will file a Certificate of Termination with the Texas Secretary of State, and take such other actions as may be necessary to terminate the company.

## ARTICLE IX
## TAXES

9.1 <u>Tax Returns</u>. The managers will cause all company tax returns to be prepared and filed with the proper authorities. Each member will furnish to the company all information it has that is necessary to enable the company's income tax returns to be prepared and filed.

9.2 <u>Tax Elections</u>. Neither the company nor any member may make an election for the company to be excluded from the application of the provisions of subchapter K of chapter 1 of subtitle A of the IRC.

## ARTICLE X
## GENERAL PROVISIONS

10.1 <u>Other Opportunities</u>. Without the written consent of members holding a majority of the Units held by all members, a member or manager will not engage in any other business or investment that is similar to or competitive in nature with the business of the company, without offering any interest or participation in the business or investment to the company and the other members.

10.2 <u>Unit Certificates</u>. The Units may be represented by certificates, if the members so elect. The president will sign any certificates that are issued.

10.3 <u>Entire Agreement; Amendments</u>. This agreement, the Kraft Employment Agreement and the Transfer Restriction Agreement constitute the members' entire agreement relating to the company, and supersede all prior agreements with respect to the company, whether oral or written. Notwithstanding any other provision of this agreement, the affirmative vote of the holders of all of the Units is required to amend the Certificate of Formation or this agreement.

10.4 <u>Binding Effect</u>. Subject to the restrictions in this agreement, the Kraft Employment Agreement and the Transfer Restriction Agreement on Dispositions of Units, this agreement is binding on and inures to the benefit of the members and their respective heirs, legal representatives, successors, and assigns.

10.5 <u>Governing Law; Severability</u>. THIS AGREEMENT IS GOVERNED BY AND WILL BE CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS, EXCLUDING ANY CONFLICT-OF-LAWS RULE OR PRINCIPLE THAT MIGHT REFER THE GOVERNANCE OR THE CONSTRUCTION OF THIS AGREEMENT TO THE LAW OF ANOTHER JURISDICTION. In the event of a direct conflict between the provisions of this agreement and (a) any provision of the Certificate of Formation, or (b) any mandatory provision of the TBOC, the applicable provision of the Certificate of Formation or the TBOC will control. If any provision of this agreement or the application of this agreement to any person or circumstance is held invalid or unenforceable to any extent, the remainder of this agreement and the application of that provision to other persons or circumstances will not be affected, and that provision will be enforced to the greatest extent permitted by law.

10.6   Further Assurances.   Each member will execute and deliver any additional documents and instruments and perform any additional acts that may be necessary or appropriate to effectuate and perform the provisions of this agreement and the transactions contemplated by this agreement.

10.7   Indemnification.   To the fullest extent permitted by law, each member will indemnify the company, each manager and each other member and hold them harmless from and against all losses, costs, liabilities, damages, and expenses (including, without limitation, costs of suit and attorney's fees) they may incur on account of any breach by that member of this agreement.

10.8   Counterparts.   This agreement may be executed in any number of counterparts, with the same effect as if all signing parties had signed the same document.  All counterparts will be construed together and constitute the same instrument.

ARTICLE XI
DEFINITIONS

11.1   Definitions.   As used in this agreement, the following terms have the following meanings:

"Dispose" or "Disposition" means a sale, assignment, transfer, exchange, mortgage, pledge, grant of a security interest, or other disposition or encumbrance (including, without limitation, by operation of law).

"IRC" means the Internal Revenue Code of 1986 and any successor statute, as amended from time to time.

"Membership Interest" means the interest of a member in the company, including all rights and obligations pertaining to the Membership Interest.

"TBOC" means the Texas Business Organizations Code and any successor statute, as amended from time to time.

"Units" means units of Membership Interest in the company.  The initial members will initially have the number of Units set out on the signature page of this agreement.

Terms not otherwise defined in this agreement that are defined in the TBOC have the meanings given them in the TBOC.

11.2   Construction.  Whenever the context requires, the gender of all words used in this agreement includes the masculine, feminine, and neuter.   All references to Articles and Sections refer to articles and sections of this agreement.

11.3   **Branscomb | PC. Each person executing this agreement other than Robert G. Hart, III and Gary Hodge acknowledges that Branscomb|PC and its lawyers are representing only Robert G. Hart, III and Gary Hodge in this transaction.  Each such person acknowledges that he has been encouraged to engage separate legal counsel to help**

him review this agreement, and the provisions of this Section, and that he has had ample opportunity to do so.

*[Signature Page Immediately Follows]*

Signed on _____, 2012, to be effective as of the date the Certificate of Formation of the company is filed by the Secretary of State.

_____
Robert G. Hart, III
Units: 400


_____
Gary Hodge
Units: 400


_____
Cliff Graham
Units: 100


_____
Stephen Kraft
Units: 100

# EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT ("Agreement") is made effective as of "Effective Date," as defined below, by and between **Grupo Habanero, LLC**, a Texas limited liability company ("Company") and **Stephen Kraft**, an individual residing in San Antonio, Texas ("Employee").

## ARTICLE I
## EMPLOYMENT AND DUTIES

     1.1    **Employment; Effective Date**. Company agrees to employ Employee and Employee agrees to be employed by Company, beginning as of September 19, 2012 (the "Effective Date") and continuing for the period of time set forth in Article II below, subject to the terms and conditions of this Agreement.

     1.2    **Position**. From and after the Effective Date, Employee shall serve as the Managing Director. The Managing Director shall devote full time and best efforts to the overall supervision of the restaurants owned by the Company and shall report directly to the Managers of the Company. The Managing Director shall live in the "vicinity" of Bexar County, Texas, as determined by the Company with reasonable discretion.

     1.3    **Duties**. Employee agrees to serve in the position referred to in Section 1.2 above and shall perform such duties as may from time to time be assigned by the Managers.

## ARTICLE II
## TERM AND TERMINATION OF EMPLOYMENT

     2.1    **Term**. This Agreement shall terminate on the first anniversary of the Effective Date ("the Term"), unless sooner terminated in accordance with the terms in this Article II.

     2.2    **Company's Right to Terminate**. Notwithstanding the provisions of Section 2.1 above, Company shall have the right to terminate Employee's employment under this Agreement at any time for any of the following reasons:

     (a)    by virtue of his physical or mental disability, Employee is unable to perform substantially and continuously the essential functions of his duties, with or without reasonable accommodations, for a period of 90 consecutive days or for a period of 120 non-consecutive days during any 12 month period; or

     (b)    at any time for any reason whatsoever or for no reason at all, in the sole discretion of Company; or

     (c)    for cause, which for purposes of this Agreement shall mean Employee (i) has been indicted for, or convicted of, or pleaded no contest to, a misdemeanor involving moral turpitude or a felony, (ii) has willfully refused without proper legal reason to perform Employee's duties, (iii) has materially breached any material provision of this Agreement, (iv) has engaged in any act of serious dishonesty which adversely affects, or reasonably could in the



EXHIBIT

B

future adversely affect, the value, reliability or performance of Employee in a material manner, or (v) breach of fiduciary duty by Employee.

(d) **Notice of Termination**. If Company desires to terminate Employee's employment at any time for any reason or for no reason at all prior to the expiration of the Term, it shall do so by giving written notice to Employee that it has elected to terminate Employee's employment and stating the effective date of the termination. Further, Company's termination of Employee's employment shall not alter or amend the provisions of Articles IV and V below.

2.3 **By Company**. If Employee's employment is terminated by Company prior to the expiration of the Term as provided in Section 2.1 above, then, upon the effective date of such termination, regardless of the reason therefore, Company's obligations under this Agreement shall immediately cease. If Employee is terminated pursuant to Sections 2.2(a) or (b) above, Company will offer to Employee and Employee will be entitled to receive severance benefits equal to $5,000.00 per month for the remainder of the Term payable on the Company's regular payment dates for employees but no less frequently than monthly, less applicable statutory deductions and withholdings (the "Severance Benefits").

# ARTICLE III
# COMPENSATION AND BENEFITS

3.1 **Base Salary**. Company promises to provide, and Employee agrees to accept, an annual Base Salary of Sixty Thousand Dollars ($60,000) ("Base Salary"), less applicable statutory deductions and withholdings, payable in accordance with Company's regular payroll procedures as presently in effect and amended from time to time. Company, by action of its Managers, may review Employee's Base Salary from time to time to determine if it should be increased.

3.2 **Bonuses**. During the Term, Company will pay Employee a quarterly bonus equal to 15% of the amount by which "Total Controllable Income" as defined hereafter exceeds "Base TCI" as defined hereafter. "Total Controllable Income" shall mean the gross revenue from all restaurants operated by the Company or its subsidiaries less those direct operating expenses identified in Exhibit A attached hereto. As an example, in 2011, the two Habaneros restaurants had a combined Total Controllable Income of $210,869 (the "Base TCI").

3.3 **Other Perquisites**. During his employment, Company will provide Employee and his family with: (i) health benefits substantially the same as those provided to Employee in 2011 by the prior owner of the restaurants; (ii) a $300 monthly car allowance; and (iii) a $200 monthly phone allowance. Employee and, to the extent applicable, Employee's spouse, dependents and beneficiaries, shall be allowed to participate, if eligible, in all other benefit plans and programs of Company, including improvements or modifications of the same, which are now, or may hereafter be, available to similarly situated employees and their spouses, dependents, and beneficiaries.

3.4 **Membership Interest Grants.**

(a) Upon execution of this Agreement and the Company Agreement of the Company, Employee shall be issued 100 units of membership interest (the "Membership Interest"), which is

equal to ten percent (10%) of all issued and outstanding units of membership interest of the Company on a fully diluted basis with an agreed value of $35,000 (the "Initial Membership Interest Price").

(b)     Company hereby makes the following representations and warranties to Employee intending Employee to rely upon them in connection with entering this Agreement:

(i)     Organization, Good Standing and Qualification. The Company is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Texas. The Company has all requisite limited liability company power and authority to own and operate its properties and assets, to execute and deliver this Agreement, to issue and sell the Membership Interest and to carry out the provisions of this Agreement.

(ii)     Capitalization; Voting Rights. As of the Effective Date and including the Membership Interest issued as set forth in this Agreement, the Company will have 1,000 issued and outstanding units of membership interest. As of the date hereof, there are no outstanding options, warrants, or other rights for the purchase or acquisition from the Company of units of membership interest. The rights, preferences, privileges and restrictions of the Membership Interest are as set forth in the Company Agreement of the Company and in this Agreement. When issued in compliance with the provisions of this Agreement, the Membership Interest will be validly issued, fully paid and non-assessable, and will be free of any liens or encumbrances, other than the Company's right to repurchase the Membership Interest and the general restriction on transfer all as provided in Section 3.4(d).

(iii)     Limited Liability Company Documents. Complete and accurate copies of the Company's Certificate of Formation and Company Agreement are attached hereto as Exhibit B. The Company is not currently contemplating any amendment to such documents.

(iv)     Authorization; Binding Obligations. All limited liability company action on the part of the Company, its officers, managers and members necessary for the authorization of this Agreement, the performance of all obligations of the Company hereunder as of the Effective Date and the authorization, sale, issuance and delivery of the Membership Interest pursuant hereto has been taken or will be taken prior to the Effective Date. This Agreement, when executed and delivered, will be valid and binding obligation of the Company enforceable in accordance with its terms, except (a) as limited by applicable bankruptcy, insolvency, reorganization, moratorium or other laws of general application affecting enforcement of creditors' rights, and (b) general principles of equity that restrict the availability of equitable remedies.

(v)     Members. Exhibit C contains a complete list of all of the Company's members, the units of membership interest they own and their addresses.

(vi)    Compliance with Laws.  To its knowledge, the Company is not in violation of any applicable statute, rule, regulation, order or restriction of any domestic or foreign government or any instrumentality or agency thereof in respect of the conduct of its business or the ownership of its properties, which violation would materially and adversely affect the business, assets, liabilities, financial condition, operations or prospects of the Company.

(c)    Right of First Offer for Equity Securities.

(i)    Notwithstanding subsection (ii) below, until the first anniversary of this Agreement, the Company shall not issue any "Equity Securities" as defined below.

(ii)    Employee shall have a right of first offer to purchase his Pro Rata Portion (as defined below) of all Equity Securities that the Company may, from time to time, propose to sell and issue after the date of this Agreement.

(iii)    Employee's "Pro Rata Portion" is equal to the ratio of (x) the number of units of membership interest of the Company which the Employee holds immediately prior to the issuance of such Equity Securities to (y) the total number of units of the Company's outstanding membership interests, immediately prior to the issuance of the Equity Securities. The term "Equity Securities" shall mean (1) any membership interest of the Company, (2) any security convertible, with or without consideration, into any membership interest (including any option to purchase such a convertible security), (3) any security carrying any warrant or right to subscribe to or purchase any membership interest or (4) any such warrant or right.

(iv)    In the event the Company proposes to undertake an issuance of Equity Securities, the Company shall deliver written notice ("Notice") to the Employee via reputable overnight delivery service of (1) its bona fide intention to undertake an issuance of Equity Securities, (2) a description of the designations, preferences, privileges and rights of the Equity Securities to be offered and of each and every right, agreement and instrument to be attached to, delivered with or made appurtenant to such securities ("Appurtenant Rights"), (3) the aggregate number of Equity Securities to be offered to the offerees thereunder (the "Offerees"), (4) the identity of the Offerees and (5) the price and terms and conditions upon which the Company proposes to offer the Equity Securities to the Offerees.

(v)    Within thirty (30) days of receiving the Notice, Employee shall notify the Company in writing if he desires to exercise, in full or in part, his rights set forth in this Paragraph (c). If Employee exercises his rights, Employee may purchase the offered Equity Securities which such Employee elects to purchase by paying the same consideration, as paid by the Offerees, and under the same terms and conditions applicable to the Offerees.

(vi)    If Employee purchases Equity Securities under this Paragraph (c) hereof, he shall also receive all Appurtenant Rights provided or granted to investors as part of the offering of Equity Securities, and shall, as a condition to receiving the Equity Securities and the Appurtenant Rights, execute and become obligated under any agreements and other instruments required to be executed by all investors in connection with such offering.

(d)    If the Employee's employment is terminated for any reason by either party on or before the first anniversary of the Effective Date, the Company may, at its option, repurchase the Membership Interest; the Company must exercise such option in writing and close such repurchase within thirty (30) days of the termination of employment. If the Company terminates Employee's employment prior to the first anniversary of the Effective Date, the Employee has the option to put the Membership Interest to the Company; the Employee must exercise such put in writing and close such repurchase within thirty (30) days of the termination of employment. In either case the aggregate purchase price for the Membership Interest will be the Initial Membership Interest Price plus or minus an amount equal to the percentage increase or decrease over Base TCI multiplied by the Initial Membership Interest Price. For example, if Base TCI is $227,000 and Total Controllable Income is increased to $327,000 then the percentage increase would be (327,000 - 227,000)/227,000 or 44.05% multiplied by the Initial Membership Interest Price of $35,000 for an increase of $15,418.50. Therefore, the purchase price for the Membership Interest would be $35,000 plus $15,418.50 equals $40,418.50. Conversely, if Base TCI is $227,000 and Total Controllable Income is reduced to $127,000 then the percentage decrease would be (127,000 - 227,000)/227,000 or -44.05% multiplied by the Initial Membership Interest Price of $35,000 for a decrease of $15,417.50. Therefore, the purchase price for the Membership Interest would be $35,000 minus $15,418.50 equals $19,581.50. In the event that the purchase of Membership Interest contemplated by this Section 3.4 occurs before the full year of Total Controllable Income has elapsed from the Effective Date, then the available data shall be annualized for purposes of the calculation of the purchase price for the Membership Interest. The Membership Interest shall not be transferred by Employee except with the express written consent of the Company. Any transfer of legal or beneficial ownership shall be void ab initio.

(e)    If the Employee's employment is terminated for any reason by either party after the first anniversary of the Effective Date, the Company may, at its option, repurchase the Membership Interest; the Company must exercise such option in writing and close such repurchase within thirty (30) days of the termination of employment. The aggregate purchase price for the Membership Interest upon exercise of the option in this Section 3.4(e) shall be the "Fair Market Value" of the Membership Interest. The "Fair Market Value" of the Membership Interest shall be the price agreed to by the parties; if the parties cannot within thirty (30) days of the exercise of the option agree upon a Fair Market Value, the Fair Market Value shall be determined by a single appraiser chosen by the parties. If the parties cannot agree upon an appraiser, the parties shall apply to the American Arbitration Association (the "AAA") to appoint a single appraiser. The appraiser shall provide a written appraisal and shall determine the Fair Market Value of the Membership Interest without deduction for its minority position and restrictions on transfer. The determination of the appraiser shall be final and binding upon the parties and the closing of the sale shall be completed within thirty (30) days of receiving the appraiser's determination. The parties shall supply the appraiser with any requested information about the Company and shall split the cost of the appraiser and any AAA fees.

(f)     All certificates evidencing units of membership interest now owned or that may be acquired by the Employee will note conspicuously on the back as follows:

"REFERENCE IS HEREBY MADE TO AN AGREEMENT DATED EFFECTIVE AS OF SEPTEMBER 19, 2012, ON FILE AT THE PRINCIPAL PLACE OF BUSINESS OF THE COMPANY AND AT ITS REGISTERED OFFICE IF THE TWO ARE NOT THE SAME, WHICH AGREEMENT RESTRICTS THE TRANSFER OR PLEDGE OF THE UNITS OF MEMBERSHIP INTEREST REPRESENTED BY THIS CERTIFICATE AND CONTAINS CERTAIN OTHER AGREEMENTS CONTEMPLATED TO BE BINDING ON THE OWNER OF MEMBERSHIP INTERESTS IN THE COMPANY. THE COMPANY WILL FURNISH A COPY OF THE AGREEMENT TO THE RECORD HOLDER OF THIS CERTIFICATE WITHOUT CHARGE, UPON WRITTEN REQUEST TO THE COMPANY AT ITS PRINCIPAL PLACE OF BUSINESS OR REGISTERED OFFICE."

## ARTICLE IV
## PROTECTION OF INFORMATION

**Confidential Information.** Employee acknowledges that during his employment with Company, Company will provide him with and/or give him access to Confidential Information (defined below) of Company. Confidential Information means all information and compilations of information of any kind, type or nature (tangible and intangible, written or oral, and including information contained, stored, or transmitted through any electronic medium), which relates to Company including, without limitation, products; services; plans, including, without limitation, business and marketing plans; procedures; formulae; processes; pricing; customers. Confidential Information does not, however, include any information that is available to the public other than as a result of any act, directly or indirectly, of Employee. Employee agrees that all Confidential Information is and shall remain the sole property of Company.

## ARTICLE V
## NON-COMPETITION AND NON-SOLICITATION OBLIGATIONS

5.1     **Non-Competition and Non-Solicitation Obligations.** In exchange for the consideration delivered in connection with that certain Asset Purchase Agreement between Coastal King, Ltd., Texas Burrito Co., LLC and Habaneros Mexican Grill, LP (the "APA") and as a material inducement for Coastal King, Ltd. to enter into the APA, and in order to protect the Confidential Information that the Company will provide in accordance with Article IV above, Employee expressly covenants and agrees that, for any reason, directly or indirectly, for himself or on behalf of or in conjunction with any other person, entity or business of whatever nature for any period during which Employee is an officer, employee, consultant or manager of the Company and for an additional 30 months from and after the date of termination of any such relationship (the "Prohibited Period") he shall not:

Engage, within the Bexar County, Texas (the "Prohibited Area") as an officer, director, manager, owner, investor, lender, partner, member, joint venturer or in a managerial or advisory capacity (whether as an employee, independent contractor, consultant or advisor, or as a sales representative, dealer or distributor), or as an employee, agent, service provider or in any other non-managerial capacity, in any Mexican restaurant business (the "Restricted Business");

For Employee or on behalf of or in conjunction with any other person, solicit or attempt to solicit, recruit, or attempt to recruit any employee, consultant or agent of Company or any of its affiliates;

Request or attempt to request any business related to any Restricted Business from any corporation, association, partnership, organization, business, individual or governmental entity, who as of the date of the request or attempted request or within 36 months prior to that date, is or was a customer, or an actively sought prospective customer, or a significant vendor or supplier of the Company or any of its affiliates.

    **5.2    Separate Covenant.** The covenants in this Article are severable and separate, and the unenforceability of any specific covenant shall not affect the provisions of any other covenant.

    **5.3    Subsequent Employment.** The Employee further expressly covenants and agrees that during the Prohibited Period, he will advise the Company of the identity of any new employer of the Employee or business started by Employee within the Prohibited Area within ten days of accepting such employment or forming such business.

    **5.4    Reasonableness of Restrictions.** Employee agrees that (i) the terms of this Article V are reasonable and constitute an otherwise enforceable agreement to which the terms of this Agreement are ancillary or a part of; (ii) the consideration provided by the Company under this Agreement is not illusory; (iii) the restrictions of this Article V are necessary and reasonable for the protection of the legitimate business interests and goodwill of the Company; and (iv) the consideration of employment given to Employee by the Company under this Agreement, including without limitation, the provision by the Company or its affiliates of Confidential Information and specialized training to Employee, gives rise to the Company's interests in the covenants set forth in this Article V.

    **5.5    Severability.** Employee and the Company agree that it was both parties' intention to enter into a valid and enforceable Agreement. Employee agrees that if any covenant contained in this Article V is found by a court of competent jurisdiction to contain limitations as to time, geographic area, or scope of activity that are not reasonable and impose a greater restraint than is necessary to protect the goodwill or other business interests of the Company or its affiliates. then the court shall reform the covenant to the extent necessary to cause the limitations contained in the covenant as to time, geographic area, and scope of activity to be restrained to be reasonable and to impose a restraint that is not greater than necessary to protect the goodwill and other business interests of the Company and its affiliates.

    **5.6    Rights and Remedies Upon Breach.** Employee acknowledges that money damages would not be sufficient remedy for any breach of this Article V by the Employee. In

the event that the Company determines that Employee has breached or attempted or threatened to breach any provision of this Article V, in addition to any other remedies at law or in equity the Company may have available to it, it is agreed that the Company shall be entitled to terminate any payments then owing to Employee under this Agreement, and, shall be entitled, upon application to any court of proper jurisdiction, to a temporary restraining order or preliminary injunction against Employee prohibiting such breach or attempted or threatened breach by proving only the existence of such breach or attempted or threatened breach. Employee agrees that the period during which the covenants contained in this Article are in effect shall be computed by excluding from such computation any time during which Employee is in violation of any provision of this Article. Furthermore, Employee agrees to waive any bonding requirement in connection with any injunction or temporary restraining order sought by the Company under this section.

## ARTICLE VI
## MISCELLANEOUS

6.1 **Notices.** For purposes of this Agreement, notices and all other communications provided for herein shall be in writing and shall be deemed to have been duly given (a) when received if delivered personally or by courier, (b) on the date receipt is acknowledged if delivered by certified mail, postage prepaid, return receipt requested, or (c) one day after transmission if sent by facsimile transmission with confirmation of transmission, as follows:

If to Employee, addressed to:

1114 Birch Hill
San Antonio, TX 78232

If to Company, addressed to:

108 N. Mesquite Street
Corpus Christi, TX 78401

or to such other address as either party may furnish to the other in writing in accordance herewith, except that notices or changes of address shall be effective only upon receipt.

6.2 **Applicable Law.** This Agreement is entered into under, and shall be construed and interpreted, and the rights of the parties shall be governed by, the laws of the State of Texas with respect to any claim or dispute related to or arising under this Agreement.

6.3 **No Waiver.** No failure by either party hereto at any time to give notice of any breach by the other party of, or to require compliance with, any condition or provision of this Agreement shall be deemed a waiver of similar or dissimilar provisions or conditions at the same or at any prior or subsequent time.

6.4 **Severability and Reformation**. If a court of competent jurisdiction determines that any provision of this Agreement is invalid or unenforceable, then the invalidity or unenforceability of that provision shall not affect the validity or enforceability of any other

{C0673907.DOC:6}

provision of this Agreement and all other provisions shall remain in full force and effect. Furthermore, the parties explicitly agree that such court is authorized to reform any such invalid or unenforceable provision to be valid and fully enforceable under the law and that the parties agree that in such case, they will treat the provision as having automatically been so reformed.

6.5     **Counterparts.** This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which together will constitute one and the same Agreement.

6.6     **Headings.** The section headings have been inserted for purposes of convenience and shall not be used for interpretive purposes.

6.7     **Assignment.** This Agreement is personal to Employee and shall not be assignable by Employee. This Agreement shall inure to the benefit of and be binding upon the Company and its successors and assigns; the Company may assign and transfer its rights and obligations under this Agreement, by operation of law or otherwise, to any successor to all or substantially all of its equity ownership interests, assets or business by dissolution, merger, consolidation, transfer or assets, or otherwise as permitted under the Company's organizational documents.

6.8     **Survival.** The termination of this Agreement and Employee's employment shall not affect any right or obligation of any party which has accrued and vested prior to such termination or which by its terms survives the termination of this Agreement and Employee's employment. The provisions of Section 3.4, except Section 3.4(c), Articles IV and V shall survive termination of this Agreement.

6.9     **Entire Agreement.** This Agreement constitutes the entire agreement of the parties with regard to the subject matter hereof, and contains all the covenants, promises, representations, warranties and agreements between the parties with respect to employment of Employee by Company. Without limiting the scope of the preceding sentence, all understandings and agreements preceding the date of execution of this Agreement and relating to the subject matter hereof are hereby null and void and of no further force and effect.

6.10    **Modification; Waiver.** Any modification to or waiver of this Agreement will be effective only with the prior written consent of Company and Employee.

*[Signature page follows.]*

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the Effective Date.

COMPANY:

GRUPO HABANERO, LLC

By: _____

Name: CIiff Graham

Title: President

EMPLOYEE:

_____

Stephen Kraft

{C0673907.DOC;6}

# EXHIBIT A

## Examples of Operating Expenses

(Spreadsheet for calculation of TCI to be attached)

# EXHIBIT B

## Company Documents

{60673907.DOC;6}

# EXHIBIT C

## List of Members and Units of Membership Interest with Addresses

Robert G. Hart, III          400 Units

Gary Hodge                   400 Units

Cliff Graham                 100 Units

Stephen Kraft                100 Units

**GRUPO HABANERO, LLC**
**108 N. MESQUITE STREET**
**CORPUS CHRISTI, TEXAS 78401**

July 3, 2014

Mr. Stephen Kraft                                              (Via Hand Delivery and U.S. Mail)
1114 Birch Hill
San Antonio, TX 78232

> RE:   Employment Agreement between Grupo Habanero, LLC and Stephen Kraft effective as of September 19, 2012 (the "Employment Agreement").

Dear Mr. Kraft:

As you know, you resigned from your position with Grupo Habanero, LLC (the "Company") as of June 6, 2014. Pursuant to the provisions of Section 3.4(e) of the Employment Agreement, the Company hereby exercises its option to repurchase your 100 units of membership interest in the Company (the "Units"). As you know, the Company loses money and without the advances made by the other principals of the Company the Company would be insolvent. In exchange for $10, which the parties agree is the fair market value of the Units, Stephen Kraft hereby sells, transfers and delivers the Units to the Company free and clear of any lien, pledge, charge, security interest, encumbrance or adverse claim, and the Company hereby accepts the Units.

If you agree to the terms of this letter agreement, please execute this Employment Agreement where indicated in the space below and return a copy to me. Upon receipt of the copy of the duly executed letter agreement, I will deliver the consideration contemplated in this letter agreement to you.

Unless we have received the signed letter agreement from you within 30 days of the exercise of the option set forth in this letter agreement, we will assume that you disagree with the fair market value of the Units set forth herein and that you will invoke the mechanisms for determining the fair market value as set forth in Section 3.4(e) of the Employment Agreement. If so, we will have to split the cost of the appraiser and any AAA fees that may be incurred as a result of such procedure.

Sincerely,

GRUPO HABANERO, LLC                          AGREED AND ACCEPTED:

By: _____                _____
Name: _____                Stephen Kraft
Title: MEMBER                                _____
                                             Date

{C0948458.DOCX:1}

**EXHIBIT**
**C**

## AFFIDAVIT OF STEVE KRAFT

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF BEXAR | § |

BEFORE ME, the undersigned Notary Public, on this day personally appeared Steve Kraft who, being by me duly sworn on oath deposed as follows:

1. "I am of sound mind and capable of making this Affidavit. I am over the age of twenty-one years and have never been convicted of a felony or any crime of moral turpitude. I am competent to testify to the matters contained in this Affidavit. Unless otherwise indicated, every statement made in this Affidavit is made on my personal knowledge and is true and correct. This Affidavit is being made in support of Plaintiffs' response to Defendants Motion to Compel Arbitration and Motion for protection.

2. I am a holder of a 10% ownership interest in Grupo Habanero, LLC whose principal office is located, 108 N. Mesquite Street, Corpus Christi, TX 78401.

3. I reside at 1115 Birch Hill, San Antonio, TX 78232

4. My Employment Agreement (Attached to the response as Exhibit B) contained a scrivener's error which stated by address was 1114 Birch Hill, San Antonio, TX 78232

5. I notified Defendants of this error prior to my termination.

6. The letter attached to Plaintiffs' response as Exhibit C was not personally delivered to me.

7. The letter was apparently posted to my neighbor's door. I did not become of aware of the letter within 30 days of my termination.

8. I did not receive the letter by facsimile transmission.



EXHIBIT
D

9. I did not receive the letter by U.S. Certified Mail, return receipt requested within 30 days of my termination by Grupo Habanero, LLC.

**FURTHER AFFIANT SAYETH NAUGHT.**

_____
**STEVE KRAFT**

SUBSCRIBED AND SWORN TO BEFORE ME on this the 13th day of January, 2015.

_____
NOTARY PUBLIC, in and for the
STATE OF TEXAS

CAROL M. CHELKOWSKI
MY COMMISSION EXPIRES
August 26, 2015

R:\13598.0001\pleadings\petitions-answers\Kraft Affidavit.doc

2



2014CI18038 -D225

## Cause No. 2014-CI-18038

| | | |
|---|---|---|
| STEPHEN KRAFT INDIVIDUALLY AND AS MEMBER ON BEHALF OF GRUPO HABANERO, LLC, Plaintiff | § § § § § | IN THE DISTRICT COURT |
| | § | 225TH JUDICIAL DISTRICT |
| vs. | § § | |
| GARY HODGE AND ROBERT HART III Defendants | § § | BEXAR COUNTY, TEXAS |

### ORDER REGARDING MOTION TO COMPEL ARBITRATION

On this day came on to be heard Defendants' DEFENDANTS, GARY HODGE AND ROBERT HART III'S MOTION TO COMPEL APPRAISAL AND ABATE LAWSUIT, the supporting affidavits of Gary Hodge, Haley Bennet, and Kenneth Roark, filed of record in this case, and the testimony of Gary Hodge in support of the Motion. *Further the Court Considered the response filed by Plaintiff and Plaintiff's affidavit* ~~Plaintiff did not file a written response, but he appeared in person and testified before the Court.~~ A record was made of the hearing.

The Court is of the opinion, and it is THEREFORE ORDERED, that Defendants' MOTION TO COMPEL APPRAISAL AND ABATE LAWSUIT is ___ GRANTED ___ DENIED.

Dated this _14_ day of _JANUARY_, 2015.

_____
JUDGE PRESIDING

Approved as to form only:

_____
Roderick J. Regan, TBN 16733040, 210-598-5400, fax 210-598-5406, email RRegan@BranscombPC.com

_____
Richard W. Espey, TBN 06667580, 2104040333, fax 2104040336, email respey@lawespey.com

{C0808503.DOCX:1}                    8

176

| Vernon's Texas Rules Annotated |
| --- |
|   Texas Rules of Civil Procedure |
|     Part II. Rules of Practice in District and County Courts |
|       Section 1. General Rules (Refs & Annos) |

TX Rules of Civil Procedure, Rule 21

Rule 21. Filing and Serving Pleadings and Motions

Currentness

(a) *Filing and Service Required.* Every pleading, plea, motion, or application to the court for an order, whether in the form of a motion, plea, or other form of request, unless presented during a hearing or trial, must be filed with the clerk of the court in writing, must state the grounds therefor, must set forth the relief or order sought, and at the same time a true copy must be served on all other parties, and must be noted on the docket.

(b) *Service of Notice of Hearing.* An application to the court for an order and notice of any hearing thereon, not presented during a hearing or trial, must be served upon all other parties not less than three days before the time specified for the hearing, unless otherwise provided by these rules or shortened by the court.

(c) *Multiple Parties.* If there is more than one other party represented by different attorneys, one copy of each pleading must be served on each attorney in charge.

(d) *Certificate of Service.* The party or attorney of record, must certify to the court compliance with this rule in writing over signature on the filed pleading, plea, motion, or application.

(e) *Additional Copies.* After one copy is served on a party, that party may obtain another copy of the same pleading upon tendering reasonable payment for copying and delivering. Tx. Supreme Court Misc. Dkt. No. 13-9165 Court of Criminal Appeals Misc. Dkt. No. 13-003

(f) *Electronic Filing.*

(1) Requirement. Except in juvenile cases under Title 3 of the Family Code, attorneys must electronically file documents in courts where electronic filing has been mandated. Attorneys practicing in courts where electronic filing is available but not mandated and unrepresented parties may electronically file documents, but it is not required.

(2) Email Address. The email address of an attorney or unrepresented party who electronically files a document must be included on the document.

(3) Mechanism. Electronic filing must be done through the electronic filing manager established by the Office of Court Administration and an electronic filing service provider certified by the Office of Court Administration.

(4) Exceptions.

(A) Wills are not required to be filed electronically.

(B) The following documents must not be filed electronically:

(i) documents filed under seal or presented to the court in camera; and

(ii) documents to which access is otherwise restricted by law or court order.

(C) For good cause, a court may permit a party to file other documents in paper form in a particular case.

(5) Timely Filing. Unless a document must be filed by a certain time of day, a document is considered timely filed if it is electronically filed at any time before midnight (in the court's time zone) on the filing deadline. An electronically filed document is deemed filed when transmitted to the filing party's electronic filing service provider, except:

(A) if a document is transmitted on a Saturday, Sunday, or legal holiday, it is deemed filed on the next day that is not a Saturday, Sunday, or legal holiday; and

(B) if a document requires a motion and an order allowing its filing, the document is deemed filed on the date that the motion is granted.

(6) Technical Failure. If a document is untimely due to a technical failure or a system outage, the filing party may seek appropriate relief from the court. If the missed deadline is one imposed by these rules, the filing party must be given a reasonable extension of time to complete the filing.

(7) Electronic Signatures. A document that is electronically served, filed, or issued by a court or clerk is considered signed if the document includes:

(A) a "/s/" and name typed in the space where the signature would otherwise appear, unless the document is notarized or sworn; or

(B) an electronic image or scanned image of the signature.

(8) Format. An electronically filed document must:

(A) be in text-searchable portable document format (PDF);

(B) be directly converted to PDF rather than scanned, if possible;

(C) not be locked; and

(D) otherwise comply with the Technology Standards set by the Judicial Committee on Information Technology and approved by the Supreme Court.

(9) Paper Copies. Unless required by local rule, a party need not file a paper copy of an electronically filed document.

(10) Electronic Notices From the Court. The clerk may send notices, orders, or other communications about the case to the party electronically. A court seal may be electronic.

(11) Non-Conforming Documents. The clerk may not refuse to file a document that fails to conform with this rule. But the clerk may identify the error to be corrected and state a deadline for the party to resubmit the document in a conforming format.

(12) Original Wills. When a party electronically files an application to probate a document as an original will, the original will must be filed with the clerk within three business days after the application is filed.

(13) Official Record. The clerk may designate an electronically filed document or a scanned paper document as the official court record. The clerk is not required to keep both paper and electronic versions of the same document unless otherwise required by local rule. But the clerk must retain an original will filed for probate in a numbered file folder.

**Credits**

Oct. 29, 1940, eff. Sept. 1, 1941. Amended by orders of Sept. 20, 1941, eff. Dec. 31, 1941; Aug. 18, 1947, eff. Dec. 31, 1947; July 11, 1977, eff. Jan. 1, 1978; June 10, 1980, eff. Jan. 1, 1981; April 24, 1990, eff. Sept. 1, 1990; Dec. 11, 2013, eff. Jan. 1, 2014.

**Editors' Notes**

**COMMENT--2013**

Rule 21 is revised to incorporate rules for electronic filing, in accordance with the Supreme Court's order--Misc. Docket No. 12-9206, amended by Misc. Docket Nos. 13-9092 and 13-9164--mandating electronic filing in civil cases beginning on January 1, 2014. The mandate will be implemented according to the schedule in the order and will be completed by July 1, 2016. The revisions reflect the fact that the mandate will only apply to a subset of Texas courts until that date.

Notes of Decisions (74)

Vernon's Ann. Texas Rules Civ. Proc., Rule 21, TX R RCP Rule 21
Current with amendments received through 3/15/2015

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Rules Annotated
   Texas Rules of Appellate Procedure
     Section One. General Provisions
       Rule 9. Documents Generally (Refs & Annos)

TX Rules App.Proc., Rule 9.5

9.5. Service

Currentness

(a) *Service of All Documents Required*. At or before the time of a document's filing, the filing party must serve a copy on all parties to the proceeding. Service on a party represented by counsel must be made on that party's lead counsel. Except in original proceedings, a party need not serve a copy of the record.

(b) *Manner of Service*.

(1) Documents Filed Electronically. A document filed electronically under Rule 9.2 must be served electronically through the electronic filing manager if the email address of the party or attorney to be served is on file with the electronic filing manager. If the email address of the party or attorney to be served is not on file with the electronic filing manager, the document may be served on that party or attorney under subparagraph (2).

(2) Documents Not Filed Electronically. A document that is not filed electronically may be served in person, by mail, by commercial delivery service, by fax, or by email. Personal service includes delivery to any responsible person at the office of the lead counsel for the party served.

(c) *When Complete*.

(1) Service by mail is complete on mailing.

(2) Service by commercial delivery service is complete when the document is placed in the control of the delivery service.

(3) Service by fax is complete on receipt.

(4) Electronic service is complete on transmission of the document to the serving party's electronic filing service provider. The electronic filing manager will send confirmation of service to the serving party.

(d) *Proof of Service*. A document presented for filing must contain a proof of service in the form of either an acknowledgment of service by the person served or a certificate of service. Proof of service may appear on or be affixed to the filed document. The clerk may permit a document to be filed without proof of service, but will require the proof to be filed promptly.

(e) *Certificate Requirements*. A certificate of service must be signed by the person who made the service and must state:

(1) the date and manner of service;

(2) the name and address of each person served; and

(3) if the person served is a party's attorney, the name of the party represented by that attorney.

**Credits**

Eff. Sept. 1, 1997. Amended by Supreme Court Dec. 23, 2002, eff. Jan. 1, 2003. Amended by Supreme Court Dec. 11, 2013, eff. Jan. 1, 2014. Approved by Court of Criminal Appeals Dec. 11, 2013, eff. Jan. 1, 2014.

**Editors' Notes**

**NOTES AND COMMENTS**

Comment to 2002 change: The change clarifies that the filing party must serve a copy of the document filed on all other parties, not only in an appeal or review, but in original proceedings as well. The rule applies only to filing *parties*. Thus, when the clerk or court reporter is responsible for filing the record, as in cases on appeal, a copy need not be served on the parties. The rule for original civil proceedings, in which a party is responsible for filing the record, is stated in subdivision 52.7.

Comment to 2013 change: Rule 9 is revised to incorporate rules for electronic filing, in accordance with the Supreme Court's order--Misc. Docket No. 12-9208, amended by Misc. Docket Nos. 13-9092 and 13-9164--mandating electronic filing in civil cases in appellate courts, effective January 1, 2014. In addition, Rule 9.9 is added to provide privacy protection for all documents, both paper and electronic, filed in civil cases in appellate courts.

Notes of Decisions (4)

Rules App. Proc., Rule 9.5, TX R APP Rule 9.5
Current with amendments received through 3/15/2015

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

549 S.W.2d 29
Court of Civil Appeals of Texas, Corpus Christi.

CATTLE FEEDERS, INC., Appellant,

v.

Jo Ann JORDAN and G. F. Jordan, Appellees.

No. 1152.  |  March 10, 1977.

Lessee sought specific performance by lessors of an option to purchase property. The 135th District Court, Goliad County, Frank H. Crain, J., entered judgment for defendants, and plaintiff appealed. The Court of Civil Appeals, Nye, C. J., held that failure of lessee to provide lessors with timely notice of its intent to exercise option was not subject to being excused on ground of an honest and justifiable mistake, that right to receive timely notice of lessee's intent to exercise its option was not waived by lessors either expressly or impliedly, and that lessors were not equitably estopped from asserting their right to receive timely notice in absence of evidence establishing a false representation or concealment on part of lessors.

Affirmed.

West Headnotes (13)

**[1]** **Contracts**
 Options;  rights of first refusal

As a general rule, in absence of equities, an optionee is held to strict compliance with terms of option agreement.

4 Cases that cite this headnote

**[2]** **Contracts**
 Options;  rights of first refusal

An optionee will be excused from strict compliance with terms of an option agreement where his conduct in failing to comply is not due to willful or gross negligence on part of optionee but is the result of an honest and justifiable mistake.

9 Cases that cite this headnote

**[3]** **Contracts**
 Options;  rights of first refusal

Equity will excuse strict compliance with terms of an option agreement where such compliance has been prevented by some act of optionor such as a waiver or misleading representations or conduct.

8 Cases that cite this headnote

**[4]** **Landlord and Tenant**
 Time

Failure of lessee to provide lessor with timely notice of its intent to exercise option to purchase did not result from an honest and justifiable mistake and, hence, was not excused where it was clear from record that lessee simply never notified lessors of its intention to exercise option and that written notice, even if sent, was never received by lessors.

1 Cases that cite this headnote

**[5]** **Estoppel**
 Nature and elements of waiver
**Estoppel**
 Implied waiver and conduct constituting waiver

Waiver, whether express or implied, is an intentional release, relinquishment, or surrender of a right that is at the time known to the party making it.

1 Cases that cite this headnote

**[6]** **Estoppel**
 Nature and elements of waiver

In order to constitute a waiver, it is essential that there be an existing right, benefit or advantage, a knowledge, actual or constructive, of existence and an actual intention to relinquish it.

1 Cases that cite this headnote

**[7]** **Estoppel**
 Nature and elements of waiver

Waiver takes place where one dispenses with performance of something which he has a right to exact, and occurs where one in possession of any right, whether conferred by law or by contract, with full knowledge of material facts does or forbears to do something, and such action is inconsistent with his right or his intention to rely upon it.

1 Cases that cite this headnote

**[8] Estoppel**

 Implied waiver and conduct constituting waiver

In order to establish an implied waiver, there must be a clear, unequivocal and decisive act showing such a purpose.

1 Cases that cite this headnote

**[9] Landlord and Tenant**

Time

Timely notice of lessee's intent to exercise its option to purchase property was neither expressly nor impliedly waived by lessors where even lessee's president testified that there was no oral agreements concerning lease and only evidence of an implied waiver was fact that lessors were occasionally in area and knew of some improvements being made by lessee to property.

1 Cases that cite this headnote

**[10] Estoppel**

Essential elements

An equitable estoppel occurs when a false representation or concealment of material fact is made with actual or constructive knowledge of facts, to a party without knowledge or means of knowledge of real facts, and with intention that it should be acted on, and party to whom it is made relies on or acts on representation to his prejudice.

4 Cases that cite this headnote

**[11] Estoppel**

Intent

Before an estoppel will arise, there must be certainty to every intent.

Cases that cite this headnote

**[12] Estoppel**

Essential elements

Failure to prove one of the essential elements of estoppel is fatal to the cause of action.

2 Cases that cite this headnote

**[13] Estoppel**

Contracts relating to real estate

Lessors were not equitably estopped from asserting their right under lease to receive timely notice of lessee's intent to exercise its option to purchase where, apart from failing to establish any false representation or concealment on part of lessors, evidence clearly showed that lessor did nothing to prevent lessee from exercising option in question.

1 Cases that cite this headnote

**Attorneys and Law Firms**

**\*30** Fly, Moeller & Stevenson, Victoria, William C. Reiff, Houston, for appellant.

Marion M. Lewis and Jackie W. Marr, Guittard & Henderson, Victoria, for appellees.

**OPINION**

NYE, Chief Justice.

Suit was brought by Cattle Feeders, Inc., the appellant herein, against Jo Ann and G. F. Jordan, appellees, seeking specific performance of an option to purchase 91.755 acres of land in Goliad County. Trial was before a jury. From a judgment denying all relief, appeal has been perfected to this Court.

On January 15, 1971, Cattle Feeders, Inc. entered into a lease agreement with Jo Ann and G. F. Jordan covering some 91.755 acres of land in two noncontiguous tracts. This land is

located north of U. S. Highway 59 in **\*31** Goliad County and is divided by a farm to market road. This acreage was part of a large tract of land in the same area which was either owned or leased by Cattle Feeders, Inc. as a part of their cattle feedlot operation. The lease stated that it was for farming, grazing and livestock feeding purposes only. The term was 5 years. The lease provided that all fences and water reservoirs constructed by the tenant were to remain on the premises. The lease, by its terms, granted Cattle Feeders an option to purchase the land in question based on certain conditions precedent, one of which was at least 90 days' written notice of such election to purchase. The option agreement provided that time was of the essence concerning exercising the option to purchase.

In either April or May of 1971, Cattle Feeders alleged that it had sent a letter to the Jordans expressing its desire to exercise the option and purchase the land. No copy of this letter was produced or introduced into evidence. On December 5, 1975, Cattle Feeders sent a letter to the Jordans in which they tendered the first purchase payment for the land pursuant to the terms set out in the option agreement. The Jordans refused this check on the grounds that they had not been notified of Cattle Feeders' intent to exercise its option as provided for in the option agreement.

Shortly thereafter, Cattle Feeders brought this suit for specific performance of the option agreement on two grounds. The first theory was that it had in fact properly exercised the option by giving written notice 90 days prior to January 15, 1976. Alternatively, Cattle Feeders urged that in the event that Cattle Feeders had not satisfied the requirement of the option agreement, the Jordans were estopped from asserting the 90 day notice requirement. The Jordans, after excepting to certain allegations in Cattle Feeders' pleadings, specifically denied Cattle Feeders' claims and brought a cross-action for immediate possession of the land. At the beginning of the trial, the Jordans filed a motion in limine to exclude from the jury all of the evidence pertaining to waiver or estoppel on the part of the Jordans. Although the trial court granted the motion, all of the excluded evidence is before us on bill of exceptions.

The jury found that no written notice of the exercising of the option was mailed to Mrs. Jordan by Cattle Feeders; that Mrs. Jordan did not receive any such notice; and that Cattle Feeders was not damaged by Mrs. Jordan's refusal to surrender possession of the land to them. Cattle Feeders does not attack these findings by the jury in this appeal. Therefore, the question as to whether or not the appellant

properly exercised the written option agreement is not before us.

Through two points of error, Cattle Feeders allege that the trial court erred in refusing to permit the appellant to present to the jury, by evidence and special issues, its alternative theory that Cattle Feeders was entitled to specific performance of the option contract on equitable grounds. The appellant is relying on the language in Jones v. Gibbs, 133 Tex. 627, 130 S.W.2d 265 (1939, opinion adopted) to the effect that strict compliance with the terms or conditions of an option is excused when such failure is brought about by certain conduct of the optionor. The crux of Cattle Feeders' argument is that the appellees engaged in such conduct as would have excused strict compliance with the terms of the option agreement and the trial court erred in refusing to allow Cattle Feeders to present this evidence to the jury. It is, therefore, necessary that we carefully review appellant's bill of exceptions evidence to determine the validity of appellant's points of error.

Appellant Cattle Feeders' first bill of exceptions covered the testimony of a Mr. Carl Knabe who did some clearing work on the land in question. Mr. Knabe testified that he burned off brush, root-plowed, raked the land and stacked and burned roots. He testified that this work was done in June and July of 1970 and that he charged Cattle Feeders $40.00 to $42.00 per acre for the work. He testified that this work makes the land more productive and **\*32** increased the value of the land. He also testified that the value of such services at the time of the trial was approximately $80.00 per acre.

The next testimony excluded by the trial court was that of the president of the appellant's corporation, a Mr. Pat Hencerling. Mr. Hencerling testified that in June and July of 1970, Cattle Feeders executed certain documents with the appellee concerning this land. He testified that these documents were later embodied in the lease agreement. He testified that the lease agreement was part of an overall transaction between the parties to purchase the land and that the land in question was leased to Cattle Feeders and not purchased outright so as to gain a tax advantage for the appellees. He testified that the lease price was about $10.00 per acre above the going rate. He testified that he cleared the land, planted various grasses and built ponds on the land. He also testified that he had the land sloped for the feed yards and constructed a mobile home park for his employees. He testified he paid approximately $40.00 to $45.00 per acre to clear the land, several hundred dollars per acre to slope certain land and $1,500.00 each for the three ponds that were constructed. He

also testified he spent $35.00 to $45.00 per acre to plant grass on approximately 5 acres to prevent erosion. He testified that the corporation spent between $10,000.00 and $12,000.00 to construct the mobile home park. He testified that it also spent approximately $2,000.00 on fences. He stated that he spent about $60.00 per acre to fertilize some 80% of the land in 1975 and planted oats at a cost of $40.00 per acre. In summary, he testified he would not have spent any of this money if he was not under the impression that Cattle Feeders either owned the land or would acquire the land. He then pointed out on a map other land in the immediate area which the corporation had previously purchased from the appellees. He testified that all this work on the land in question was clearly visible from the road adjacent to the land and that the appellees were seen in the vicinity of the property.

On cross-examination under the bill of exceptions, Hencerling stated that he had the right, under the lease, to make all the improvements and that appellees could not have stopped any of the improvements. He admitted that he had never discussed the improvements with the appellees. Finally, Hencerling stated that the reason he made all the improvements was his reliance on the written notice to appellees.

The final testimony under the bill of exceptions was that of the appellee Jo Ann Jordan. Mrs. Jordan testified that she owned land in the vicinity of the land in question which she leased or used to graze cattle. She stated that since 1974, she visited the area about once very two weeks but between 1971 and 1975, she only occasionally visited the area. She said she observed the improvements on the subject land. She testified she always thought appellant would exercise its option but never knew this for a fact. She said her assumption was based on the improvements and the integration of the land into the remainder of the appellant's operations. She said she refused the tendered money because she was no longer bound by the agreement. She stated that prior to December 5, 1975, she received no communication from appellant indicating an intent to exercise its option. She stated that had the option been properly exercised she would have sold the land to appellant as per the agreement.

The only remaining question involved in this case is whether or not the appellant is entitled to the land in question through some act or acts of the appellees which excused or prevented the exercising of the option agreement.

**[1]** **[2]** **[3]** As a general rule, in absence of equities, an optionee is held to strict compliance with the terms of an option agreement. Zeidman v. Davis, 161 Tex. 496, 342 S.W.2d 555 (1961); Tidwell v. Lange, 531 S.W.2d 384 (Tex.Civ.App. Waco 1975, no writ). The equities which will excuse strict compliance with the terms of an option agreement are set out in **\*33** Jones v. Gibbs, 130 S.W.2d 265 (Tex.Com.App. 1939, opinion adopted), see pp. 272-273. These equitable principles can be summarized. An optionee will be excused from strict compliance where his conduct in failing to comply was not due to willful or gross negligence on the part of the optionee but was rather the result of an honest and justifiable mistake. In addition, equity will also excuse strict compliance where the strict compliance was prevented by some act of the optionor such as waiver or misleading representations or conduct.

**[4]** There is no evidence in the record that Cattle Feeders' failure to provide appellees with timely notice of its intent to exercise the option was the result of an honest and justifiable mistake. To the contrary, the record indicates that the appellant simply never notified the appellees of its intention to exercise the option. The written notice, even if sent, was never received by appellees.

**[5]** **[6]** **[7]** Next, we consider waiver and estoppel. Waiver, whether express or implied, is an intentional release, relinquishment, or surrender of a right that is at the time known to the party making it. In order to constitute a waiver, it is essential that there be an existing right, benefit or advantage, a knowledge (actual or constructive) of the existence and an actual intention to relinquish it. It must be a voluntary act made with full knowledge of the facts. Rio Delta Land Company v. Johnson, 475 S.W.2d 346 (Tex.Civ.App. Corpus Christi 1971, writ ref'd n. r. e.). A waiver takes place where one dispenses with performance of something which he has a right to exact, and occurs where one in possession of any right, whether conferred by law or by contract, with full knowledge of material facts does or forbears to do something, and such action is inconsistent with his right or his intention to rely upon it. Ford v. Culbertson, 158 Tex. 124, 308 S.W.2d 855 (1958); First National Bank of Midland v. Stoutco, Inc., 530 S.W.2d 619 (Tex.Civ.App. San Antonio 1975, writ dism'd); Zurich Insurance Company v. Wiegers, 527 S.W.2d 511 (Tex.Civ.App. Austin 1975, no writ); Rice v. Travelers Indemnity Company, 526 S.W.2d 698 (Tex.Civ.App. Waco 1975, writ ref'd n. r. e.); Texana Oil Company v. Stephenson, 521 S.W.2d 104 (Tex.Civ.App. El Paso 1975, no writ).

**[8]** **[9]** We have carefully reviewed all of the record and find that there is no evidence of any waiver. Even appellant's president testified there were no oral agreements concerning

the lease. The only evidence of implied waiver is the fact that appellee was in the area occasionally, knew of some of the improvements to the land and that appellant was using the land. In order to establish an implied waiver, there must be a clear unequivocal and decisive act showing such a purpose. Corrin v. Slagle, 300 S.W.2d 657 (Tex.Civ.App. Fort Worth 1957, writ ref'd n. r. e.); Bounds v. Home Mut. Life & Accident Ass'n No. 1, 290 S.W.552 (Tex.Civ.App. Amarillo 1927, no writ). There is simply no evidence anywhere in the record that appellee waived her right to notice of appellant's intention to exercise its option.

[10]  [11]  [12]  [13]  The elements of equitable estoppel are: 1) a false representation or concealment of material fact; 2) made with actual or constructive knowledge of the facts; 3) to a party without knowledge or means of knowledge of the real facts; 4) made with the intention that it should be acted on; and 5) the party to whom it was made must have relied on or acted on it to his prejudice. Gulbenkian v. Penn, 151 Tex. 412, 252 S.W.2d 929 (1952); Clifton v. Ogle, 526 S.W.2d 596 (Tex.Civ.App. Fort Worth 1975, writ ref'd n. r. e.); Connally v. Home Insurance Company, 525 S.W.2d

252 (Tex.Civ.App. Amarillo 1975, writ ref'd n. r. e.); Astro Sign Company v. Sullivan, 518 S.W.2d 420 (Tex.Civ.App. Corpus Christi 1974, writ ref'd n. r. e.). Before an estoppel will arise, there must be certainty to every intent. Rio Delta Land Company v. Johnson, supra. The evidence totally fails to establish any false representation or concealment on the part of the appellees. In fact, the evidence clearly shows that the appellees did nothing to prevent the appellant Cattle Feeders from exercising the option in question. Failure to prove one of the essential  **\*34**  elements of estoppel is fatal to the cause of action. Barfield v. Howard M. Smith Company of Amarillo, 426 S.W.2d 834 (Tex.Sup.1968).

After reviewing all of appellant's bill of exceptions evidence, it is unnecessary for us to determine the correctness of the trial court's action in preventing the jury from hearing this evidence. Even if all of the evidence had been submitted to the jury, it would not have supported a judgment favorable to appellant's claim to equitable relief.

Appellant's points of error are overruled. The judgment of the trial court is AFFIRMED.

---

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

320 S.W.3d 578
Court of Appeals of Texas,
Tyler.

Brady W. CHAMBERS and
Evelyn B. Chambers, Appellants,
v.
HUNT PETROLEUM CORPORATION, Appellee.

No. 12–09–00225–CV.    |    Aug. 25, 2010.

**Synopsis**

**Background:** Lessors brought action to quiet title to 3.94
acre tract of land, seeking declaration that lessee's option to
purchase was invalid and judgment for back taxes. Lessee
filed counterclaim seeking declaration that the option was
valid and a decree ordering its specific performance, seeking
an award of clearing and mowing costs under the theory
of quantum meruit, and attorney's fees. The 188th Judicial
District Court, Gregg County, David Scott Brabham, J.,
entered judgment for lessee, and lessors appealed.

**Holdings:** The Court of Appeals, Bill Bass, J., held that:

[1] lessors' refusal to perform lease's option to purchase
excused lessee's failure to tender consideration as required to
exercise option;

[2] lessee's failure to pay taxes did not preclude specific
performance; and

[3] evidence was insufficient to support award in quantum
meruit for clearing and mowing costs.

Affirmed in part, reversed in part and rendered in part, and
reversed and remanded in part.

West Headnotes (18)

**[1]      Contracts**
    Options;  rights of first refusal

Strict compliance with the provisions of an
option contract is required.

1 Cases that cite this headnote

**[2]      Contracts**
    Options;  rights of first refusal

Exercise of an option must be unqualified and
strictly in accordance with the terms of the
agreement, unless equity requires otherwise.

1 Cases that cite this headnote

**[3]      Contracts**
    Options;  rights of first refusal

The failure of the optionee to comply strictly
with the terms or conditions of the option will be
excused when the failure is brought about by the
conduct of the optionor.

1 Cases that cite this headnote

**[4]      Contracts**
    Options;  rights of first refusal

Where a defendant has openly and avowedly
refused to perform his part of an option contract
or declared his intention not to perform it, the
plaintiff seeking to exercise the option need not
make tender of payment of the consideration
before bringing suit; formal tender is excused
when tender would be a useless and idle
ceremony.

1 Cases that cite this headnote

**[5]      Contracts**
    Options;  rights of first refusal

A tender of consideration is excused where
the optionor intentionally avoids giving the
purchaser an opportunity of making it.

1 Cases that cite this headnote

**[6]      Landlord and Tenant**
    Breach of Agreement

Evidence was sufficient to support finding
that lessors openly refused to perform lease's
option to purchase which excused lessee's failure
to tender $100 consideration with 60 days

of the notice of the exercise of the option to purchase; evidence indicated that lessors refused to respond to lessee's repeated attempted to communicate with them during the 60-day period, but, almost immediately after the expiration of that time period, gave lessor formal notice to vacate the premises.

Cases that cite this headnote

**[7]** **Contracts**
 Excuses for Nonperformance or Defects

A prerequisite to the remedy of excuse of performance is that the covenants in a contract must be mutually dependent promises.

Cases that cite this headnote

**[8]** **Contracts**
 Dependent or independent stipulations

When a covenant goes only to part of the consideration on both sides and a breach may be compensated for in damages, it is to be regarded as an independent covenant, unless this is contrary to the expressed intent of the parties.

Cases that cite this headnote

**[9]** **Contracts**
 What are conditions precedent in general

A "condition precedent" in a contract is an event that must occur or an act that must be performed before a right can accrue to enforce an obligation.

Cases that cite this headnote

**[10]** **Contracts**
 Conditions Precedent in General

Such terms as "if," "provided that," "on condition that," or some similar phrase of conditional language are normally required to create a condition precedent.

1 Cases that cite this headnote

**[11]** **Contracts**
 Conditions Precedent in General

Courts will not construe a contract provision as a condition precedent unless they are compelled to do so by language that may be construed in no other way.

1 Cases that cite this headnote

**[12]** **Contracts**
 Conditions Precedent in General

If a contract contains a condition precedent, it must either have been met or excused before the other party's obligation can be enforced.

Cases that cite this headnote

**[13]** **Specific Performance**
 Fraud or inequitable conduct of plaintiff subsequent to contract

A court may refuse to grant equitable relief such as specific performance to a party who has been guilty of unlawful or inequitable conduct regarding the issue in dispute.

Cases that cite this headnote

**[14]** **Specific Performance**
 Sufficiency of performance by plaintiff in general

Lessee's failure to pay taxes as required under lease did not preclude specific performance of lease's option to purchase provision; lease's taxes provision was a covenant independent of the option to purchase, $100 payment for exercise of option was nominal and real price for tract was embraced within $39,600 consideration already paid on execution of the lease, lessors knew of the option to purchase and never informed lessee of the taxes due or asked lessee to pay its pro rata share, and damages were available to compensate lessors.

Cases that cite this headnote

**[15]** **Implied and Constructive Contracts**
 Nature of employment and promise to pay

Evidence was insufficient to support award in quantum meruit to lessee of 3.94 acre tract for cost incurred in clearing and mowing lessors'

entire 7.94 acre tract; lessee's own evidence, including memos and invoices, showed that the work was done "as a favor" to lessor and that lessee "thought it would be in our best interest to help out" lessor by cleaning up his side of the property, and lessee had never previously asked lessors to pay any part of the clearing and mowing costs, which had been incurred four years prior to the subject quiet title action.

Cases that cite this headnote

**[16]** **Implied and Constructive Contracts**

    Work and labor in general; quantum meruit

To recover under the doctrine of quantum meruit, a plaintiff must establish that: (1) valuable services and/or materials were furnished, (2) to the party sought to be charged, (3) which were accepted by the party sought to be charged, and (4) under such circumstances as reasonably notified the recipient that the plaintiff, in performing, expected to be paid by the recipient.

Cases that cite this headnote

**[17]** **Implied and Constructive Contracts**

    Amount of Recovery

The measure of damages for a claim in quantum meruit is the reasonable value of the work performed and the materials furnished.

Cases that cite this headnote

**[18]** **Implied and Constructive Contracts**

    Work and labor in general; quantum meruit

**Implied and Constructive Contracts**

    Implication of request or promise to pay

The party seeking to recover in quantum meruit must establish that the work done was accepted by the party to be charged under such circumstances as reasonably notified the recipient that the plaintiff in performing expected to be paid by the recipient.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*580** Deborah J. Race, Lawrence L. Beason, for Appellants.

Diane V. Devasto, J. Matt Rowan, Jerry S. Harris, for Appellee.

Panel consisted of WORTHEN, C.J., GRIFFITH, J., and BASS, Retired Justice, Twelfth Court of Appeals, sitting by assignment.

## *OPINION*

BILL BASS, Justice.

This is an appeal from a judgment granting specific performance to Hunt Petroleum Corporation of an option to purchase, and awarding damages and attorney's fees. In three issues, Brady W. Chambers and Evelyn Chambers contend that (1) the option had expired because Hunt failed to timely tender the $100.00 purchase money, (2) Hunt was not entitled to enforce the option because it was in default on the contract's provisions, and (3) there was insufficient evidence to support the award of damages. We affirm the trial court's order for specific performance, reverse and render the award of damages, render judgment awarding taxes paid by the Chamberses, and remand the cause for a redetermination of attorney's fees.

## **\*581** *BACKGROUND*

The parties' predecessors in interest, Sonat Exploration Company and First Church of the Nazarene, on August 7, 1992, entered into a lease with an option to purchase involving 3.94 acres of a 7.94 acre tract in Longview, Gregg County, Texas. The term of the lease was fifteen years. Sonat paid $39,300.00 at the execution of the lease "as rent for the entire lease term." The lease required Sonat to pay all ad valorem taxes and other costs during the term "as if it were the fee simple owner," and provided that the church would have no ownership responsibilities. The lease granted Sonat the exclusive option to purchase the 3.94 acre tract "at any time prior to the end of the lease term." The lease and the option were assignable. The option agreement contained the following provision:

> The option shall be exercisable by giving written notice to the Lessor

prior to the end of the lease and the purchase shall be completed by conveyance of the property by General Warranty Deed and payment of the purchase price within sixty (60) days from the delivery of the notice of the intent to exercise the option. The purchase price shall be one hundred dollars ($100) to be paid in cash at closing.

On November 22, 2004, the Chamberses bought the 7.94 acre tract that was subject to the lease for $50,000.00. Shortly thereafter, the Chamberses received notice from the City of Longview that excessive overgrowth on the tract was a violation of the municipal code. Brady Chambers contacted Hunt Petroleum Corporation, the successor in interest to Sonat, to notify it of the problem and its responsibility under the lease to clear the 3.94 acre tract to correct the code violations.

In May 2005, Hunt hired a contractor to clear and mow the 3.94 acres. The contractor "began clearing the approximately 8 acres, our half and as a favor to Mr. Chambers, his half also." The cost for clearing and mowing the 7.94 acres was $17,353.00. The foreman's memo noted that "there was a brush and dirt pile on Mr. Chambers['s] half of the property that was buried in a pit that we dug. We put the excess dirt in a low area on his side to help it from collecting water." The foreman's memo also stated that "[w]e thought it would be in our best interest to help out Mr. Chambers by cleaning up his side." Hunt mowed the entire tract in 2006 and 2007. Only the $4,625.00 cost of the 2007 mowing was charged to this tract.

The Chamberses paid $1,698.00 in taxes attributable to Hunt's 3.94 acres.

On July 16, 2007, Brad Russell, district landman for Hunt, sent the Chamberses formal notice of Hunt's exercise of its option to purchase. Russell stated in the letter that Hunt would prepare a plat and general warranty deed for the Chamberses' review. The Chamberses did not respond. Russell sent another letter to the Chamberses on September 8, 2007, once again informing them that Hunt was exercising the option in the lease and enclosing a general warranty deed. Russell asked the Chamberses to review the deed and sign it. In his letter, Russell stated that he would call the Chamberses and fix a time to meet with them to pay the $100.00 purchase price, pursuant to the lease terms. The Chamberses did not respond

to this letter. On September 20, 2007, Russell sent a third letter to the Chamberses referring to the numerous occasions that Hunt had attempted without success to communicate with them by telephone despite Hunt's leaving several messages for them on their voice mail. Another warranty deed was enclosed for the Chamberses to execute. The letter concluded by asking the Chamberses to call one of **\*582** two numbers to schedule a time to close. The Chamberses did not respond to the third letter.

On October 8, 2007, Hunt received a letter from the Chamberses' lawyer advising Hunt it was in default under the lease, and, as a result, was now holding over.

On November 5, 2007, the Chamberses filed a suit to quiet title to the 3.94 acre tract. They sought a declaration that the option to purchase was invalid on various grounds, and judgment awarding them the back taxes they had paid on the property.

Hunt counterclaimed seeking a declaration that the option was valid and a decree ordering its specific performance. It also sought an award of 50.6% of the land clearing and mowing costs under the theory of quantum meruit, and attorney's fees.

The trial court found that Hunt had properly and timely exercised its option. The trial court ordered the Chamberses to execute a warranty deed, and, upon its delivery, that Hunt tender $100.00 to the Chamberses. The court also awarded Hunt $11,132.00 in damages (50.6% of the total clearing and mowing charges), and $29,289.91 in attorney's fees.

### DID THE OPTION EXPIRE BECAUSE OF HUNT'S FAILURE TO TENDER THE $100.00 PURCHASE MONEY?

In their first issue, the Chamberses contend that the option to purchase expired because Hunt failed to meet its contractual obligation to tender the $100.00 purchase price within the sixty day period allowed for closing after its notice of exercise of the option. They maintain that there are no special circumstances that serve to excuse Hunt from strict compliance with the contract's terms. The Chamberses argue that there is no evidence, or at least insufficient evidence, or findings to support the trial court's conclusion that they were solely to blame for the failure to close.

*Standard of Review*

In an appeal from a bench trial, the trial court's findings of fact have the same force and effect as a jury verdict and are reviewable for legal and factual sufficiency under the same standards that are applied to the review of a jury verdict. *Anderson v. City of Seven Points,* 806 S.W.2d 791, 794 (Tex.1991).

When reviewing a finding for legal sufficiency, we must credit evidence favorable to the judgment if a reasonable fact finder could, disregard contrary evidence unless a reasonable fact finder could not, and reverse the fact finder's determination only if the evidence presented in the trial court would not enable a reasonable and fair minded fact finder to reach the judgment under review. *City of Keller v. Wilson,* 168 S.W.3d 802, 827 (Tex.2005). The court should sustain an appellant's legal sufficiency challenges if the record reveals (1) there is a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) that the evidence conclusively establishes the opposite of a vital fact. *Id.* More than a scintilla of evidence exists if the evidence rises to a level that would enable reasonable and fair minded people to differ in their conclusions. *Ford Motor Co. v. Ridgway,* 135 S.W.3d 598, 601 (Tex.2004).

When considering a factual sufficiency challenge, we consider all of the evidence and set aside the judgment only if it so contrary to the overwhelming weight of the evidence that it is clearly wrong and unjust. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986).

**\*583** We review the trial court's conclusions of law de novo. *State v. Heal,* 917 S.W.2d 6, 9 (Tex.1996).

*Applicable Law*

**[1]** **[2]** Strict compliance with the provisions of an option contract is required. *See Jones v. Gibbs,* 133 Tex. 627, 639–40, 130 S.W.2d 265, 271 (Tex. Comm'n App.1939, opinion adopted). Exercise of an option must be unqualified and strictly in accordance with the terms of the agreement, unless equity requires otherwise. *City of Brownsville v. Golden Spread Electric Coop.,* 192 S.W.3d 876, 880 (Tex.App.-Dallas 2006, pet. denied).

**[3]** **[4]** **[5]** However, the failure of the optionee to comply strictly with the terms or conditions of the option will be excused when the failure is brought about by the conduct of the optionor. *Jones,* 133 Tex. at 640, 130 S.W.2d at 272. "It is thoroughly settled that where a defendant has openly and avowedly refused to perform his part of the contract or declared his intention not to perform it, the plaintiff need not make tender of payment of the consideration before bringing suit." *Burford v. Pounders,* 145 Tex. 460, 466, 199 S.W.2d 141, 144 (Tex.1947); *Rus–Ann. Dev., Inc. v. ECGC, Inc.,* 222 S.W.3d 921, 927 (Tex.App.-Tyler 2007, no pet.). Formal tender is excused when tender "would be a useless and idle ceremony." *Burford,* 145 Tex. at 467, 199 S.W.2d at 145. A tender of consideration is excused where the optionor intentionally avoids giving the purchaser an opportunity of making it. 81 C.J.S. *Specific Performance* § 116 (1977).

*Discussion*

**[6]** The trial court made the following findings of fact germane to this issue.

> 10. On July 16, 2007, prior to the expiration of the Lease with Option, Defendant gave Plaintiffs written notice of its election to exercise the option to purchase the 3.94 acres. Plaintiffs received this notice on or about July 25, 2007, but made no response to it.

> 11. Subsequent to July 25, 2007, Defendant made several attempts to contact Plaintiffs, both in writing and by telephone, in order to arrange a closing of the purchase of the 3.94 acres in accordance with the terms of the Lease with Option, but Plaintiffs ignored all of [Defendant's] attempts to do so.

> 12. Defendant was at all material times ready, willing and able to close the purchase of the 3.94 acres pursuant to the terms of the Lease with Option.

Based on these findings, the trial court concluded that "the failure to close was solely the fault of the [Chamberses]."

The Chamberses acknowledge that "[i]t is thoroughly settled that where a defendant has openly and avowedly refused to perform his part of the contract or declared his intention not to perform it, the plaintiff need not make tender of payment of the consideration before bringing suit." *See Burford,* 145 Tex. at 466, 199 S.W.2d at 144; *Rus–Ann Dev.,* 222 S.W.3d at 927. However, the Chamberses insist that their silence in response to Hunt's attempts to communicate with them did not amount to an open refusal to perform the contract that might serve to

excuse Hunt's tender of the $100.00 consideration. The lease agreement required payment of the $100.00 consideration within sixty days of the notice of the exercise of the option. The Chamberses argue that because Hunt did not timely pay the consideration, its attempt to exercise the option was not "strictly in accordance with the terms of the agreement" and therefore ineffective. *See Besteman v. Pitcock,* 272 S.W.3d 777, 784 (Tex.App.-Texarkana 2008, no pet.).

We disagree. The trial court was justified in inferring that the Chamberses' refusal **\*584** to respond to Hunt's repeated attempts to communicate with them during the critical sixty day period for closing was calculated to defeat Hunt's exercise of its option. Almost immediately after the expiration of the lease and the sixty days provided for closing of Hunt's exercise of its option, the Chamberses did communicate with Hunt giving it formal notice to vacate the premises. In our view, the Chamberses' conduct was tantamount to a refusal to perform their part of the contract. A tender of consideration is excused where the optionor intentionally avoids giving the purchaser an opportunity of making it. *See* 81 C.J.S *Specific Performance* § 116. A tender of the nominal $100.00 consideration under these circumstances "would have been a vain and useless thing." *See Burford,* 145 Tex. at 466, 199 S.W.2d at 144.

Ample evidence supports the trial court's findings. The findings support its conclusion that the failure to close within sixty days following Hunt's notice was solely the fault of the Chamberses. The Chamberses' first issue is overruled.

### IS A PARTY IN DEFAULT ON OTHER CONTRACT PROVISIONS ENTITLED TO ENFORCE AN OPTION IN THAT CONTRACT?

Article III of the lease required the lessee, Hunt, to pay "all ad valorem taxes during the term of the lease" and to pay "all other costs associated with the property as if it were the fee simple owner." In their second issue, the Chamberses maintain that Hunt is not entitled to the equitable remedy of specific performance of the option provided by Article V of the lease because it had breached the agreement by failing to pay the taxes on the 3.94 acres, and by allowing the tract to become overgrown in violation of the contract and the Longview municipal code. The question presented is whether Hunt's breach of the covenant to pay the taxes and other costs associated with the property excuses the Chamberses' performance of the contract's option provision.

*Applicable Law*

[7]  [8]  [9]  [10]  [11]  [12]  "A prerequisite to the remedy of excuse of performance is that the covenants in a contract must be mutually dependent promises." *Hanks v. GAB Bus. Servs., Inc.,* 644 S.W.2d 707, 708 (Tex.1982). "[W]hen a covenant goes only to part of the consideration on both sides and a breach may be compensated for in damages, it is to be regarded as an independent covenant, unless this is contrary to the expressed intent of the parties." *Id.* A "condition precedent" in a contract is an event that must occur or an act that must be performed before a right can accrue to enforce an obligation." *Centex Corp. v. Dalton,* 840 S.W.2d 952, 956 (Tex.1992). Such terms as "if," "provided that," "on condition that," or some similar phrase of conditional language are normally required to create a condition precedent. *Criswell v. European Crossroads Shopping Ctr.,* 792 S.W.2d 945, 948 (Tex.1990). Courts will not construe a contract provision as a condition precedent unless they are compelled to do so by language that may be construed in no other way. *See Reilly v. Rangers Mgmt., Inc.,* 727 S.W.2d 527, 530 (Tex.1987). "If a contract contains a condition precedent, it must either have been met or excused before the other party's obligation can be enforced." *Cal–Tex Lumber Co. v. Owens Handle Co.,* 989 S.W.2d 802, 809 (Tex.App.-Tyler 1999, no pet.).

[13]  "A court may refuse to grant equitable relief [specific performance] to a [party] who has been guilty of unlawful or inequitable conduct regarding the issue in dispute." *Lazy M. Ranch, Ltd. v. TXI Operations, LP,* 978 S.W.2d 678, 683 (Tex.App.-Austin 1998, pet. denied).

**\*585** *Discussion*

[14]  We conclude that the requirement found in Article III of the lease that the lessee pay taxes and other ownership costs associated with the 3.94 acre tract is a covenant independent of the option agreement found in Article V. It is not a dependent covenant or condition precedent whose nonperformance would render the option agreement unenforceable by Hunt.

A breach by Hunt of its obligations under Article III is readily compensable by damages. The lease contains no language from which it may be even inferred that the parties intended to condition the lessee's enforcement of the option agreement upon its payment of taxes and other costs associated with the property. An examination of the entire agreement reveals

no relationship between the taxes and other costs provision and the option provision. There is no conditional language indicating that the enforceability of the option is dependent upon Hunt's performance of its obligations under Article III.

In *Cook v. Young,* 269 S.W.2d 457 (Tex.Civ.App.-Fort Worth 1954, no writ), the lessee sought specific performance of an option to purchase clause in the lease agreement. *Id.* at 458. The lessor argued that the grant of summary judgment in the lessee's favor was improper, because there was a fact issue regarding whether the lessee had complied with a term of the lease requiring that it pay all the utility bills for the leased property. *Id.* at 460. The court of appeals held that compliance with the terms of the lease was not a condition precedent to the lessee's exercise of the option. *Id.* The court stated that "[w]hile we find such a provision in the lease contract, we do not find it in that part of the instrument containing the option to purchase. The option is unconditionally granted and there is no requirement creating any condition precedent or otherwise limiting the right to exercise the option." *Id.*

In *Giblin v. Sudduth,* 300 S.W.2d 330 (Tex.Civ.App.-Austin 1957, writ ref'd n.r.e.), a contract for the sale of land also gave the buyer an option to buy an adjoining tract. The option provided as follows:

> The seller agrees to give the purchaser an option on the acre tract joining the property they are buying from the seller on the east; this option will be for 5 years and the purchasers can take up their option at any time within 5 years from date by paying the seller $1500.00 in cash. The purchaser agrees to pay a yearly rental of $10.00.

*Id.* at 332. The court of appeals held that the purchaser's failure to pay the rent did not bar the purchaser's exercise of the option. "The option was not conditioned upon the payment of the annual rental, the option was for five years[,] and the purchasers were allowed to take up their option at any time within five years by paying the seller $1500.00 in cash." *Id.*

In a case cited by the Chamberses, *Lazy M. Ranch, Ltd. v. TXI Operations, LP,* the contract required TXI to pay Lazy M. $2,000.00 for the right to conduct subsurface tests for gravel on part of the Lazy M. land—1,669 acres specifically described by metes and bounds. *Lazy M. Ranch,* 978 S.W.2d at 680. For the same consideration, the contract gave TXI

the option to lease 300 acres out of the 1,669 acres to mine subsurface materials. To exercise the option, the contract required TXI (1) to give Lazy M. written notice of its decision to exercise the option within six months of the execution of the contract and (2) tender $98,000.00 to Lazy M. TXI attempted to exercise the option by delivering written notice accompanied by a $98,000.00 bank check. Lazy M. returned the check with a letter explaining that it would not lease the land, because TXI had **\*586** breached the contract by entering on and testing Lazy M.'s land outside the 1,669 acres specified in the contract. *Id.* The uncontradicted summary judgment evidence showed that, despite Lazy M.'s repeated objections, TXI intentionally persisted in coring and testing outside of the area subject to the agreement. In conducting these tests, TXI stole valuable information about the subsurface potential of the ranch. *Id.* at 681.

The Austin Court of Appeals held that TXI's conduct constituted a material breach of an implied covenant not to explore outside the area agreed upon. *Id.* Consistent with the other opinions cited, the court of appeals acknowledged that having decided that TXI's conduct was a material breach of an implied covenant, it must determine whether the implied covenant was independent or dependent. *Id.* A breach of an independent covenant would give the nonbreaching party only a cause of action for damages resulting from the breach. *Id.* The breach of a dependent covenant gives the nonbreaching party the election to terminate the contract. *Id.* In that event TXI would have forfeited its option. "Forfeitures will be avoided unless [the] contract language admits of no other construction or results in a construction that is unreasonable, inequitable, or oppressive." *Id.* (citing *Reilly,* 727 S.W.2d at 530). The court considered several factors in determining whether it would be inequitable and oppressive to characterize a party's nonperformance as merely a breach of an independent covenant: (1) the extent to which the nonbreaching party will be deprived of the benefit it reasonably could have anticipated had the breach not occurred, (2) the extent to which the injured party can be adequately compensated for the part of the benefit lost, (3) the likelihood that the defaulting party will cure its failure, and (4) the extent to which the conduct of the party failing to perform comports with standards of good faith and fair dealing. *Id.* at 681–82 (citing RESTATEMENT OF CONTRACTS (SECOND) § 241(a) (1981); *Hernandez v. Gulf Group Lloyds,* 875 S.W.2d 691, 693 (Tex.1994)).

The Chamberses stress that Hunt was unaware of the option to purchase until they informed Hunt that the 3.94 acres was

overgrown and that the lease required Hunt to maintain the tract in compliance with the municipal code. The Chamberses speculate that but for their notice, Hunt would have remained ignorant of their option to purchase and probably would have failed to exercise it. The Chamberses paid the taxes on the entire tract. They claim they bought the entire tract without knowledge of the easement. The equities, the Chamberses contend, favor them and make it inequitable and oppressive to reward Hunt by enforcing the option.

We, on the contrary, believe the equities weigh in Hunt's favor. The $100.00 to be paid at closing was nominal in that it bore no relationship to the value of property exchanged. The real price paid for the tract upon the option's exercise was embraced within the $39,600.00 consideration already paid by the lessee at the execution of the lease in 1992. The lease was of record when the Chamberses bought the property. The Chamberses secured a title policy when they bought the property in 2004. The lease with option to purchase was pointed out in the policy as an exception to coverage. The Chamberses knew or should have known of the option to purchase when they bought the property.

Once informed that the 3.94 acres was overgrown, Hunt responded immediately by clearing the tract to cure the problem and comply with the contract and the municipal code. The Chamberses complain of Hunt's failure to pay the ad valorem taxes on the 3.94 acres from November of 2004 **\*587** when they bought the 7.96 acres until the time of trial. The Chamberses, as record owners, received the tax notices for the entire tract. They concede they never informed Hunt regarding the taxes or asked it to pay its pro rata share. Even if Hunt had neglected to pay the taxes after being told what was due, the injured party could have been adequately and easily compensated by damages. Hunt's conduct deprived the Chamberses of no benefit it reasonably could have anticipated. Hunt's conduct was fully consistent with standards of good faith and fair dealing.

We have weighed the equities using the criteria set out in *Lazy M.* Fairness does not require that we regard the covenants breached by Hunt as constructively dependent in order to avoid an inequitable or oppressive result. The covenants breached by Hunt were independent covenants whose nonperformance will not excuse the nonbreaching party's performance. Hunt's predecessor had already paid all but $100.00 of the actual consideration for the property. Hunt was never informed of the amount of taxes due nor was it asked to pay them. A forfeiture of Hunt's option because of its

breach of an independent covenant to pay those taxes would be genuinely inequitable and oppressive. The Chamberses' second issue is overruled.

### IS THE EVIDENCE SUFFICIENT TO SUPPORT THE AWARD OF DAMAGES FOR CLEARING AND MOWING?

**[15]** In their third issue, the Chamberses contend that the evidence is legally and factually insufficient to support the award to Hunt of $11,132.00 representing 50.6% of the clearing and mowing charges Hunt incurred on the entire tract. The Chamberses' share of the 7.96 acres equals 50.6%.

The foreman's memo showing the cost for clearing and mowing the entire tract stated "on 5–04–2005, M & J Construction began clearing approximately 8 acres (our half and as a favor to Mr. Chambers, his half also...." The memo detailed how Mr. Chambers had met with him and stated, "We thought it would be in our best interest to help out Mr. Chambers by cleaning up his side."

Brady Chambers testified that he walked around the tract with the foreman and the contractor. Chambers recalled that they told him that he was being so nice that they would clean up the brush piles he had on his side. He testified that he had never asked Hunt to mow his property. Chambers stated that, in fact, he had already had his part of the tract mowed for $200.00. In 2005, Hunt spent $17,353.28 on the property, but it charged only $4,625.00 to this property in 2007. Hunt never asked for payment for this work, the bulk of which was performed in May 2005, almost four years before trial in April 2009. Hunt sought to recover under the doctrine of quantum meruit.

### *Applicable Law*

**[16]** **[17]** "To recover under the doctrine of quantum meruit, a plaintiff must establish that: (1) valuable services and/or materials were furnished, (2) to the party sought to be charged, (3) which were accepted by the party sought to be charged, and (4) under such circumstances as reasonably notified the recipient that the plaintiff, in performing, expected to be paid by the recipient." *Heldenfels Bros., Inc. v. City of Corpus Christi,* 832 S.W.2d 39, 41 (Tex.1992). The measure of damages for a claim in quantum meruit is the reasonable value of the work performed and the materials furnished. *M.J. Sheridan & Son Co. v. Seminole*

*Pipeline Co.,* 731 S.W.2d 620, 625 (Tex.App.-Houston [1st Dist.] 1987, no writ).

**\*588** *Discussion*

Hunt proved the expense it incurred in clearing and mowing the 7.96 acres by the memos and invoices. Hunt's own evidence shows that the work on the Chamberses' half was done "as a favor to Mr. Chambers." The same memo states, "We thought it would be in our best interest to help out Mr. Chambers by cleaning up his side."

This is consistent with Chambers's testimony that he was led to believe that Hunt buried the brush piles on his part of the tract as a favor for his cooperation. Brad Russell, Hunt's landman who testified to the clearing and mowing costs, conceded that he had no reason to disbelieve Chambers's testimony. Hunt, he told the court, had never previously asked the Chamberses to pay any part of the clearing and mowing costs, although most of the work had been done four years before.

 **[18]** The party seeking to recover in quantum meruit must establish that the work done was accepted by the party to be charged "under such circumstances as reasonably notified the recipient that the plaintiff in performing expected to be paid by the recipient." *See Heldenfels Bros., Inc.,* 832 S.W.2d at 41.

There is an absolute absence of any evidence in this record indicating that Hunt expected to be paid for the work done on the Chamberses' part of the tract. The evidence, in fact, conclusively establishes the contrary. The Chamberses' third issue is sustained.

*CONCLUSION*

That part of the judgment granting specific performance of the option to purchase the 3.94 acres is ***affirmed.*** The award of damages to Hunt in the amount of $9,433.61 ($11,132.00 clearing and mowing costs less $1,698.39 taxes paid by Chambers attributable to the 3.94 acres) is ***reversed*** and judgment ***rendered*** that Hunt take nothing on its claim for clearing and mowing costs. Judgment is ***rendered*** awarding the Chambers $1,698.39 for taxes they paid on the 3.94 acres. The award of attorney's fees to Hunt is ***reversed,*** and the cause is ***remanded*** to the trial court for reconsideration of the amount of attorney's fees.

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

322 S.W.3d 901
Court of Appeals of Texas,
Houston (14th Dist.).

H. Frank FAUCETTE and J. Lawrence
Schadler, Appellants/Cross–Appellees,

v.

Grace C. CHANTOS and A.J. Chantos
& Associates, Inc. d/b/a Sarco of
Texas, Appellees/Cross–Appellants.

No. 14–08–00536–CV. | Sept. 23, 2010.

**Synopsis**

**Background:** Former employer company and its principal shareholder brought action against former employees for breach of contract, tortious interference with contract, and other claims after failed sale of company to employees. The 151st District Court, Harris County, Caroline Elizabeth Baker, J., granted company and shareholder partial summary judgment, awarded, after a jury trial, company and shareholder damages for breach of contract, and granted judgment notwithstanding the verdict to former employees on tortious interference claim. Both parties appealed.

**Holdings:** The Court of Appeals, Jeffrey V. Brown, J., held that:

[1] former employees' acceptance of option to purchase remaining share of company did not vary materially from the described option, and thus acceptance could create a binding contract;

[2] evidence was legally and factually sufficient to support jury's finding on breach of contract damages;

[3] company's claim was properly characterized as one for tortious interference with prospective relations rather than tortious interference with existing contracts; and

[4] company did not demonstrate that employees engaged in independently tortious or unlawful acts that interfered with its business relations, as required to support tortious interference with prospective relations claim.

Affirmed.

Frost, J., concurred in part, dissented in part, and filed opinion.

West Headnotes (23)

**[1]** **Appeal and Error**
 Rendering Final Judgment

When appellate court reviews cross-motions for summary judgment, it considers both motions and renders the judgment that the trial court should have rendered.

1 Cases that cite this headnote

**[2]** **Contracts**
 Options; rights of first refusal

An "option" is a privilege or right which the owner of property gives another to buy certain property at a fixed price within a certain time.

3 Cases that cite this headnote

**[3]** **Contracts**
 Options; rights of first refusal

An option contract has two components: (1) an underlying contract that is not binding until accepted, and (2) a covenant to hold open to the optionee the opportunity to accept.

2 Cases that cite this headnote

**[4]** **Contracts**
 Options; rights of first refusal

Generally, acceptance of an option must be unqualified, unambiguous, and strictly in accordance with the terms of the agreement.

2 Cases that cite this headnote

**[5]** **Contracts**
 Options; rights of first refusal
**Contracts**
 Qualified or conditional acceptance of offer

A conditional acceptance of an offer is generally considered a rejection and counteroffer, but that does not mean the parties to an option cannot modify the option or the terms of the underlying sale by mutual agreement.

1 Cases that cite this headnote

**[6]     Corporations and Business Organizations**
    Performance or breach

Former employees' acceptance of option to purchase remaining shares of former employer company did not vary materially from the option described in contract, and thus acceptance could create a binding contract as would support company and its principal shareholder's breach of contract claim against employees after failed sale of company, despite argument that employees' mere statements that they were ready to purchase some of the stock were not sufficient to accept the option; parties arranged a share ownership agreement that was consistent with intended purpose of option, and by notifying company of their intent to exercise the option, employees entered into a bilateral contract and became obligated to perform.

Cases that cite this headnote

**[7]     Contracts**
    Options;  rights of first refusal

Election is the act of the optionee which converts the option contract into a binding promise on the part of the optionor to sell.

Cases that cite this headnote

**[8]     Contracts**
    Offer and acceptance in general
**Contracts**
    Options;  rights of first refusal

The effect of a timely and proper election under an option contract, and of a timely and proper acceptance of an offer, is the same, in that the option contract, on the one hand, and the offer on the other, are turned into a bilateral contract.

1 Cases that cite this headnote

**[9]     Contracts**
    Options;  rights of first refusal

Having exercised an option by election the optionee must then proceed to perform the conditions of the option contract in order to complete the transaction.

Cases that cite this headnote

**[10]     Contracts**
    Options;  rights of first refusal

The acceptance of an option ascribes contractual duties to the optionee in the same way that it does the optionor.

Cases that cite this headnote

**[11]     Appeal and Error**
    Necessity of objection in general

Appellate court would measure the sufficiency of the evidence against the language in jury charge regarding damages for breach of contract in company's action against former employees regarding failed sale of company to employees, where employees did not complain that the charge's measure of damages was improper or otherwise object to the charge.

Cases that cite this headnote

**[12]     Corporations and Business Organizations**
    Damages or amount of recovery

Evidence was legally and factually sufficient to support jury's finding of breach of contract damages of $192,266 to principal shareholder of former employer company in shareholder's action against former employees regarding failed sale of company shares to employees, where amount was exactly the price per share multiplied by the number of shares jury charge stated would have been sold had the breach of contract not occurred.

Cases that cite this headnote

**[13] Damages**
 Nature and theory of compensation

Jury award of breach of contract damages to principal shareholder of former employer company in amount of $192,266 was not a double recovery in shareholder's action against former employees regarding failed sale of shareholder's company shares to employees, even if shareholder was awarded the price she would have received for the shares while retaining the shares; jury was not asked to determine fair market value of shares or to calculate shareholder's net profits on sale of shares.

Cases that cite this headnote

**[14] Judgment**
 Where directed verdict or binding instructions would have been proper

**Judgment**
 Where there is no evidence to sustain verdict

A trial court may disregard a jury's verdict and render a judgment notwithstanding the verdict if no evidence supports one or more of the jury's findings or if a directed verdict would have been proper.

Cases that cite this headnote

**[15] Appeal and Error**
 Judgment

**Appeal and Error**
 Extent of Review

To determine whether the trial court erred in rendering a judgment notwithstanding the verdict, appellate court reviews the entire record, crediting favorable evidence if reasonable jurors could and disregarding contrary evidence unless reasonable jurors could not.

Cases that cite this headnote

**[16] Torts**
 Contracts

To prevail on a tortious-interference claim, plaintiff is required to prove: (1) contracts existed which were subject to defendant's interference; (2) defendant willfully and intentionally committed acts of interference; (3) defendant's acts proximately caused damages; and (4) actual damages or loss occurred.

3 Cases that cite this headnote

**[17] Torts**
 Prospective advantage, contract or relations; expectancy

Elements of tortious interference with prospective contract are: (1) a reasonable probability that the parties would have entered into a contractual relationship; (2) an independently tortious or unlawful act by the defendant that prevented the relationship from occurring; (3) the defendant did such act with a conscious desire to prevent the relationship from occurring or knew that the interference was certain or substantially certain to occur as a result of his conduct; and (4) the plaintiff suffered actual harm or damage as a result of the defendant's interference.

10 Cases that cite this headnote

**[18] Torts**
 Contracts

A third party is prohibited from tortiously interfering with a terminable-on-notice or terminable-at-will contract, but merely inducing one of the parties to exercise his right to terminate contractual relations after giving the required notice does not necessarily constitute tortious interference with contract under state law.

1 Cases that cite this headnote

**[19] Torts**
 Competition

Harm that results only from lawful competition is not compensable by the interference with contract tort.

Cases that cite this headnote

Cases that cite this headnote

**[20]** **Torts**

🔑 Business relations or economic advantage, in general

Former employer's claim against its former employees was properly characterized as one for tortious interference with prospective relations, rather than tortious interference with existing contracts as employer argued, in action arising out of employees' formation of new business and obtaining of some of employer's former lines of business; although two of employer's customers exercised the terminable-on-notice provisions of their contracts, there was no evidence that either customer breached their contract with employer, and employer did not allege or show that employees induced customers to breach contracts during thirty-day termination period.

4 Cases that cite this headnote

**[21]** **Torts**

🔑 Prospective advantage, contract or relations; expectancy

One's interest in a contract terminable at will is primarily an interest in future relations between the parties, and he has no legal assurance of them; for this reason, an interference with this interest is closely analogous to interference with prospective contractual relations. Restatement (Second) of Torts § 766 comment.

Cases that cite this headnote

**[22]** **Trial**

🔑 Statement of Issues

Jury question was broad enough to encompass claim for tortious interference with prospective relations, in former employer's claim against its former employees regarding employees' formation of new business and obtaining of some of employer's former lines of business, where jury question asked whether employees "intentionally interfered with the manufacturer's representative contracts [employer] had" with customers.

**[23]** **Torts**

🔑 Business relations or economic advantage, in general

Former employer did not demonstrate that former employees engaged in independently tortious or unlawful acts that interfered with its business relations with customers, as required to support employer's tortious interference with prospective relations claim against employees arising out of employees' formation of new business and obtaining of some of employer's former lines of business; employer's argument that employees planned to resign without notice or warning, in a manner and at a time when they knew it would harm employer, only supported interference with employer's own performance of its contracts.

12 Cases that cite this headnote

**Attorneys and Law Firms**

**\*904** Clinard J. Hanby, The Woodlands, for appellants.

Bradley R. Walton, Peter Michael Kelly, James B. Lewis, Susan J. Taylor, Houston, for appellees.

Panel consists of Justices FROST, BROWN, and Senior Justice HUDSON. [*]

[*] Senior Justice J. Harvey Hudson, sitting by assignment.

**OPINION**

JEFFREY V. BROWN, Justice.

This case involves the failed sale of a company to its employees, who instead resigned from the company, formed their own business, and obtained some of the seller's former lines of business. The company, A.J. Chantos & Associates, Inc., d/b/a Sarco of Texas ("Sarco") and its principal shareholder, Grace C. Chantos, sued former employees H. Frank Faucette and J. Lawrence Schadler, alleging breach of contract, tortious interference with contract, and other claims.

Both sides moved for summary judgment on the breach-of-contract claim, and the trial court granted Chantos and Sarco's motion for partial summary judgment on liability for breach of contract.

The case was then tried to a jury on damages for breach of contract and on the tortious-interference claim. The jury awarded Chantos $192,266.00 in damages for breach of contract. The jury found both defendants liable for tortious interference and awarded Sarco $201,407.21 in damages. The trial court granted Faucette **\*905** and Schadler's motion for judgment notwithstanding the verdict on the tortious-interference claim, but entered a judgment on the breach-of-contract claim for the amount awarded by the jury, attorney's fees, pre- and post-judgment interest, and costs.

On appeal, appellants Faucette and Schadler contend the trial court erred in granting Chantos and Sarco's motion for partial summary judgment on the breach-of-contract claim and in not granting their motion for summary judgment. In resolving this issue, we are asked to consider the infrequent circumstance of a grantor of an option suing the holder of the option for allegedly breaching the option's terms. The appellants also contend that the evidence at trial was legally and factually insufficient to prove damages for breach of contract.

On cross-appeal, Chantos and Sarco contend that the trial court erred in granting Faucette and Schadler's motion for judgment notwithstanding the verdict because Chantos and Sarco presented legally sufficient evidence of each element of tortious interference.

For the reasons explained below, we affirm.

## I

Grace Chantos and her husband, Andy, formed Sarco of Texas, a representative sales agency for plumbing supplies, in 1979. In 1983, they incorporated the agency as A.J. Chantos & Associates, Inc., d/b/a Sarco of Texas. Sarco had contracts with manufacturers in the plumbing, air-conditioning, and heating industry. It was standard in the industry that the contracts with the manufacturers had thirty-day termination provisions. Despite the thirty-day cancellation provision, Sarco represented several manufacturers for twenty years or more. These manufacturers included Elkay, Vanguard, McGuire, and Precision.

Grace and Andy had two children, Linda and Andrew. Andrew worked for Sarco until 1993, when he started his own agency, Sarco Central, in New Braunfels. Linda married Faucette, who worked for Sarco for a few years in the 1980s, returned to Sarco as a salesman in 1994, and remained there until October 7, 2003. J. Lawrence Schadler worked as a salesman for Sarco from 1994 until October 7, 2003. The only other sales employee for Sarco was Lane Malmburg, who started with Sarco in 2002. Malmburg resigned the same day as Faucette and Schadler—October 7, 2003.

For many years, Andy Chantos had suffered from a serious illness. In 2001, he and Grace began to consider retiring and entered into negotiations with Chumley & Associates to sell the agency. Ultimately, Andy and Grace broke off negotiations with Chumley and offered to sell Sarco to Andrew, Faucette, and Schadler. [1] Andrew already owned 260 of Sarco's 1,000 shares, most of which were obtained in 2001 when Sarco acquired Andrew's company, Sarco Central. In the spring and summer of 2001, the parties executed the "Sale and Purchase Agreement" containing the option to purchase all the shares of stock in Sarco (the "contract").

1    Grace Chantos testified that the reason she and Andy broke off negotiations with Chumley was because Chumley could not offer permanent employment to Faucette and Schadler.

The contract provided that, when Faucette, Schadler, and Andrew acquired forty-nine percent of the company, they would have the option to purchase the remainder of the company from Chantos. The relevant portion of the contract provided:

> At such time as Buyers have acquired a total of forty-nine percent (49%) of the **\*906** authorized and outstanding shares of the Corporation, Buyers shall have the option to purchase the remaining shares, but only in a lump sum wherein Buyers purchase all remaining shares.

\* \* \*

> This Agreement shall terminate unless the Sale and Purchase contemplated is completed in its entirety within thirty-two (32) months from the date of execution of the Agreement.

Andy became gravely ill in late 2001, and after that he and Grace did not actively participate in the operation of Sarco. Faucette, Schadler, and Linda operated Sarco on a day-to-day

basis. On August 18, 2002, Andy died. Grace returned to work in May of 2003, and Linda resigned.

On July 22, 2003, Faucette, Schadler, Chantos, Andrew, and attorney Brad Walton met to discuss exercising the option. At the time of the meeting, Faucette owned 118 of Sarco's 1,000 shares; Schadler owned 116 shares, and Andrew owned 260 shares. Thus, together they owned 494 shares, or 49.4 percent of the company.[2] The parties discussed a plan in which Faucette and Schadler were to purchase enough shares from Chantos to bring their ownership to 260 shares each—the same number Andrew already owned.[3] The company would then purchase the remaining shares. The parties also discussed having another meeting within sixty days, apparently to finalize the agreement. But no second meeting occurred, and Faucette and Schadler did not purchase the shares.

[2]    At trial, the testimony reflected that Schadler owned 120 shares, but we are confined to the summary judgment record for purposes of the appellants' first issue.

[3]    Schadler testified that the reason the parties discussed equalizing the shares was that Grace was concerned about Schadler and Faucette having more shares than Andrew. Andrew, however, testified that the change actually helped Schadler and Faucette, who did not have to purchase as many shares.

Sometime after the July 22 meeting, Faucette and Schadler's business relationship with Grace deteriorated, and after one particularly heated encounter with Grace, they decided to leave Sarco and form their own representative agency. In early September, Faucette discussed leaving Sarco with Schadler and Malmburg. They all resigned on October 7, 2003. About a week or two before they resigned, Schadler went to some of the manufacturers with which Sarco had representative contracts, including Elkay, Vanguard, McGuire, and Precision, and posed a "hypothetical" question asking if he and the others left Sarco, whether they could represent those manufacturers. Also, in late September or early October, Faucette spoke with an attorney about incorporating a new manufacturer's representative company to be called Tri–Rep Sales, Inc. Faucette, Schadler, and Malmburg did not inform Grace of their plans or that they were going to quit. They continued to represent to Grace and Andrew that they intended to complete the purchase of shares in Sarco.

On the day Faucette, Schadler, and Malmburg resigned, Grace was in California. Consequently, the office was left without salespeople and unable to function adequately.[4] That same day, Vanguard sent Sarco written notice that it was terminating its manufacturer's sales representative **\*907** contract with the company. Three days later, on October 10, 2003, Elkay also terminated its sales agreement with Sarco. Elkay and Vanguard signed representation agreements with Tri–Rep shortly after that. Grace and Andrew were unable to find experienced salespeople to staff the company, and Sarco was therefore unable to service its remaining lines. After Tri–Rep began operating, its annual sales ranged between $1 million and $3 million.

[4]    Faucette and Schadler testified that they intended to work the entire week after they resigned, but because Grace changed the locks they were unable to do so. Schadler also testified that they continued to take orders for Sarco from Malmburg's home for thirty days, and Sarco was paid the commissions on those orders.

## II

### *Breach of the Option Contract*

Grace and Sarco moved for partial summary judgment on their breach-of-contract claim. They alleged that, after Andy passed away, Faucette and Schadler "concluded that it would be far less expensive to simply take the clients and suppliers of [Sarco] rather than to continue with the purchase." They also alleged that Faucette and Schadler persuaded several of Sarco's largest manufacturers and clients to leave Sarco and to sign representation contracts with them. Grace and Sarco contended that Faucette and Schadler breached the option contract when, at the meeting on July 22, 2003, Faucette and Schadler gave notice of their intent to exercise their option to purchase all of the remaining shares of the company, but then failed to complete the purchase.

Faucette and Schadler responded to this motion and filed their own motion for summary judgment on the breach-of-contract claim. In Faucette and Schadler's motion for summary judgment and response, they argued that they did not exercise the option because they did not tender the funds to purchase the shares within the time required by the contract. Consequently, they argued, their failure to timely exercise the option according to its terms legally amounted to nothing more than a rejection of the option.

On November 2, 2006, the trial court granted Grace and Sarco's motion for partial summary judgment. Faucette and Schadler moved for reconsideration, which the trial court denied.

In their first issue, Faucette and Schadler contend that the trial court erred in denying their motion for summary judgment on the breach-of-contract claim and in granting Grace and Sarco's motion.

 **[1]**    We review the trial court's grant of summary judgment de novo. *Joe v. Two Thirty Nine Joint Venture,* 145 S.W.3d 150, 156–57 (Tex.2004). A movant must establish its right to summary judgment by showing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. *Nixon v. Mr. Prop. Mgmt. Co.,* 690 S.W.2d 546, 548 (Tex.1985). We take as true all evidence favorable to the non-movant, and we indulge every reasonable inference and resolve any doubts in the non-movant's favor. *Joe,* 145 S.W.3d at 157. We review a summary judgment for evidence that would enable reasonable and fair-minded jurors to differ in their conclusions. *Wal–Mart Stores, Inc. v. Spates,* 186 S.W.3d 566, 568 (Tex.2006) (per curiam). When we review cross-motions for summary judgment, we consider both motions and render the judgment that the trial court should have rendered. *Coastal Liquids Transp., L.P. v. Harris County Appraisal Dist.,* 46 S.W.3d 880, 884 (Tex.2001).

 **[2]**    **[3]**    It is undisputed that, under the terms of the contract, Faucette and Schadler, along with Andrew Chantos, acquired an option to compel Grace to sell the remaining shares of Sarco on the stated terms before the option expired. An option is a privilege or right which the owner of property gives another to buy certain property at a fixed price within a certain time. **\*908** *State v. Clevenger,* 384 S.W.2d 207, 210 (Tex.Civ.App.-Houston 1964, writ ref'd n.r.e.). An option contract has two components: (1) an underlying contract that is not binding until accepted and (2) a covenant to hold open to the optionee the opportunity to accept. *Comeaux v. Suderman,* 93 S.W.3d 215, 220 (Tex.App.-Houston [14th Dist.] 2002, no pet.); *Hott v. Pearcy/Christon, Inc.,* 663 S.W.2d 851, 853 (Tex.App.-Dallas 1983, writ ref'd n.r.e.).

In their motion for partial summary judgment, Grace and Sarco contended that in the meeting on July 22, 2003, Faucette and Schadler committed to exercise their option to purchase the remaining fifty-one percent of the Sarco shares and agreed that they would make financial arrangements to purchase the shares. Among other things, Grace and Sarco supported their motion with the following testimony from Faucette's deposition:

Q. During that [July 22] meeting did you state that you were ready, willing and able to go forward with the deal to purchase the remaining 51 percent in conjunction with—

A. I believe we did.

Q. —and that would have been in conjunction with Andrew C. Chantos and Lawrence—

A. Correct.

Q. —Schadler.

And you told Grace you were going to go forward with the deal?

A. I believe I did.

Grace and Sarco also pointed to similar excerpts of both Faucette's and Schadler's testimony in which they confirmed that they agreed to exercise the option to purchase the remaining fifty-one percent of the corporation and discussed how they would finance the purchases. Based on Faucette and Schadler's testimony, Grace and Sarco contended that Faucette and Schadler committed to exercise the option to purchase the remaining shares of the company and specifically worked out the details of how the purchase was to be made, including seeking financing. But rather than complete the sale, Faucette and Schadler breached their contractual obligation by failing and refusing to carry through with their agreement to purchase the remaining shares of stock.

 **[4]**    **[5]**    **[6]**    On appeal, Faucette and Schadler argue that the option is not enforceable because their alleged acceptance varied materially from the option described in the contract. They also contend that their alleged acceptance was, at best, a statement of intent to purchase shares sometime in the future, and the sale was not completed by the deadline specified in the contract. Generally, acceptance of an option must be unqualified, unambiguous, and strictly in accordance with the terms of the agreement. *Comeaux,* 93 S.W.3d at 220; *Crown Const. Co. v. Huddleston,* 961 S.W.2d 552, 558 (Tex.App.-San Antonio 1997, no writ). A conditional acceptance of an offer is generally considered a rejection and counteroffer. *See United Concrete Pipe Corp. v. Spin–Line Co.,* 430 S.W.2d 360, 363–64 (Tex.1968); *Hutcherson v. Cronin,* 426 S.W.2d

638, 641 (Tex.Civ.App.-Tyler 1968, no writ). But that does not mean the parties to an option cannot modify the option or the terms of the underlying sale by mutual agreement. *See Humble Oil & Refining Co. v. Westside Inv. Corp.,* 428 S.W.2d 92, 94–95 (Tex.1968); *Wall v. Trinity Sand & Gravel Co.,* 369 S.W.2d 315, 317 (Tex.1963).

Faucette and Schadler argue that their alleged acceptance varied materially from the option contained in the contract because the parties' agreement was changed. Specifically, at the July 22 meeting, Faucette and Schadler expressed an intent only to purchase enough shares from Grace so that they would each own 260 shares, the same number as held by Andrew Chantos. Conversely, the offer contained in the contract provided that the "Buyers" shall have the option to purchase **\*909** the remaining shares, "but only in a lump sum wherein Buyers purchase all remaining shares." The "Buyers" are defined in the contract as Andrew C. Chantos, H. Frank Faucette, and J. Lawrence Schadler. Thus, Faucette and Schadler argue, the option called for three buyers, Andrew, Faucette, and Schadler, to make a lump-sum purchase of fifty-one percent of the shares of stock in Sarco. But the summary-judgment evidence showed that the alleged acceptance called for Faucette to purchase 142 shares, Schadler to purchase 144 shares, Andrew to purchase nothing, and Sarco itself to purchase the remaining 220 shares.[5] Consequently, they contend, their alleged acceptance amounted to nothing more than a counteroffer and rejection of the option contained in the contract. *See Antonini v. Harris County Appraisal Dist.,* 999 S.W.2d 608, 610–11 (Tex.App.-Houston [14th Dist.] 1999, no pet.) ("Acceptance must be identical with the offer in order to make a binding contract.").

[5]     Faucette's testimony included the following exchange:
        Q. So the plan was as of this July 22 meeting, was for you, Lawrence Schadler and Andrew C. Chantos to all equalize the number of shares you owned at 26 percent each and for Sarco of Texas to purchase the remaining 22 percent. Is that correct?
        A. I believe that is correct.
        Schadler also confirmed this plan in the excerpts of his testimony attached to Grace and Sarco's motion.

It is undisputed that Grace owned fifty-one percent of the company's shares, her son Andrew owned twenty-six percent of the shares, and Faucette and Schadler owned the rest. The summary-judgment evidence shows that at the July 22 meeting, Faucette and Schadler agreed to exercise the option to purchase Grace's shares. That Andrew, one of the "Buyers" defined in the contract, was not purchasing

any additional shares does not raise an inference defeating summary judgment. The intended purpose of the option was to enable the majority shareholders (now Grace) to relinquish ownership of the company to the other shareholders (Andrew, Faucette, and Schadler) once they acquired forty-nine percent of the company. The evidence conclusively shows that the parties expressed an agreement consistent with this purpose. The arrangement to equalize the share ownership and to have the company itself buy the remaining shares merely goes to the manner in which the other shareholders would accomplish the agreed-upon purpose of buying out Grace's ownership interest. On these facts, therefore, there was no counteroffer and rejection that rendered the agreement unenforceable.

Faucette and Schadler argue, however, that the alleged acceptance was not made in the manner or within the time the contract required. They point to the contract's provision that the option requires the buyers to "purchase" all of the remaining shares and to do so "only in a lump sum." Therefore, they contend, the contract required them to actually tender performance, not merely to announce an intent to perform without ever tendering any money. As additional support for their interpretation of the contract, Faucette and Schadler point to the "Term of Agreement" provision, which states that the contract "shall terminate unless the Sale and Purchase contemplated in its entirety within thirty-two (32) months from the date of execution of the Agreement." This language, they contend, requires that actual payment be made prior to the end of thirty-two months to exercise the option. Thus, their mere statements at the July 22 meeting that they were ready to purchase some of Grace's stock were not sufficient to accept the option.

In their motion, Grace and Sarco relied on a line of cases holding that unless an **\*910** option to purchase contains provision to the contrary, the optionee is only required to notify the optionor prior to the expiration of the option period, and then tender performance within a reasonable time thereafter to exercise the option. *See, e.g., English v. English,* 44 S.W.3d 102 (Tex.App.-Houston [14th Dist.] 2001, no pet.); *Maxwell v. Lake,* 674 S.W.2d 795, 798 (Tex.App.-Dallas 1984, no writ); *San Antonio Joint Stock Land Bank v. Malcher,* 164 S.W.2d 197, 200 (Tex.Civ.App.-San Antonio 1942, writ ref'd w.o.m.). In *English,* for example, an ex-wife notified her ex-husband that she was exercising the option contained in the parties' divorce decree to buy out her ex-husband's interest in their homestead within the option period, but she did not complete the purchase before the option expired. *Id.* at 104. This court held that "where the option

instrument is silent regarding the method of exercising the option, giving timely notice to the optionor and subsequently tendering performance within a reasonable time is sufficient to exercise the option." *Id.* (citing *Maxwell v. Lake,* 674 S.W.2d at 798). Grace and Sarco argue that, because the option provision of the contract did not specify the manner or method in which they were to be notified that the option was accepted, Faucette's and Schadler's agreement to purchase the remaining shares of stock at the July 22 meeting was sufficient to exercise the option.

On appeal, Faucette and Schadler argue that these cases stand merely for the proposition that unless the option provides otherwise, acceptance of the option does not require the optionee to tender actual payment before the option expires; they do not hold that an optionee may accept an option by mere notice without ever tendering payment. Thus, Faucette and Schadler contend, an optionee who never tenders performance cannot enforce the option. They also argue that the option in this case does "provide otherwise" because it requires the purchase be completed in its entirety according to its terms and within the specified deadline. In any event, they contend that because they never tendered payment within the option period, they never exercised the option. As support, Faucette and Schadler cite *Kruegel v. Berry,* 75 Tex. 230, 9 S.W. 863, 864–65 (1888), in which the supreme court concluded that a lessee who had an option to purchase leased land for a specified amount within two years "had the right at any time during the term of the lease ... to purchase the land by paying the consideration agreed upon," but because he did not seek to enforce the option before the expiration of the two-year period, and the land was then sold to a third party, the lessee was not entitled to specific performance of the option contained in the lease. *Kruegel* did not involve a situation in which the lessee gave notice of an intent to exercise the option but failed to pay the consideration for the option within the option period. And, the court in *Kruegel* did not address whether acceptance alone is insufficient to exercise an option.

 **[7]**   **[8]**   **[9]**   **[10]**   In this case, as in all option cases, the option contract itself is an offer by the optionor to the optionee. By agreeing to purchase the remaining shares at the July 22 meeting—an arrangement that fulfilled the intended purpose of the option—Faucette and Schadler elected to accept the offer. The effect of this election is the formation of a contract that binds both the optionor and the optionee:

> Election is the act of the optionee which converts the option contract into a binding promise on the part of the

optionor to sell. The effect of a timely and proper election under the contract, and of a timely and proper acceptance of an offer, is the same, in that the option contract, on the one hand, and the offer on the other, are turned into a bilateral **\*911** contract. *Having exercised the option by election the optionee must then proceed to perform the conditions of the option contract in order to complete the transaction.*

*Ferguson v. von Seggern,* 434 S.W.2d 380, 385 (Tex.Civ.App.-Dallas 1968, writ ref'd n.r.e.) (emphasis added); *see also Hott,* 663 S.W.2d at 854 ("When the optionee gives notice or otherwise complies with the terms and conditions of the option ... a bilateral executory contract is formed, one party having the duty to convey and the other the duty to pay."). The cases in which an optionee exercises the option and thus binds the optionor to perform are legion. *See, e.g., Sinclair Refining Co. v. Allbritton,* 147 Tex. 468, 218 S.W.2d 185, 188–90 (1949); *Smith v. Hues,* 540 S.W.2d 485, 490 (Tex.Civ.App.-Houston [14th Dist.] 1976, writ ref'd n.r.e.); *Luccia v. Ross,* 274 S.W.3d 140, 149–50 (Tex.App.-Houston [1st Dist.] 2008, pet. denied); *Odum v. Sims,* 609 S.W.2d 881, 882 (Tex.Civ.App.-San Antonio 1980, no writ); *Kenver Corp. v. Robinson,* 492 S.W.2d 317, 319–20 (Tex.Civ.App.-Beaumont 1973, writ ref'd n.r.e.); *Giblin v. Sudduth,* 300 S.W.2d 330, 332–34 (Tex.Civ.App.-Austin 1957, writ ref'd n.r.e.); *see also El Paso Natural Gas Co. v. W. Bldg. Assocs.,* 675 F.2d 1135, 1139–41 (10th Cir.1982) (holding optionee's acceptance of option without tender of purchase price created mutually binding contract entitling optionee to specific performance). But the acceptance of an option ascribes contractual duties to the optionee in the same way that it does the optionor. By notifying Grace and Sarco of their intent to exercise the option, Faucette and Schadler entered into a bilateral contract and became obligated to perform. *See Ferguson,* 434 S.W.2d at 385. And when they failed to perform by refusing to complete the purchase of the remaining shares, they breached the contract.

Because we affirm the trial court's grant of summary judgment in favor of Grace and Sarco, we do not address Faucette and Schadler's competing motion for summary judgment.

We overrule Faucette and Schadler's first issue.

### *Damages for Breach of Option Contract*

In their second issue, Faucette and Schadler contend that the evidence is legally and factually insufficient to prove damages for breach of contract. They argue that Grace was awarded what she would have received from the sale of the remaining shares of Sarco without any evidence of the value of the shares she should have surrendered in the transaction. According to Faucette and Schadler, proper proof of damages required not only evidence of the amount Grace would have received had the sale of the shares been performed, but also evidence of the value of the shares she would have surrendered in the transaction. *See Miga v. Jensen,* 96 S.W.3d 207, 215 (Tex.2002) (holding damage award resulting from a breach of an agreement to purchase securities is the difference between the contract price and the fair market value of the asset at the time of the breach); *Holt Atherton Indus. Inc. v. Heine,* 835 S.W.2d 80, 84 (Tex.1992) (evidence of lost income was legally insufficient to prove lost profits). They also argue there was undisputed evidence that she retained the shares, sold assets of the company, and kept the proceeds for herself. [6]

6    Faucette and Schadler also complain that the judgment was erroneously rendered jointly and severally against them for breach of contract. They state in their brief that even if they were required to exercise the option for the entire option price, Grace was entitled, at most, to an award of $82,472 against Faucette and $81,705 against Schadler. But Faucette and Schadler do not provide any argument or authority to support their contention that the trial court erred in rendering a judgment against them jointly and severally; therefore, it is waived. *See* Tex.R.App. P. 38.1(i).

**\*912** When examining a legal-sufficiency challenge, we review the evidence in the light most favorable to the challenged finding and indulge very reasonable inference that would support it. *City of Keller v. Wilson,* 168 S.W.3d 802, 822 (Tex.2005). We credit favorable evidence if reasonable jurors could and disregard contrary evidence unless reasonable jurors could not. *Id.* at 827. The evidence is legally sufficient if it would enable reasonable and fair-minded people to reach the verdict under review. *Id.*

When examining a factual-sufficiency challenge, we consider and weigh all the evidence, both supporting and contradicting the finding. *Mar. Overseas Corp. v. Ellis,* 971 S.W.2d 402, 406–07 (Tex.1998). We set aside the fact finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Pool v. Ford Motor Co.,* 715 S.W.2d 629, 635 (Tex.1986).

[11]   Initially, we note that the jury was asked to determine Grace's damages for the breach of contract the court had found. The question was worded as follows:

> What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Grace C. Chantos for her damages, if any, that resulted from such breach of contract?
>
> Consider the following elements of damages, if any, and none other:
>
> The amount Grace C. Chantos would have received for the sale of her 502 shares of the business corporation if H. Frank Faucette and J. Lawrence Schadler had not breached the Sale and Purchase Agreement.

At the charge conference, Faucette's and Schadler's only objection to this question was that the answers should have been separate for each of them. They did not complain that the instruction's measure of damages was improper or otherwise object to the instruction. Therefore, we measure the sufficiency of the evidence against the language in the charge. *Osterberg v. Peca,* 12 S.W.3d 31, 55 (Tex.2000) (holding, when no objection is made to jury issue, sufficiency of the evidence is measured against charge given by court rather than some other unidentified law); *Kroger Co. v. Brown,* 267 S.W.3d 320, 323 (Tex.App.-Houston [14th Dist.] 2008, no pet.) (measuring sufficiency of damages evidence against commonly understood meaning of undefined term used in charge); *see also Equistar Chems., L.P. v. Dresser–Rand Co.,* 240 S.W.3d 864, 868 (Tex.2007) (holding argument that charge submitted improper measure of damages was waived by failure to object in trial court); *Tribble & Stephens Co. v. Consolidated Services, Inc.,* 744 S.W.2d 945, 949 (Tex.App.-San Antonio 1987, writ denied) (holding failure to raise issue of improper measure of damages in trial court waived review of complaints that proper measure of damages was not submitted to jury and that plaintiff failed to present evidence on the proper measure).

[12]  [13]  Here, the jury was instructed that the measure of damages is the amount of money Grace "would have received for the sale of her 502 shares" of the company had Faucette and Schadler not breached the contract. Under the terms of the contract, the price per share was $383. The jury awarded $192,266, which is exactly the share price multiplied by 502.

Therefore, the jury's answer is supported by legally sufficient evidence. And, although Faucette and Schadler complain *913 that Grace received a double recovery because she was awarded the sales price while retaining the shares, the jury was not asked to determine fair market value of the shares or to calculate Grace's net profits on the sale of the shares. The evidence, measured against the question asked, is also factually sufficient to support the jury's award.

Having overruled Faucette and Schadler's second issue, we next turn to Grace and Sarco's cross-appeal.

### III

### *Tortious Interference*

At trial, the jury found Faucette and Schadler tortiously interfered with Sarco's manufacturers' representative contracts with Elkay and Vanguard. In a single issue, Sarco contends the trial court erred in granting Faucette and Schadler's motion for JNOV on the tortious-interference findings because Sarco presented legally sufficient evidence of each element of that cause of action.

[14] [15] A trial court may disregard a jury's verdict and render a judgment notwithstanding the verdict if no evidence supports one or more of the jury's findings or if a directed verdict would have been proper. *Tiller v. McLure,* 121 S.W.3d 709, 713 (Tex.2003). The final test for legal sufficiency is whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review. *City of Keller v. Wilson,* 168 S.W.3d 802, 827 (Tex.2005). To determine whether the trial court erred in rendering a JNOV, we review the entire record, crediting favorable evidence if reasonable jurors could and disregarding contrary evidence unless reasonable jurors could not. *Id.* at 807.

[16] To prevail on a tortious-interference claim, Sarco was required to prove: (1) contracts existed which were subject to Faucette and Schadler's interference; (2) Faucette and Schadler willfully and intentionally committed acts of interference; (3) Faucette's and Schadler's acts proximately caused damages; and (4) actual damages or loss occurred. *Browning–Ferris, Inc. v. Reyna,* 865 S.W.2d 925, 926 (Tex.1993); *Rodarte v. Investeco Group, LLC,* 299 S.W.3d 400, 411 (Tex.App.-Houston [14th Dist.] 2009, no pet.).

Sarco argues that the evidence shows that Faucette and Schadler intentionally destroyed Sarco's business for their own financial gain. Specifically, Faucette and Schadler, while receiving salaries and bonuses from Sarco to enable them to purchase the company and promising they were continuing with the purchase, persuaded the manufacturers who had been with Sarco for over twenty years to terminate their contracts so they could do business with Faucette and Schadler's new company, Tri–Rep. Further, Faucette and Schadler planned their method of departure from Sarco—resigning without notice when Grace was out of the state and taking the only other salesman with them—knowing it would cause great harm to Sarco.

Faucette and Schadler respond that Sarco's claim is not one for tortious interference with *existing* contracts, but is actually one for tortious interference with *prospective* contracts. They point out that Elkay and Vanguard complied with their contracts, giving Sarco the contractually required thirty-day notice of termination, and that Sarco continued to act as manufacturer's representative for those thirty days. According to Faucette and Schadler, Sarco is actually seeking to recover damages for the loss of the *prospect* that Elkay and Vanguard would continue to renew the manufacturer's representative contracts indefinitely.

This distinction is significant because in *914 *Wal–Mart Stores, Inc. v. Sturges,* 52 S.W.3d 711, 726 (Tex.2001), our supreme court held that to prevail on a claim for tortious interference with prospective contracts the plaintiff must additionally prove that the defendant's conduct was "independently tortious or wrongful." The *Sturges* court explained that conduct that is merely "sharp" or perceived as "unfair competition" is not actionable as the basis for this tort. *Id.* The plaintiff is not required to prove an independent tort; instead, the plaintiff need only establish that the defendant's conduct would be actionable under a recognized tort. *Id.*

[17] Thus, after *Sturges,* the following formulation of the elements of the tort has been adopted:

(1) a reasonable probability that the parties would have entered into a contractual relationship;

(2) an "independently tortious or unlawful" act by the defendant that prevented the relationship from occurring;

(3) the defendant did such act with a conscious desire to prevent the relationship from occurring or knew that the

interference was certain or substantially certain to occur as a result of his conduct; and

(4) the plaintiff suffered actual harm or damage as a result of the defendant's interference.

*See Baty v. ProTech Ins. Agency,* 63 S.W.3d 841, 860 (Tex.App.-Houston [14th Dist.] 2001, pet. denied). Faucette and Schadler contend that Sarco does not even attempt to meet the burden of showing independently tortious conduct.

Sarco contends that *Sturges* does not apply because its claims were brought for tortious interference with existing contracts. Sarco points out that that it proved the existence of its contracts with the manufacturers and that Faucette and Schadler deprived Sarco of the benefits of those contracts. Sarco further points out that under Texas law the terminable-on-notice or terminable-at-will status of a contract is not a defense to an action for tortious interference. *See Juliette Fowler Homes, Inc. v. Welch Assocs., Inc.,* 793 S.W.2d 660, 666 (Tex.1990) (terminable-on-notice contract); *Sterner v. Marathon Oil Co.,* 767 S.W.2d 686, 689 (Tex.1989) (terminable-at-will contract). Both *Juliette Fowler Homes* and *Sterner* instruct that "[u]ntil a contract is terminated, it is valid and subsisting, and third persons are not free to tortiously interfere with it." *Juliette Fowler Homes, Inc.,* 793 S.W.2d at 666; *Sterner,* 767 S.W.2d at 689 (citing RESTATEMENT (SECOND) OF TORTS § 766 cmt. g (1979)); *see also Knox v. Taylor,* 992 S.W.2d 40, 57–58 (Tex.App.-Houston [14th Dist.] 2001) (rejecting terminable-on-notice status of contract as defense to tortious-interference-with-contract claim and holding third party's mailing of defamatory memo interfered with plaintiff's business relationship).

 **[18]** **[19]** But as to terminable-on-notice or terminable-at-will contracts, the protection *Juliette Fowler Homes* and *Sterner* provide is somewhat limited. The supreme court has also instructed that a party cannot be liable for inducing another party "to do what it had a right to do" under a contract. *ACS Investors, Inc. v. McLaughlin,* 943 S.W.2d 426, 431 (Tex.1997). Thus, a third party is prohibited from tortiously interfering with a terminable-on-notice or terminable-at-will contract, but "merely inducing one of the parties to exercise his right to terminate contractual relations after giving the required notice does not *necessarily* constitute tortious interference with contract under Texas law." *Juliette Fowler Homes, Inc.,* 793 S.W.2d at 667. Likewise, "harm that results only from lawful competition is not compensable by the interference tort." *Sturges,* 52 S.W.3d at 727.

 **\*915** **[20]** In this case, the jury was asked in separate questions whether Faucette and/or Schadler "intentionally interfered with the manufacturer's representative contracts [Sarco] had" with Elkay and Vanguard. The jury answered "yes" to both. But there was no evidence that either Elkay or Vanguard breached their contracts with Sarco. It was undisputed that Elkay and Vanguard gave thirty days' written notice of termination as their contracts provided, and Sarco did not allege or show that Faucette and/or Schadler induced them to breach their contracts with Sarco during the thirty-day termination period. Sarco's real complaint below and on appeal is the loss of the continuing business relationship with Elkay and Vanguard, two of its most profitable lines, which had existed for over twenty years.

This court has recognized that tortious interference with prospective contractual relations includes continuing business relations. *See Heil–Quaker Corp. v. Mischer Corp.,* 863 S.W.2d 210, 214 (Tex.App.-Houston [14th Dist.] 1993), *writ granted, judgm't vacated w.r.m.,* 877 S.W.2d 300 (Tex.1994). In *Heil–Quaker,* the appellants argued there was no evidence to support the jury finding of tortious interference with business relations because the tortious interference alleged was directed to an existing contract rather than a prospective contractual relationship. *Id.* at 214. The court rejected this contention, stating that tortious interference with business or prospective contractual relations concerns not only business relations that have not yet been reduced to a contract but also continuing business relations not amounting to a formal contract. *Id.* (citing RESTATEMENT OF TORTS (SECOND)))) § 766B, cmt. a, c (1979)).

More recently, in an appeal from a summary judgment, the Fort Worth court of appeals rejected a contention that a claim for tortious interference with prospective relations could not apply to a complaint that business was taken from an existing customer. *Astoria Indus. of Iowa, Inc. v. SNF, Inc.,* 223 S.W.3d 616, 633 (Tex.App.-Fort Worth 2007, pet. denied). Citing *Heil–Quaker Corp.,* the court concluded that tortious interference with prospective business relations includes tortious interference with continuing business relationships. *Id.* The court then proceeded to review the summary-judgment evidence concerning the defendant's alleged interference with the plaintiff's existing customer, including whether there was no evidence that the defendant engaged in independently tortious conduct. *See id.* at 633–37.

**[21]** In the context of at-will or terminable-on-notice contracts, the Restatement provides further support for the conclusion that the loss of the contract due to another's tortious acts is properly considered tortious interference with prospective, or continuing, business relations:

> One's interest in a contract terminable at will is primarily an interest in future relations between the parties, and he has no legal assurance of them. *For this reason, an interference with this interest is closely analogous to interference with prospective contractual relations.* (See § 766B.)

RESTATEMENT (SECOND) OF TORTS § 766 cmt. g (1979) (emphasis added). Likewise, section 766B, the section applicable to prospective contractual relations, includes "interferences with ... the opportunity of selling or buying land or chattels or services, and any other relations leading to potentially profitable contracts." *Id.* § 766B cmt. c. The comments to this section explain that "[i]n many respects, a contract terminable at will is closely analogous to the relationship covered by this Section." *Id.*

**[22]** We conclude, therefore, that under the facts of this case, Sarco's claim is **\*916** properly characterized as one for tortious interference with prospective relations, rather than tortious interference with existing contracts. We further conclude that the jury questions, as written, were broad enough to encompass this theory.

**[23]** Because we have concluded that Sarco's claim is one for tortious interference with prospective contracts, Sarco was required to demonstrate that, among other things, Faucette and Schadler engaged in independently tortious or unlawful acts that interfered with its business relations with Elkay and Vanguard. *See Sturges,* 52 S.W.3d at 726.[7] But Sarco does not assert that Faucette and Schadler engaged in any independently tortious conduct.[8] In the absence of any evidence to support this element of the cause of action, we conclude the trial court did not err in granting the JNOV.

[7] We acknowledge that there are cases in which the elements of tortious interference with contracts was applied to the alleged loss of continuing business relationships. *See, e.g., SP Midtown, Ltd. v. Urban Storage, L.P.,* No. 14–07–00717–CV, 2008 WL 1991747, *8–9 (Tex.App.-Houston [14th Dist.] May 8, 2008, pet. denied) (mem. op.); *Anderson, Greenwood & Co. v. Martin,* 44 S.W.3d 200, 218 (Tex.App.-Houston [14th Dist.] 2001, pet. denied). But these cases are distinguishable because the issue presented here was not addressed.

[8] We note that an allegation that Faucette and Sarco breached a fiduciary duty could have supplied the independently tortious conduct to support this element. *See RenewData Corp. v. Strickler,* No. 03–05–00273–CV, 2006 WL 504998, at *10–12 (Tex.App.-Austin Mar. 3, 2006, no pet) (mem. op.) (holding former employee's breach of fiduciary duties to employer satisfies the *Sturges* prerequisites for a claim of tortious interference with prospective business relations). But Grace and Sarco did not plead, seek to demonstrate, or request a jury question concerning whether Faucette and Chantos breached any fiduciary duty to Sarco.

Sarco contends, however, that it is not required to demonstrate that a contract was breached to show actionable interference with contract relations. Instead, Sarco argues that a party may be liable for interference by actions that do not necessarily induce a breach of contract but which injure persons so that they are unable to perform a contract, destroy or damage property that is the subject matter of a contract, or make performance of a contract "more burdensome, difficult or impossible, or of less or no value to the one entitled to performance." *See Tippett v. Hart,* 497 S.W.2d 606, 610 (Tex.Civ.App.-Amarillo 1973), *writ ref'd n.r.e.,* 501 S.W.2d 874 (Tex.1973); RESTATEMENT (SECOND) OF TORTS § 766A. According to Sarco, Faucette and Schadler planned to resign without notice or warning, in a manner and at a time when they knew it would harm Sarco, and took Sarco's only other salesperson with them, leaving the company unable to continue its contracts with Elkay, Vanguard, and even its other lines, because it no longer had a sales force.

Sarco's argument fails, however, because it conflates distinct theories of tortious interference in a way that is inconsistent with the jury questions and the evidence. Sarco's authorities address the situation in which a plaintiff may recover for tortious interference with the plaintiff's performance of her own contracts, not tortious interference with the other party to the contract's performance. For example, in *Tippett v. Hart,* Hart sued Tippett for allowing his cattle to graze on her land without her permission, causing her to breach a contract she had with a governmental agency that prohibited grazing. *See* 497 S.W.2d at 607–11. Likewise, the Restatement (Second) of Torts section 766A, entitled "Intentional Interference with Another's Performance of His Own Contract," provides as follows:

**\*917** One who intentionally and improperly interferes with the performance of a contract ... between another and a third person, by preventing the other from performing the contract or causing his performance to be more expensive or burdensome, is subject to liability to the other for the pecuniary loss resulting to him.

RESTATEMENT (SECOND) OF TORTS § 766A (1979). Section 766A "is concerned only with the actor's intentional interference with the plaintiff's performance of his own contract, either by preventing that performance or making it more expensive or burdensome." *Id.* cmt. a. Further, "[i]t is to be contrasted with [section] 766, which states the rule for the actor's intentional interference with a third person's performance of his existing contract with the plaintiff and section 766B, which concerns 'the actor's intentional interference with the plaintiff's prospective contract relations." *Id.*

Here, the jury was asked whether Faucette and Schadler tortiously interfered with Sarco's contracts with Elkay and Vanguard—not whether Faucette and Schadler tortuously interfered with Sarco's own performance of its contracts with Elkay and Vanguard. Even if we read the jury question broadly enough to encompass this theory, there is no evidence that Faucette and Schadler tortiously interfered by preventing Sarco from performing its contracts with Elkay and Vanguard. Elkay and Vanguard notified Sarco that they were exercising their contractual rights to terminate their contracts on thirty days' notice almost immediately after Faucette's and Schadler's resignations, and Sarco points to no evidence that Faucette's and Schadler's actions impaired or destroyed its ability to perform its contracts with Elkay and Vanguard during the remaining thirty days of each contract. As previously discussed, Sarco's real complaint concerning Elkay and Vanguard is the loss of these two profitable lines of business to Faucette and Schadler's new company, Tri–Rep. Further, to the extent Sarco points to evidence that it was unable to conduct business after Faucette and Schadler resigned, the jury was not asked whether Faucette and Schadler interfered with Sarco's ability to perform its own contractual obligations to its remaining lines.

Therefore, viewing the evidence in a light most favorable to the jury's verdict, we hold that the trial court did not err in

granting Faucette and Schadler's motion for JNOV, and we overrule Sarco's issue.

* * *

Having overruled the parties' issues on appeal and cross-appeal, we affirm the trial court's judgment.

(FROST, J. concurring and dissenting).

KEM THOMPSON FROST, Justice, concurring and dissenting.

To the extent this court affirms the trial court's judgment notwithstanding the verdict as to the tortious-interference-with-contract claims, I concur in the judgment. To the extent this court affirms the trial court's judgment awarding recovery on the breach-of-contract claims and declines to render a take-nothing judgment on these claims, I respectfully dissent.

Under the unambiguous language of the agreement in question, to exercise their option to acquire the remaining shares of the corporation, the option holders had to make the purchase by means of a lump-sum payment within a specified time from the execution date of the contract, and if this purchase did not occur within that time frame, the agreement and the option in it would terminate. It is undisputed that the option holders never purchased the remaining shares, and the plaintiffs judicially admitted that the contract upon which they base their breach-of-contract **\*918** claims terminated at the expiration of the time period specified in the contract. Because the option holders did not exercise their option in the manner required by the contract and because the contract terminated by its own terms, the trial court erred in granting summary judgment in the plaintiffs' favor as to liability on the breach-of-contract claims and in denying the defendants' motion for summary judgment as to these claims. Accordingly, the trial court's judgment should be reversed, and this court should render a take-nothing judgment.

*Relevant Background*

Plaintiffs/appellees/cross-appellants Grace C. Chantos and A.J. Chantos & Associates, Inc., d/b/a Sarco of Texas (hereinafter collectively, the "Chantos Parties")[1] sued defendants/appellants/cross-appellees H. Frank Faucette and J. Lawrence Schadler (hereinafter collectively, the "Option Holders") for breach of a written contract entitled "Sale and

Purchase Agreement" (hereinafter, the "Contract"). Grace Chantos, Grace's husband Andrew J. Chantos, Faucette, and Faucette's wife executed the Contract on May 25, 2001. Schadler and his wife executed the Contract on July 24, 2001.

1    Though Sarco was a plaintiff in the trial court, it was not a party to the Contract, and the trial court rendered judgment only in favor of Grace. References in this opinion to the "parties" pertain to the contracting parties, not to the parties to the litigation, and do not include Sarco.

In a section of the Contract entitled "Sale and Purchase," the parties detailed the contemplated sale of the shares of A.J. Chantos & Associates, Inc., d/b/a Sarco of Texas (hereinafter, "Sarco") by Grace and her husband to the Option Holders and Andrew J. Chantos (collectively hereinafter, the "Buyers"). The parties agreed that during the first thirty months of the Contract or until the Buyers acquired forty-nine percent of the Sarco shares, whichever occurred first, the Option Holders were required to purchase at least four Sarco shares per month. Under the terms of the Contract, if the Buyers acquired at least forty-nine percent of the outstanding Sarco shares, then the Buyers had "the option to purchase the remaining shares, but only in a lump sum wherein Buyers purchase all remaining shares." The parties agreed that "[t]his Agreement *shall terminate unless* the Sale and Purchase contemplated is completed *in its entirety* within thirty-two (32) months from the date of execution of the Agreement" (hereinafter, the "Termination Provision"), (emphasis added). The parties did not specify a date of execution in the Contract. But in light of the two dates on which parties executed the Contract, this thirty-two month period ended no later than on March 24, 2004 (hereinafter, the "End Date").

It is undisputed that, by July 22, 2003, the Buyers had acquired forty-nine percent of the Sarco shares and that they had the option to purchase the remaining Sarco shares provided in the Contract (hereinafter, the "Option"). The Chantos Parties moved for partial summary judgment as to the Option Holders' liability on the breach-of-contract claims. In their sole ground for summary judgment, the Chantos Parties asserted that the summary-judgment evidence conclusively proves that (1) the Option Holders exercised the Option by giving oral notice to Grace at the July 22, 2003 meeting of their acceptance and intent to exercise the Option; and (2) the Option Holders breached the Contract by failing and refusing to purchase the remaining Sarco shares from Grace. The Chantos Parties agreed that acceptance of an option must be unqualified, unambiguous, and strictly in accordance with

the **\*919** terms of the agreement; but they asserted that the Contract did not contain any terms regarding the manner for exercising the Option. Therefore, the Chantos Parties argued, the Option Holders could accept and exercise the Option by giving oral notice to Grace at the July 22, 2003 meeting of their acceptance and intent to exercise the Option.

Both in response to the Chantos Parties' motion and as a ground for summary judgment in their own motion for final summary judgment, the Option Holders asserted that, under the Contract, the parties specified the manner in which the Option Holders had to exercise the Option—they had to purchase Grace's remaining shares in a lump-sum payment by the End Date. The summary-judgment evidence conclusively proves that the Option Holders did not purchase Grace's remaining shares by the End Date. Therefore, the Option Holders asserted, (1) the Contract terminated by its own terms; and (2) the Option Holders had no obligation to purchase the remaining shares under the Contract and did not breach any of its terms. The Option Holders attached to their motion for summary judgment responses to requests for admissions, in which the Chantos Parties judicially admitted that the Contract terminated within thirty-two months of the Contract's execution date and that the Contract was currently terminated.

The trial court denied the Option Holders' summary-judgment motion and granted the Chantos Parties' motion, ruling that, as a matter of law, the Option Holders breached the Contract and are liable to Grace for the breach.

### *Principles of Option Law*

When one acquires an option to purchase property, the holder of the option purchases the right to compel a sale of the property on the stated terms before expiration of the option. *See Comeaux v. Suderman,* 93 S.W.3d 215, 219–20 (Tex.App.-Houston [14th Dist.] 2002, no pet.). Option contracts have two components: (1) an underlying contract that is not binding until accepted and (2) a covenant to hold open to the option holder the opportunity to accept. *See id.* at 220. Before the option can ripen into an enforceable contract of sale, however, the option holder must manifest his acceptance. *See id.* Acceptance of an option must be unqualified, unambiguous, and strictly in accordance with the terms of the agreement. *See id.* For this reason, a failure to exercise an option according to its terms, including untimely or defective acceptance, is simply ineffectual, and legally

amounts to nothing more than a rejection. *See id.* If the contract is silent regarding the method of exercising the option, the option holder may exercise the option by timely giving notice to the optionor of the option holder's intent to exercise the option, and the option holder also may be required to tender performance within a reasonable time. [2] *See English v. English,* 44 S.W.3d 102, 105 (Tex.App.-Houston [14th Dist.] 2001, no pet.).

[2]    Various cases state that, if the contract is silent regarding the method of exercising the option, the option holder may exercise the option by timely giving notice to the optionor of the option holder's intent to exercise the option and by subsequently tendering performance within a reasonable time. *See, e.g., English v. English,* 44 S.W.3d 102, 105 (Tex.App.-Houston [14th Dist.] 2001, no pet.) (stating that "we conclude and hold that where the option instrument is silent regarding the method of exercising the option, giving timely notice to the optionor and subsequently tendering performance within a reasonable time is sufficient to exercise the option"). But, given that the overwhelming majority of option cases involve option holders seeking to enforce the option, it may be that the tender of performance is required in these cases because the option holder seeks to enforce the option rather than as part of the exercise of the option. *See id.* (stating that "if [option holder] gave notice of her intent to exercise the option within the applicable 180 day period, such notice would be sufficient to trigger her rights under the divorce decree"). This court need not address this issue to dispose of this appeal, and it is not addressed in this opinion.

**\*920  *Principles of Contract Interpretation***

In construing contracts, this court's primary concern is to ascertain and give effect to the intentions of the parties as expressed in the contract. *Kelley–Coppedge, Inc. v. Highlands Ins. Co.,* 980 S.W.2d 462, 464 (Tex.1998). To ascertain the parties' true intentions, this court must examine the entire agreement in an effort to harmonize and give effect to all provisions of the contract so that none will be rendered meaningless. *MCI Telecomms. Corp. v. Tex. Utils. Elec. Co.,* 995 S.W.2d 647, 652 (Tex.1999). Whether a contract is ambiguous is a question of law for the court. *Heritage Res., Inc. v. NationsBank,* 939 S.W.2d 118, 121 (Tex.1996). A contract is ambiguous when its meaning is uncertain and doubtful or is reasonably susceptible to more than one interpretation. *Id.* But, when a written contract is worded so that it can be given a certain or definite legal

meaning or interpretation, it is unambiguous, and the court construes it as a matter of law. *Am. Mfrs. Mut. Ins. Co. v. Schaefer,* 124 S.W.3d 154, 157 (Tex.2003). This court cannot rewrite the Contract or add to its language under the guise of interpretation. *See id.* at 162. Rather, this court must enforce the Contract as written. *See Royal Indem. Co. v. Marshall,* 388 S.W.2d 176, 181 (Tex.1965).

**    *Analysis of the Contract***

In the Contract, the parties agreed that, if the Buyers acquired at least forty-nine percent of the outstanding Sarco shares, then the Buyers would have the option to purchase the remaining shares, but only through a lump-sum payment by which the Buyers would acquire all remaining shares. The parties also agreed that the entire Contract would terminate unless the contemplated purchase of the Sarco shares was completed in its entirety by the End Date. The parties did not agree that any provisions of the Contract would survive termination of the Contract. If the Option Holders could have exercised the Option simply by giving notice to Grace of their acceptance and intent to exercise the Option and without purchasing the remaining shares from Grace, such an exercise would have imposed a binding obligation on the Option Holders to purchase the remaining shares by a lump-sum payment. But this construction of the Contract would render the Termination Provision meaningless. *See Kruegel v. Berry,* 75 Tex. 230, 9 S.W. 863, 863–64 (1888) (stating that option holder under lease had to tender purchase price before lease terminated in order to exercise option to buy leased premises for a specified price); *Nguyen v. Woodley,* 273 S.W.3d 891, 898 (Tex.App.-Houston [14th Dist.] 2008, no pet.) (holding that contract for purchase of real property terminated by its own terms upon buyer's giving of a certain notice and that therefore the contract was no longer valid and enforceable); *Cate v. Woods,* 299 S.W.3d 149, 153 (Tex.App.-Texarkana 2009, no pet.) (holding that trial court erred as a matter of law by enforcing contract for purchase of real property that had terminated by its own terms). [3]

[3]    The Chantos Parties rely upon the *English* case. *See English,* 44 S.W.3d at 103–5. But, in that case, the divorce decree in question contained language materially different from the language in the Contract. *See id.* The divorce decree did not contain language similar to the Termination Provision, and the decree was silent as to the manner in which the option should be exercised. *See id.* Therefore, the English case is not on point.

**\*921** If the Termination Provision is given effect, then the Option Holders could not be bound to purchase the remaining shares because they could wait until the End Date passed and any obligation to purchase the remaining shares would terminate. Harmonizing and giving effect to all provisions of the contract so that none will be rendered meaningless, this court should conclude that, under the unambiguous language of the Contract, the parties specified the manner in which the Option Holders had to exercise the Option—they had to purchase the remaining shares by the End Date. *See MCI Telecomms. Corp.,* 995 S.W.2d at 652. The summary-judgment evidence proves as a matter of law that the Option Holders did not do so, and therefore, they did not exercise the Option. After the End Date passed, the Contract terminated without any exercise of the Option. Indeed, the Chantos Parties have judicially admitted that the Contract upon which the trial court's judgment is based terminated on or before the End Date, which was before the Chantos Parties filed this lawsuit in the trial court.

In their Contract, the parties required the Option Holders to purchase Sarco stock up to the forty-nine-percent threshold. The parties could have required the Option Holders to purchase the remaining stock; however, the parties chose not to do so. Instead, they agreed to contractual language under which the Option Holders had the ability to choose whether they wanted to exercise the Option by purchasing the remaining shares from Grace no later than the End Date. This court cannot rewrite the Contract or add to its language under the guise of interpretation; instead, the court must enforce the Contract as written. *See Schaefer,* 124 S.W.3d at 157; *Marshall,* 388 S.W.2d at 181.

***Conclusion***

The sole ground asserted in the Chantos Parties' motion for summary judgment lacks merit.[4] In their cross-motion, the Option Holders proved as a matter of law that they did not exercise the Option and that the Contract terminated by its own terms.[5] Though the majority notes the Option Holders' arguments in this regard, the majority does not address these arguments or explain why they lack merit. The court should address these arguments, sustain the Option Holders' first issue, and hold that the trial court erred by failing to grant the Option Holders' motion.[6] Accordingly, this court should reverse the trial court's judgment and render judgment that the Chantos Parties take nothing.

[4] On appeal, the Chantos Parties assert, in the alternative, that this court should affirm the trial court's judgment on the breach-of-contract claims based on an alleged modification of the Contract by the parties at the July 22, 2003 meeting. Significantly, however, the Chantos Parties did not assert any alleged modification of the Contract as a ground in their summary-judgment motion. Therefore, this court cannot affirm the trial court's summary judgment on this unasserted ground. *See Stiles v. Resolution Trust Corp.,* 867 S.W.2d 24, 26 (Tex.1993)

[5] Presuming for the sake of argument that the Option Holders could have exercised the Option by notice alone and that they did so, the Chantos Parties still could not prevail on a breach-of-contract claim because the Contract terminated on the End Date and the parties did not agree that any contractual obligations would survive termination. *See Nguyen,* 273 S.W.3d at 898; *Cate,* 299 S.W.3d at 153.

[6] This court appropriately holds the trial court did not err in granting the Option Holders' motion for judgment notwithstanding the verdict as to the tortious-interference-with-contract claims.

166 S.W.3d 743
Supreme Court of Texas.

Mary MATHIS, Petitioner,

v.

Joseph F. LOCKWOOD, Respondent.

No. 04–0516.   |   June 17, 2005.

**Synopsis**

**Background:** Plaintiff filed petition for declaratory judgment and motion for turnover of property. Following post-answer default judgment, defendant filed motion for rehearing. Following a hearing, the 303rd Judicial District Court, Dallas County, Richard Johnson, J., denied motion. Defendant appealed. The Court of Appeals, 132 S.W.3d 629, affirmed. Defendant appealed.

**[Holding:]** The Supreme Court held that defendant's nonappearance at trial was not intentional or result of conscious indifference, and thus she was entitled to have default judgment that had been entered against her set aside.

Reversed and remanded.

West Headnotes (3)

**[1]**     **Judgment**
        Want or Insufficiency of Notice of Proceedings

        **Judgment**
        Mistake, Surprise, or Excusable Neglect in General

        **Judgment**
        Weight and Sufficiency of Evidence

Defendant's nonappearance at trial concerning petition for declaratory judgment and motion for turnover of property was not intentional or result of conscious indifference, and thus she was entitled to have default judgment that had been entered against her set aside; plaintiff failed to prove that he had effected service of trial setting on defendant, given that record contained no certificate of service, no return receipt from certified or registered mail, and no affidavit certifying service, as required by rule governing methods of service, notice to defendant's former attorney was no longer notice to her after her attorney withdrew, and notice to defendant's last known address had been sent to plaintiff's home, but plaintiff could not serve defendant by serving himself. Vernon's Ann.Texas Rules Civ.Proc., Rule 21a.

30 Cases that cite this headnote

**[2]**     **Trial**
        Nature of Evidence in General

Parties waived oath requirement with respect to testimony of plaintiff's counsel that notice had been sent to defendant and defendant's statement denying that she had received notice, when neither party raised any objection in circumstances that clearly indicated each was tendering evidence on record based on personal knowledge on sole contested issue, with respect to post-judgment hearing on defendant's motion to set aside default judgment that had been entered against her in proceeding in which plaintiff sought declaratory judgment and turnover of property to him.

23 Cases that cite this headnote

**[3]**     **Process**
        Presumptions and Burden of Proof

Notice properly sent pursuant to rule governing methods of service raises a presumption that notice was received; however, it cannot be presumed that notice was properly sent, and when notice is challenged, it must be proved according to the rule. Vernon's Ann.Texas Rules Civ.Proc., Rule 21a.

34 Cases that cite this headnote

**\*743** On Petition for Review from the Court of Appeals for the Fifth District of Texas.

**Attorneys and Law Firms**

Mary Mathis, pro se.

Rhonda F. Hunter, for Joseph F. Lockwood.

**Opinion**

PER CURIAM.

Mary Mathis, appearing pro se, appeals the trial court's refusal to set aside a post-answer default judgment against her. The court of appeals affirmed, holding Mathis failed to overcome a presumption that she received notice of the trial setting. 132 S.W.3d 629, 632. Finding neither presumption nor evidence to support this conclusion, **\*744** we reverse and remand to the trial court for a new trial.

Mathis and her two children lived with respondent Joseph Lockwood for some period of time before suit. When the relationship soured, Lockwood filed suit seeking a declaration that he and Mathis were not common-law spouses, and the return of property he claimed Mathis had stolen. Mathis apparently filed an answer, though it is not in the record.

The case was set for trial December 13, 2002, before a visiting judge. Mathis did not appear. After brief testimony from Lockwood, a post-answer default judgment was rendered in his favor.

On January 9, 2003, Mathis filed a "Motion for a Request Rehearing" asserting she never received notice of the December 13th trial. She testified to the same effect at a hearing on the motion before the court's presiding judge on February 4th. Conversely, Lockwood's counsel testified that notice was sent to Mathis's last known address and her former attorney. None of the witnesses were sworn, and while the reporter's record indicates Lockwood's counsel tendered a document to the judge at this hearing, none appears in the reporter's record.[1] The trial court refused to set aside the default judgment.

[1]     At Mathis's request, the court of appeals ordered both the district clerk and the court reporter to supplement the record with any exhibits. Tex.R.App. P. 34.5(c), 34.6(d). Neither found any.

For many years, a post-answer default could be set aside only if a defendant proved three elements: (1) nonappearance was not intentional or the result of conscious indifference; (2) a meritorious defense; and (3) a new trial would cause neither delay nor undue prejudice. *Cliff v. Huggins,* 724 S.W.2d 778, 779 (Tex.1987) (citing *Craddock v. Sunshine Bus Lines,* 134 Tex. 388, 133 S.W.2d 124, 126 (1939)).

When the first element is established by proof that the defaulted party was not given notice of a trial setting, we have dispensed with the second element for constitutional reasons. *Lopez v. Lopez,* 757 S.W.2d 721, 723 (Tex.1988) (citing *Peralta v. Heights Med. Ctr., Inc.,* 485 U.S. 80, 108 S.Ct. 896, 99 L.Ed.2d 75 (1988)).

For the same reasons, the court of appeals also dispensed with the third element. 132 S.W.3d at 631; *accord In the Matter of the Marriage of Lisa Ann Runberg,* 159 S.W.3d 194, 200 (Tex.App.Amarillo 2005, no pet.); *In the Matter of the Marriage of Brenda May Parker,* 20 S.W.3d 812, 817–18 (Tex.App.Texarkana 2000, no pet.). We need not reach that issue here, however, because in any event Mathis's sworn motion asserted that a new trial would not injure Lockwood, and nothing in the record establishes the contrary. *Cliff,* 724 S.W.2d at 779–80 (requiring new trial as "there is nothing in the record to show that a new trial will work an injury to [the plaintiff]"); *see also Dir., State Employees Workers' Comp. Div. v. Evans,* 889 S.W.2d 266, 268 (Tex.1994) (holding *Craddock* elements may be established by affidavit, even if not tendered as evidence at new trial hearing).[2]

[2]     While Mathis's motion for new trial was filed after the trial court's initial hearing on her "rehearing" motion, it was brought to the trial court's attention at a second hearing held about a month later.

**[1]**   **[2]**   Thus, the only question before us is whether Mathis established the first element. Her sworn motion for new trial asserted that she failed to appear at the December 13th trial because she never received notice of the setting. At the post-judgment hearing, Lockwood's counsel testified that notice was sent to Mathis, and **\*745** Mathis denied receiving it. While statements by neither were under oath, the oath requirement was waived when neither raised any objection in circumstances that clearly indicated each was tendering evidence on the record based on personal knowledge on the sole contested issue. *Banda v. Garcia,* 955 S.W.2d 270, 272 (Tex.1997) (holding attorney's unsworn statements tendered as evidence were sufficient absent objection); *see also Wheeler v. Green,* 157 S.W.3d 439, 444 (Tex.2005) (holding pro se litigants are governed by the same rules as attorneys).

The court of appeals held that the trial court as fact finder could have concluded that Mathis failed to overcome the presumption "that a trial court hears a case only after proper notice to the parties" and "that she was notified of the trial setting." 133 S.W.3d at 631–32 (citing *Hanners v. State Bar of Tex.,* 860 S.W.2d 903, 908 (Tex.App.Dallas 1993, no writ)). We disagree that there were any such presumptions on the facts presented here.

 **[3]** It is true that notice properly sent pursuant to Rule 21a raises a presumption that notice was received. Tex.R. Civ. P. 21a; *Cliff,* 724 S.W.2d at 780. But we cannot presume that notice was properly sent; when that is challenged, it must be proved according to the rule.

Unlike service of citation, Rule 21a allows service of notices by anyone competent to testify. Tex. R Civ. P. 21a. When a party or attorney of record serves the notice (as occurred here), "[t]he party or attorney of record shall certify to the court compliance with this rule in writing over signature and *on the filed instrument." Id.* (emphasis added). Like any other contemporaneous business record, this certificate bears some assurance of trustworthiness as it was prepared as a matter of office routine before any dispute about notice arose.

"A certificate by a party or an attorney of record, or the return of the officer, or the affidavit of any person showing service of a notice shall be prima facie evidence of the fact of service." *Id.* Here, the record contains no certificate of service, no return receipt from certified or registered mail, and no affidavit certifying service. Instead, the only evidence of service in the record was the oral assurance of counsel. As the rule's requirements are neither vague nor onerous, we decline to expand them this far. As none of the prerequisites for prima facie proof of service were met, the court of appeals was incorrect in indulging a presumption that Mathis received the notice Lockwood's counsel sent.

Without this presumption, there was no evidence that Mathis received notice of the trial setting. Testimony by Lockwood's counsel that notice was *sent* did not contradict Mathis's testimony that notice was never *received. See id.* ("Nothing herein shall preclude any party from offering proof that the notice or instrument was not received...."). Even if the trial judge disbelieved Mathis's testimony, that would not provide affirmative evidence that service occurred. *See Bose Corp. v. Consumers Union of U.S., Inc.,* 466 U.S. 485, 512, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984) ("When the testimony of a witness is not believed, the trier of fact may simply disregard it. Normally the discredited testimony is not considered a sufficient basis for drawing a contrary conclusion.").

No other alternatives established service. Notice to Mathis's former attorney was no longer notice to Mathis after her attorney withdrew. Tex.R. Civ. P. 10; *see, e.g., Stoner v. Thompson,* 578 S.W.2d 679, 684 (Tex.1979) (holding pro se party was charged with notice of all pleadings served on him, or on his attorney prior to withdrawal). Notice to Mathis's last known **\*746** address was sent to Lockwood's home; Lockwood could not serve Mathis by serving himself. And counsel's statement at the trial that "I had my office call her and speak to her about today's hearing" shows no personal knowledge that notice was received, certainly none 45 days before trial. Tex.R. Civ. P. 245.

Citing Rule 21a's provision that notice may be sent to a party's last known address, the court of appeals held that litigants have a duty "to keep the court and parties apprised of their correct and current address." 132 S.W.3d at 631. Not all courts of appeals appear to agree. *See Ewton v. Gayken,* 130 S.W.3d 382, 384–85 (Tex.App.Beaumont 2004, pet. denied) (holding court clerk erred by sending dismissal notice to attorney's address of record rather than forwarding address printed on returned envelope). But even assuming there is such a duty, unless noncompliance was intentional rather than a mistake, due process requires some lesser sanction than trial without notice or an opportunity to be heard. *Peralta,* 485 U.S. at 85–86, 108 S.Ct. 896; *Cliff,* 724 S.W.2d at 779.

Because the *Craddock* test was satisfied in this case, the trial court abused its discretion in refusing to set aside the default judgment against Mathis. Accordingly, without hearing oral argument, we grant Mathis's petition for review, reverse the court of appeals' judgment, and remand the case to the trial court for further proceedings consistent with this opinion. Tex.R.App. P. 59.1.

**Parallel Citations**

48 Tex. Sup. Ct. J. 895

---

440 S.W.2d 885
Court of Civil Appeals of Texas.
Corpus Christi.

S. K. Y. INVESTMENT CORPORATION, Appellant,

v.

H. E. BUTT GROCERY COMPANY, Appellee.

No. 473. | May 8, 1969.

Action by lessor against lessee for breach of lease of space in proposed shopping center. The 28th District Court, Nueces County, Horace S. Young, J., entered a take-nothing summary judgment in favor of lessee and lessor appealed. The Court of Civil Appeals, Green, C. J., held that where lessor did not have title to demised premises, had not obtained a building permit and had performed only site work, consisting of ground leveling and bulldozing of brush, construction work had not 'commenced upon the building containing the demised premises' within lease termination clause and lessee was entitled to terminate lease.

Affirmed.

West Headnotes (12)

[1] **Judgment**
     Absence of issue of fact

Summary judgment will be rendered only where record shows that there is no genuine issue as to material fact and that moving party is entitled to a judgment as a matter of law. Rules of Civil Procedure, rule 166–A.

Cases that cite this headnote

[2] **Judgment**
     Presumptions and burden of proof

Burden of proof that there is no genuine issue as to any material fact and that movant is entitled to judgment as matter of law is on the movant, and all doubts as to existence of a material fact issue are resolved against him.

Cases that cite this headnote

[3] **Judgment**
     Hearing and determination

In determining motion for summary judgment, trial court has duty to determine if there are any genuine issues of a material fact to be tried, and not to weigh the evidence or determine its credibility and thus try the case on the affidavits. Rules of Civil Procedure, rule 166–A.

Cases that cite this headnote

[4] **Judgment**
     Matters of fact or conclusions

Affidavits supporting or opposing motion for summary judgment must set forth such facts as would be admissible in evidence. Rules of Civil Procedure, rule 166–A.

2 Cases that cite this headnote

[5] **Judgment**
     Matters of fact or conclusions

Affidavits supporting or opposing motion for summary judgment must be factual as conclusions of affiant are not considered to have any probative value. Rules of Civil Procedure, rule 166–A.

3 Cases that cite this headnote

[6] **Judgment**
     Landlord and tenant

Statement of lessor's president in his affidavit on motion for summary judgment that site preparation work constituted "commencement of construction" within lease provision authorizing termination by lessee if construction had not commenced by particular date was mere conclusion of affiant and had no probative force as evidence. Rules of Civil Procedure, rule 166–A.

2 Cases that cite this headnote

[7] **Landlord and Tenant**
     Breach by lessor

Where lessor did not have title to demised premises, had not obtained a building permit and had performed only site work, consisting of ground leveling and bulldozing of brush, construction work had not "commenced upon the building containing the demised premises" within lease termination clause and lessee was entitled to terminate lease.

Cases that cite this headnote

**[8]    Contracts**
 Breach by making performance impossible

When one contracting party, by wrongful means, prevents other party from performing, such as by rendering performance impossible, such action constitutes a breach of contract which not only excuses performance by injured party but also entitles injured party to recover for any damage sustained because of the breach.

6 Cases that cite this headnote

**[9]    Customs and Usages**
 Explanation of Contract

Where a written contract is ambiguous or obscure, so that intent of the parties is uncertain or where it is silent on a matter that needs to be explained by extraneous evidence or where it appears from the terms of the contract that other covenants were clearly contemplated to effect the purposes of the contract, evidence with reference to uniform and well settled custom or usage pertaining to the matters with which they contract is admissible.

Cases that cite this headnote

**[10]    Customs and Usages**
 Exclusion by terms of contract

Where lease of space in proposed shopping center did not obligate lessee to furnish financial statements in order to help lessor obtain permanent financing for shopping center and contract provided that no obligation or limitation not stated in the lease should be imposed on either party, evidence of customs and usages concerning furnishing of financial statements

was not admissible in lessor's action against lessee for breach of the lease.

1 Cases that cite this headnote

**[11]    Customs and Usages**
 Adding to terms of contract

Where a contract is clear, complete and unambiguous and where it expressly provides that no obligation not stated therein would be imposed on either party, new terms cannot be added to the contract by incorporating a usage or custom which would add to the contractual obligations of one of the parties.

1 Cases that cite this headnote

**[12]    Customs and Usages**
 Adding to terms of contract

Where lease did not require lessee to provide interior design requirements to lessor's architect so that design of proposed building could be rendered and lease provided that no obligation or limitation not stated therein would be imposed on either party, evidence as to business customs and usages concerning furnishing of lessee's requirements for interior design was not admissible in breach of lease action to add obligations expressly assumed by the lessee.

2 Cases that cite this headnote

**Attorneys and Law Firms**

 **\*887**  Keys, Russell, Watson & Seaman, William H . Keys, Corpus Christi, for appellant.

Sorrell, Anderson & Porter, Charles R. Porter, Jr., Corpus Christi, for appellee.

**OPINION**

GREEN, Chief Justice.

This appeal is from a take-nothing summary judgment in a damage suit brought by appellant S.K.Y. Investment

Corporation against appellee H. E. Butt Grocery Company for alleged breach of contract. The summary judgment evidence consists of the pleadings of the parties, answers to interrogatories propounded by appellee to appellant, and affidavits and counter affidavits, with exhibits attached.

It was shown by such evidence that appellant was a corporation created to acquire, construct, lease and operate a shopping center to be located in Kingsville, Texas, with the name 'Sky Way Mall Shopping Center.' Prior to entering into a lease contract with appellee, appellant had obtained a purchase option for land and had contacted various other business concerns who might be interested in leasing portions of the shopping center proposed to be constructed by appellant. After negotiations, appellant as Landlord and appellee as Tenant executed a written lease agreement dated March 21, 1967, under the terms of which appellee would occupy a portion of the center. Construction work on he center had not been started when the lease was executed, and the contract contained the following provision:

*'Article 2*

B. If prior to September 1, 1967, construction work has not commenced upon the building containing the demised premises, Tenant may thereafter at its option cancel this lease, by giving notice to the Landlord of its option to cancel on or before March 1, 1968. * * *'

Appellee's motion for summary judgment was based, in part upon its contention that construction upon the demised premises had not commenced by September 1, 1967. By letter dated September 1, 1967, appellee gave notice to appellant that since construction work had not commenced, appellee was exercising its election to cancel and terminate the lease.

Appellant alleged its cause of action in alternate counts. It pleaded (1) that construction had commenced by September 1, 1967, and that appellee's attempted cancellation constituted a breach of the contract, **\*888** and (2) in the alternative, that if construction had not commenced by that date, failure to so commence was caused by the breach by appellee of obligations that appellee owed under the contract in (a) failing to furnish details for the working plans and specifications to be prepared by appellant and approved by appellee, and/or (b) in failing to furnish requested financial information necessary to the procurement of long term financing.

 **[1]   [2]   [3]   [4]   [5]**   In passing upon the points raised on this appeal, we shall be guided by the rules concerning summary judgments established by our State Supreme Court. Rule 166-A, Texas Rules of Civil Procedure provides that summary judgments shall be rendered where the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. The burden of proof is on the movant, and all doubts as to the existence of a material fact issue are resolved against him. Great American Reserve Insurance Company v. San Antonio Plumbing Supply Company, Tex., 391 S.W.2d 41. The duty of the court is to determine if there are any genuine issues of a material fact to be tried, and not to weigh the evidence or determine its credibility and thus try the case on the affidavits. Gulbenkian v. Penn, 151 Tex. 412, 252 S.W.2d 929; Gaines v. Hamman, 163 Tex. 618, 358 S.W.2d 557; Parrott v. Garcia, Tex., 436 S.W.2d 897. Affidavits supporting or opposing the motion must set forth such facts as would be admissible in evidence. They must be factual; conclusions of affiant are not considered to have any probative value. Box v. Bates, 162 Tex. 184, 346 S.W.2d 317; Crain v. Davis, Tex., 417 S.W.2d 53; Travis County Water Control & Improvement District No. 12 v. McMillen, Tex., 414 S.W.2d 450.

Appellant by its first point of error asserts that a genuine issue of a material fact was raised as to whether appellant had commenced construction on the building in question prior to September 1, 1967. Appellee answers this in its first reply point by stating that the record shows as a matter of law that such construction had not been commenced on the date mentioned.

The conflict between the parties appears to be based on a difference of opinion as to what is meant by commencement of construction work. Factually, the record shows without dispute that the only work which had been done on the land prior to September 1, 1967, consisted of ground leveling and bulldozing of brush, etc., which was commenced on July 15, 1967, and completed prior to September 1, 1967. In this connection, the following interrogatories were asked of appellant, and the following replies given.

> '15. Was construction commenced on the proposed Skyway Mall prior to September 1, 1967? If so, state the date such construction commenced and what work was completed or in progress on September 1, 1967. Also state who performed such work.'

Answer:

'15. Yes. Site work, consisting of ground leveling and bulldozing of brush, etc., was commenced on July 15, 1967.'

Question:
'16. Was construction commenced 'upon the building containing the demised premises' as described in the lease in question prior to September 1, 1967? If so, state the date such construction commenced and what work was completed or in progress on September 1, 1967. Also state who performed such work.

Answer:
'16. Unless site work may be construed as such, construction was not commenced 'upon the building containing the demised premises' because of Defendant's failure to submit its interior design requirements and to furnish the requisite financing information.'

The latter part of this answer will be considered under subsequent points of error.

**\*889** **[6]** While the affidavit of appellant's president states his opinion that such site work constituted the commencement of construction, this was a mere conclusion of affiant, and had no probative force as evidence. Box v. Bates, supra.

The above answers of appellant to the interrogatories, together with affidavits attached to appellee's motion for summary judgment evidencing that on September 1, 1967, no construction work on any building had been commenced on the land in question, make it apparent that appellant relies solely on the site work and bulldozing to support its contention that construction work had commenced 'upon the building containing the demised premises' by September 1, 1967. It was admitted by appellant that it did not own title to the land on that date, and that it had not obtained a building permit.

**[7]** Appellant cites no authorities in support of its contention under its first point. Appellee states in its brief that a diligent search on counsel's part failed to disclose any Texas cases on the proposition of what constitutes commencement of construction work on a building, and we have found no such authorities. However, appellee cites us a number of out of state authorities, including an annotation in 1 A.L.R. 3rd 822, which are persuasive on this question. The cases come about through an attempt by a mechanic's lien claimant to cause his lien to be superior to a lien claimed by a deed of trust or mortgage lien holder, where the mechanic's lien proponent asserts that work had commenced upon the building before the inception of the mortgage or deed of trust lien. The rule of law that seems to govern is set out in Rupp v. Cline & Son, Inc., 230 Md. 573, 188 A.2d 146, 1 A.L.R.3rd 815, where the court said:

'These cases make it clear that before there can be the Commencement of a building which would give a mechanics' lien claimant a preference over a recorded mortgage there must be (1) a manifest commencement of some work or labor on the ground which everyone can readily see and recognize as the commencement of a building and (2) the work done must have been begun with the intention and purpose then formed to continue the work until the completion of the building. If either of these elements is missing then there has been no 'commencement of the building' within the meaning of (a Maryland statute).'

See, also, Maule Industries, Inc. v. Gaines Construction Co., Fla.App., 157 So.2d 835, where the court held that the removing of the grass and scarifying of a portion of the land did not constitute a visible commencement of operations within the meaning of the lien statute, and other authorities cited in annotation in 1 A.L.R.3rd 822 et seq.

We hold that the record shows without factual basis for dispute that construction work had not commenced upon the building containing the demised premises prior to September 1, 1967. Appellant's first point of error is overruled.

By its second and third points, appellant takes the position that even if it failed timely to commence construction upon 'the building containing the demised premises', such construction was prevented and appellant's failure is excused by appellee's breach of the contract (1) in wrongfully failing to furnish its requirements for interior design to appellant's architect, and (2) in wrongfully failing to provide that financial information normally and customarily furnished to financial concerns interested in providing long-term permanent financing to owners of shopping centers.

[8] When one party to a contract, by wrongful means, prevents the other party from performing, as by making it impossible for him to perform, such an action by the party at fault constitutes a breach of contract. The effect of such a breach is not only to excuse performance by the injured party, but also to entitle him to recover **\*890** for any damage he may sustain by reason of the breach. 13 Tex.Jur.2d, p. 557, p. 587, Contracts, s 307, s 325; Smith v. Lipscomb, 13 Tex. 532; Sanderson v. Sanderson, 130 Tex. 264, 109 S.W.2d 744, syl. (16, 17), op. adopted; City of Houston v. Howe & Wise, Tex.Civ.App., 323 S.W.2d 134, wr. ref. n.r.e .

Concerning appellant's contention that appellee breached the contract in wrongfully failing to provide that financial information normally and customarily furnished to financial concerns interested in providing long term permanent loans to builders of shopping centers, and that such breach of the contract prevented appellant from performing its obligations, appellant relied on an affidavit from its president, Clarence Yarbrough, Jr, and on appellant's answers to interrogatories propounded by appellee. The pertinent parts of the affidavit read as follows:

'As president of the corporation, I was charged with the responsibility of obtaining permanent financing of a long-term nature for the construction of the shopping center. This was within the contemplation of the parties to the lease agreement, and Defendant well knew that the successful acquisition of permanent financing depends upon the quality of the tenants within the proposed shopping center, their financial stability, the history of their operations, minimum rental to be received by Plaintiff under the respective leases, the terms of the leases, etc. Defendant also well knew, and it is a fact, that, normally and customarily, the concern which is to permanently finance the shopping center seeks and is furnished not only C.Y. balance sheets but also profit and loss statements from the proposed tenants. At all times material hereto, Defendant knew that Plaintiff was negotiating for permanent financing with Franklin Life Insurance Company and was aware that, as a condition for permanent financing, Franklin Life Insurance required Defendant to provide it with a profit and loss statement. On numerous occasions, I requested of Defendant that it furnish such profit and loss statement but Defendant continued to arbitrarily and capriciously refuse such information. As a direct consequence of such refusal on the part of Defendant, Franklin Life Insurance Company refused to approve the permanent financing sought by the Plaintiff corporation.

Permanent financing upon a project of this size takes time to arrange, and Defendant knew it. Franklin Life Insurance Company's refusal to approve the permanent financing sought by the Plaintiff made it necessary for other sources to be investigated, and action was commenced immediately to reach this end. By reason of Defendant's said actions, insufficient time remained within which to complete all the formal requisites of permanent financing by the time of Defendant's wrongful termination of its lease agreement on September 1, 1967, though at such time Plaintiff had reached an informal agreement with General American Life Insurance Company to provide such financing. Defendant at all times was well aware of the refusal of Franklin Life Insurance Company to approve the financing and the necessity of obtaining other financing. If there was a failure to commence construction of the premises to be used as a shopping center, which is not admitted but is denied, such failure was attributable solely to the failure of Defendant to furnish the information normally and customarily furnished by proposed tenants to concerns who will provide long-term financing for shopping centers.'

In answer to interrogatories, appellant replied that if construction was not commenced it was in part because of appellee's failure to furnish requisite financial information and that it was because of such failure that Franklin Life Insurance Co., decided to cancel its financing arrangements. Appellant further answered that **\*891** the furnishing by proposed tenants of shopping centers of financial statements and/or profit and loss statements for inspection and approval by the lender of funds is customary, normal and usual in the negotiation and construction of a shopping center.

The statements in the answers to the interrogatories and in Yarbrough's affidavit as to the reasons given for the cancellation by the insurance company of its plans to finance this project are to a large extent conclusions and without probative force. Box v. Bates, supra; Crain v. Davis, supra. However, assuming that a fact issue was presented that the cause of appellant's failure to comply with its obligations was the failure of appellee to submit financial and/or profit and loss statements to the insurance company proposing to finance the construction, the summary judgment evidence does Not raise a genuine issue of the Material fact that appellee was under any legal obligation to furnish same.

A fact issue was raised as to a general custom, practice and usage of a party in appellee's position as Tenant to furnish the financial statements requested. Appellant cites the

following cases as authority for the rule that parties to an agreement are presumed to have contracted with reference to general custom, practice and usage as to that particular business: Luling Oil & Gas Company v. Humble Oil & Refining Company, 144 Tex. 475, 191 S.W.2d 716 where the agreement was silent or obscure as to a particular subject; Bender v . Peyton, 4 Tex.Civ.App. 57, 23 S.W. 222, wr. ref.; Latta v. Transit Grain Company, Tex.Civ.App., 222 S.W.2d 467, n. w. h.; Stalcup v. Eastham, Tex.Civ.App., 330 S.W.2d 237, wr. ref. n. r. e., and other authorities.

 **[9]**    As we understand and construe these authorities, they stand for the proposition that where a written contract is ambiguous or obscure, so that the intent of the parties is uncertain; or where it is silent on a matter that needs to be explained by extraneous evidence; or where it appears from the terms of the contract that other covenants were clearly contemplated to effect the purposes of the contract, evidence with reference to a uniform and well settled custom or usage pertaining to the matters with which they contract is admissible.

The contract in issue here was a full, well prepared instrument of some fifteen legal size pages, double spaced typing. Neither party makes any statement in its pleadings or briefs that the contract is unclear or ambiguous as to any of its terms, or that extraneous evidence is needed to explain any of its provisions. There are many provisions concerning the respective obligations incurred by the parties. There is NO provision concerning any obligation to furnish the financial statements referred to by appellant.

Article 14 of the contract contains the following agreement of the parties: 'No obligation or limitation not stated herein shall be imposed on either party hereto. * * *' (Emphasis added).

 **[10]**    In this situation, we hold that evidence of customs and usages would not be admissible to add to the obligations of appellee. Miller v. Gray, 136 Tex. 196, 149 S.W.2d 582, 141 A.L.R. 1237; City of Houston v. Finn, 139 Tex. 111, 161 S.W.2d 776, 778; George v. El Paso County Water Control & Improvement District No. 1, Tex.Civ.App., 332 S.W.2d 144, 148, wr. ref. n. r. e.; Kingsley v. Western Natural Gas Co., Tex.Civ.App., 393 S.W.2d 345, 353, wr. ref. n. r. e.: Republic National Bank of Dallas v. National Bankers Life Insurance Company, Tex.Civ.App., 427 S.W.2d 76, 80 wr. ref. n. r. e.

 **[11]**    We hold that the law of this State, as demonstrated in the authorities above cited, is that where a contract is clear, complete, and unambiguous, and especially where it expressly provides that 'no obligation **\*892**  * * * not stated

herein shall be imposed on either party hereto,' new terms can not be added to the contract by incorporating a usage or custom which would add to the contractual obligations of one of the parties .

 **[12]**    The necessity of interior design requirements is emphasized by the affidavit of architect Turner, filed in opposition to appellee's motion for summary judgment. Turner is shown to be a licensed professional architect in Texas, employed by appellant to prepare preliminary working drawings and specifications for the proposed center. He referred to the portion of the contract which provided that 'Construction of the demised premises by the Landlord shall be in accordance with plans and specifications to be prepared by Landlord and approved by Tenant,' and stated that appellee's interior design was needed to merit appellee's approval of Landlord's plans and specifications. According to Turner, this information is normally and customarily supplied as a matter of course by tenants in proposed shopping centers. Requests were made by him of appellee for the information, and such information was withheld by appellee, even though it was necessary for completion of the working drawings and specifications, for cost estimating, and for negotiation of a construction contract. He stated in his affidavit that without the information requested of appellee, it was not possible to prepare grade elevations or commence site preparation and grading prior to September 1, 1967.

Affiant Yarbrough stated that he had requested appellee to furnish its interior design requirements, that same were refused, and that without such information grade elevations could not be prepared and only ground leveling and bulldozing on the ground could be done.

Assuming the facts to be as stated above, there still is no showing that appellee breached any of its contractual obligations. There was no provision in the contract requiring appellee to furnish the information referred to. We again refer to the agreement of the parties stated in the contract in Article 14 thereof, supra. For the reasons heretofore stated in connection with the matter of furnishing financial statements, we hold that evidence as to business customs and usages concerning the furnishing of Tenant's requirements for interior designs was not admissible to add to the obligations expressly assumed by appellee in the written contract.

Appellant's second and third points of error are overruled.

Our decisions on the above points are decisive of this appeal. Appellee was entitled, as a matter of law, to the judgment which was rendered. It is, accordingly, unnecessary to pass on the other propositions raised and discussed in the briefs of the parties.

Judgment affirmed.

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

**WestlawNext**· © 2015 Thomson Reuters. No claim to original U.S. Government Works.

290 S.W.3d 886
Supreme Court of Texas.

STATE FARM LLOYDS, Petitioner,

v.

Becky Ann JOHNSON, Respondent.

No. 06–1071. | Argued Jan. 15, 2008. | Decided July 3, 2009. | Rehearing Denied Aug. 28, 2009.

**Synopsis**

**Background:** Insured brought action against homeowners insurer for a declaratory judgment that dispute over extent of loss caused by hail was dispute over amount of loss and was subject to appraisal. The 296th Judicial District Court, Collin County, Betty Canton, J., entered summary judgment in favor of insurer. Insured appealed. The Court of Appeals, 204 S.W.3d 897, reversed and rendered, and remanded in part. Insurer filed petition for review.

**[Holding:]** The Supreme Court, Brister, J., held that, as a matter of first impression, insurer could not avoid insured's demand for appraisal to determine her amount of loss.

Affirmed, and remanded.

West Headnotes (3)

**[1]     Insurance**
          Subjects and Scope of Appraisal

Property insurer and insured's dispute over roof damage from hail fell within scope of appraisal, to determine "amount of loss," under appraisal provision in standard-form policy, to extent parties' disagreed which shingles needed replacing.

52 Cases that cite this headnote

**[2]     Insurance**
          Subjects and Scope of Appraisal

Dispute, before any coverage action was filed, over extent of hail damage to insured's roof, whether only ridgeline was damaged or entire roof needed to be replaced, related to amount of loss, within meaning of appraisal provision of homeowners policy, so that insured could demand appraisal on that question, even if appraisers' inquiry would include some causation element.

46 Cases that cite this headnote

**[3]     Insurance**
          Contracts
        **Insurance**
          Validity

An appraisal clause, in property insurance policy, binds the parties to have the extent or amount of the loss determined in a particular way, and like any other contractual provision, should be enforced.

39 Cases that cite this headnote

**Attorneys and Law Firms**

**\*887**  John Christopher Nickelson, Joseph W. Spence, Julia Ann Dobbins, Michael W. Huddleston, Shannon, Gracey, Ratliff & Miller, L.L.P., Fort Worth, TX, for Petitioner.

Russell J. Bowman, Scott Bowman & Staella, Dallas, TX, for Respondent.

Linda Jene Burgess, Winstead PC, Peter R. Meeker, Davis & Wilkerson, P.C., Austin, TX, for Amicus Curiae.

**Opinion**

Justice BRISTER delivered the opinion of the Court.

Appraisal clauses have appeared in most property insurance policies in Texas for many years. Although they rarely detail the scope of appraisal, there has rarely been any litigation about it. The parties here agree that the scope of appraisal includes damage questions and excludes liability questions, but they disagree which is involved in this dispute about hail damage to a homeowner's roof. Because an appraisal has yet to take place, we agree with the insured that the record

does not establish that it will exceed the permissible scope of appraisal. Accordingly, we affirm the court of appeals' judgment in favor of the insured.

## I. Background

A hailstorm moved through Plano, Texas in April of 2003, damaging the roof of Becky Ann Johnson's home. She filed a claim under her homeowners insurance policy with State Farm Lloyds. State Farm's inspector concluded that hail had damaged only the ridgeline of her roof, and estimated repair costs at $499.50 (less than the policy's $1,477 deductible). By contrast, Johnson's roofing contractor concluded the entire roof needed to be replaced at a cost of more than $13,000. [1]

[1] The estimate in the record lists $13,428.19 as the "Roof Total," but also lists a "Total Contract Price" of only $6,476.65. We use the larger number as that is the figure both parties quote in their briefs.

To settle this difference, Johnson demanded appraisal of the "amount of loss" under the following provision in her standard-form policy:

> **Appraisal.** If you and we fail to agree on the amount of loss, either one can demand that the amount of the loss be set by appraisal. If either makes a written demand for appraisal, each shall select a competent, disinterested appraiser. Each shall notify the other of the appraiser's identity within 20 days of receipt **\*888** of the written demand. The two appraisers shall then select a competent, impartial umpire.... The appraisers shall then set the amount of the loss. If the appraisers submit a written report of an agreement to us, the amount agreed upon shall be the amount of the loss. If the appraisers fail to agree within a reasonable time, they shall submit their differences to the umpire. Written agreement signed by any two of these three shall set the amount of the loss.

State Farm refused to participate in an appraisal, asserting that the parties' dispute concerned causation and not "amount of loss." Johnson filed suit seeking only a declaratory judgment compelling appraisal. On cross-motions for summary judgment, the trial court agreed with State Farm that no appraisal was warranted. The court of appeals reversed, holding that appraisal was required. [2] We granted State Farm's petition to decide whether the dispute here fell within the scope of this appraisal clause. [3]

[2] 204 S.W.3d 897. As this suit sought nothing except appraisal, the judgments of both the trial court (denying it) and the court of appeals (compelling it) are final judgments within our appellate jurisdiction. *See* TEX. GOV'T CODE § 22.001(a).

[3] The Texas Windstorm Insurance Association and the Property Casualty Insurers Association of America submitted amicus curiae briefs supporting parts of State Farm's petition for review.

While trial courts have some discretion as to the timing of an appraisal, they have no discretion to ignore a valid appraisal clause entirely. [4] Accordingly, we review the entire record to decide whether either party was entitled to summary judgment as a matter of law. [5]

[4] *In re Allstate County Mut. Ins. Co.,* 85 S.W.3d 193, 196 (Tex.2002).

[5] *See Canyon Reg'l Water Auth. v. Guadalupe–Blanco River Auth.,* 258 S.W.3d 613, 616 (Tex.2008); *Texas Mun. Power Agency v. Pub. Util. Comm'n,* 253 S.W.3d 184, 192 (Tex.2007).

## II. A Brief History of Appraisal Clauses

Insurance appraisal clauses have been around for a long time. In 1888 in *Scottish Union & National Insurance Co. v. Clancy,* this Court enforced an appraisal clause much like the one used here. [6] It would be going too far to say the Court approved of such clauses, but we unequivocally found them enforceable:

[6] 71 Tex. 5, 8 S.W. 630, 631 (1888) (providing for three appraisers and that "the award of any two, in writing, shall be binding and conclusive as to the amount of such loss or damage").

> However injudicious it may be for parties to bind themselves by such agreement, it seems to be well settled that, having done so, they cannot disregard it.... In the absence of fraud, accident, or mistake, the parties having agreed that the amount of loss shall be determined in a particular way, we are constrained to hold that such stipulation is valid.... [7]

[7] *Id.*

Today, appraisal clauses "are uniformly included in most forms of property insurance policies." [8] "Virtually

every property insurance policy for both homeowners and corporations contains a provision specifying **\*889** 'appraisal' as a means of resolving disputes about the 'amount of loss' for a covered claim." [9] An appraisal clause like the one used here "appears in almost every homeowners, automobile, and property policy in Texas." [10]

8    Johnny C. Parker, *Understanding the Insurance Policy Appraisal Clause: A Four–Step Program,* 37 U. TOL. L.REV. 931, 931 (2006).

9    Timothy P. Law & Jillian L. Starinovich, *What Is It Worth? A Critical Analysis of Insurance Appraisal,* 13 CONN. INS. L.J. 291, 292–93 (2006–07).

10   Br. of Prop. Cas. Insurers Ass'n of Am. as Amicus Curiae Supporting Pet'rs at 8.

Although the history of such clauses is both deep and wide, they have required this Court's attention only five times since *Scottish Union*: in 1892, [11] 1897, [12] 1919, [13] 1965, [14] and 2002. [15] All of these cases concerned waiver or enforceability of the appraisal clause itself; we have never resolved a dispute about the scope of appraisal, or the meaning of "amount of loss." Accordingly, in addressing this issue for the first time we keep in mind that appraisals have apparently resolved such matters for many years without our aid.

11   *See Scottish Union & Nat'l Ins. Co. v. Clancy,* 83 Tex. 113, 18 S.W. 439, 441 (1892) (holding insurer's attempt to adjust and settle claim did not waive its right to appraisal).

12   *See Am. Cent. Ins. Co. v. Bass,* 90 Tex. 380, 38 S.W. 1119, 1120 (1897) (holding insurer's denial of liability did not waive its right to appraisal).

13   *See Del. Underwriters v. Brock,* 109 Tex. 425, 211 S.W. 779, 781 (1919) (holding insurer's appointment of biased appraiser waived its right to appraisal).

14   *See Glens Falls Ins. Co. v. Peters,* 386 S.W.2d 529, 532 (Tex.1965) (holding appraisal required as building was not a total loss).

15   *See In re Allstate County Mut. Ins. Co.,* 85 S.W.3d 193, 195 (Tex.2002) (holding appraisal clause was not an unenforceable arbitration agreement).

### III. The Scope of Appraisal: Damages vs. Liability

In *Scottish Union,* we referred to the scope of appraisal in the course of distinguishing it from arbitration:

> But here the [appraisal clause] does not divest the courts of jurisdiction, but only binds the parties to have the extent or amount of the loss determined in a particular way, leaving the question of liability for such loss to be determined, if necessary, by the courts. [16]

16   8 S.W. at 631.

In 1897, we repeated this distinction between *damage* questions for appraisers and *liability* questions for the courts:

> It seems to be generally held that a stipulation that the question of liability shall be determined by arbitration is contrary to public policy and void, but it is otherwise, as we have seen, as to the ascertainment of the amount of the loss. There is neither repugnancy nor inconsistency in leaving the former question to the courts when the liability is disputed, and at the same time in providing that the amount of the recovery shall be settled by arbitration. [17]

17   *Am. Cent.,* 38 S.W. at 1119.

While policies hostile to arbitration have largely been preempted, [18] limiting appraisal to damages and not liability is surely **\*890** still correct. [19] Most appraisal clauses do not define the scope of appraisal in detail (as is the case here), but the ordinary meaning of the words serves that purpose. [20] The word "appraisal" itself generally means "[t]he determination of what constitutes a fair price; valuation; estimation of worth." [21] The policy directs the appraisers to decide the "amount of loss," not to construe the policy or decide whether the insurer should pay. [22] And the policy requires each party to select a "competent, disinterested appraiser," not a lawyer or insurance expert. [23]

18   *See In re Am. Homestar of Lancaster, Inc.,* 50 S.W.3d 480, 484 (Tex.2001) ("Congress passed the Federal

Arbitration Act in 1925 to reverse the longstanding judicial hostility to arbitration agreements....").

19 *See In re Allstate,* 85 S.W.3d at 198 (citing *Scottish Union* for the proposition that appraisal "binds the parties to have the extent or amount of the loss determined in a particular way, leaving the question of liability for such loss to be determined, if necessary, by the courts").

20 *Don's Bldg. Supply, Inc. v. OneBeacon Ins. Co.,* 267 S.W.3d 20, 23 (Tex.2008) ("Policy terms are given their ordinary and commonly understood meaning unless the policy itself shows the parties intended a different, technical meaning.").

21 BLACK'S LAW DICTIONARY 110 (8th ed.2004).

22 *See* 15 COUCH ON INSURANCE § 210:42 ("As a general rule, the sole purpose of an appraisal is to determine the amount of damage. As a consequence, an appraisal clause does not permit appraisers to determine whether a loss was, in fact, total. However, the replacement cost of real property may be appraised, that is, estimated or evaluated.").

23 *See* 15 COUCH ON INSURANCE § 213:44 ("An appraiser can make no legal determinations."); Br. of Tex. Windstorm Ins. Ass'n as Amicus Curiae Supporting Pet'rs at 8 ("In actual practice, appraisers and umpires are frequently unqualified to make complex liability determinations under an insurance policy. There is no requirement that they be licensed. Umpires are often lawyers or mediators with no particular experience or expertise in property insurance coverage or claims. Appraisers are often contractors who may be familiar with repair costs but are not qualified to make policy interpretations or to determine cause and origin of the damage being claimed. There is no explicit requirement that the appraisers and umpire inspect the property or read the policy, and many do not.").

The line between liability and damage questions may not always be clear, as discussed below. But while appraisal clauses might be drafted more precisely, the scarcity of suits on the subject suggests the 1888 test is still adequate: the scope of appraisal is damages, not liability.

### IV. The Scope of Appraisal: Causation

State Farm argues that no appraisal is needed here because appraisers cannot decide causation issues. Texas courts have split on this question, [24] as have the few courts elsewhere to address it. [25] But the **\*891** record here does not establish as

a matter of law either that this dispute is about causation or that it is beyond the scope of appraisal.

24 *Compare Lundstrom v. United Servs. Auto. Ass'n–CIC,* 192 S.W.3d 78, 89 (Tex.App.-Houston [14th Dist.] 2006, pet. denied) (rejecting claim that consideration of causation bars appraisal) *with Germania Farm Mut. Ins. Ass'n v. Williams,* No. 11–00–00393–CV, 2002 WL 32341841, at \*3–4 (Tex.App.-Eastland May 23, 2002, no pet.) (citing *Wells* for proposition that appraisers cannot consider causation); *see also Salinas v. State Farm Lloyds,* 267 Fed.Appx. 381, 386 (5th Cir.2008) (following *Wells* as Texas law); *Holt v. State Farm Lloyds,* No. CA 3:98–CV–1076–R, 1999 WL 261923, at \*3 (N.D.Tex. April 21, 1999) (same).

25 *Compare CIGNA Ins. Co. v. Didimoi Prop. Holdings, N.V.,* 110 F.Supp.2d 259, 264 (D.Del.2000) (holding causation was for appraisers), *Augenstein v. Ins. Co. of N. Am.,* 372 Mass. 30, 360 N.E.2d 320, 324 (1977) (same), *and Am. Cent. Ins. Co. v. Dist. Ct., Ramsey County, Second Jud. Dist.,* 125 Minn. 374, 147 N.W. 242, 244 (1914) (same), *with HHC Assocs. v. Assurance Co. of Am.,* 256 F.Supp.2d 505, 511 (E.D.Va.2003) (holding causation was question for court rather than appraisers), *Wausau Ins. Co. v. Herbert Halperin Distrib. Corp.,* 664 F.Supp. 987, 989 (D.Md.1987) (same), *Rogers v. State Farm Fire & Cas. Co.,* 984 So.2d 382, 392 (Ala.2007) (same), *Munn v. Nat'l Fire Ins. Co.,* 237 Miss. 641, 115 So.2d 54, 58 (1959) (same), *and Merrimack Mut. Fire Ins. Co. v. Batts,* 59 S.W.3d 142, 153 (Tenn.Ct.App.2001) (same); *see also Knapp v. Allstate Ins. Co.,* 134 F.3d 378, 1998 WL 23225, at \*1 (9th Cir.1998) (unpublished table mem.) (holding appraisers could discount appraisal for pre-existing wear-and-tear); *Johnson v. Nationwide Mut. Ins. Co.,* 828 So.2d 1021, 1022 (Fla.2002) (holding causation is for appraisers when insurer admits part of loss is covered and for court when insurer denies any coverage).

### A. Is this a causation dispute?

First, the record does not prove that the dispute here is about causation.

 **[1]** In its motion for summary judgment, State Farm asserted that "the only shingles on Johnson's roof that were actually damaged by hail were the shingles on the ridge of her roof." A dispute about how many shingles were damaged and needed replacing is surely a question for the appraisers. If the parties must agree on precisely which shingles have been damaged

before there can be an appraisal, appraisals would hardly be necessary. What's more, either party could avoid appraisal by simply picking a few extras. The cost of replacing shingles (or anything else) is a function of both *price* and *number;* appraisers must factor in both shingle prices and shingle numbers to decide the "amount of loss." To the extent the parties disagree which shingles needed replacing, that dispute would fall within the scope of appraisal.

On appeal, State Farm emphasizes it is disputing not just which shingles were damaged, but which were damaged *by hail.* But nothing in the summary judgment record establishes Johnson's roof was damaged by anything else. In State Farm's denial letter, its summary judgment motion, and even its briefs in this Court, there is neither evidence nor even a hint about what else caused the damage. The trial court could not conclude this was a causation dispute just because State Farm claimed it was.

Nor does the record conclusively establish that the parties' dispute is solely about how much of the roof was damaged rather than how much needs to be replaced. Sometimes it may be unreasonable or even impossible to repair one part of a roof without replacing the whole. [26] The policy provides that State Farm will pay reasonable and necessary costs to "repair or replace" damaged property, and repair or replacement is an "amount of loss" question for the appraisers. [27] On this record, the trial court could not conclude as a matter of law that the parties' dispute was about causation rather than something else.

[26]    *See, e.g., Wausau Ins. Co.,* 664 F.Supp. at 987.

[27]    *Gulf Ins. Co. v. Pappas,* 73 S.W.2d 145, 146–47 (Tex.Civ.App.-San Antonio 1934, writ ref'd).

### B. Are causation disputes a question of liability or damages?

Even if the parties' dispute involves causation, that does not prove whether it is a question of liability or damages.

Causation relates to both liability and damages because it is the connection between **\*892** them. For example, the Texas Pattern Jury Charges place causation in both the broad-form liability questions, [28] and in the broad-form damage questions that limit damages to those "resulting" from a particular occurrence, [29] and exclude damages due to other

causes. [30] In the abstract, it is hard to say whether causation is more a question of liability or damages.

[28]    *See, e.g.,* STATE BAR OF TEX., TEXAS PATTERN JURY CHARGES—GENERAL NEGLIGENCE PJC C 4.1 (2008); STATE BAR OF TEX., TEXAS PATTERN JURY CHARGES—MALPRACTICE, PREMISES, PRODUCTS PJC C 51.3, 51.7, 51.19, 61.5, 66.4, 66.5, 71.3–71.7 (2008); STATE BAR OF TEX., TEXAS PATTERN JURY CHARGES—BUSINESS, CONSUMER, INSURANCE, EMPLOYMENT PJC 102.1, 102.7, 102.8, 102.14 (2008).

[29]    *See, e.g.,* STATE BAR OF TEX., TEXAS PATTERN JURY CHARGES—GENERAL NEGLIGENCE PJC C 8.2–8.5, 8.11, 9.2–9.5, 11.3 (2008); STATE BAR OF TEX., TEXAS PATTERN JURY CHARGES—MALPRACTICE, PREMISES, PRODUCTS PJC 80.3–80.6, 80.13, 81.3–81.6, 83.4, 84.3–84.4 (2008); STATE BAR OF TEX., TEXAS PATTERN JURY CHARGES—BUSINESS, CONSUMER, INSURANCE, EMPLOYMENT PJC 110.2, 110.5, 110.8, 110.13, 110.14, 110.18–110.22, 110.26–110.28, 110.30 (2008).

[30]    *See, e.g.,* STATE BAR OF TEX., TEXAS PATTERN JURY CHARGES—GENERAL NEGLIGENCE PJC C 8.7–8.9 (2008); STATE BAR OF TEX., TEXAS PATTERN JURY CHARGES—MALPRACTICE, PREMISES, PRODUCTS PJC 80.7–80.9 (2008); STATE BAR OF TEX., TEXAS PATTERN JURY CHARGES—BUSINESS, CONSUMER, INSURANCE, EMPLOYMENT PJC 110.7, 110.25 (2008).

But in actual cases, causation usually falls into one category or the other. Thus, when different causes are alleged for a single injury to property, causation is a liability question for the courts. For example, in *Wells v. American States Preferred Insurance Co.*, appraisers assessed foundation damage due to plumbing leaks (a covered peril) as "0" but damage due to settling (an excluded peril) as $22,875.94. [31] The Dallas Court of Appeals set aside the appraisal, holding appraisers could decide the amount of damage but not what caused it. [32] Appraisers can decide the cost of repairs in this context, but if they can also decide causation there would be no liability questions left for the courts.

[31]    919 S.W.2d 679, 685–86 (Tex.App.-Dallas 1996, writ denied).

[32]    *Id.* at 685.

By contrast, when different types of damage occur to different items of property, appraisers may have to decide the damage caused by each before the courts can decide liability. For example, in *Lundstrom v. United Services Automobile Ass'n,* the appraisers assessed $4,226.19 for damages due to water (a covered peril) but made no finding for damages due to mold (as to which coverage was disputed). [33] Rejecting the argument that appraisal is barred "whenever causation factors into the award," the court of appeals affirmed the water damage award, and rendered mold damage moot by finding no coverage. [34] In this context, courts can decide whether water or mold damage is covered, but if they can also decide the amount of damage caused by each, there would be no damage questions left for the appraisers.

[33]     192 S.W.3d 78, 88 (Tex.App.-Houston [14th Dist.] 2006, pet. denied).

[34]     *Id.* at 89, 95.

The same is true when the causation question involves separating loss due to a covered event from a property's pre-existing condition. Wear and tear is excluded in most property policies (including this one) because it occurs in every case. If State Farm is correct that appraisers can never allocate damages between covered and excluded perils, then appraisals can never **\*893** assess hail damage unless a roof is brand new. [35] That would render appraisal clauses largely inoperative, a construction we must avoid. [36]

[35]     *See, e.g., CIGNA Ins. Co. v. Didimoi Prop. Holdings, N.V.,* 110 F.Supp.2d 259, 263 (D.Del.2000) (holding that if "amount of loss" does not include causation, "appraisal would be a useless exercise because it would not fix the amount of loss and either party could still contest damages").

[36]     *Fiess v. State Farm Lloyds,* 202 S.W.3d 744, 748 (Tex.2006) ( "[I]t has again long been the rule that we must read all parts of a policy together, giving meaning to every sentence, clause, and word to avoid rendering any portion inoperative.").

This was the conclusion we reached in *Gulf Insurance Co. of Dallas v. Pappas,* a case in which a fire worsened pre-existing sags in the floors and roof of a building. [37] The parties hotly disputed how much the floors sagged before the fire, and whether the building's interior should be repaired or completely replaced to restore it to its previous condition. [38] The court of appeals held these issues were for the appraisers

rather than the jury, [39] and by refusing the writ we adopted that opinion. [40] If appraisers cannot take pre-existing wear and tear into consideration in valuing the amount of loss, then we should have reversed it instead.

[37]     73 S.W.2d 145, 146 (Tex.Civ.App.-San Antonio 1934, writ ref'd).

[38]     *Id.* at 146–47

[39]     *Id.*

[40]     *See Fiess,* 202 S.W.3d at 749; *Hyundai Motor Co. v. Vasquez,* 189 S.W.3d 743, 754 n. 52 (Tex.2006).

Indeed, appraisers must always consider causation, at least as an initial matter. An appraisal is for damages caused by a specific occurrence, not every repair a home might need. When asked to assess hail damage, appraisers look only at damage caused by hail; they do not consider leaky faucets or remodeling the kitchen. When asked to assess damage from a fender-bender, they include dents caused by the collision but not by something else. Any appraisal necessarily includes some causation element, because setting the "amount of loss" requires appraisers to decide between damages for which coverage is claimed from damages caused by everything else.

 [2]    This of course does not mean appraisers can rewrite the policy. No matter what the appraisers say, State Farm does not have to pay for repairs due to wear and tear or any other excluded peril because those perils are excluded. But whether the appraisers have gone beyond the damage questions entrusted to them will depend on the nature of the damage, the possible causes, the parties' dispute, and the structure of the appraisal award (as discussed more fully below). State Farm cannot avoid appraisal at this point merely because there might be a causation question that exceeds the scope of appraisal.

### C. When should appraisals be reviewed?

Even if the appraisal here turns out to involve not just damage but liability questions, that does not mean appraisal should be prohibited as an initial matter.

This case comes to us in an unusual posture. At least a dozen Texas cases involve appraisals of hail damage, every one challenging an appraisal after it had **\*894** taken place. [41]

By contrast, this appraisal has yet to occur. That makes a big difference for several reasons.

41      *See, e.g., Citizens' Ins. Co. v. Schofield,* 116 Tex. 418, 293 S.W. 802, 805 (1927) (adopting opinion of Commission that allowed claim by insurer for expenses incurred in pre-suit appraisal); *American Cent. Ins. Co. v. Bass,* 90 Tex. 380, 38 S.W. 1119, 1120 (1897) (holding pre-suit appraisal had not been waived); *Gardner v. State Farm Lloyds,* 76 S.W.3d 140, 142 (Tex.App.-Houston [1st Dist.] 2002, no pet.) (affirming pre-suit appraisal); *Germania Farm Mut. Ins. Ass'n v. Williams,* No. 11–00–00393–CV, 2002 WL 32341841, at *4 (Tex.App.-Eastland May 23, 2002, no pet.) (rejecting pre-suit appraisal); *Vanguard Underwriters Ins. Co. v. Smith,* 999 S.W.2d 448, 451 (Tex.App.-Amarillo 1999, no pet.) (abating suit for appraisal); *Toonen v. United Servs. Auto. Ass'n,* 935 S.W.2d 937, 940 (Tex.App.-San Antonio 1996, no writ) (affirming pre-suit appraisal); *Hennessey v. Vanguard Ins. Co.,* 895 S.W.2d 794, 796 (Tex.App.-Amarillo 1995, writ denied) (involving pre-suit appraisal); *Barnes v. W. Alliance Ins. Co.,* 844 S.W.2d 264, 267 (Tex.App.-Fort Worth 1992, writ dism'd by agr.) (setting aside pre-suit appraisal); *Pyles v. United Servs. Auto. Ass'n,* 804 S.W.2d 163, 164 (Tex.App.-Houston [14th Dist.] 1991, writ denied) (affirming pre-suit appraisal); *Gulf Ins. Co. v. Carroll,* 330 S.W.2d 227, 231 (Tex.Civ.App.-Waco 1959, no writ) (holding pre-suit appraisal had been waived); *U.S. Fid. & Guar. Co. v. Jordan,* 278 S.W.2d 569, 571 (Tex.Civ.App.-Amarillo 1955, writ dism'd) (holding insurer waived pre-suit appraisal); *Cont'l Fire & Cas. Ins. Corp. v. Surber,* 231 S.W.2d 750, 752 (Tex.Civ.App.-Fort Worth 1950, no writ) (involving pre-suit appraisal).

First, appraisal is intended to take place before suit is filed; this Court and others have held it is a condition precedent to suit. [42] Appraisals require no attorneys, no lawsuits, no pleadings, no subpoenas, and no hearings. It would be a rare case in which appraisal could not be completed with less time and expense than it would take to file motions contesting it. Allowing litigation about the scope of appraisal before the appraisal takes place would mark a dramatic change in Texas insurance practice, and surely encourage much more of the same.

42      *Scottish Union & Nat'l Ins. Co. v. Clancy,* 71 Tex. 5, 8 S.W. 630, 631–32 (1888) (holding appraisal was condition precedent to litigation); *Am. Cent. Ins. Co. v. Terry,* 26 S.W.2d 162, 166 (Tex. Comm'n App.1930) (holding approved); *Vanguard Underwriters Ins. Co. v.*

*Smith,* 999 S.W.2d 448, 450 (Tex.App.-Amarillo 1999, no pet.); *Providence Lloyds Ins. Co. v. Crystal City Indep. Sch. Dist.,* 877 S.W.2d 872, 878 (Tex.App.-San Antonio 1994, no writ).

Second, in most cases appraisal can be structured in a way that decides the amount of loss without deciding any liability questions. As already noted, when an indivisible injury to property may have several causes, appraisers can assess the amount of damage and leave causation up to the courts. When divisible losses are involved, appraisers can decide the cost to repair each without deciding who must pay for it. [43] When an insurer denies coverage, appraisers can still set the amount of loss in case the insurer turns out to be wrong. [44] And when the parties disagree whether there has been any loss at all, nothing prevents the appraisers from finding "$0" if that is how much damage they find.

43      *See, e.g., Lundstrom v. United Servs. Auto. Ass'n–CIC,* 192 S.W.3d 78, 87–89 (Tex.App.-Houston [14th Dist.] 2006, pet. denied) (rejecting argument that appraisal is barred "whenever causation factors into the award," and affirming appraisal in which appraisers separated water damage from mold damage).

44      *Am. Cent. Ins. Co. v. Bass,* 90 Tex. 380, 38 S.W. 1119, 1119–20 (1897).

Third, the scant precedent involving disputes about the scope of appraisal suggests that appraisals generally resolve such disputes. The final appraisal award here may substantiate State Farm's claim **\*895** that only the ridgeline suffered hail damage, or reach some in-between figure that proves acceptable to all concerned. Litigating the scope of appraisal is wasteful and unnecessary if the appraisal itself can settle this controversy.

Finally, even if an appraisal award is flawed, that can be easily remedied by disregarding it later. Thus, when insureds objected to appraisal procedures that were allegedly "inaccurate, unreliable, and biased," we held in 2002 that the appraisal should go forward and the results could be challenged later if the insureds were dissatisfied. [45] If an appraisal is not an honest assessment of necessary repairs, that can be proved at trial and the award set aside. [46]

45      *In re Allstate County Mut. Ins. Co.,* 85 S.W.3d 193, 196 (Tex.2002).

46     *See Gulf Ins. v. Pappas,* 73 S.W.2d 145, 146–47 (Tex.Civ.App.-San Antonio 1934, writ ref'd).

 **[3]**    But in every property damage claim, someone must determine the "amount of loss," as that is what the insurer must pay. An appraisal clause "binds the parties to have the extent or amount of the loss determined in a particular way."[47] Like any other contractual provision, appraisal clauses should be enforced. There may be a few times when appraisal is so expensive and coverage is so unlikely that it is worth considering beforehand whether an appraisal is truly necessary.[48] But unless the "amount of loss" will never be needed (a difficult prediction when litigation has yet to begin), appraisals should generally go forward without preemptive intervention by the courts.

47     *In re Allstate,* 85 S.W.3d at 195 (quoting *Scottish Union & Nat'l Ins. Co. v. Clancy,* 71 Tex. 5, 8 S.W. 630, 631 (1888)).

48     *See, e.g., Glens Falls Ins. Co. v. Peters,* 386 S.W.2d 529, 532 (Tex.1965) (remanding for appraisal after parties agreed to try first whether building was a total loss).

* * *

We do not decide today whether the appraisal conducted on remand will necessarily be binding. The summary judgment record does not, and probably cannot, answer that question until after the appraisal has taken place. But for the reasons stated above, we affirm the court of appeals' order granting Johnson's motion for summary judgment to compel State Farm to participate in the appraisal process, and remanding the issue of her attorney's fees to the trial court for consideration.

**Parallel Citations**

52 Tex. Sup. Ct. J. 1042

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

2004 WL 1792374
Only the Westlaw citation is currently available.

SEE TX R RAP RULE 47.2 FOR
DESIGNATION AND SIGNING OF OPINIONS.

*MEMORANDUM OPINION*
Court of Appeals of Texas,
Austin.

TRUDY'S TEXAS STAR, INC., Appellant

v.

WEINGARTEN REALTY INVESTORS, Appellee.

No. 03-03-00538-CV.  |  Aug. 12, 2004.

From the District Court of Travis County, 261st Judicial District, No. Gn301352; Margaret A. Cooper, Judge Presiding.

**Attorneys and Law Firms**

Ernest W. Boyd, for Trudy's Texas Star, Inc.

Charles S. Baker, for Weingarten Realty Investors.

Before Justices KIDD, B.A. SMITH and PEMBERTON.

*MEMORANDUM OPINION*

BEA ANN SMITH, Justice.

**\*1** Trudy's Texas Star, Inc. and Weingarten Realty Investors dispute which of two provisions in their lease agreement controls the determination of Trudy's rental payments for the extension period of their lease of restaurant space. Trudy's contends that the arbitration provision controls; Weingarten insists that the trial court properly ordered Trudy's to abide by the lease's appraisal provision. For the reasons that follow, we affirm the trial court's summary judgment in favor of Weingarten.

**BACKGROUND**

In 1996, Trudy's leased restaurant space in the Brodie Oaks shopping center from Austin Retail BOA I and II for an initial term of six years. Weingarten purchased the center and the lease in 1998, becoming Trudy's' landlord.

The lease provides that Trudy's would pay both a base rent ("minimum guaranteed rental") and a percentage rent ("percentage rental") each month. Under the lease, the base rent increased twice during the six-year term, once after three years, and again after five years. [1] The percentage rent amounted to six percent of monthly gross sales (defined in the lease) when they exceeded $200,000 (the "breakpoint").

[1] From months one through thirty-six, the base rent was $7,702.92; from months thirty-seven to sixty, it was $8,442.08; and from months sixty-one to seventy-two, it was $8,942.08.

The lease also granted Trudy's an option to extend the term of the lease for one five-year period by giving Weingarten notice of such intent at least nine months before the expiration of the initial six-year term: "Such extended term shall be upon all of the terms and conditions set forth in this lease except that Minimum Guaranteed Rental shall equal the 'fair market rental value' of the Premises as determined under Section 4.6 below."

Section 4.6 provides

> If Tenant exercises its 60-month extension operation ... and Landlord and Tenant are not able to reach an agreement with respect to the fair market rental value of the Premises within six (6) months prior to the commencement of such option period, Landlord and Tenant shall each within fifteen (15) days thereafter, name a professional appraiser who is a qualified, professional, licensed appraiser and shall notify the other party in writing in accordance with the notice provision of this lease of the name of such appraiser. If the two appraisers cannot agree on a fair market rental value, the two appraisers thus appointed shall, by agreement between them within forty-five (45) days of their appointment, appoint a third appraiser who shall also be a qualified, professional, licensed appraiser, and the three appraisers shall determine the fair market rental value of the Premises. By written communication mailed or delivered on

or before the date which is two (2) months prior to the commencement of the sixty (60) month option period, the appraisers shall notify both Landlord and Tenant of their findings. If the three appraisers are unable to agree upon a valuation, the value agreed upon by any two of them shall be binding. If none of the three appraisers thus selected are able to agree on the valuation by the date which is two (2) months prior to the date of commencement of the option period, then the average of the valuations of the two appraisers closest to each other shall be binding. Landlord and Tenant shall each bear the cost of the appraiser appointed by them and shall each pay for one-half (½) of the cost of the third appraiser.

**\*2** In mid-April 2002, Trudy's gave Weingarten notice that it was exercising its option to extend the lease. By early October 2002, the parties had each engaged an appraiser under section 4.6 of the lease;[2] the two appraisals of fair market rental value were highly incompatible. Their disagreement centered on whether a fair market rental value must take into account the additional percentage rental based on gross sales. In an e-mail dated October 8, 2002, Weingarten's representative wrote to Trudy's' counsel: "I believe before we go to the expense of hiring a third appraiser, we need to confirm the ground rules for what we are trying to determine. In reviewing the lease with our attorneys, I believe it is very clear that the only item subject to negotiation between the appraisers is the Minimum Guaranteed Rental."It was Weingarten's position that a fair market rental value could be calculated without regard to the percentage rental. Trudy's, which had proved exceedingly successful in this location, wished to lower from six percent the percentage used to calculate the percentage rental and to increase the breakpoint above $200,000 in gross sales. To urge this adjustment it combined the base rent and percentage rent to calculate an overall rent per square foot for bargaining purposes. Weingarten was willing to negotiate new rental terms but never agreed to the percentage or breakpoint figures proposed by Trudy's.

2  It is not clear from the record what communications transpired between April and October, but based on their correspondence starting on October 8, we can conclude

that each had already engaged an appraiser, received an appraisal value, and communicated the value to the other.

Negotiations continued for several months, during which both Trudy's and Weingarten proposed to invoke the appraisal process as a last resort if their negotiations proved unsuccessful. In February 2003, Trudy's sent a letter to Weingarten indicating that it intended "to pursue the hiring of a third appraiser to resolve this matter. [Trudy's] will speak with the appraiser which Trudy's previously used and will provide third appraiser to you as soon as possible so that you may consider the person and determine if he or she is acceptable to you."About a week later, Trudy's decided instead to proceed to arbitration pursuant to section 30.2 of the lease agreement, which provides that the parties shall submit "any dispute related to this lease" to binding arbitration. Trudy's sent Weingarten a formal demand for arbitration in mid-April.

Shortly thereafter, Trudy's filed a lawsuit seeking to compel arbitration due to the parties' dispute over the "method of calculation and proper amount of rent to be paid."Weingarten filed an answer and counterclaim, in which it sought a declaratory judgment that Trudy's must comply with section 4.6 to determine fair market rental value. Weingarten then filed a motion for summary judgment, arguing that the lease clearly expresses the intent of the parties to resolve their dispute over base rent for the extension period through the specific appraisal process outlined in section 4.6, rather than the general arbitration clause in section 30.2. The trial court granted the motion, and Trudy's appeals that judgment.

### DISCUSSION

**\*3** Trudy's first asserts that the trial court erred in declaring that section 4.6 of the lease controls this dispute rather than ordering the parties to arbitration. Trudy's cites section 30.2 of the lease, providing that the parties shall submit "any dispute related to this lease" to binding arbitration, after unsuccessfully resolving it on their own or through mediation. Weingarten rejoins that section 4.6 controls, being more specific and indicating a clear intent by the parties to resolve the base-rent issue by appraisals.

The court's primary concern in construing a written contract is to ascertain the true intentions of the parties as expressed in the instrument. *National Union Fire Ins. v. CBI Indus., Inc.,* 907 S.W.2d 517, 520 (Tex.1995). We examine and consider the entire writing in an effort to harmonize and to

give effect to all the provisions of the contract so that none will be rendered meaningless.*Coker v. Coker,* 650 S.W.2d 391, 393 (Tex.1983). No single provision will control; rather, all provisions must be considered with reference to the whole instrument. *Id.* In the event that two provisions of a contract arguably conflict, courts apply rules of construction to harmonize the provisions. *See Ogden v. Dickinson State Bank,* 662 S.W.2d 330, 332 (Tex.1983). A specific provision controls over a general provision. *See Forbau v. Aetna Life Ins. Co.,* 876 S.W.2d 132, 133-34 (Tex.1994).

If a contract is unambiguous, its terms can be interpreted as a matter of law by the court. *Coker,* 650 S.W.2d at 393. A contract is not ambiguous if it can be given a certain or definite legal meaning or interpretation. *Lopez v. Munoz, Hockema & Reed, L.L.P.,* 22 S.W.3d 857, 861 (Tex.2000). Only if contract language is subject to two or more reasonable interpretations is it ambiguous, and whether a contract is ambiguous is a question of law for the court to decide by looking at the agreement as a whole in light of the circumstances present when the contract was entered. *National Union,* 907 S.W.2d at 520. Whether an agreement imposes a duty on the parties to arbitrate a dispute is a matter of contract interpretation and is a question of law for the court.*Tenet Healthcare Ltd. v. Cooper,* 960 S.W.2d 386, 388 (Tex.App.-Houston [14th Dist.] 1998, pet. dism'd w.o.j.).

The lease provides for two separate and independent monthly payments: the base rent and the percentage rent. The option to extend, which Trudy's could unilaterally exercise, specifies that all the terms of the initial lease, which necessarily include the percentage-rental provision, continue to apply during the extension period; the base rent is to be adjusted to equal the "fair market rental value." Section 4.6 outlines an appraisal process to be used when Trudy's and Weingarten "are not able to agree to fair market rental value."As evidenced by the parties' failed negotiations and pleadings, they have not been able to reach an agreement as to fair market rental value. Section 4.6 reveals their intent to submit the issue of fair market rental value to appraisers to determine base rent during the extension period. The lease language can be given a definite legal meaning and is not reasonably susceptible to more than one meaning. *See Coker,* 650 S.W.2d at 393. It is, therefore, not ambiguous concerning how the parties must resolve a dispute over "fair market rental value"; they must follow the procedures in section 4.6 to hire two, and if necessary three, appraisers. The appraisal provision in section 4.6-pertaining to a dispute as to fair market rental value-is more specific than the general arbitration provision in section

30.2, which broadly covers "any dispute." Pursuant to rules of contract construction, the more specific section 4.6 must control over the more general section 30.2. *See Forbau,* 876 S.W.2d at 133-34.

**\*4** Nonetheless, Trudy's urges that a broad arbitration clause purporting to cover all disputes related to a contract creates a presumption in favor of arbitration and that any doubts as to whether a dispute falls under its scope are to be resolved in favor of arbitration. *See In re FirstMerit Bank, N.A.,* 52 S.W.3d 749, 753 (Tex.2001). Although Trudy's correctly states the presumption in favor of arbitration over resolution of disputes by the courts, the presumption does not necessarily favor arbitration over other forms of alternative dispute resolution, especially when the parties have intentionally chosen one alternative remedy for a specific dispute. The public policy favoring arbitration indicates a concern with its function as an alternative to resolution of a dispute by the courts: "In addition to alleviating some measure of the burden on the courts, arbitration in a commercial context is a valuable tool which provides business people, and all citizens, with greater flexibility, efficiency, and privacy."*L.H. Lacy Co. v. City of Lubbock,* 559 S.W.2d 348, 352 (Tex.1977). This same public policy is advanced by the decision of parties to resolve their disputes through means other than arbitration, such as the appraisal process chosen here; there is no reason to blindly favor arbitration over another alternative form of dispute resolution specifically chosen by the parties to resolve a particular kind of dispute. *See*Tex. Civ. Prac. & Rem.Code Ann. § 154.021 (West 1997) (court shall confer with parties to determine most appropriate alternative dispute resolution procedure).

The Texas Supreme Court has recently upheld the enforceability of appraisal clauses, distinguishing them from arbitration clauses: "[W]hile arbitration determines the rights and liabilities of the parties, appraisal merely 'binds the parties to have the extent or amount of the loss determined in a particular way.' " *In re Allstate County Mut. Ins. Co.,* 85 S.W.3d 193, 195 (Tex.2002) (quoting *Scottish Union & Nat'l Ins. Co. v. Clancy,* 71 Tex. 5, 8 S.W. 630, 631 (Tex.1888)); *see also Hartford Lloyd's Ins. Co. v. Teachworth,* 898 F.2d 1058, 1061-62 (5th Cir.1990) (both arbitration and appraisal aim to submit dispute to third party for speedy and efficient resolution without recourse to courts; however, they are significantly different procedures). Here, the appraisal provision in section 4.6 binds the parties to have the fair market rental value determined in a particular way; it does

not deprive either party of its rights under the contract or determine liability. The Fort Worth Court of Appeals granted a writ of mandamus to abate a lawsuit until the parties had complied with the appraisal provision in their contract, likening the appraisal provision to an arbitration clause in the sense that each compels enforcement upon a showing that the dispute falls within its scope. *See Vanguard Underwriters Ins. Co. v. Smith,* 999 S.W.2d 448, 451 (Tex.App.-Fort Worth 1999, orig. proceeding). Here, the dispute over fair market rental value falls squarely within the scope of the appraisal provision, which thus must be enforced. We hold that the trial court properly ordered Trudy's to abide by the appraisal process in section 4.6 and, therefore, overrule Trudy's first issue.

**\*5** Trudy's alternatively argues that by pursuing negotiations and not strictly adhering to its timeliness, Weingarten waived its right to enforce section 4.6, or that at least there is a material fact issue concerning its waiver. Waiver is the intentional relinquishment of a known right or intentional conduct inconsistent with claiming that right. *Jernigan v. Langley,* 111 S.W.3d 153, 156 (Tex.2003). "There can be no waiver of a right if the person sought to be charged with waiver says or does nothing inconsistent with an intent to rely upon such right." *Id.* When the facts and circumstances are undisputed or clearly established, as they are here, waiver is a question of law for the court. *See id.* at 156-57.

The undisputed evidence shows repeated attempts by Weingarten to invoke the appraisal process when other negotiations were faltering. Indeed, both parties had timely proceeded through the initial steps outlined in section 4.6 by hiring appraisers who conducted appraisals and communicated their conclusions to one another.[3] However, Weingarten and Trudy's were also in the midst of protracted negotiations over new rental terms for the extension period. Weingarten did nothing inconsistent with an intent to rely on the appraisal process as a last resort-in fact, it repeatedly invoked the procedures when the negotiations seemed to break down. The delay in hiring the third appraiser was due to the ongoing negotiations over rent, not to Weingarten's intentional relinquishment of its right to invoke section 4.6, as evidenced by its recurring invitation to proceed to hire the third appraiser. We hold that Weingarten did not waive its right to rely on section 4.6 and overrule Trudy's second issue.

---

3    According to the timeline in section 4.6, the parties were each to have appointed an appraiser by about August 1, 2002, if they had not already agreed on a fair market

rental value. By about September 15, 2002, they were to appoint the third appraiser, if necessary. The first correspondence in the record is dated October 8, 2002. It is an e-mail from Weingarten to Trudy's, clarifying that only the base rent is subject to negotiation between the appraisers and stating that Weingarten is willing to proceed to hire the third appraiser. The evidence indicates only that the timeline for hiring the third appraiser was not followed. It also indicates the reason for the delay in hiring the third appraiser: the protracted negotiations between the parties, purportedly to resolve the issue of fair market rental value without having to incur the cost of a third appraiser.

Finally, Trudy's argues that the trial court granted more relief than Weingarten requested in its motion for summary judgment. Weingarten's motion sought a declaration that section 4.6 was the proper method for determining the fair market rental value. By granting such declaration and decreeing that Trudy's "shall take nothing in its claims" against Weingarten, Trudy's insists that the trial court implicitly granted judgment on the "definitional dispute" concerning the term "fair market rental value." Because Weingarten did not submit this issue to the trial court for determination in its summary-judgment motion, argues Trudy's, it was error for the court to deny relief to Trudy's on an issue that was not before it on summary judgment.

Trudy's correctly cites *Alder v. Laurel* for the proposition that a trial court considering a motion for summary judgment is restricted to the issues raised in the motion, the response, and subsequent replies. 82 S.W.3d 372, 375-76 (Tex.App.-Austin 2002, no pet.)(citing *Stiles v. Resolution Trust Corp.,* 867 S.W.2d 24, 26 (Tex.1993)); *see also*Tex.R. Civ. P. 166a(c). Also, it is error for a trial court to grant more relief than is sought. *See Bandera Elec. Coop., Inc. v. Gilchrist,* 946 S.W.2d 336, 337 (Tex.1997); *Page v. Gellar,* 941 S.W.2d 101, 102 (Tex.1997). However, we cannot conclude that this trial court granted judgment on an issue not before it.

**\*6** In its petition, Trudy's asked the court to compel the parties to arbitration to resolve their dispute over the fair market rental value. Weingarten, in response, sought a declaratory judgment that section 4.6 of the lease, not section 30.2, controls the dispute and that Trudy's must comply with that provision. Although the parties may dispute what "fair market rental value" means, the trial court held that they have contracted for a way to resolve that dispute via the appraisal process outlined in section 4.6. We overrule Trudy's third issue.

### CONCLUSION

Section 4.6 specifically governs this dispute concerning fair market rental value. To determine the base rent for the extension period, Trudy's must follow the appraisal process set forth in section 4.6 and may not compel arbitration under section 30.2. Weingarten did not waive its right to enforce the appraisal provision, and the trial court did not grant more relief than Weingarten requested. Therefore, we affirm the summary judgment in all respects.

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

304 S.W.3d 661
Court of Appeals of Texas,
Fort Worth.

Alvie Max WINEGAR and
Alice Winegar, Appellants,

v.

Noel David MARTIN, Roberta Sue Martin, Travis
Ryan Martin, and Angela R. Martin, Appellees.

No. 2–09–019–CV.    |    Jan. 21, 2010.

**Synopsis**
**Background:** Royalty interest holders brought action against
co-tenants for declaration that they owned 1/3, rather than
1/9 royalty interest. The 355th District Court, Hood County,
Ralph H. Walton, Jr., J., granted summary judgment in favor
of co-tenants. Royalty interest holders appealed.

**Holdings:** The Court of Appeals, Sue Walker, J., held that:

[1] deed reserved a 1/9 royalty interest, and

[2] there was no mutual mistake by royalty holder and co-
tenants.

Affirmed.

West Headnotes (20)

**[1]    Deeds**
    Creation by deed in general

Primary duty of the court in interpreting what
estate a deed conveys is to ascertain the intent of
the parties.

Cases that cite this headnote

**[2]    Deeds**
    Creation by deed in general

In interpreting what estate a deed conveys, courts
look to the intent that is expressed by the

instrument, not the intent that the parties may
have had, but failed to express in the instrument.

Cases that cite this headnote

**[3]    Deeds**
    Repugnant or conflicting parts or clauses

In seeking to ascertain the intention of the
parties, the court must attempt to harmonize
all parts of a deed because the parties to an
instrument intend every clause to have some
effect.

Cases that cite this headnote

**[4]    Deeds**
    Consideration
**Deeds**
    Language of instrument
**Deeds**
    Construction and operation of exceptions
**Deeds**
    Construction and operation of reservations

In determining the legal effect of a deed, whether
as to grant, exception, reservation, consideration,
or other feature, the inquiry is not to be
determined alone from a single word, clause, or
part, but from every word, clause, and part that
is pertinent.

Cases that cite this headnote

**[5]    Deeds**
    Questions for jury

Ambiguity in a deed is a question of law.

Cases that cite this headnote

**[6]    Deeds**
    Language of instrument

An instrument is not ambiguous if it can be given
a definite or certain meaning as a matter of law;
but, if a deed is subject to two or more reasonable
interpretations, it is ambiguous.

Cases that cite this headnote

**[7]  Deeds**

🔑 Language of instrument

An ambiguity in a deed does not arise simply because the parties advance conflicting interpretations; instead, both interpretations must be reasonable.

Cases that cite this headnote

**[8]  Judgment**

🔑 Particular Cases

If the language in a deed is ambiguous, a fact question exists for the jury to resolve, making summary judgment improper.

Cases that cite this headnote

**[9]  Deeds**

🔑 Questions for jury

If a court finds the language in a deed to be unambiguous, the court may construe the deed as a matter of law.

Cases that cite this headnote

**[10]  Mines and Minerals**

🔑 Construction and operation in general

Specific rules of construction apply to cases in which a grantor owns an undivided mineral interest and reserves a fraction of that interest.

Cases that cite this headnote

**[11]  Mines and Minerals**

🔑 Nature of estate granted or reserved

If the deed reserves a fraction of the minerals under the land conveyed, then it reserves a fraction of the part of the mineral interest actually owned by the grantor and conveyed by the deed.

1 Cases that cite this headnote

**[12]  Mines and Minerals**

🔑 Kind, quantity, and location of minerals granted or reserved

When the deed reserves a fraction of the minerals under the land described, then the deed reserves a fraction of the minerals under the entire tract of land, regardless of the part of the mineral estate actually conveyed.

1 Cases that cite this headnote

**[13]  Mines and Minerals**

🔑 Nature of estate granted or reserved

Deed that reserved for royalty owner an undivided 1/3 of his non-participating royalty interest reserved a 1/9 royalty interest; owner reserved his 1/3 mineral interest and then reserved a 1/3 royalty of 1/3 interest out of the mineral interest conveyed.

1 Cases that cite this headnote

**[14]  Mines and Minerals**

🔑 Nature of estate granted or reserved

There was no mutual mistake by royalty holder and co-tenants regarding whether royalty owner was reserving 1/3 royalty interest or 1/3 interest out of mineral interest conveyed; parties had opposite understandings of deed's effect, since co-tenants did not know that royalty owner thought he was reserving 1/3 royalty interest and royalty owner thought he was doing so, and no evidence existed that co-tenants knew of royalty owner's purported misunderstanding that he thought he was reserving a 1/3 royalty interest.

Cases that cite this headnote

**[15]  Contracts**

🔑 Mutual mistake

Under the doctrine of mutual mistake, when parties to an agreement have contracted under a misconception or ignorance of a material fact, the agreement will be avoided.

Cases that cite this headnote

**[16]  Evidence**

🔑 Contracts in general

When a party alleges that, by reason of mutual mistake, an agreement does not express the real intentions of the parties, extrinsic evidence is admissible to show the real agreement.

Cases that cite this headnote

**[17]    Reformation of Instruments**
       Mutuality of Mistake

When a party seeks reformation due to mutual mistake, the party must show what the parties' true agreement is and that the instrument incorrectly reflects that agreement due to a mutual mistake.

Cases that cite this headnote

**[18]    Contracts**
       Mutual mistake

To prove a mutual mistake, the evidence must show that both parties were acting under the same misunderstanding of the same material fact.

Cases that cite this headnote

**[19]    Evidence**
       Construction
**     Mines and Minerals**
       Nature of estate granted or reserved

Statement by co-tenants that they did not understand that royalty owner was reserving a 1/3 royalty was not judicial admission of mutual mistake; if anything, it showed that parties had opposite understandings of deed's effect, since co-tenants did not know that royalty owner thought he was reserving 1/3 royalty interest and royalty owner thought he was doing so, and no evidence existed that co-tenants knew of royalty owner's purported misunderstanding that he thought he was reserving a 1/3 royalty interest.

Cases that cite this headnote

**[20]    Evidence**
       Inferences from evidence

Where any plausible inference would be a guess, neither fact may be inferred.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*662**  Thomas M. Michel, Griffith, Jay & Michel, LLP, Fort Worth, TX, for Appellant.

David E. Keltner, Marianne M. Auld, Jody S. Sanders, Kelly Hart & Hallman LLP, Fort Worth, TX, for Appellee.

Panel: DAUPHINOT, GARDNER, and WALKER, JJ.

## \*663  OPINION

SUE WALKER, Justice.

## I. INTRODUCTION

The primary issue in this appeal is whether a royalty reservation in a deed reserved the grantor's entire 1/3 royalty interest or only a 1/3 of his 1/3 royalty interest, or a 1/9 royalty interest. The trial court granted summary judgment in favor of Appellees Noel David Martin, Roberta Sue Martin, and Travis Ryan Martin (the Martins)[1] and against Appellants Alvie Max Winegar and Alice Winegar, judicially declaring that Appellants own an undivided 1/9 (1/3 of the grantor's 1/3) nonparticipating royalty interest. In seven issues, the Winegars appeal the trial court's summary judgment in favor of the Martins. We will affirm.

[1]    Appellee Angela R. Martin was married to Travis Ryan Martin, but they divorced before this suit was filed. Angela did not contest the relief sought by the Winegars at trial, she did not join in the Martins' motions for summary judgment, and she has not filed a brief in this appeal.

## II. FACTUAL BACKGROUND

Alvie Winegar, Noel David Martin, and Travis Martin purchased 107.123 acres of property in Hood County as 1/3 cotenants. The purchase included the surface estate and 100% of the mineral estate. In 2003, Alvie agreed to sell his 1/3

interest in the land to the Martins and Angela and reserve to himself a nonparticipating royalty interest.

The first paragraph of the deed from Alvie to the Martins and Angela conveyed to the Martins and Angela "all of Grantor's undivided ONE–THIRD (1/3) interest on the real property more particularly described in Exhibit 'A' attached hereto." The second paragraph provides in part,

> Included in this Deed and conveyed from Grantor to Grantee is the right to receive all royalty (except as limited by the reservation below), bonus, delay rentals, and the right to enter into or make oil, gas, and/or mineral leases. Out of the undivided mineral interest conveyed, Grantor reserves to himself, and his heirs, successors, personal representatives, and assigns, an undivided ONE–THIRD (1/3) of royalty ("non-participating royalty interest"), which reserved non-participating royalty interest shall only be payable out of oil, gas, or other minerals that may be produced from the Lands. By this reservation, Grantor shall not participate in the making of any leases on the undivided mineral interest conveyed to Grantee, or be entitled to receive or own any bonus or delay rentals for the granting of any lease on the Lands by Grantee.

In April 2004, the Martins and Angela executed a mineral lease with Quicksilver Resources, covering the entire 107.023–acre property. In December 2007, Quicksilver sent Alvie a division order showing that he owned a 1/9 royalty interest in the property. [2]

[2]   Earlier that year, Alvie had conveyed 1/2 of his royalty interest to his wife, Alice. Thus, any royalty interest reserved to Alvie is now owned by him and Alice.

The Winegars filed suit against the Martins and Angela in February 2008, seeking a declaration that they own a 1/3, rather than a 1/9, royalty interest, reformation of the deed based on mutual mistake, and economic damages. The Martins filed a counterclaim seeking a declaration that the Winegars own a 1/9 royalty interest. The Winegars and the Martins filed cross-motions for summary judgment on their requests for declaratory judgment. The Martins also moved for summary judgment **\*664** on statute of limitations grounds and moved for no-evidence summary judgment on the Winegars' remaining claims. [3] After a hearing, the trial court entered a final judgment granting the Martins' motions for traditional and no-evidence summary judgment and denying the Winegars' motion for partial summary judgment. In its order, the trial court judicially declared that the deed from Alvie to the Martins and Angela reserved to Alvie "an undivided 1/9th (1/3rd of [Alvie's] 1/3rd) nonparticipating royalty interest." The trial court denied all other relief requested. The Winegars filed this appeal.

[3]   The Winegars later filed a supplemental petition pleading the discovery rule and quasi-estoppel to avoid the Martins' statute of limitations defense.

## III. STANDARDS OF REVIEW

### A. Traditional Summary Judgment

In a summary judgment case, the issue on appeal is whether the movant met the summary judgment burden by establishing that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. Tex.R. Civ. P. 166a(c); *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding,* 289 S.W.3d 844, 848 (Tex.2009). We review a summary judgment de novo. *Mann Frankfort,* 289 S.W.3d at 848.

We take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *20801, Inc. v. Parker,* 249 S.W.3d 392, 399 (Tex.2008); *Sw. Elec. Power Co. v. Grant,* 73 S.W.3d 211, 215 (Tex.2002). We consider the evidence presented in the light most favorable to the nonmovant, crediting evidence favorable to the nonmovant if reasonable jurors could and disregarding evidence contrary to the nonmovant unless reasonable jurors could not. *Mann Frankfort,* 289 S.W.3d at 848. We must consider whether reasonable and fair-minded jurors could differ in their conclusions in light of all of the evidence presented. *See Wal–Mart Stores, Inc. v. Spates,* 186 S.W.3d 566, 568 (Tex.2006); *City of Keller v. Wilson,* 168 S.W.3d 802, 822–24 (Tex.2005).

The summary judgment will be affirmed only if the record establishes that the movant has conclusively proved all

essential elements of the movant's cause of action or defense as a matter of law. *City of Houston v. Clear Creek Basin Auth.,* 589 S.W.2d 671, 678 (Tex.1979).

When both parties move for summary judgment and the trial court grants one motion and denies the other, the reviewing court should review both parties' summary judgment evidence and determine all questions presented. *Mann Frankfort,* 289 S.W.3d at 848. The reviewing court should render the judgment that the trial court should have rendered. *Id.*

### B. No–Evidence Summary Judgment

After an adequate time for discovery, the party without the burden of proof may, without presenting evidence, move for summary judgment on the ground that there is no evidence to support an essential element of the nonmovant's claim or defense. Tex.R. Civ. P. 166a(i). The motion must specifically state the elements for which there is no evidence. *Id.; Timpte Indus., Inc. v. Gish,* 286 S.W.3d 306, 310 (Tex.2009). The trial court must grant the motion unless the nonmovant produces summary judgment evidence that raises a genuine issue of material fact. *See* Tex.R. Civ. P. 166a(i) & cmt.; *Hamilton v. Wilson,* 249 S.W.3d 425, 426 (Tex.2008).

When reviewing a no-evidence summary judgment, we examine the entire record in the light most favorable to the nonmovant, **\*665** indulging every reasonable inference and resolving any doubts against the motion. *Sudan v. Sudan,* 199 S.W.3d 291, 292 (Tex.2006). We review a no-evidence summary judgment for evidence that would enable reasonable and fair-minded jurors to differ in their conclusions. *Hamilton,* 249 S.W.3d at 426 (citing *City of Keller,* 168 S.W.3d at 822). We credit evidence favorable to the nonmovant if reasonable jurors could, and we disregard evidence contrary to the nonmovant unless reasonable jurors could not. *Timpte Indus.,* 286 S.W.3d at 310 (quoting *Mack Trucks, Inc. v. Tamez,* 206 S.W.3d 572, 582 (Tex.2006)). If the nonmovant brings forward more than a scintilla of probative evidence that raises a genuine issue of material fact, then a no-evidence summary judgment is not proper. *Smith v. O'Donnell,* 288 S.W.3d 417, 424 (Tex.2009).

### IV. DEED CONSTRUCTION

In the Winegars' fourth, fifth, and sixth issues, they argue that the trial court erred by declaring that the deed from Alvie

to the Martins and Angela reserved an undivided 1/9 royalty interest because it unambiguously reserved a 1/3 royalty interest and because, alternatively, the reservation language in the deed is ambiguous, making summary judgment improper.

### A. General Rules of Deed Construction

**[1]** **[2]** The primary duty of the court in interpreting what estate a deed conveys is to ascertain the intent of the parties. *Alford v. Krum,* 671 S.W.2d 870, 872 (Tex.1984), *overruled on other grounds by Luckel v. White,* 819 S.W.2d 459 (Tex.1991). We look to the intent that is expressed by the instrument, not the intent that the parties may have had but failed to express in the instrument. *Alford,* 671 S.W.2d at 872; *Pierson v. Sanger,* 93 Tex. 160, 163, 53 S.W. 1012, 1013 (1899).

**[3]** **[4]** In seeking to ascertain the intention of the parties, the court must attempt to harmonize all parts of a deed because the parties to an instrument intend every clause to have some effect. *Woods v. Sims,* 154 Tex. 59, 64, 273 S.W.2d 617, 620 (1954); *see Plainsman Trading Co. v. Crews,* 898 S.W.2d 786, 789 (Tex.1995). In determining the legal effect of a deed, whether as to grant, exception, reservation, consideration, or other feature, the inquiry is not to be determined alone from a single word, clause, or part but from every word, clause, and part that is pertinent. *Zephyr Oil Co. v. Cunningham,* 265 S.W.2d 169, 174 (Tex.Civ.App.-Fort Worth 1954, writ ref'd n.r.e.).

**[5]** **[6]** **[7]** The question of ambiguity in a deed is a question of law. *Cherokee Water Co. v. Freeman,* 33 S.W.3d 349, 353 (Tex.App.-Texarkana 2000, no pet.) (citing *Reilly v. Rangers Mgmt., Inc.,* 727 S.W.2d 527, 529 (Tex.1987)). An instrument is not ambiguous if it can be given a definite or certain meaning as a matter of law. *Coker v. Coker,* 650 S.W.2d 391, 394 (Tex.1983). If, however, a deed is subject to two or more reasonable interpretations, it is ambiguous. *See Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.,* 940 S.W.2d 587, 589 (Tex.1996). An ambiguity does not arise simply because the parties advance conflicting interpretations; instead, both interpretations must be reasonable. *Lopez v. Munoz, Hockema & Reed, L.L.P.,* 22 S.W.3d 857, 861 (Tex.2000).

**[8]** **[9]** If the language in a deed is ambiguous, a fact question exists for the jury to resolve, making summary judgment improper. *Corine, Inc. v. Harris,* 252 S.W.3d

657, 659 (Tex.App.-Texarkana 2008, no pet.) (citing *J. Hiram Moore, Ltd.* **\*666** *v. Greer,* 172 S.W.3d 609, 614 (Tex.2005)). If a court finds the language in a deed to be unambiguous, the court may construe the deed as a matter of law. *Id.* (citing *Westwind Exploration, Inc. v. Homestate Sav. Ass'n,* 696 S.W.2d 378, 381 (Tex.1985)).

### B. Legal Distinction Between Reservations from Land "Conveyed" and Land "Described"

 **[10]** **[11]** Specific rules of construction apply to cases in which a grantor owns an undivided mineral interest and reserves a fraction of that interest. *See Averyt v. Grande, Inc.,* 717 S.W.2d 891, 893 (Tex.1986). Courts have drawn a distinction between reservations from the land "conveyed" and reservations from the land "described." *See Middleton v. Broussard,* 504 S.W.2d 839, 842 (Tex.1974). If the deed reserves a fraction of the minerals under the land *conveyed,* then the deed reserves a fraction of the part of the mineral interest actually owned by the grantor and conveyed by the deed. *Averyt,* 717 S.W.2d at 893; *Hooks v. Neill,* 21 S.W.2d 532, 538 (Tex.Civ.App.-Galveston 1929, writ ref'd). In *Hooks,* the grantor owned and conveyed all of his undivided 1/2 interest in a tract of land. 21 S.W.2d at 538. The grantor reserved a 1/32 interest in oil under the "said land and premises herein described *and conveyed.*" *Id.* The court focused on the words "and conveyed" and held that the deed unambiguously reserved 1/32 of the 1/2 minerals that the grantor conveyed, or a 1/64 mineral interest. *Id.*

 **[12]** On the other hand, when the deed reserves a fraction of the minerals under the land *described,* then the deed reserves a fraction of the minerals under the entire tract of land, regardless of the part of the mineral estate actually conveyed. *Averyt,* 717 S.W.2d at 893; *King v. First Nat'l Bank of Wichita Falls,* 144 Tex. 583, 586, 192 S.W.2d 260, 262 (1946). In *King,* the deed conveyed a 1/2 interest "in and to the following described land" and reserved "from the 'hereinabove described land' an undivided one-eighth of the 'usual and customary one-eighth royalty reserved by the landowner.' " 144 Tex. at 586, 192 S.W.2d at 262. The court focused on the words "described land" and held that the grantor reserved an undivided 1/8 "of the royalty from the entire land," rather than 1/8 of the grantor's undivided 1/2 interest that he conveyed. *Id.* at 586–87, 192 S.W.2d 260, 192 S.W.2d at 262–63.

The rules from *Hooks* and *King* have been consistently applied by the Texas Supreme Court and our sister courts. *Compare Averyt,* 717 S.W.2d at 894 (holding that reservation of royalty from minerals "that may be produced from all of the described land" reserved royalty from minerals produced from whole of tracts described in deed), *and Middleton,* 504 S.W.2d at 841, 843 (holding that a conveyance of 1/64 royalty interest in minerals under "all of the above described land and premises" operated to convey 1/64 royalty interest from all lands described, not just the fractional interest conveyed), *with Clack v. Garcia,* 323 S.W.2d 468, 468–69 (Tex.Civ.App.-San Antonio 1959, no writ) (holding that reservation of undivided 1/16 interest in minerals under and that may be produced from "the interest of said grantors in said land" was reservation of 1/16 of grantor's interest, or 1/256 mineral interest), *and Dowda v. Hayman,* 221 S.W.2d 1016, 1018 (Tex.Civ.App.-Fort Worth 1949, writ ref'd) (holding that reservation of 1/2 of all the minerals "on and under the land and premises herein conveyed" reserved 1/2 of the grantor's mineral interest in the land being conveyed).

### C. Deed Reserved One–Ninth Royalty Interest

 **[13]** Here, the deed provides, "*Out of the undivided mineral interest conveyed,* **\*667** Grantor reserves ... an undivided ONE–THIRD (1/3) of royalty ("non-participating royalty interest")...." [Emphasis added.] This reservation is similar to that in *Hooks;* it reserved a fraction (1/3) of royalty interest out of the mineral interest *conveyed. See Clack,* 323 S.W.2d at 468–69; *Dowda,* 221 S.W.2d at 1018; *Hooks,* 21 S.W.2d at 538. The deed conveyed a 1/3 mineral interest, which included a 1/3 royalty interest. The deed reserved to Alvie 1/3 of royalty out of the 1/3 mineral interest conveyed, or a 1/9 royalty interest.

The Winegars attempt to distinguish the reservation in this case from that in *Hooks, Clack,* and *Dowda.* They argue that in those cases, the grantor conveyed a mineral interest and then reserved a percentage of the *mineral* interest conveyed, whereas here, Alvie conveyed his mineral interest and then reserved a *royalty* interest out of the mineral interest conveyed. In other words, Alvie conveyed all of his 1/3 interest in the minerals—including the rights to develop, to lease, to receive bonus payments, to receive delay rentals, to receive royalty payments (the bundle of sticks)—and then reserved one of those sticks out of the bundle (i.e. royalty interest). *See Luckel,* 819 S.W.2d at 463 ("A royalty interest

is an interest in land that is a part of the total mineral estate."); *Altman v. Blake,* 712 S.W.2d 117, 118 (Tex.1986) (stating the five essential attributes of mineral estates are the rights to develop (right of ingress and egress), to lease (executive right), to receive bonus payments, to receive delay rentals, and to receive royalty payments). This distinction does not change our holding. The deed carved an undivided 1/3 of royalty "out of the undivided [1/3] mineral interest conveyed." In other words, Alvie reserved a fraction—1/3— out of the entire 1/3 interest in royalty that he owned. *See Clack,* 323 S.W.2d at 468–69; *Dowda,* 221 S.W.2d at 1018; *Hooks,* 21 S.W.2d at 538.

Taking as true all evidence favorable to the Winegars as the nonmovants and indulging every reasonable inference and resolving any doubts in their favor, we hold that the Martins met their summary judgment burden by establishing that no genuine issue of material fact exists and that they are entitled to judgment as a matter of law that the deed unambiguously reserved an undivided 1/9 nonparticipating royalty interest. *See* Tex.R. Civ. P. 166a(c); *Mann Frankfort,* 289 S.W.3d at 848; *Parker,* 249 S.W.3d at 399; *Sw. Elec. Power Co.,* 73 S.W.3d at 215. We overrule the Winegars' fourth, fifth, and sixth issues.

### V. NO MUTUAL MISTAKE

[14]  In the Winegars' seventh issue, they argue that the trial court erred by granting the Martins' no-evidence summary judgment because the Winegars presented some evidence on the issue of mutual mistake. [4]

4   The Winegars also argue in their seventh issue that a fact issue exists regarding their "counter-defense" of quasi-estoppel. They pleaded quasi-estoppel to avoid the Martins' limitations defense, and because we uphold the trial court's summary judgment on grounds other than limitations, we need not address this issue. *See* Tex.R.App. P. 47.1; *Provident Life & Accident Ins. Co. v. Knott,* 128 S.W.3d 211, 216 (Tex.2003); *Star–Telegram, Inc. v. Doe,* 915 S.W.2d 471, 473 (Tex.1995).

[15]  [16]  [17]  Under the doctrine of mutual mistake, when parties to an agreement have contracted under a misconception or ignorance of a material fact, the agreement will be avoided. *Williams v. Glash,* 789 S.W.2d 261, 264 (Tex.1990). When a party alleges that, by reason of mutual mistake, an agreement does not express the real intentions of the parties, extrinsic evidence is admissible to show the real agreement. **\*668** *See Johnson v. Conner,* 260 S.W.3d 575, 581 (Tex.App.-Tyler 2008, no pet.). When a party seeks reformation due to mutual mistake, the party must show what the parties' true agreement was and that the instrument incorrectly reflects that agreement due to a mutual mistake. *See id.* (citing *Estes v. Republic Nat'l Bank of Dallas,* 462 S.W.3d 273, 275 (Tex.1970)).

[18]  To prove a mutual mistake, the evidence must show that both parties were acting under the same misunderstanding of the same material fact. *Walden v. Affiliated Computer Servs., Inc.,* 97 S.W.3d 303, 326 (Tex.App.-Houston [14th Dist.] 2003, pet. denied); *see also City of The Colony v. N. Tex. Mun. Water Dist.,* 272 S.W.3d 699, 735 (Tex.App.-Fort Worth 2008, pet. filed) (holding appellant produced no evidence to support mutual mistake element requiring that both parties be mistaken about a common intention).

[19]  Here, the Winegars argue that the Martins "judicially admitted that there was a mistake" when they stated in their motion for summary judgment, "The Martins did not understand that [Alvie was] reserving a 1/3 royalty." This statement is not a judicial admission of mutual mistake; if anything, it shows that the parties had *opposite* understandings of the deed's effect—the Martins did not know Alvie thought he was reserving a 1/3 royalty interest while Alvie thought he was reserving a 1/3 royalty interest. *See Walden,* 97 S.W.3d at 326; *Johnson,* 260 S.W.3d at 581–82. Likewise, no evidence exists that the Martins knew of Alvie's purported misunderstanding that he thought he was reserving a 1/3 royalty interest. *See Seymour v. Am. Engine & Grinding Co.,* 956 S.W.2d 49, 58 (Tex.App.-Houston [14th Dist.] 1996, writ denied) ("Knowledge by one party that the other is acting under a mistake of fact is equivalent to a mutual mistake.").

[20]  The Winegars further assert that the Martins' statement that they did not understand that Alvie was reserving a 1/3 royalty interest directly conflicts with an email exchange between David Martin and Mark Kalpakis, an attorney who was David Martin's neighbor. In the email exchange, David Martin requested that Kalpakis provide "language for the title company that would allow me to retain the executive rights and provide *only 1/3 interest in future royalties.*" [Emphasis added.] One could infer from this email that, by using the phrase "provide only 1/3 interest in future royalties," David Martin meant a 1/3 interest in future royalties either out of the mineral interest conveyed or out of the entire mineral interest. [5] Any plausible inference would be a guess; consequently, "neither fact may be inferred." *See City of*

*Keller,* 168 S.W.3d at 813 (quoting *Tubelite, a Div. of Indal, Inc. v. Risica & Sons, Inc.,* 819 S.W.2d 801, 805 (Tex.1991)). Considering the record as a whole, we cannot say that David Martin's email to Kalpakis created conflicting evidence of probative value such that reasonable and fair-minded jurors would differ in their conclusion that the Martins believed Alvie was reserving 1/3 of his 1/3 royalty interest, rather than his entire 1/3 royalty interest. *See Hamilton,* 249 S.W.3d at 426 (citing *City of Keller,* 168 S.W.3d at 822); *Kindred v. Con/Chem, Inc.,* 650 S.W.2d 61, 63 (Tex.1983).

5    Furthermore, Kalpakis responded to David Martin's email by providing the reservation language that was later used in the deed from Alvie to the Martins and Angela, reserving a 1/3 royalty interest out of the mineral interest conveyed. We have already explained that this reservation unambiguously reserved a 1/9 royalty interest.

Examining the entire record in the light most favorable to the Winegars, as the **\*669** nonmovants, indulging every reasonable inference and resolving any doubts against the Martins' motion, we hold that the Winegars have not produced a scintilla of probative evidence raising a genuine issue of material fact on mutual mistake. *See Smith,* 288 S.W.3d at 424; *Sudan,* 199 S.W.3d at 292. We overrule the Winegars' seventh issue.

## VI. CONCLUSION

The Winegars' remaining three issues dispute whether the trial court granted the Martins' summary judgment motion at least in part on limitations. Having overruled the Winegars' fourth through seventh issues and having held that the trial court did not err by granting summary judgment in favor of the Martins and by judicially declaring that the deed reserved an undivided 1/9 nonparticipating royalty interest, we need not address the Winegars' remaining issues. *See* Tex.R.App. P. 47.1; *Provident Life & Accident Ins. Co.,* 128 S.W.3d at 216; *Star–Telegram,* 915 S.W.2d at 473. We affirm the trial court's judgment.

**Parallel Citations**

176 Oil & Gas Rep. 776

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.